**2014-1406**

# United States Court of Appeals
# for the Federal Circuit

ALEXANDER SHUKH,

*Plaintiff-Appellant*,

v.

SEAGATE TECHNOLOGY, LLC, a Delaware Limited Liability
Company, SEAGATE TECHNOLOGY, INC., a Delaware corporation,
and SEAGATE TECHNOLOGY,
a holding company of the Cayman Islands,

*Defendants-Appellees*,

*and*

UNKNOWN OWNERS AND ASSIGNEES,

*Defendant,*

*and*

SEAGATE TECHNOLOGY PLC, an Irish public limited company,

*Defendant-Appellee.*

*Appeal from the United States District Court for the District of
Minnesota in No. 0:10-cv-00404-JRT-JJK, Judge John R. Tunheim.*

## NON-CONFIDENTIAL OPENING BRIEF FOR APPELLANT

Constantine John Gekas
GEKAS LAW LTD.
33 North LaSalle Street, Suite 2220
Chicago, Illinois 60602
Tel: (312) 726-4501
Fax: (312) 726-4505
CJG@gekaslaw.com
*Attorney for Appellant
Alexander M. Shukh, Ph.D.*

SEPTEMBER 9, 2014

## APPELLANT'S CERTIFICATE OF INTEREST

Counsel for the appellant Alexander M. Shukh certifies the following:

1.    The full name of every party or amicus represented by me is: **Alexander M. Shukh.**

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: **Alexander M. Shukh.**

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: **None.**

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

James H. Kaster
Cristina Parra Herrera
Katherine M. Vander Pol
Sarah W. Steenhoek
NICHOLS KASTER PLLP
4600 IDS Center
80 S. Eighth Street
Minneapolis, MN 55402

Constantine John Gekas
John C. Gekas
GEKAS LAW LLP
Suite 1700
Eleven S. LaSalle Street
Chicago, IL 60603

Constantine John Gekas          Constantine John Gekas
GEKAS LAW LTD.                  GEKAS LAW LTD.
Suite 1700                      Suite 2220
Eleven S. LaSalle Street        33 N. LaSalle Street
Chicago, IL 60603               Chicago, IL 60602

  Constantine John Gekas             /s/ Constantine John Gekas
Name of Counsel                    Signature of Counsel

Law Firm:              GEKAS LAW LTD.
Address:               33 N. LaSalle Street, Suite 2220
City, State, ZIP:      Chicago, Illinois 60602
Telephone Number:  312-726-4501
FAX Number:            312-726-4505
E-mail Address:  CJG@gekaslaw.com

# TABLE OF CONTENTS

**Page**

APPELLANT'S CERTIFICATE OF INTEREST.............................ii

TABLE OF CONTENTS....................................................iv

TABLE OF AUTHORITIES ...............................................x

STATEMENT OF RELATED CASE ......................................1

JURISDICTIONAL STATEMENT........................................1

STATEMENT OF THE ISSUES .........................................2

STATEMENT OF THE CASE ...........................................6

STATEMENT OF FACTS................................................8

    I.    Alexander M. Shukh, Ph.D. .......................................8

    II.    Inventorship. ........................................................9

        A.    Dr. Shukh's Employment/Assignment Agreement. ......9

        B.    Seagate's patenting process. ..........................................9

        C.    Seagate concealed that it had omitted Dr. Shukh from patent applications. .............................................10

        D.    Dr. Shukh's reliance on the IP Department................12

        E.    Opinion of Howard Rockman......................................12

        F.    Dr. Shukh's reputational injury. .................................13

        G.    Dr. Shukh's discovery of Seagate's fraud and complaint to Seagate's General Counsel. ...................14

    III.    National Origin Retaliation. ...................................15

        A.    Dr. Shukh's Discrimination Complaints in 2006 & 2007. ...........................................................................15

B.    Seagate's Actions from 2006-2007 onward. .................. 18

C.    Damages. ....................................................... 20

D.    Dr. Shukh's evidence of pretext. ................................ 21

E.    The dismissal of Dr. Shukh's Title VII punitive damage claim. ....................................................... 23

IV.    Dr. Shukh's last day at Seagate. ......................................... 23

V.    Seagate's EEOC Response. ................................................. 24

VI.    Dr. Shukh's conciliation efforts & Seagate's long-delayed privilege assertion. .................................................. 25

VII.    The Filing of this Case and the Initial Events. ..................... 25

A.    Seagate's tardy privilege assertions. ............................ 26

B.    The Amended Complaint's addition of a Claim to declare Document Return Provision unenforceable.... 26

C.    The denial of Seagate's two Disqualification Motions. .......................................................... 26

D.    Dr. Shukh's Motion to require Seagate to give proper notice to the PTO. ............................................ 27

E.    The District Judge's Dismissal Rulings & PTO Notice Rulings. ............................................... 28

VIII. Seagate's Answer Counterclaims & Motion For Document Return . ............................................... 29

IX.    The Privilege Issues. ...................................................... 30

A.    Seagate's March 2012 "Document Dump." .................. 30

B.    The logged Massaroni Communications. ..................... 31

C.    Massaroni's bar memberships. ................................. 31

D.   Dr. Shukh's Motion to Compel and the rulings...........31

X.   The cross-motions for summary judgment motion on fraud and inventorship. .......................................32

   A.   Dr. Shukh's Rule 56(d) argument & the Massaroni deposition. ...................................................32

   B.   Dr. Shukh's timely summary judgment motion on fraud. .............................................................33

   C.   The District Judge's grant of Seagate's summary judgment motion and denial of Dr. Shukh's cross-motion....................................................33

XI.   Seagate's expert disclosure violations. .....................35

   A.   The hard drive expert Bajorek....................35

      1.   The Marvell case & Intematix ............35

      2.   IBM's Fraud Case Against Bajorek...................36

      3.   Seagate's belated disclosures............................36

   B.   Heitzman, Seagate's vocational expert.......................37

   C.   The Protective Order stopping Dr. Shukh's expert discovery.......................................................38

XII.   Conclusion. ..........................................................39

SUMMARY OF ARGUMENT.....................................................39

ARGUMENT ...............................................................................41

I.   DR. SHUKH'S INVENTORSHIP RIGHTS ARE CONSTITUTIONALLY PROTECTED...............................41

II.   *FILMTEC* SHOULD BE OVERRULED.............................42

   A.   Dr. Shukh Has Standing Regardless of Any Economic Injury. ...........................................42

B.    *FilmTec* Is Contrary to Equity and Law. ................. 43

C.    The Supreme Court Disapproves of Patent Variances from Established Rules of Law.................. 47

D.    *FilmTec* Reflects Unwise Policy.................................. 48

E.    The Equities Favor Dr. Shukh's Ownership. ............. 50

F.    Dr. Shukh's Reputational Injury Created a Triable Issue of Fact for the Jury. ........................................... 50

III.   DR. SHUKH WAS WRONGLY DENIED ACCESS TO COMMUNICATIONS ABOUT HIS OWN INVENTIONS. ..................................................................... 51

A.    Dr. Shukh Shared a Common Interest With Seagate. 52

B.    Seagate Delayed Too Long Before Claiming Privilege. .................................................................... 56

C.    Massaroni's Unauthorized Practice of Law Vitiates Any Privilege............................................................... 57

D.    The Subject Matter Waiver Ruling Was Too Narrow. 59

E.    Conclusion. ................................................................ 60

IV.   THE RULINGS AGAINST DR. SHUKH'S CONTRACT AND TORT CLAIMS AND ENFORCING THE DOCUMENT RETURN PROVISIONS AGAINST HIM WRONGLY REWARDED SEAGATE'S FRAUDULENT CONDUCT. ........................................................................ 61

A.    Because of Seagate's admitted wrongdoing, the Dismissal of Dr. Shukh's Contract, and Tort Claims was error. ................................................................... 61

1.    Seagate Commited Serious Violations of the Patent Act............................................................ 61

2.    Breach of Contract & Rescission. ....................... 62

3.    Seagate Breached its Fiduciary Duty................. 63

4.    Seagate's Misconduct Constituted Unjust Enrichment. ....................................................... 64

B.    The Confidentiality and Document Return Provisions of the Employment/Assignment Agreement Are Unenforceable Due to Seagate's Misconduct. ................................................................. 65

1.    Seagate Has Unclean Hands. ............................. 66

2.    The Confidentiality and Document Return Clause is Unconscionable. .................................. 66

3.    Forcing Dr. Shukh to Surrender his Invention Documents Violates the Patent Clause of the Constitution. ................................. 68

V.    SEAGATE'S FRAUDULENT CONDUCT ENTITLED DR. SHUKH, NOT SEAGATE, TO SUMMARY JUDGMENT ON HIS FRAUD CLAIM. .............................. 68

A.    The District Judge Should Have Considered the Cross-Motions on the Fraud Claim Together. ............. 69

B.    It Was *Per Se* Reversible Error for the Judge to Refuse To Consider the Massaroni Testimony. ........... 69

C.    Dr. Shukh Adduced Conclusive Evidence of Reliance. .................................................................... 70

D.    Dr. Shukh Sustained Damages from Seagate's Fraud and Concealment. ............................................ 72

E.    Dr. Shukh was Entitled to Summary Judgment on Fraud on Account of Seagate's Fraudulent Concealment of His Inventorship Claims from the PTO. ......................................................................... 72

F.    Conclusion. ................................................................ 76

VI.   THE DISTRICT JUDGE IGNORED PARTS OF DR. SHUKH'S RETALIATION EVIDENCE AND CONSTRUED THE REST AGAINST HIM. ......................... 77

    A.   Dr. Shukh's *Prima Facie* Case Was Unrebutted Because Seagate Never Explained His Omissions from Patent Applications. ............................................ 77

    B.   There Were Material Issues of Fact on Intent and Pretext. ........................................................................ 78

    C.   Dr. Shukh Presented Ample Evidence of Pretext. ...... 82

VII.  THE OTHER DISCOVERY RULINGS WERE WRONG. ................................................................................. 87

    A.   Bajorek's Testimony Should Be Barred. ...................... 87

    B.   Dr. Shukh's Expert Discovery Was Proper and Should Not Have Been Cut Short. ................................ 89

VIII. DISMISSING THE TITLE VII PUNITIVE DAMAGE CLAIM AND DENYING LEAVE TO AMEND WERE ERROR. ................................................................................. 93

CONCLUSION ...................................................................................... 94

# TABLE OF AUTHORITIES

## Constitutional Provisions

U.S. Const., Art. I, Section 8 ........................................................ 41, 43, 68

## Cases

*Accurate Controls, Inc. v. Cerro Gordo County Bd. of Supervisors*, 627 F.Supp.2d 976 (N.D. Iowa 2009) ......................................................... 69

*Advanced Magnetic Closures, Inc. v. Rome Fastener,* 607 F.3d 817 (Fed. Cir. 2010) .................................................................... 61, 75

*AF Holdings v. Doe*, 2012 U.S.Dist.LEXIS 17894 (S.D. Fla. 2012).. 91, 92

*Am. Computer Trust Leasing v. Boerboom Int'l*, 967 F.2d 1208 (8th Cir. 1992) .......................................................................... 73

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................... 77

*Anglin v. Maxim Healthcare Servs.*, 2009 U.S.Dist.LEXIS 34562 (M.D. Fla. 2009) ..................................................................... 92

*Apex Municipal Fund v. N-Group Securities*, 841 F.Supp. 1423 (S.D. Tex. 1993) ...................................................................... 57

*Arachnid, Inc. v. Merit Indus.*, 939 F.2d 1574 (Fed. Cir. 1991). ........... 43

*Ashcraft & Gerel v. Shaw*, 728 A.2d 798 (Md. App. 1999) ..................... 54

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................... 94

*Aspinwall v. Gill*, 2 F. 697 (C.C.D. N.J. 1887) ....................................... 45

*Avid Identification Sys. v. Crystal Imp. Corp.*, 603 F.3d 967 (Fed. Cir. 2010) ...................................................................... 74

*Baker v. Silver Oak Senior Living Mgmt. Co.*, 581 F.3d 684 (8th Cir. 2009). ....................................................................... 83

*Baron Servs., Inc. v. Media Weather Innovations LLC*, 717 F.3d 907 (Fed. Cir. 2013) ................................................................. 60

*Beasley v. Avery Dennison Corp.*, 2006 U.S.Dist.LEXIS 74033 (W.D. Tex. 2006) ........................................................................ 53

*Beech Aircraft Corp. v. Edo Corp.*, 990 F.2d 1237 (Fed. Cir. 1993) ........ 55

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) .................................... 94

*Bilski v. Kappos*, 130 S.Ct. 3218 (2010) .................................................. 42

*Bolia v. Mercury Print Prods.,* 2004 U.S.Dist.LEXIS 22730 (W.D.N.Y. 2004) ..................................................................................... 91

*Bone v. G4s Youth Servs.*, 686 F.3d 948 (8th Cir. 2012) .......................... 82

*Bowles v. NAHB*, 224 F.R.D. 246 (D.D.C. 2004) .................................... 57

*Bowles v. Osmose Util. Srvs*, 443 F.3d 671 (8th Cir. 2006) .................... 94

*Brennan's v. Brennan's Restaurants*, 590 F.2d 168 (5th Cir. 1979) ....... 54

*Briscoe v. Fred's Dollar Store*, 24 F.3d 1026 (8th Cir. 1994) ................. 83

*Brown v. Overhead Door Corp.*, 2008 U.S.Dist.LEXIS 34879 (N.D. Ill. 2008) ..................................................................................... 89

*Bruno Indep. Living Aids v. Acorn Mobility Servs.*, 394 F.3d 1348 (Fed. Cir. 2005). ................................................................................ 74

*Burlington Northern & S.F. Ry. v. White*, 548 U.S. 53 (2006) ... 79, 80, 81

*Buysse v. Paine, Webber, Jackson & Curtis, Inc.*, 623 F.2d 1244 (8th Cir. 1980) ..................................................................................... 62

*Cabana v. Forcier*, 200 F.R.D. 9 (D. Mass. 2001) .................................. 91

*Campbell v. U.S.*, 470 Fed. Appx. 153 (4th Cir. 2012) ........................... 87

*Carman v. McDonnell Douglas Corp.*, 114 F.3d 790 (8th Cir. 1997) ..... 60

*Carnegie Mellon Univ. v. Marvell Technology*, 2012 U.S.Dist.LEXIS 120555 (W.D. Pa. 2012) ................................................................... 36

*Checkpoint Sys. v. All-Tag Sec. S.A.*, 412 F.3d 1331 (Fed. Cir. 2005) ... 51

*Chou v. Univ. of Chicago*, 254 F.3d 1347 (Fed. Cir. 2001) ....... 3, 28, 62

*Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922 (8th Cir. 2007) ...................... 81

*Clonch v. I-Flow*, 2010 U.S.Dist.LEXIS 121607 (S.D. Ohio 2010) ......... 94

*Consol. Aluminum Corp. v. Foseco Int'l, Ltd.,* 910 F.2d 804 (Fed. Cir. 1990) ................................................................................................. 66

*Crooks v. Lynch*, 557 F.3d 846 (8th Cir. 2009) ...................................... 93

*Daum v. Planit Solutions, Inc.,* 619 F.Supp.2d 652 (D. Minn. 2009)..... 62

*Davidson Pipe Co. v. Laventhol & Horwath*, 120 F.R.D. 455 (S.D.N.Y. 1988) ................................................................................................. 90

*Davis v. Re-Trac Mfg. Corp.*, 149 N.W.2d 37 (Minn. 1967). .................. 71

*Davis v. U.S. Bancorp*, 383 F.3d 761 (8th Cir. 2004) ............................. 87

*Day Distrib. Co. v. Nantucket Allserve, Inc.*, 2008 U.S.Dist.LEXIS 57334 (D. Minn. 2008).................................................................................. 64

*DeBold v. Case*, 329 B.R. 252 (B.A.P. 8th Cir. 2005)........................ 53, 54

*DeBold v. Case*, 452 F.3d 756 (8th Cir. 2006) ........................................ 53

*Dey L.P. v. Ivax Pharms.*, 233 F.R.D. 567 (C.D. Cal. 2005).................... 60

*Diversified Indus. v. Meredith*, 572 F.2d 596 (8th Cir. 1977)................. 56

*Dotson v. Avon Prods., Inc.*, 2011 U.S.Dist.LEXIS 25941 (D.S.C. 2011)94

*EEOC v. Ethan Allen, Inc.*, 44 F.3d 116 (2d Cir. 1994)........................... 83

*EEOC v. TransStates Airlines, Inc.*, 462 F.3d 987 (8th Cir. 2006) ........ 83

*Estate of Hoffbeck*, 415 N.W.2d 447 (Minn. App. 1987).......................... 66

*Eureka Inv. v. Chicago Title*, 743 F.2d 932 (D.C. Cir. 1984) .................54

*Evident Corp. v. Church & Dwight*, 399 F.3d 1310 (Fed. Cir. 2005). ....74

*FDIC v. Ogden Corp.*, 202 F.3d 454 (1st Cir. 2000)...............................54

*Ferguson v. N. Broward Hosp.*, 2011 U.S.Dist.LEXIS 52535 (S.D. Fla. 2011) .................................................................................................90

*FilmTec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568 (Fed. Cir. 1991) .............................................................................................. passim

*Financial Technologies Int'l v. Smith*, 2000 U.S.Dist.LEXIS 18220 (S.D.N.Y. 2000)................................................................................58

*Finley v. Marathon Oil Co.*, 75 F.3d 1225 (7th Cir. 1996)......................88

*Fisher v. U.S.*, 425 U.S. 391 (1976) ........................................................55

*Flo Pac v. NuTech,* 2010 U.S.Dist.LEXIS 131120 (D. Md. 2010)...........53

*Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs.*, 2007 U.S.Dist.LEXIS 37686 (D. Minn. 2007) ...............................................92

*Floyd v. Missouri Dep't of Soc. Servs.*, 188 F.3d 932 (8th Cir. 1999) .....86

*Fort James v. Solo Cup*, 412 F.3d 1340 (Fed. Cir. 2005) ........................59

*Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Inc.*, 292 F.3d 1363 (Fed. Cir. 2002) .........................................................................61

*Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir. 1970).........................54

*Gaworski v. ITT Comm. Fin. Corp.*, 17 F.3d 1104 (8th Cir. 1994).........86

*Gayler v. Wilder*, 51 U.S. 477 (1850) .....................................................44

*Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352 (Fed. Cir. 2004) ....67

*Graham v. John Deere Co.*, 383 U.S. 1 (1966). ......................................52

*Grand Trunk Western Ry. v. H.W. Nelson Co.*, 116 F.2d 823 (6th Cir. 1941) ...................................................................................................54

*Great Am. Fid. Ins. Co. v. JWR Constr. Servs.*, 882 F.Supp.2d 1340 (S.D. Fla. 2012) ................................................................................... 69

*Griva v. Davison*, 637 A.2d 830 (D.C. 1994) ........................................... 54

*Group One v. Hallmark Cards, Inc.*, 407 F.3d 1297 (Fed. Cir. 2005) .... 87

*Gucci Am. v. Guess?,* 2010 U.S.Dist.LEXIS 65871 (S.D.N.Y. 2010) ...... 59

*Gucci Am. v. Guess?*, 2011 U.S.Dist.LEXIS 15 (S.D.N.Y. 2011) ............ 59

*Hanson v. USAID*, 372 F.3d 286 (4th Cir. 2004) .................................... 54

*Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968 (8th Cir. 1994). .............. 78

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................... 43

*Hess v. Adv. Cardiovascular Sys., Inc.*, 106 F.3d 976 (Fed. Cir. 1997) .. 67

*Highmark, Inc. v. Allcare Health Mgmt. Sys.*, 134 S. Ct. 1744 (2014) ... 47

*Hillerich & Bradsby v. MacKay*, 26 F.Supp.2d 124 (D.D.C. 1998) ........ 53

*Hollins v. Powell*, 773 F.2d 191(8th Cir. 1985) ...................................... 56

*Hollywood Dairy v. Timmer*, 411 N.W.2d 258 (Minn. App. 1987). ........ 64

*Hoyt Props. v. Prod. Res. Group, L.L.C.*, 716 N.W.2d 366 (Minn. App. 2006) ................................................................................................ 71

*Hume v. U.S.*, 132 U.S. 406 (1889) ......................................................... 66

*IBM v. Bajorek*, 191 F.3d 1033 (9th Cir. 1999) ...................................... 36

*IMC Chemicals, Inc. v. Niro, Inc.*, 2000 U.S.Dist.LEXIS 22850 (D. Kan. 2000) ................................................................................................ 57

*In re Davis*, 264 N.W.2d 371 (Minn. 1978) ............................................ 58

*In re Digital Equip. Corp.*, 949 F.2d 228 (8th Cir. 1991) ....................... 91

*In re Grand Jury*, 138 F.3d 978 (3d Cir. 1998) ...................................... 57

*In re Seagate Tech.*, 497 F.3d 1360 (Fed. Cir. 2007) ......................... 52, 60

*In re Sealed Case*, 877 F.2d 976 (D.C. Cir. 1989) ...................................57

*In re Spalding Sports*, 203 F.3d 800 (Fed. Cir. 2000)............................51

*In re Vargas*, 2009 Bankr. LEXIS 512 (Bankr. D.R.I. 2009).................54

*Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879 (1988) ............................45

*Jenks v. New Hampshire Motor Speedway*, 2011 U.S.Dist.LEXIS 113988 (D.N.H. 2011)......................................................................................89

*Johnson v. Blaukat*, 453 F.3d 1108 (8th Cir. 2006)..........................50, 51

*Kademani v. Mayo Clinic, Inc.*, 2010 U.S.Dist.LEXIS 144660 (D. Minn. 2010) ..................................................................................................94

*Karlstad State Bank v. Fritsche,* 392 N.W.2d 615 (Minn. App. 1986). ..73

*Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240 (1933)...........66

*Kientzy v. McDonnell Douglas Corp.,* 990 F.2d 1051 (8th Cir. 1993).....80

*Kim v. Nash Finch Co.*, 123 F.3d 1046 (8th Cir. 1997) .........................79

*Klein v. First Edina Nat. Bank*, 196 N.W.2d 619 (Minn. 1972). ......74, 75

*Knox v. Knox*, 25 N.W.2d 225 (1946)................................................50, 54

*Krauser v. Evollution IP Holdings, Inc.*, 975 F.Supp.2d 1247 (S.D. Fla. 2013) ..............................................................................................43, 51

*Kroll v. Finnerty*, 242 F.3d 1359 (Fed. Cir. 2001)..................................58

*L&H Airco, Inc. v. Rapistan Corp.*, 446 N.W.2d 372 (Minn. 1989)........73

*LeNeave v. N. Am. Life Assurance Co.*, 854 F.2d 317 (8th Cir. 1988) ....67

*Limelight Networks v. Akamai Techs., Inc.*, 134 S. Ct. 2111 (2014) ......47

*Littleton v. Pilot Travel Ctrs.*, 568 F.3d 641 (8th Cir. 2009) .................79

*M.H. & J. v. Caritas Family Servs.,* 488 N.W.2d 282 (Minn. 1992).......73

*MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923 (8th Cir. 2004). ......79, 80

*Malco Mfg. v. Elco Corp.*, 45 F.R.D. 24 (D. Minn. 1968) ........................58

*Mass. Eye and Ear v. QLT*, 167 F.Supp.2d 108 (D. Mass. 2001) ...........53

*Mass. Eye and Ear v. QLT*, 412 F.3d 215 (1st Cir. 2005)......................53

*Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). ...77

*McClure v. Career Sys. Dev. Corp.*, 447 F.3d 1133 (8th Cir. 2006) ........79

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .......................78

*Medtronic, Inc. v. Mirowski Family Vent.*, 134 S. Ct. 843 (2014) ..........47

*Merck Eprova v. ProThera*, 670 F.Supp.2d 201 (S.D.N.Y. 2009) ...........53

*Metro Motors v. Nissan Motor Corp.*, 339 F.3d 746 (8th Cir. 2003).......66

*Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*, 527 F.3d 1330 (Fed. Cir. 2008) ................................................................................................60

*Mid Am. Bldg. Supply v. Schmidt Builders Supply*, 2013 U.S.Dist.LEXIS 45366 (D. Kan. 2013)................................................69

*Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333 (7th Cir. 1989) ................................................................................................90

*Minnesota Timber Producers v. Am. Mut. Ins. Co. of Boston*, 766 F.2d 1261 (8th Cir. 1985)...........................................................................63

*Mitchell v. Winslow*, 17 F. Cas. 527 (C.C.D. Me. 1843).........................45

*Moschetti v. CCPRR*, 119 F.3d 707 (8th Cir. 1997) ...............................86

*Murphy v. Country House, Inc.*, 240 N.W.2d 507 (Minn. 1976) .............70

*Nat'l Minority Supplier Dev. Council Bus. Consortium Fund, Inc. v. Hessian & McKasy*, 2005 U.S.Dist.LEXIS 39986 (D. Minn. 2005) .....63

*National Texture Corp. v. Hymes*, 282 N.W.2d 890 (Minn. 1979)..........55

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120 (2014).........47

*Navajo Nation v. Peabody Holding Co.*, 255 F.R.D. 37 (D.D.C. 2008) ... 57

*Newman Grill Sys. v. Ducane Gas Grills*, 320 B.R. 312 (Bankr. D.S.C. 2004) ................................................................................................. 53

*Nicolson Pavement Co. v. Jenkins*, 81 U.S. 452 (1872) ........................... 44

*O'Leary v. Purcell Co.*, 108 F.R.D. 641 (M.D.N.C. 1985) ....................... 57

*Octane Fitness v. ICON Health & Fitness*, 134 S. Ct. 1749 (2014) ........ 47

*Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262 (6th Cir. 2010) ....... 88

*Onyiah v. St. Cloud State Univ.*, 684 F.3d 711 (8th Cir. 2012). ............. 82

*PaineWebber Group, Inc. v. Zinsmeyer Trusts Pshp.*, 187 F.3d 988 (8th Cir. 1999) ................................................................................................. 56

*Pei-Hreng v. Chu*, 2010 U.S.Dist.LEXIS 112777 (S.D. Tex. 2010) ........ 60

*Peterson v. Arellono*, 185 N.W.2d 282 (Minn. 1971) ............................... 73

*Phillips v. Collings*, 256 F.3d 843 (8th Cir. 2001) ................................... 79

*Phillips v. The Raymond Corp.*, 213 F.R.D. 521 (N.D. Ill. 2003) ........... 89

*PPG Industries v. Celanese Polymer Specialties*, 840 F.2d 1565 (Fed. Cir. 1988) ................................................................................................. 87

*Precision Pine & Timber, Inc. v. U.S.*, 596 F.3d 817 (Fed. Cir. 2010) .... 63

*Pye v. Nu Aire Inc.*, 641 F.3d 1011 (8th Cir. 2011) ........................... 68, 77

*Rack Room Shoes v. U.S.*, 718 F.3d 1370  (Fed. Cir. 2013) .............. 42, 61

*Rahlf v. Mo-Tech Corp.*, 642 F.3d 633 (8th Cir. 2011) ............................ 86

*Railroad Co. v. Trimble*, 77 U.S. 367 (1870) ........................................... 44

*Rhines v. Salinas Constr. Techs., Ltd.*, 2014 U.S.App.LEXIS 11984 (5th Cir. 2014) ......................................................................................... 86, 93

*Richfield Bank v. Sjogren*, 244 N.W.2d 648 (Minn. 1976) ................ 74, 75

*RJM Sales v. Banfi Prods.*, 546 F.Supp. 1368 (D. Minn. 1982) ............ 67

*Roberge v. Cambridge Coop. Creamery*, 79 N.W.2d 142 (Minn. 1956) ... 65

*Ross Univ. Sch. of Med. v. Brooklyn-Queens Health Care*, 2013 U.S.Dist.LEXIS 45949 (E.D.N.Y. 2013) .............................................. 69

*Salgado by Salgado v. GMC*, 150 F.3d 735 (7th Cir. 1998) .................. 88

*Saudi v. Northrop Grumman Corp.*, 427 F.3d 271 (4th Cir. 2005) ........ 87

*Schering Corp. v. Mylan Pharms.* 2011 U.S.Dist.LEXIS 92362 (D.N.J. 2011) ....................................................................................................... 60

*Silgan Containers v. Nat'l Union Fire Ins.*, 2011 U.S.Dist.LEXIS 35010 (N.D. Cal. 2011) ..................................................................................... 90

*Simpson v. Motorists Mut.*, 494 F.2d 850 (7th Cir. 1974) ..................... 54

*Sisk v. Picture People*, 669 F.3d 896 (8th Cir. 2012). ........................... 78

*SKF USA Inc. v. U.S. Customs & Border Prot.*, 556 F.3d 1337 (Fed. Cir. 2009) ........................................................................................................ 52

*Smith v. St. Louis Univ.*, 109 F.3d 1261 (8th Cir. 1997) ....................... 79

*Sperry v. Florida*, 373 U.S. 379 (1963) ................................................. 58

*Spiess v. Brandt*, 41 N.W.2d 561 (Minn. 1950) ..................................... 70

*Sports & Travel Marketing, Inc. v. Chicago Cutlery Co.*, 811 F.Supp. 1372 (D. Minn. 1993) .............................................................................. 67

*Spray Products v. Strouse, Inc.*, 31 F.R.D. 244 (E.D. Pa. 1962) ............ 53

*Squire Sanders v. Givaudan Flavors*, 937 N.E.2d 533 (Ohio 2010) ....... 54

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993) ....................... 78, 82

*Stark v. Magnuson*, 2 N.W.2d 814 (Minn. 1942) ................................... 65

*Stathos v. Murphy*, 276 N.Y.S.2d 727 (App. 1966), *aff'd,* 19 N.Y.2d 883 (1967) ...................................................................................................... 45

*Tavory v. NTP, Inc.*, 297 Fed. Appx. 976 (Fed. Cir. 2008)......................67

*TCS Holdings, Inc. v. Onvoy Inc.*, 2008 U.S.Dist.LEXIS 88035 (D. Minn. 2008). ..................................................................................65

*Thomas v. Marina Assocs.*, 202 F.R.D. 433 (E.D. Pa. 2001)...................92

*Thompson v. Nesheim*, 280 Minn. 407, 159 N.W.2d 910 (Minn. 1968)..50

*Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011) .........82, 84

*Trost v. Trek Bicycle Corp.*, 162 F.3d 1004 (8th Cir. 1998) ...................88

*Troyer v. I-Flow Corp.*, 2011 U.S.Dist.LEXIS 67042 (S.D. Ohio 2011)..94

*Trustees of Stanford University v. Roche Molecular Sys.*, 131 S.Ct. 2188 (2011) ...........................................................................2, 44

*Turner v. Gonzales*, 421 F.3d 688 (8th Cir. 2005)..................................79

*U.S. Test v. NDE Envtl*, 196 F.3d 1376 (Fed. Cir. 1999) .......................46

*U.S. v. De la Jara*, 973 F.2d 746 (9th Cir. 1992) ..................................57

*U.S. v. Hypoguard USA*, 559 F.3d 818 (8th Cir. 2009). .........................93

*U.S. v. Schwimmer*, 892 F.2d 237 (2d Cir. 1989) ..................................53

*U.S. v. United Shoe Mach. Corp.,* 89 F.Supp. 357 (D. Mass. 1950) .......58

*Universitas Educ., LLC v. Nova Group, Inc.*, 2013 U.S.Dist.LEXIS 1720 (S.D.N.Y. 2013)..................................................................92

*University of Colo. Found. v. American Cyanamid*, 196 F.3d 1366 (Fed. Cir. 1999) ...........................................................................42

*Upjohn Co. v. U.S.*, 449 U.S. 383 (1981) ...............................................55

*Wachtel v. Health Net*, 482 F.3d 225 (3d Cir. 2007) .............................56

*Walsh v. Nat'l Computer Sys.*, 332 F.3d 1150 (8th Cir. 2003)..........80, 93

*Warth v. Seldin*, 422 U.S. 490 (1975).....................................................43

*Waste Management v. Int'l Surplus Lines*, 579 N.E.2d 322 (Ill. 1991) ..54

*Wegener v. Johnson*, 527 F.3d 687 (8th Cir. 2008) ................................. 88

*Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10 (1st Cir. 2001) .. 88

*Winbond Elecs. v. ITC*, 2001 U.S. App. LEXIS 25113 (Fed. Cir. 2001) . 60

*Witzig v. Philips*, 144 N.W.2d 266 (Minn. 1966)..................................... 71

*Yancheng Baolong Biochemical Prods. v. U.S.*, 406 F.3d 1377 (Fed. Cir. 2005) ......................................................................................... 52

*Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101 (9th Cir. 2001) ......................................................................................... 88

*Young v. Warner-Jenkinson Co.*, 152 F.3d 1018 (8th Cir. 1998)............ 86

*Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909 (8th Cir. 2011). ....................................................................................... 78

*Zappa v. Cruz*, 238 F.3d 25 (1st Cir. 2001)............................................. 93

*Zappa v. Cruz*, 30 F.Supp. 2d 123 (D.P.R. 1998) ................................... 93

*Zirinsky v. Sheehan*, 413 F.2d 481 (8th Cir. 1969) ................................ 64

*Zutz v. Case Corp.*, 2006 U.S.Dist.LEXIS 10207 (D. Minn. 2006) ......... 66

## Statutes

28 U.S.C. §1338(a) ..................................................................................... 1

35 U.S.C. §118 .......................................................................................... 49

35 U.S.C. §256 ..................................................................................... 1, 42

35 U.S.C. §285 .......................................................................................... 47

Cal. Bus. Code §6126................................................................................ 58

Leahy-Smith America Invents Act, Pub. L. No. 112-29, 125 Stat. 284 §4(a)(1) (2011)................................................................. 49

Minn. U. Comm. Code §336.2-105(2) ..................................... 46

Patent Act of 1836, ch. 357, §11, 5 Stat. 121 ......................... 44

## Regulations

37 C.F.R. §10 ......................................................................... 58

37 C.F.R. Ch. 300, §§301-24 ................................................... 49

## Rules

Cal. Bar Rule 3.370, *et seq.* ................................................... 58

Cal. Rule of Court 9.46 ........................................................... 57

Federal Circuit Rule 28(a)(5) .................................................. 1

Federal Rule of Appellate Procedure 28(a)(4) ......................... 1

Federal Rule of Civil Procedure 26(a)(2)(B)(v) ....................... 87

Federal Rule of Civil Procedure 26(b)(2)(D) ........................... 87

Federal Rule of Civil Procedure 26(c) ..................................... 91

Federal Rule of Civil Procedure 37(c)(1)................................. 88

Federal Rule of Civil Procedure 45(c)(2)(B)............................ 92

Federal Rule of Civil Procedure 45(c)(3)................................. 91

Federal Rule of Civil Procedure 8(d)(3) .................................. 65

Federal Rule of Evidence 501(a) ............................................. 52

Minn. R. Admission 9 ............................................................................58

**Other Authorities**

Chisum on Patents, Vol. 8-22 §22.03[1][k][v] (2012)........................48, 49

*Corbin on Contracts*, Vol. 9 §50.2 (J.E. Murray, Jr., rev. ed. 2007) .......46

Curtis, G., *A Treatise on the Law of Patents for Useful Inventions* §170
  (3d ed. 1867) ...................................................................................44

*Federal Practice and Procedure*, Vol. 8 §2015 (3d ed. 2010) ..................90

http://patft.uspto.gov/netahtml/PTO/search-bool.html ...........................8

Manual of Patenting Examination Procedure §2001.04. .......................76

*McCormick on Evidence* §91 (4th ed. 1992) ...........................................54

*Moore's Federal Practice*, Vol. 9 §45.50 [3] (2014) ..................................91

*Moore's Federal Practice*, Vol. 9 §45.50 [4] (2014) ..................................91

*Oxford English Dictionary* (2d ed. 1989 & online version 2011)............90

*Pomeroy on Equity Jurisprudence*, Vol. 3 §§1287-88 (4th ed. 1918)......44

Restatement (Second) of Contracts §205 & comment d. ........................63

Robinson, W.G., *Law on Patents for Useful Inventions*, Vol. 1, §411
  (1890) ...............................................................................................45

Story, J., *Equity Jurisprudence* Vol. 2 (6th ed. 1853).............................45

Tressemer, P., *Best Practices for Drafting University Technology
  Assignment Agreements after Filmtec, Stanford v. Roche, and Patent
  Reform,* 2012 U.Ill.J.L.Tech.&Pol'y 347 (2012) ...................................49

Wigmore J., *Evidence*, Vol. 8, §2192 (3d ed. 1940) .................................55

*Wigmore on Evidence*, Vol. 8 §2312 (McNaughton rev. 1961)................54

*Williston on Contracts*, Vol. 6 (R.A. Lord, 4th ed. 2006) ........................46

**Redaction Notice:** Pages 10-12 of the non-confidential version of this Brief have redactions of references to information contained in material filed under seal in the District Court. The confidential version highlights the redacted material.

## STATEMENT OF RELATED CASE

Pursuant to Circuit Rule 47.5, Appellant states that he previously filed a Petition for a Writ of Mandamus in this Court, *In re Shukh*, Misc. Docket No. 12-132, that arose from the same civil proceeding as this appeal.

On October 16, 2012, by a per curiam order, a three-judge panel composed of Judges Linn, Dyk and Wallach denied that Petition. 485 Fed. Appx. 437 (Fed. Cir. 2012).

 One of the privilege issues raised in that Petition is included in this appeal. *See* Statement of Issues Presented, B(2)(a) ("Common Interest Doctrine," *infra*, p. 3, and Argument, Section 0, *infra*, p. 52.)

## JURISDICTIONAL STATEMENT

Pursuant to Federal Rule of Appellate Procedure 28(a)(4) and Federal Circuit Rule 28(a)(5), Appellant represents as follows:

The U.S. District Court for the District of Minnesota had jurisdiction over this case pursuant to 28 U.S.C. §1338(a) because it arises in part under Title 35, U.S. Code, section 256, entitled "Correction of named inventor," a section of an Act of Congress relating to patents. The District Court had jurisdiction over the remaining claims pursuant to 28 U.S.C. §1367.

1

On April 1, 2014, the District Court entered a final Judgment (A1) that also made final the prior rulings challenged in this appeal.

On April 7, 2014, Appellant timely filed his Notice of Appeal (A11127), and this appeal was docketed in this Court on April 10, 2014.

This Court has jurisdiction pursuant to 28 U.S.C. §1295.

## STATEMENT OF THE ISSUES

A.    (1) Whether the "automatic assignment" rule of *FilmTec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568 (Fed. Cir. 1991), should be overruled given the doubts expressed by three Justices of the Supreme Court in *Trustees of Stanford University v. Roche Molecular Sys.*, 131 S.Ct. 2188, 2199 & 2203 (2011) (*Stanford*).

(2)    Whether, if *FilmTec* is overruled, Appellant has (a) standing to bring a 35 U.S.C. §256 action to correct inventorship, and (b) equitable title to those of his inventions for which Appellees fraudulently omitted him on patent applications to the U.S. Patent and Trademark Office (PTO), and committed other acts of fraud and concealment both on Appellant and the PTO.

(3)    Whether, if *FilmTec* is not overruled, but by reason of the appellant inventor's reputational interest, a doctrine recognized but not explicated by this Court in *Chou v. Univ. of Chicago*, 254 F.3d

2

1347 (Fed. Cir. 2001) and its progeny, the appellant inventor has standing to seek correction of inventorship under Section 256 for inventions and patents from which he was fraudulently omitted.

(4)    Whether the *FilmTec* rule contravenes the protection of inventor's rights in the Patent Clause, Article I, Section 8 of the U.S. Constitution.

B.    (1) Whether under the Patent Clause of the U.S. Constitution and the Patent Act, an appellant inventor is entitled to access to and use of his inventorship communications with his employer/assignee's patent attorneys solely to prove his Section 256 inventorship and other claims, including fraud by the employer/assignee in an action brought confidentially under seal solely against the employer/assignee.

(2) Whether, notwithstanding an employer/assignee's assertion of an exclusive attorney/client privilege over an employee/inventor's communication with the employer/assignee's patent counsel, an employee/inventor is entitled to access to and use of his inventorship communications under:

(a)    the "common interest" doctrine enunciated by this Court in such decisions as *In re Regents of Univ. of Cal.*, 101 F.3d 1386, 1389 (Fed. Cir. 1996), or

3

(b)    the "waiver by delay" doctrine,

solely to prove his Section 256 inventorship and other claims in a confidential action filed only against the employer/assignee.

(3) Whether any attorney-client privilege asserted by an employer/assignee over an inventor's inventorship communications was vitiated by the fact that its General Counsel, with whom the inventor had important inventorship communications, was illegally practicing law in California in violation of a criminal misdemeanor prohibition of the unauthorized practice of law, although that lawyer was admitted to practice in other jurisdictions and before the PTO.

C.    (1) Whether, ignoring an employer/assignee's unclean hands arising from its mostly uncontradicted fraudulent conduct against an inventor and the PTO, the District Court wrongly dismissed the inventor's contract and tort claims.

(2)    Whether the employer/assignee's wrongful conduct gave it unclean hands that should have invalidated the "document return" provisions of his employment/assignment agreement.

(3)    Whether because of the employer/assignee's unclean hands, the district court wrongly granted summary judgment on the employer/assignee's breach of contract claim based on those

provisions, and wrongly ordered the inventor to return to the employer/assignee, documents he authored that proved both his inventorship and the employer/assignee's wrongdoing.

(4)    Whether stripping an inventor of his own documents that prove his inventorship contravenes the Patent Clause of the U.S. Constitution.

D.    (1) Whether an employer/assignee of an inventor's inventions committed common law fraud on him by failing to include him on patent applications for his inventions for which it had given him inventorship awards and otherwise conceded his inventorship, and by concealing that failure from him and from the PTO both by omission and affirmative false statements.

(2) Whether an employer/assignee's fraud vitiates its claims to equitable or legal title of an inventor's inventions.

E.    Whether the District Court erred in granting summary judgment against Appellant on his federal and state national origin retaliation claims when the record disclosed evidence of retaliatory acts and hostile environment retaliation sufficient to create genuine issues of material fact which evidence the District Court wrongly

ignored or construed against him without considering the correct rules of law.

F.    Whether the District Court unfairly and prejudicially limited Appellant's discovery by refusing to allow discovery of facts related to the background, qualifications and credibility of Appellees' experts and by denying his request for a short and reasonable discovery extension.

G.    Whether Appellant's Title VII punitive damage claim was improperly and prematurely stricken given the District Court's explicit conclusion that a reasonable jury could conclude that Appellant was mistreated by Appellees.

## STATEMENT OF THE CASE

This case, filed on February 16, 2010, brought the following Claims and others:

| | |
|---|---|
| Second Claim: | Correction of Inventorship |
| Third Claim: | Rescission |
| Fourth Claim: | Breach of Contract |
| Fifth Claim: | Fraud and Concealment |
| Sixth Claim: | Breach of Fiduciary Duty |
| Seventh Claim: | Unjust Enrichment |

Eleventh & Twelfth Claims:   Title VII and Minnesota Human
                             Rights Act (MHRA) Retaliation

Thirteenth Claim:            Declaratory Judgment regarding
                             confidentiality & document
                             return provisions

Dr. Shukh seeks reversal of the following:

March 30, 2011 Opinion dismissing Claims (A2; 2011
U.S.Dist.LEXIS 33924);

November 30, 2011 Opinion on Seagate's Counterclaims and
document return injunction Motion  (A36; 2011
U.S.Dist.LEXIS 137402);

June 29, 2012 Opinion upholding Seagate' s assertion of
privilege over Dr. Shukh's invention records (A74;  872
F.Supp.2d 851) and the underlying Magistrate Judge's Order
(A59;  848 F.Supp.2d 987);

July 3, 2012 Opinion dismissing the Title VII Punitive
Damages Claim (A91; 873 F.Supp.2d 1087);

January 3, 2013 Opinion denying a discovery extension
(A115, 2013 U.S.Dist.LEXIS 833) and the underlying
Magistrate Judge Order (A103; A106);

March 25, 2013 Opinion granting summary judgment
against Dr. Shukh on the Fraud and Inventorship Correction
Claims (A149; 2013 U.S.Dist.LEXIS 41262);

July 3, 2013 Order denying as moot Plaintiff's Motion for
Partial Summary Judgment on the Fraud Claim (A187; 2013
U.S.Dist.LEXIS 93482);

September 30, 2013 Opinion stopping expert discovery and
refusing to bar one expert (A191, 295 F.R.D. 228), and the
Magistrate Judge's Protective Order regarding expert
discovery (A132);

March 31, 2014 Opinion granting summary judgment on the Retaliation Claims (A215; 2014 U.S.Dist.LEXIS 42909); and

April 1, 2014 Final Judgment (A1).

## STATEMENT OF FACTS

**I.      Alexander M. Shukh, Ph.D.**

Dr. Shukh, a native of Belarus in the former Soviet Union, is "recognized internationally as outstanding in the field of hard disk drive magnetic recording." (A217-18.)

In 1997, Seagate hired him from Minsk on an H1-B ("highly specialized knowledge") visa. (A816, A5591, A6125-27.)

He brought his family to America to escape political repression and the lingering effects of Chernobyl on his wife and daughters. (A4242-45.)

He became a U.S. Citizen on July 30, 2009. (A1116.)

Before 1997, he received twenty-four foreign patents. He earned twenty-two U.S. patents at Seagate and is in Seagate's Inventor Hall of Fame. (A816-17.) After Seagate, he earned nine more of his own in other technologies. (http://patft.uspto.gov/netahtml/PTO/search-bool.html.)

Each Seagate drive employs up to five of his patents, bringing Seagate enormous profits. (A817.)

8

This is not puffery, but is Seagate's own evaluation in its sworn I-140 INS Petition sponsoring his "Outstanding Researcher" visa. (A5247-56, A5258-74, A5277-92, A5591-93.)

Nevertheless, his Seagate tenure was unhappy:

> [T]he Court is not without empathy for what appears to have been a difficult *decade* of employment . . . [A] reasonable jury could determine that the relationship between Shukh and Seagate was rife with conflicts and that Seagate may have mistreated Shukh…. (A272.) (emphasis added).

## II.    Inventorship.

### A.    Dr. Shukh's Employment/Assignment Agreement.

Dr. Shukh signed an Employment/Assignment Agreement whereby he "hereby assign[ed]" Seagate his inventions.  (A827-28.)

It required him to convey his inventions to Seagate, and made his documents confidential and Seagate property that he was required to return when he left the company. (A828-29.)

### B.    Seagate's patenting process.

Inventions were disclosed on "Invention Disclosures" submitted to Seagate's IP Law Department. (A1118-19, A3635-37, A5334-38, A9941-42.)

A committee of engineers and lawyers–the "Patent Review Board" (PRB)–reviewed them to determine whether to apply for patents. (*Id.*)

*Confidential Material Redacted*

The IP Department informed employees of PRB's decisions, and supervised patent prosecution supposedly in consultation with inventors. (A9942.)

Seagate's Policies rewarded inventions and patents. Employees with ten or more patents were admitted to Seagate's Inventor Hall of Fame. (A5213-16.)

## C. Seagate concealed that it had omitted Dr. Shukh from patent applications.

Seagate has never explained the events related to Dr. Shukh's omission from patent applications:

- '457 Patent (US7,233,457): Seagate's IP Department told him that ████████████ Redacted ████████████ An application for his invention and the other was filed but he was never told that he had been omitted. (A5123-25, A5135.)

  Seagate's Answer admits the documents. (A5347-50.)

- '150 Patent (US7,684,150): The IP Department told him that ██Redacted██ ████████████████████████████. Although it had filed a Provisional Application listing him as inventor, it later filed a Utility Application that omitted him. He was given an Invention Award and financial bonus for that invention. He was never

10

informed that he had been omitted. (A1117-28, A5125-28, A5135-37.)

Those documents appear at A1115-1260 and the Awards at A1244-45, A4065-66 & A5117-18.

Seagate admits the documents. (A5350-58.)

- '902 Patent (US6,525,902): The IP Department told him that █████ ████████████████████████████████████████████ ████████████████████████████████████. In fact, Seagate filed a Utility Application omitting him. Seagate never told him about that Application or his omission. (A5128-31. A5137-39.)

The Award appears at A5116.

Seagate admits the documents. (A5358-66.)

- '114 and '236 Patents (US6,548,114 & US6,738,236): Seagate filed Utility Applications for two of his inventions omitting him, and concealed them and his omission. (A5131-33, A5139-41.)

Seagate admits the documents. (A5366-74.)

- A-Writer : The IP Department told him that ████ Redacted ████ ████████████████████████████████████████████ ████ ██ █████. But, Seagate filed four applications

*Confidential Material Redacted*

containing his concept but omitting him, and did not inform him of those applications or his omission. The '002 Patent (US7,983,002) issued from one of those applications. (A5141-44.)

Seagate admits the documents. (A5374-83.)

- Application Publication US2006/0132971: The IP Department told him ████████████████Redacted████████████████ ████████████████████████████████████████████ ██████████████████████. But it concealed his omission from that other application, and later filed an application that included that invention but also omitting him. (A5144-46.)

Seagate admits the relevant documents. (A5383-89.)

## D.    Dr. Shukh's reliance on the IP Department.

Dr. Shukh "truly relied" on the IP personnel. (A4841).

It's natural. I need to believe to the company because it's natural. I used to believe when people say me they supposed to do that. This is their obligations, they're lawyers. (A3534, A5047-48; *see also* A819.)

As a result, he acquiesced to what they told him.

## E.    Opinion of Howard Rockman

Howard Rockman, an experienced patent practitioner (A5578-79) opined that (1) Seagate's failure to name Dr. Shukh as an inventor was a false statement of material fact on the applications, (2) Dr. Shukh

justifiably relied on the IP Department to protect his inventorship, and (3) Seagate's inequitable conduct before the PTO was fraudulent conduct that injured Dr. Shukh. (A5582-84.)

## F. Dr. Shukh's reputational injury.

First, Dr. Shukh lost the recognition as an inventor of patents in his area of expertise. (A5147-50.)

Second, although in his first few years at Seagate, his reputation was as a world-renowned scientist (A5247-56, A5258-74, A5277-92), by 2007, he was reputed to be difficult to work with because he complained he was not given due credit for his inventions, even though his complaints were viewed as correct.

> However, [Dr. Shukh's] insistence on getting appropriate credit for all design ideas and implementations stifles open discussion and adoption of his ideas. Since this issue has become more important to Alex as time goes on, and since he believes he has not been fairly recognized for his past contributions, it's an emotional issue. . . . I do understand Alex's concerns about credit for past work. He has made a number of contributions over the years, and I have come to see over the past 6 months that he sometimes doesn't receive proper credit for work he has done in the past. (A6286.)

Third, although omitted from several patents, he was criticized for a "decrease in [his] patent submissions." (A6150.)

Fourth, he was not promoted, was denied salary raises and benefits, and was selected for termination. (A10913, A9570: Allen Dep.

174-75.) He was also denied recognition and bonuses under Seagate's Inventor Policies. (A6288-89.)

Fifth, after he was fired, he couldn't find a job. (A5150.)

Sixth, his patent expert opined that his omission from the patents negatively impacted his professional reputation (A5583-84), and his immigration expert opined that inclusion in the patents would have "significantly strengthened" the INS "Outstanding Researcher" Petition. (A5592.)

## G.    Dr. Shukh's discovery of Seagate's fraud and complaint to Seagate's General Counsel.

In late 2006 and then mid-2007, Dr. Shukh learned of Seagate's lies. (A817-19, A1125, A3429.)

He also learned that the '150 application was still pending. (A817, A835-36, A4065-66.) *See* '150 Discussion, *supra*, p. 10.

On August 30, 2007, he emailed Ken Massaroni, then Seagate's IP V.P., who soon became General Counsel. (A817-18, A3712-17, A5966-70.)

Massaroni, a patent lawyer, had an expert knowledge of patent prosecution and inventorship. (A5934-47.)

The emails complained about the violation of inventorship rights and attached inventorship proof including inventor awards. (A817-18, A3712-17, A5966-70.)

On March 6, 2008, Massaroni rejected the complaints without mentioning the documentary proof. (A3717.)

Before doing so, he communicated with internal Seagate patent lawyers. Seagate has withheld those communications. (A5953-61, A5972-77: Entries SGTPRV252, 367, 1870, 2083.) *See* Discussion, *infra*, pp. 31-31.

Massaroni admitted that Seagate did not notify the PTO of Dr. Shukh's inventorship claims, but based on attorney-client privilege refused to say why. (A5960-61.)

Seagate has also never explained that failure.

## III.    National Origin Retaliation.

Dr. Shukh appeals the summary judgment against him on his Retaliation Claims. (A215.)

### A.    Dr. Shukh's Discrimination Complaints in 2006 & 2007.

Because the District Judge ruled that Dr. Shukh could not rely on protected conduct that occurred *after* some of Seagate's retaliatory actions (A261-62), the following recounts his national origin complaints

15

*before and during* Seagate's retaliation from 2006-2007 onward. (A9088-9108.)

- At a January 5, 2006 meeting, VP Dave Brown, angrily asked Dr. Shukh "What are you doing here in this country?" accused him of hating America and Americans, and told him to "know your place." Dr. Shukh asked "Why you treat me like the enemy? Cold War is over." (A9088-91: Shukh Dep. 745-55; A10825.)

- In his FY2006 evaluation, Dr. Shukh complained that he was criticized because of his "strong Russian accent" and that Seagate's equal opportunity policy was "in serious contradiction with reality." (A9092-93: Shukh Dep. 761-62; A9664.)

- On August 16, 2006, another supervisor told Dr. Shukh that "there was a decision about you." (A9095: Shukh Dep. 770-73; A10828.)

- On September 7, 2006, Dr. Shukh emailed Ken Allen, another VP and Debra Reutiman (an HR official), complaining he had not been promoted because "maybe since I am Russian" and because of "my strong accent." (A9094-95: Shukh Dep. 766-72; A10842.)

- On January 11, 2007, Dr. Shukh complained to HR about mistreatment, comparing it to human slavery, that it violated his

16

"human rights" and that there was a "persistent strong bias" against him. (A9098-99: Shukh Dep. 783-89; A10856-57.)

- In a February 21, 2007 meeting with HR's Doug Engelke, he complained that he would no longer tolerate "this kind of harassment and discrimination." (A9100: Shukh Dep. 790-92; A10859.)

- In a February 23, 2007 memo to his new supervisor Allen, he demanded to be respected like a human being and be "treat[ed] equally to other people in the company." (A9100-01: Shukh Dep. 792-95, A10861-63.)

- In September 2007, VP Brown stated that an award to Declan Macken showed that there was no discrimination because Macken was also not an American. (A9101-03: Shukh Dep. 797-802.)

- Thereafter, Dr. Shukh demanded the "same rights like everybody for practical implementation of his ideas." (A9103-04: Shukh Dep. 802-06, A10866.)

- In January 2008, Dr. Shukh wrote a high-ranking manager at California HQ, complaining that "there was a decision" about him, and that he would never be a manager "[o]f course, because I am Soviet." (A9104-05: Shukh Dep. 806-11; A10871.)

## B.    Seagate's Actions from 2006-2007 onward.

In January 2007, Dr. Shukh complained to a supervisor about his concerns.  (A9098-9108: Shukh Dep. 784-90; A10856.)

The next day, Ken Allen, a recipient of the September 7 national origin complaint, summoned Dr. Shukh to his office and threatened to get "ten cases" against him because Dr. Shukh was a "bad person." (*Id.*)

On January 11, Dr. Shukh wrote a complaint to HR's Engelke, and forwarded him copies of his earlier complaints about harassment and national origin discrimination.  (*Id.*)

On January 24, 2007, HR's Reutiman forwarded Engelke Dr. Shukh's September 1 complaint that he was being discriminated against because of "a personal bias to me." (A9333-35: Engelke Dep. 114-23; A10885-86.)

Then, on January 30, 2007, Dr. Shukh re-sent Engelke the September 7 complaint. (A9333-35: Engelke Dep. 114-22; A10888-10900.)

Engelke admitted that the September 7 email was a complaint of unfair treatment because of national origin. (A9335: Engelke Dep. 121.)

Engelke did not investigate that complaint. (A9335: Engelke Dep. 121-22.)

18

On February 20, 2007, Engelke rejected Dr. Shukh's other complaints without dealing with the discrimination complaints. (A9337-38: Engelke Dep. 132-34; A10902.)

A few days earlier, Allen had summoned Dr. Shukh to his office and leveled several accusations against him. (A10904.) On February 20, Allen wrote a memo threatening to fire Dr. Shukh that also did not deal with his discrimination complaints. (*Id.* A8569-70: Allen Dep. 172-76.)

Dr. Shukh wrote back, denying Allen's accusations and reiterating his demands to be respected "like a human being" and to be treated "equally to other people in the company." (A10907.)

Allen then:

- reassigned Dr. Shukh to Allen's unit (A9569, A9572-73: Allen Dep. 169-70, 184-87; A10911);

- isolated him from the other engineers, isolation that lasted until he was fired in January 2009. (A9020-23, A9053: Shukh Dep., 471-83, 606; A10911);

- "physically" isolated him which Dr. Shukh felt was an "atmosphere of hate and isolation." (A9569, A9572-73: Allen Dep. 169-70, 184-87; A10329, A10911);

- falsely criticized him in evaluations for an inability to work on teams notwithstanding the teamwork awards he had received (A6286-88, A10935, 10938, 10939; A10817-23; A9561-63: Allen Dep. pp. 137-48);

- refused to consider him for promotions (A10939-40);

- refused to investigate his national origin discrimination complaints (*see* Discussion, *supra*, p.18);

- ordered him to attend remedial interpersonal relations training (A6288);

- excluded him from important developmental and technical meetings  and prevented him from publishing technical papers (A9028-29, A9032, A9054, A9055-56: Shukh Dep., at 504, 507, 519, 522, 608, 614-15; A9785-86: Vas'ko Dep. pp. 112-14);

- in part based the decision to terminate him on the "difficulties" arising from his discrimination and retaliation complaints. (A9570: Allen Dep. 174-75.)

### C.    Damages.

In addition to the loss of patents, salary and benefits, etc., Dr. Shukh personally suffered greatly from Seagate's abuse, including a formal diagnosis of anxiety and depression, loss of hair, insomnia, all

seriously negatively impacting his family relationships. (A8056-57, A8065-90, A10315-43, 10355-69, 10370-72.)

### D.    Dr. Shukh's evidence of pretext.

The District Judge concluded that the supervisors "***believed***" that Dr. Shukh was unable to work with other engineers on a team. (A271.)

The following showed that belief was objectively untrue and could not be reasonably held.

Seagate's INS Petition highly praised Dr. Shukh without mention of any difficulties with co-workers. (A5247-56, A5258-74, A5277-92, A5591-93.) *See* Discussion, *supra*, Section I, pp. 8-9.

He was a co-inventor with twenty-seven other engineers, seven on more than one patent. He submitted many other Invention Disclosures with twenty co-inventors, with seven repeats. (A10774-90, A10792-93.)

He circulated thousands of pages of memos and technical documents, documented by a 171 page list. (A10602-10772.)

Vladyslav Vas'ko, a former Seagate engineer, testified that Dr. Shukh had a productive relationship with co-workers and had many coauthors on inventions. He said that Dr. Shukh's difficulties were not with co-workers, but with managers who reacted badly in meetings when Dr. Shukh asked them difficult but legitimate questions causing

them to avoid asking him to meetings. (A9785-86: Vas'ko Dep. pp. 112-14.)

Dr. Shukh received Teamwork Awards in 1999 from Seagate's CEO, and in 2000, and, in May 2007 from Allen himself during the same time period that Allen was accusing Dr. Shukh of a lack of teamwork. (A6286-88, A10935-39; A10817-23; A9561-63: Allen Dep. pp. 137-48).

Seagate cited a mere four specific incidents supposedly showing Dr. Shukh's difficulties with co-workers.

In 2001, Dr. Shukh complained that another engineer had expropriated his ideas. But those complaints were found to be true and justified by Allen, the supervisor who later criticized him for that complaint. (A10795-97.)

Dr. Shukh's evidence showed that a 2006 incident was initiated by another engineer, a black belt in judo, who criticized Dr. Shukh for "stealing" his work and then came to Dr. Shukh's cubicle and physically threatened him. (A10800-01; A9107-08: Shukh Dep. pp. 818-23.)

In the third undated incident with Amin and van Ek, all Dr. Shukh did was fairly critique their use of wrong data. (A8989: Shukh Dep. pp. 352-53.) Both were co-inventors with Dr. Shukh on patents.

(A10775.) Van Ek, Dr. Shukh's supervisor for Fiscal Year 2005, gave Dr. Shukh an "Effective" rating for Teamwork. (A10805.)

The 1997 or 2000 insults of Frank Stageberg were not insults at all. Stageberg admitted that the criticism had validity because the model was ugly. (A9159-60: Stageberg Dep. pp. 69-74.) The two had a friendly relationship, were co-inventors on a patent and on another application. (A10775, A10811-15.)

E.    **The dismissal of Dr. Shukh's Title VII punitive damage claim.**

December 1, 2012 was the date for the close of fact discovery and to seek leave to plead punitive damages. (A4565-66.)

On January 24, 2012, Seagate moved to dismiss Dr. Shukh's Title VII punitive damage claim. (A4322.)

The District Judge granted that Motion on July 3, 2012, five months before December 1, and refused to allow Dr. Shukh to amend. (A91, 873 F.Supp.2d 1087.)

IV.    **Dr. Shukh's last day at Seagate.**

On January 14, 2009, Dr. Shukh was notified that he was fired effective March 16, 2009. The next morning, his supervisor, Ken Allen came to his office and told him to leave immediately because Dr. Shukh was copying documents. (A820-24, A3175-77.)

23

Dr. Shukh reiterated his complaints that Seagate had stolen his intellectual property, committed fraud, and unlawfully discriminated against him because of his national origin. (*Id.*)

Dr. Shukh told Allen that he had copied the evidence of Seagate's wrongdoing, consulted a lawyer, and would take legal action. (*Id.*)

Allen demanded that Dr. Shukh sign "Termination Certification" and return whatever material he had copied. (*Id.*)

Dr. Shukh refused. (*Id.*)

As he walked Dr. Shukh out, Allen insulted him by wishing him "every success in building a new political party in Belarus." Dr. Shukh responded that he was "planning to stay in the United States and to join one of the political parties here." (A824, ¶46.)

## V.    Seagate's EEOC Response.

March 16, 2009 was Dr. Shukh's last day on Seagate's payroll. The next day, he filed his EEOC charge. (A5394-95.)

Seagate's Response was filed on May 18, 2009. (A10913-17.) It falsely asserted that

> At no time did Shukh claim a belief that he was being treated differently due to his national origin or age. Accordingly, Shukh did not engage in any protected activity. (A10917.)

It also admitted that:

24

> After a history of combative and unproductive behavior in
> his working relationships, Shukh was selected for
> termination in connection with a Company-wide reduction in
> force conducted by Seagate. (A10913.)

That corroborated Allen's deposition admissions that his "difficulties"
with Dr. Shukh were a secondary factor in selecting him for
termination. (A9570: Allen Dep. 174-75.)

## VI.    Dr. Shukh's conciliation efforts & Seagate's long-delayed privilege assertion.

On May 26, 2009, without asserting privilege, Seagate's new IP
Counsel wrote Dr. Shukh reminding him of the confidentiality and
document return provisions. (A1719.)

In September and October 2009, Dr. Shukh's counsel contacted
Seagate's EEOC lawyer to negotiate a Standstill Agreement. (A1731-
37.) He informed her that Dr. Shukh had extensive documentary
material and twice sent her copies of several of those documents.
(A1738-49, 1753-65.) In her various responses, two declining the
Standstill, she never asserted confidentiality or privilege. (A1750-52,
A1766-68, A1769-70.)

## VII.    The Filing of this Case and the Initial Events.

On February 16, 2010, this case was filed under seal. (A448,
A10925-29.)

## A.    Seagate's tardy privilege assertions.

On March 17, 2010, Seagate's new counsel returned the Waiver of Summons form, but did not assert confidentiality or privilege or demand the return of documents. (A1776-77.)

Finally, on March 26, 2010, another lawyer sent a letter demanding document return, for the first time asserting confidentiality and privilege. (A1778-80.)

But Seagate did not file any motion asserting privilege or demanding document return until August 30, 2010, six months later. (R.25: Seagate 1st Disq. & Doc. Return Mot.)

## B.    The Amended Complaint's addition of a Claim to declare Document Return Provision unenforceable.

On April 7, 2010, Dr. Shukh sought the Court's protection by filing an Amended Complaint including a Claim to declare the confidentiality and document return provisions unenforceable. (A526, A1918-19.)

Seagate moved to Dismiss the Amended Complaint. (A623, A632.)

## C.    The denial of Seagate's two Disqualification Motions.

On August 30, 2010, Seagate moved for the disqualification of Dr. Shukh's Counsel and the return of documents. (R.25: Seagate 1st Disq. & Doc. Return Mot.; A768.)

After hearing, the Magistrate Judge denied the motion without prejudice but ordered Dr. Shukh to give Seagate numbered copies of the retained documents. (A975.) Dr. Shukh did so promptly.

On November 9, 2010, Seagate filed its renewed Disqualification Motion (R.91: Seagate's 2d Disq. & Doc. Return Mot.; A1392.)

On December 2, 2010, after hearing, the Magistrate Judge denied it. (A1906-26, 2010 U.S.Dist.LEXIS 133393.)

He ruled that Dr. Shukh had properly disclosed the documents he retained so that his counsel could "fulfill his or her professional duty to make sure that there is a proper basis for a suit…[even though] they might otherwise be privileged from third-party review…." (A1920-21.)

He also denied disqualification, because neither Dr. Shukh nor his counsel had done anything improper, and because Seagate had delayed asserting privilege. (A1921-26.)

Seagate did not seek review of that ruling.

### D.    Dr. Shukh's Motion to require Seagate to give proper notice to the PTO.

On October 10, 2010, Dr. Shukh filed a Motion for a Preliminary Injunction Ordering Seagate to Disclose this Litigation and Other Material Information to the Patent Office. (A1056.)

He asserted that Seagate's failure to notify the PTO of his inventorship claims was "a fraud that now continues by reason of Seagate's apparent failure to notify the PTO of this lawsuit and his claims." (A1069.)

### E.    The District Judge's Dismissal Rulings & PTO Notice Rulings.

On March 31, 2011, the District Court ruled on Seagate's dismissal Motion and other matters. (A2, 2011 U.S.Dist.LEXIS 33924.)

First, the District Judge applied *FilmTec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568 (Fed. Cir. 1991), holding that Dr. Shukh had no economic standing to seek correction of inventorship. (A10-16.)

But, under *Chou v. Univ. of Chicago*, 254 F.3d 1347, 1358 (Fed. Cir. 2001), he denied dismissal of the Correction of Inventorship Claim, based on the allegations of "reputational interests." (A15-16.)

The Court also dismissed the claims for Rescission (Claim Three), Breach of the Employment/Assignment Agreement (Claim Four), and Unjust Enrichment (Claim Six) holding that (1) Seagate committed no wrongdoing by omitting Dr. Shukh from its patent applications for his inventions, and (2) the obligations of the Patent Act requiring that it do so could not be read into that Agreement. (A17-20.)

In contrast, he refused to dismiss the Fraud Claim, holding that it adequately alleged that Seagate had made misrepresentations about the patenting of inventions. (A20-21.)

Finally, the Court refused to declare the confidentiality and document return clauses unenforceable, ruling that Seagate's misconduct did not constitute bad faith or unclean hands. (A30-32.)

## VIII.  Seagate's Answer Counterclaims & Motion For Document Return .

On April 15, 2011, Seagate answered, and counterclaimed for Breach of the document return provision. (A1927.) Dr. Shukh filed a Dismissal Motion in part arguing again that the document return provisions were unenforceable due to Seagate's misconduct. (A2063)

On June 13, 2011, Seagate filed a Motion for Summary Judgment, Preliminary Injunction, and Return of Documents on the grounds that the documents and other materials Dr. Shukh retained were confidential, privileged, and Seagate's property. (A2248.) Dr. Shukh opposed, yet again on the grounds of Seagate's misconduct, in addition to constitutional invalidity. (A2996.)

On November 30, 2011, the District Judge denied dismissal and ordered Dr. Shukh to return the documents. (A36.)   He rejected Dr.

Shukh's arguments that Seagate's unclean hands should bar enforcing the document return provision.

Dr. Shukh returned the documents and the case proceeded as if he had never retained them in the first place.

## IX.  The Privilege Issues.

In September 2011, Seagate produced 86,000+ documents (A3616 & 3633), accompanied by two Privilege Logs that listed Dr. Shukh as either author, recipient, or copyee on all the documents.  (A3391-3425.)

### A.  Seagate's March 2012 "Document Dump."

On March 23, 2012, without warning, Seagate produced an additional 285,000+ pages that Dr. Shukh labeled as a "Document Dump." (A5480.) Seagate produced a Privilege Log No. 3, and a "Redaction Log," of which only excerpts are of record. (A5972-77.)

On May 2, 2012, Dr. Shukh was granted one 90-day discovery extension due to the Document Dump (his 180-day request was denied). (A4565.)

On September 24, 2012, Dr. Shukh was denied a second 90-day extension notwithstanding the prejudice from the Document Dump (A104-05, A110-14), a denial later affirmed by the District Court Judge. (A115.)

### B.    The logged Massaroni Communications.

Seagate's Logs list several documents either authored by or copied to Massaroni to whom Dr. Shukh had complained as described above at p. 14. (A3403-04, A3413, A5972, A5974, A5976-77: Privilege Log Nos. 1, 2 & 3: Entries SGTPRV252-3, 367, 1870, 1920-22, & 2083; Redaction Log Entry SEA369523-33.)

### C.    Massaroni's bar memberships.

After becoming General Counsel in October 2007, Massaroni split his time between California and Minnesota. (A3449-51, A3453-54, A3537-39.) However, he was not and still is not a member of either Bar. A71, A3770-71.)  He is admitted to the Indiana, District of Columbia and Patent Bars. (*Id.*)

During the events in this case, Massaroni represented one non-Seagate client. (A3518-36.)

### D.    Dr. Shukh's Motion to Compel and the rulings.

On September 13, 2011, Dr. Shukh moved to compel production of the logged documents. (A3322.)

On December 15, 2011, the Magistrate Judge granted the Motion in part on one narrow ground, covering only a few documents, that Seagate had made a limited subject matter waiver. (A59.)

Although he had previously ruled that the documents were not privileged during Dr. Shukh's counsel's pre-suit review (A1920-21), this time he held that they were privileged and non-discoverable. He rejected Dr. Shukh's "common interest" and other arguments. (A68-73.)

On June 29, 2012, on basically the same grounds, the District Judge affirmed that Order and denied certification of an interlocutory appeal to this Court. (A74, A87-88.)

These were the same documents that the Magistrate Judge had previously ruled were not privileged and could be properly shown to his Counsel to evaluate whether he had a case.

On October 16, 2012, this Court denied Dr. Shukh's Mandamus Petition for lack of finality. (A5293, 485 Fed. Appx. 437.)

## X. The cross-motions for summary judgment motion on fraud and inventorship.

On June 29, 2012, months before the final discovery and motions dates, Seagate moved for summary judgment on Dr. Shukh's inventorship and fraud claims. (A4569.)

### A. Dr. Shukh's Rule 56(d) argument & the Massaroni deposition.

In part, Dr. Shukh argued under Rule 56(d) that he had not yet completed discovery. (A4956-61.)

32

On November 28, 2012, Dr. Shukh deposed Massaroni. (A5930.)

Massaroni admitted that neither he nor Seagate disclosed Dr. Shukh's inventorship claims to the PTO. (A5960-61.)

## B. Dr. Shukh's timely summary judgment motion on fraud.

On March 7, 2013, three weeks before the dispositive motion deadline, Dr. Shukh filed his own Summary Judgment Motion on his Fraud Claim. (A7646.)

He sought partial summary judgment on reliance and complete summary judgment because of Seagate's false statements and omissions, and its failure to notify the PTO of Dr. Shukh's inventorship claims. (*Id.*)

## C. The District Judge's grant of Seagate's summary judgment motion and denial of Dr. Shukh's cross-motion.

On March 25, 2013, without mentioning Dr. Shukh's Motion, the District Judge granted Seagate's, ruling that Dr. Shukh had no reputational injury for inventorship standing and could not prove the reliance element of fraud. (A149.)

He rejected Dr. Shukh's Rule 56(d) argument, concluding that he had adequate time for discovery before the December 1 cut-off. (A164 n.8.)

But then he refused to consider Massaroni's deposition admission that Seagate failed to notify the PTO of Dr. Shukh's inventorship claims. The District Judge ruled that Dr. Shukh had "manufacture[d]" and "raised for the first time" that argument to avoid summary judgment. (A182 n.18.)

That was incorrect because Dr. Shukh had made precisely that argument a year and a half earlier. (A1069.) *See* Discussion, *supra*, p. 27.

Thus, he ruled that Dr. Shukh had an adequate opportunity for discovery, but then refused to consider evidence timely obtained during discovery that confirmed a contention Dr. Shukh had raised early in the case.

On July 3, 2013, over Dr. Shukh's objection, the District Judge denied as moot the fraud portion of Dr. Shukh's summary judgment motion. (A187.)

Without any real explanation, the District Judge refused again to consider Dr. Shukh's fraud arguments based on the timely-obtained Massaroni testimony. (A189.)

## XI.    Seagate's expert disclosure violations.

The Amended Scheduling Order required Seagate's Rule 26(a)(2) expert disclosures by December 1, 2012. (A4565.) Expert discovery closed 60 days later. (*Id.*)

On November 30, Seagate disclosed its experts including Christopher Bajorek and Angela Heitzman.

### A.    The hard drive expert Bajorek.

On that date and then twice again, December 5, and December 21, 2012, Seagate served slightly different versions of Bajorek's report and CV. Those documents emphasized his expertise in hard drives, his 25-year career at IBM, and a supposed short stint in 2007-08 at a California company known as Intematix. (A6748-58, A6760-62, A6764, A6766-79.)

But all three failed to disclose his prior expert cases.

### 1.    *The Marvell case & Intematix*

Dr. Shukh's investigation uncovered that just a few weeks earlier, Bajorek had given expert testimony about hard disk drives in a $1.54 billion patent infringement case after the scope of his testimony was narrowed based on admitted limitations on his expertise. (A6804-6999.)

35

*Carnegie Mellon v. Marvell Technology*, 2012 U.S.Dist.LEXIS 120555, *5&13 (W.D. Pa. 2012).[1]

The transcript also showed that Bajorek did not tell the jury about his employment at Intematix. (A6804-6999.)

### 2.    IBM's Fraud Case Against Bajorek

Dr. Shukh also discovered *IBM v. Bajorek*, 191 F.3d 1033 (9th Cir. 1999), revealing that IBM had sued Bajorek for fraud, charging that when he resigned he improperly exercised stock options worth nearly $1 million by fraudulently misrepresenting that he was not going to a competitor when in fact he was. IBM's Complaint against Bajorek is also in the record. (A6781-6802.)

### 3.    Seagate's belated disclosures

In December, Dr. Shukh subpoenaed Bajorek, IBM and Intematix about those matters. (A6380-6400.)

Only then, did Seagate start to leak out the required expert case information. On January 2, 2013, it disclosed *Marvell* as well as two other cases in which Bajorek had testified as an expert for Seagate

---

[1] The *Marvell* case is now pending here as Appeal No. 14-1492.

itself. (A7022-33.) Seagate's counsel stated that the failure to make a timely disclosure was "inadvertent." (A7020.)

Two days later, Seagate disclosed that the Minnesota case was "actually an arbitration," but it did not reveal the arbitral forum, case number, or case name. (A7041.)

Finally, on January 7, 2013, Seagate disclosed the case name and number of that arbitration at the AAA. (A7038.)

Dr. Shukh subpoenaed AAA (A6409) and issued a production request to Seagate. (A6402.)

He also obtained the transcript of Bajorek's trial testimony in the first of the Seagate cases. (A7117-7232.) *Siemens v. Seagate Tech.*, CV06-788JVS (C.D. Cal.). It showed that Seagate's two lead lawyers herein represented Seagate in that trial, and were in the courtroom when Bajorek testified. (A7117.)

Bajorek also did not disclose his employment at Intematix to the *Siemens* jury. (*Id.*)

## B.    Heitzman, Seagate's vocational expert

Seagate's November 30 disclosure listed Heitzman as its vocational expert on the reasonableness of Dr. Shukh's job search. (A6760-62.)

37

Dr. Shukh subpoenaed Heitzman in part for a list of the cases in which she testified in court and her reports in other cases regarding the "reasonableness" of job searches. (A6512.)

Dr. Shukh's investigation had revealed prior cases where Heitzman gave reports and testimony, including for Seagate's law firm herein. (A7276-7321.)

## C.    The Protective Order stopping Dr. Shukh's expert discovery.

On January 10, 2013, three weeks after the IBM and Intematix subpoenas, and five weeks after Seagate's first incomplete disclosures, Seagate moved to stop Dr. Shukh's expert discovery. (A6335.)

On January 18, 2013, the Magistrate Judge ordered Dr. Shukh to withdraw his subpoenas, even those issued to third parties in other districts, and quashed his requests to Seagate. He ruled that the discovery was overbroad and that expert discovery was limited to "the events giving rise to the litigation at hand and the opinions to be received in evidence during that litigation."  (A139.)

Dr. Shukh deposed Bajorek a few days later without any of the materials he sought. Expert discovery closed February 1. (A7425-47.)

38

On February 1, 2013, Dr. Shukh took a timely appeal to the District Judge from that Protective Order (A7378), and simultaneously moved to bar Bajorek's expert testimony because of the disclosure violations. (A7396.)

Eight months later, the District Judge affirmed the Protective Order for essentially the reasons stated by the Magistrate Judge, and denied the Motion to Bar Bajorek on the grounds that the disclosure violation was harmless. (A191.)

## XII.    Conclusion.

The final order in the case, on the retaliation Claim, was entered on March 31, 2014; the Judgment the next day. (A215, A1.)

This appeal followed.

## SUMMARY OF ARGUMENT

*FilmTec*–Dismissal of Dr. Shukh's Inventorship Correction Claim should be reversed. The "automatic assignment" rule of *FilmTec* should be overruled as contrary to the Constitution's Patent Clause and to principles of Equity and Law, and as ill-considered policy.

Dr. Shukh adduced sufficient evidence of reputational injury giving him standing even if *FilmTec* is not overruled.

*Privilege*–The denial of Dr. Shukh's access to his own invention records and communications contravenes the Patent Clause. His access to those materials also stems from his common interest in patenting his inventions. Anyway, Seagate's delayed privilege claims waived the privilege. The privilege is also void because Seagate's General Counsel was practicing law illegally in California. The ruling that Seagate waived the privilege was too narrow because waiver of some privileged communications waives the privilege for the subject matter.

*Contract and Tort Claims*–Seagate's omission of Dr. Shukh from patent applications and failure to notify the PTO of his inventorship claims was inequitable conduct and violated its fiduciary duty to protect Dr. Shukh's inventorship rights. Thus, Seagate had unclean hands, and his state law claims were sufficient. Contract provisions requiring Dr. Shukh to return his documents were unenforceable.

*Fraud*–Because of Seagate's inequitable conduct, Dr. Shukh, not Seagate, was entitled to summary judgment on his Fraud Claim. He justifiably relied on Seagate's false statements and was damaged.

The failure to consider important admissions of wrongdoing by Seagate's General Counsel timely obtained during discovery was error.

*National Origin Retaliation*–The District Judge ignored the retaliation law and important evidence that proved that Seagate's articulated reasons for retaliation were false.

*Expert Discovery*–Dr. Shukh's expert discovery was explicitly proper under Rule 26. The lower court had no jurisdiction to quash subpoenas issued in other Districts. Seagate had no standing to so move and waited too long to do so.

One of Seagate's experts should have been barred because of the tardy disclosure of his prior expert testimonial cases which was not harmless.

*Title VII Punitive Damages*–The premature dismissal of the punitive damage claim was unfair and based on an error of law.

## ARGUMENT

### I.   DR. SHUKH'S INVENTORSHIP RIGHTS ARE CONSTITUTIONALLY PROTECTED.

The Constitution's Article I, Section 8 empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to    Inventors the exclusive Right to their respective… Discoveries…."

The patent laws must be construed in that spirit and are not meant to promote the progress of science and useful arts not create

41

private fortunes for patent owners. *Bilski v. Kappos*, 130 S.Ct. 3218, 3252 (2010). The key purpose of patent law is to reward invention. *University of Colo. Found. v. American Cyanamid*, 196 F.3d 1366, 1372 (Fed. Cir. 1999).

Only the true and original inventor may obtain a patent. 35 U.S.C. §§102(f), 111, 115, 116 & 256.

Thus, **inventors** have the constitutionally exclusive right to patent discoveries in their name.

## II. *FILMTEC* SHOULD BE OVERRULED.

Under *FilmTec*, Dr. Shukh was denied standing to correct inventorship for lack of an ownership or pecuniary injury. (A10-14.)

For the reasons in the Dissent and Concurrence in *Stanford,* 131 S.Ct. at 2199 & 2203, *FilmTec* should be overruled.

Standing is reviewed *de novo*. *Rack Room Shoes v. U.S.*, 718 F.3d 1370, 1374 (Fed. Cir. 2013); *Dunbar v. Wells Fargo Bank, N.A.*, 709 F.3d 1254, 1256 (8th Cir. 2013).

### A. Dr. Shukh Has Standing Regardless of Any Economic Injury.

35 U.S.C. §256 grants inventors a private right of action to correct inventorship, regardless of any economic injury. *Warth v. Seldin*, 422

42

U.S. 490, 500 (1975); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373-74 (1982).

Therefore, for inventors who sign "hereby assign" assignments, *FilmTec* repeals the Constitution's Patent Clause Section 256.

This is the essence of the holding of *Krauser v. Evollution IP Holdings*, 975 F.Supp.2d 1247, 1261 (S.D. Fla. 2013), that to deny standing "would mean that the true inventor of a product who lacked any economic or ownership interest in his product would have no means of redress," an untenable proposition.

## B.   *FilmTec* Is Contrary to Equity and Law.

*FilmTec*'s unexplained "automatic assignment" holding contravenes common sense, plain English, and rules of Equity and contract law.

It exaggerates trivial differences in language–"I hereby assign" vs. "I will assign"–that mean the same thing.  *See Arachnid, Inc. v. Merit Indus.*, 939 F.2d 1574, 1581 (Fed. Cir. 1991).

Because an invention does not exist at the time that language is agreed to, both must merely state an *intention* to assign in the future.

This is an ancient Rule of Equity and Law.

Before *FilmTec*, a present assignment of future inventions conveyed merely equitable rights, not legal title. *Stanford*, 131 S.Ct. at 2203 (Breyer, J., dissenting) (citing G. Curtis, A Treatise on the Law of Patents for Useful Inventions §170, p. 155 (3d ed. 1867)).

Early patent decisions regarding the transfer of future rights to patents were necessarily based on the assumption that the invention was in existence at the time of the transfer. *Gayler v. Wilder*, 51 U.S. (17 Wall.) 477, 493 (1850) (interpreting assignment language of Section 11 of the Patent Act of 1836, ch. 357, §11, 5 Stat. 121). *See also Railroad Co. v. Trimble*, 77 U.S. (10 Wall.) 367 (1870) (assignment of patent extension); *Nicolson Pavement Co. v. Jenkins*, 81 U.S. (14 Wall.) 452 (1872) (assignment of reissued patent).

Commentators on Equity Jurisprudence deemed it "elementary" that a contract for the sale of a chattel that a seller did not own did not pass legal title to the buyer without some new act by the seller after the property was acquired. 3 *Pomeroy on Equity Jurisprudence* §1287, at 3094 & §1288, at 3098-99 (4th ed. 1918). The assignment of personal property to be acquired at a future time operated only to vest equitable ownership in the purchaser when the property was acquired by the vendor. *Id.*, pp. 3103-04.

Justice Story announced the same rule. 2 Joseph Story*, Equity Jurisprudence*, §1040, p. 407 (6th ed. 1853). Until property comes into existence, the assignee "has nothing but the contingency, which is a very different thing from the right immediately to recover and enjoy the property." *Id.,* §1040*b*, p. 411. "It is not an interest in property; but a mere right under the contract…it amounts, not to an assignment of a present interest, but only to a contract to assign when the interest becomes vested." *Id.*

Justice Story so ruled in an early patent case. *Mitchell v. Winslow*, 17 F.Cas. 527 (Story, J., C.C.D. Me. 1843), cited by *FilmTec. See Aspinwall v. Gill*, 2 F. 697 (Bradley, J., C.C.D. N.J. 1887) & 1 Robinson, W.G., *Law on Patents for Useful Inventions*, §411 (1890).

Under law and personal property law, to effect a transfer the property must have an actual or potential existence at the time of transfer, and an affirmative transfer action is required. *Stathos v. Murphy*, 276 N.Y.S.2d 727, 730 (App. 1966), *aff'd,* 19 N.Y.2d 883 (1967). *See also Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 886 (1988).

Contract law is the same: "Courts recognize assignments of interests that do not exist [that are but] mere expectancies and therefore take effect as 'equitable assignments' when the right assigned

comes into existence." 9 Murray, *Corbin on Contracts* §50.2, at 229 (2007).

Section 2-105(2) of Minnesota's UCC states that a "purported present sale of future goods or of any interest therein operates as a contract to sell." Minn. U. Comm. Code §336.2-105(2).

Citing that section, *Williston* teaches that "a present assignment in gross of a patent and all future patents on improvements on the device operates as a contract to assign such future patents." 6 Lord, *Williston on Contracts* §13:17, at 755 (4th ed. 2006).

Because patents and all interests have the attributes of personal property under 35 U.S.C. §261, those rules should control.

Indeed, *U.S. Test v. NDE Envtl*, 196 F.3d 1376 (Fed. Cir. 1999), demonstrates the doctrinal confusion of *FilmTec. FilmTec* holds that "patents today have the attributes of personal property," 939 F.2d at 1952, whereas *U.S. Test* holds that a patent is not a "good" but only a "general intangible." 196 F.3d at 1382-83. These characterizations cannot be reconciled.

### C.    The Supreme Court Disapproves of Patent Variances from Established Rules of Law.

Recent Supreme Court decisions reject patent law variances from recognized rules of law. *Medtronic, Inc. v. Mirowski Family Vent.*, 134 S.Ct. 843, 849 (2014) was a declaratory judgment action by an accused infringer involving whether the plaintiff accused or the defendant patentee bore the burden of proof on infringement. Writing for a unanimous Court, Justice Breyer cited authorities from the 1800s and observed "[s]imple legal logic, resting upon settled case law, strongly supports our conclusion."

This same aversion appears starkly in other of the recent decisions of the High Court. *Octane Fitness v. ICON Health & Fitness*, 134 S.Ct. 1749, 1758 (2014) (construing §285's exceptional case standard like comparable fee-shifting statutes); *Highmark, Inc. v. Allcare Health Mgmt. Sys.*, 134 S. Ct. 1744, 1748 (2014) (same); *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014) (definitiveness standard of §112(2) construed in harmony with non-patent authorities); *Limelight Networks v. Akamai Techs., Inc.*, 134 S. Ct. 2111, 2117 (2014) (induced infringement under §271(b) construed under general statutory interpretive principles).

47

*FilmTec*'s variance from established principles is also ill-advised.

### D.    *FilmTec* Reflects Unwise Policy.

*FilmTec* announces an anti-inventor rule destructive of the Patent Clause and Patent Act.

Professor Chisum criticizes this Court's "excessively technical application of the standing requirement," and notes that "[t]here is little justification…to upset ownership interests traditionally and appropriately grounded in general legal principles of contract, property and employment law." 8-22 Chisum on Patents §22.03[1][k][v], p. 22-89 (2012).

The correct rule should be that an assignment of future inventions conveys only equitable rights. To convey legal title, an additional act is required once the invention exists.

Requiring such affirmative steps will not interfere with employers' rights to employees' inventions. They merely need obtain a formal assignment from the employee.

This is nothing new. Rule 3.73(b)(1)(i) of the PTO's MPEP, 37 C.F.R. §3.73(b)(1)(i), requires patent applicants to establish the right to prosecute a patent application by proving ownership by "[d]ocumentary

evidence of a chain of title from the original owner to the assignee (*e.g.*, copy of an executed assignment)." [2]

*FilmTec*'s failure to insist on formal assignments makes title records of the PTO worthless because no one can rely on them as proof of ownership. *See* MPEP, 37 C.F.R. §§301-24, entitled "Ownership and Assignment."

This "uncertainty endangers the reliance interests of patent owners." 8-22 Chisum, *supra*, §22.03[1][k][v] at p. 22-89. It also threatens other stake-holders' interests: *e.g.*, licensees and lenders *See* Tressemer, P., *Best Practices for Drafting University Technology Assignment Agreements after Filmtec, Stanford v. Roche, and Patent Reform,* 2012 U.Ill.J.L.Tech.&Pol'y 347 (2012).

*FilmTec* makes no sense.

---

[2] The Leahy-Smith America Invents Act slightly amended Section 118 by eliminating an inventor's refusal or absence as preconditions for an assignee to prosecute a patent application.  Pub. L. No. 112-29, 125 Stat. 284 §4(a)(1) (2011). Of course, new Section 118 does not permit an assignee to falsely omit the true inventor from the applications.

### E.     The Equities Favor Dr. Shukh's Ownership.

Inexcusably, and without any explanation, Seagate did not include Dr. Shukh on applications for his inventions and concealed his inventorship claims from him and the PTO.

Seagate should not be permitted to profit from such wrongdoing. *Knox v. Knox*, 25 N.W.2d 225, 228 (Minn. 1946) (constructive trust); *Thompson v. Nesheim*, 280 Minn. 407, 159 N.W.2d 910, 917 (Minn. 1968) (same).

*FilmTec* should be overruled.

### F.     Dr. Shukh's Reputational Injury Created a Triable Issue of Fact for the Jury.

Standing and summary judgment are reviewed *de novo. See* Argument, p. 42. *Johnson v. Blaukat*, 453 F.3d 1108, 1112 (8th Cir. 2006).

The summary judgment ruling on reputational standing was wrong because the Judge drew all factual inferences against Dr. Shukh.

A trier of fact could easily conclude that Dr. Shukh's reputation was damaged from the lost recognition of being an inventor of important patents in his area of expertise.

The Judge focused on Dr. Shukh's testimony that certain "personal traits" were not damaged. But those traits do not relate to a

reputation as a patented inventor. People have different reputations. More patents are relevant to an inventor's reputation. An Olympic caliber swimmer may have a reputation for hard training and healthy habits but also for losing the big races. More patents do enhance inventorship reputation, just as more Gold Medals for Michael Phelps would enhance his reputation as history's greatest swimmer.

The Judge wrongly resolved issues of material fact. *Johnson*, 453 F.3d at 1112; *Checkpoint Sys. v. All-Tag Sec. S.A.*, 412 F.3d 1331, 1339 (Fed. Cir. 2005).

Moreover, as held in *Krauser v. Evollution IP Holdings*, 975 F.Supp.2d at 1261, mere omission from a patent confers sufficient repurational standing.

Summary judgment (A185) against reputational standing should be reversed.

## III.    DR. SHUKH WAS WRONGLY DENIED ACCESS TO COMMUNICATIONS ABOUT HIS OWN INVENTIONS.

The rulings doing so were wrong. (A59, A74.)

Federal Circuit privilege law applies. *In re Spalding Sports*, 203 F.3d 800, 807 (Fed. Cir. 2000).

Review is *de novo*. *Yancheng Baolong Biochemical Prods. v. U.S.*, 406 F.3d 1377, 1380 (Fed. Cir. 2005).

Federal Rule of Evidence 501(a) governs . *In re Seagate Tech.*, 497 F.3d 1360, 1375 (Fed. Cir. 2007).

FRE 501(a) explicitly makes the Constitution and Patent Act superior to any common law privilege.

Rule 501 must be construed harmoniously with Patent Clause and Patent Act. Cf. *Graham v. John Deere Co.*, 383 U.S. 1, 6 (1966).

It was error to elevate Seagate's attorney-client privilege assertions over Dr. Shukh's constitutional and statutory inventorship rights to communications about his own inventions.

These constitutional problems should have been avoided. *SKF USA Inc. v. U.S. Customs & Border Prot.*, 556 F.3d 1337, 1349 (Fed. Cir. 2009).

## A.    Dr. Shukh Shared a Common Interest With Seagate.

*In re Regents,* 101 F.3d 1386, 1389 (Fed. Cir. 1996), held that "[a] community of legal interests may arise between parties jointly developing patents; they have a common legal interest in developing the patents to obtain greatest protection and in exploiting the patents."

Therefore, they share in the privilege that might apply to any related communications.

That rule has been applied in closely analogous cases. *Flo Pac v. NuTech,* 2010 U.S.Dist.LEXIS 131120, *34-35 (D. Md. 2010) (inventors/assignors and assignee); *Merck Eprova v. ProThera*, 670 F.Supp.2d 201, 211 (S.D.N.Y. 2009) (joint patent prosecutors); *Beasley v. Avery Dennison Corp.*, 2006 U.S.Dist.LEXIS 74033 (W.D. Tex. 2006) (same); *Mass. Eye and Ear v. QLT*, 167 F.Supp.2d 108, 124 (inventors/assignees), *accepted*, 167 F.Supp.2d 108 (D. Mass. 2001), *rev'd in part on other grounds*, 412 F.3d 215 (1st Cir. 2005); *Newman Grill Sys. v. Ducane Gas Grills*, 320 B.R. 312, 323 (Bankr. D.S.C. 2004) (inventors/assignors); *Hillerich & Bradsby v. MacKay*, 26 F.Supp.2d 124, 126-27 (D.D.C. 1998) (co-inventors); *Spray Products v. Strouse, Inc.*, 31 F.R.D. 244, 247 (E.D. Pa. 1962).

The Eighth Circuit recognizes this doctrine. *DeBold v. Case*, 329 B.R. 252, 268-69 (B.A.P. 8th Cir. 2005), *aff'd*, 452 F.3d 756 (8th Cir. 2006).

So do other Circuits. *FDIC v. Ogden Corp.,* 202 F.3d 454, 461 (1st Cir. 2000); *U.S. v. Schwimmer*, 892 F.2d 237, 243-44 (2d Cir. 1989); *Wachtel v. Health Net*, 482 F.3d 225, 231 (3d Cir. 2007); *Hanson v.*

*USAID*, 372 F.3d 286, 292 (4th Cir. 2004); *Brennan's v. Brennan's Restaurants*, 590 F.2d 168, 171 (5th Cir. 1979); *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103 (5th Cir. 1970); *Grand Trunk Western Ry. v. H.W. Nelson Co.*, 116 F.2d 823, 835 (6th Cir. 1941); *Simpson v. Motorists Mut.*, 494 F.2d 850, 855 (7th Cir. 1974); *Eureka Inv. v. Chicago Title*, 743 F.2d 932, 936-38 (D.C. Cir. 1984).

As do Minnesota and other states. *Knox v. Knox*, 25 N.W.2d 225, 230 (1946); *Squire Sanders v. Givaudan Flavors*, 937 N.E.2d 533, 540 (Ohio 2010); *Ashcraft & Gerel v. Shaw*, 728 A.2d 798, 811 (Md. App. 1999); *Griva v. Davison*, 637 A.2d 830 (D.C. 1994); *Waste Management v. Int'l Surplus Lines*, 579 N.E.2d 322, 328 (Ill. 1991).

Leading scholarly formulations are the same. 8 *Wigmore on Evidence* §2312 at 603-09 (McNaughton rev. 1961); *McCormick on Evidence* §91, 335-36 (4th ed. 1992) (quoted in *FDIC v. Ogden Corp.*, 202 F.3d 454, 461 (1st Cir. 2000); *Debold*, 329 B.R. at 268-69; *In re Vargas*, 2009 Bankr. LEXIS 512, *3-5 (Bankr. D.R.I. 2009).

The District Court's conclusions that there was no common interest is puzzling because the Magistrate Judge ruled "[b]oth Seagate's and Dr. Shukh's interests were aligned in that they both wanted to get the inventorship of the patents right." (A72.)

Indeed, in a decision precisely on that point, the Minnesota Supreme Court has explicitly ruled that in an employee/employer dispute related to patent ownership, the employee's consultations about patenting created an attorney-client relationship between him and the employers' patent attorneys, therefore entitling him to discovery from them as to those communications. *National Texture Corp. v. Hymes*, 282 N.W.2d 890, 896 (Minn. 1979). Therefore, even under the District Judge's incorrect analysis, Dr. Shukh is entitled to discover these communications.

Moreover, the ruling that Dr. Shukh has no ownership interest was irrelevant. (A81, n.4, A15, n.9.) "[I]nventorship and ownership are separate issues." *Beech Aircraft Corp. v. Edo Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993).

The attorney-client privilege is meant to encourage full and frank communication with lawyers. *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981). But, it is a narrow exception to the usual rules requiring full disclosure of relevant information. *See* 8 J. Wigmore, *Evidence* §2192, p. 64 (3d ed. 1940); *Fisher v. U.S.*, 425 U.S. 391, 403 (1976). It applies "only where necessary to achieve its purpose," *ibid.* "Where this purpose

ends, so too does the protection of the privilege," *Wachtel v. Health Net, Inc.*, 482 F.3d 225, 231 (3d Cir. 2007).

The denial of an inventor's access to his or her own invention records and communications with company counsel encourages inventors ***not*** to share information with those lawyers. The District Court's conclusion is thus doubly unwise.

Moreover, the ruling contradicts the Magistrate Judge's earlier ruling that Dr. Shukh could disclose communications to his lawyer to enable him to "fulfill his or her professional duty to make sure that there is a proper basis for a suit." (A1920-21.)

Once disclosed, any supposed privilege is permanently pierced. *PaineWebber Group, Inc. v. Zinsmeyer Trusts Pshp.*, 187 F.3d 988, 992 (8th Cir. 1999). It is irrational to rule that counsel can review documents to see if the client has a case, but then cannot use those documents in the case, must return them, and can never even refer to or discuss them in the course of that case.

## B.    Seagate Delayed Too Long Before Claiming Privilege.

Seagate has the burden to properly invoke privilege and show it has not been waived. *Hollins v. Powell*, 773 F.2d 191, 196 (8th Cir. 1985); *Diversified Indus. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1977).

It gets "no greater protection...than [its] own precautions warrant." *In re Sealed Case*, 877 F.2d 976, 980 (D.C. Cir. 1989).

On Dr. Shukh's last day, Seagate "had [the] clear obligation to 'move expeditiously for relief' by taking 'legal measures' to preserve the privilege.'" *Bowles v. NAHB*, 224 F.R.D. 246, 255 (D.D.C. 2004). The failure "to take any legal action to assert its privilege or otherwise to recover the documents for more than a year" did not constitute "reasonable steps" to protect its privilege. *Id.* at 253. *IMC Chemicals, Inc. v. Niro, Inc.*, 2000 U.S.Dist.LEXIS 22850, *82-83 (D. Kan. 2000); *Apex Municipal Fund v. N-Group Securities*, 841 F.Supp. 1423, 1433 (S.D. Tex. 1993); *O'Leary v. Purcell Co.*, 108 F.R.D. 641, 645 (M.D.N.C. 1985); *In re Grand Jury*, 138 F.3d 978, 982 (3d Cir. 1998); *U.S. v. De la Jara*, 973 F.2d 746, 750 (9th Cir. 1992); and *Navajo Nation v. Peabody Holding Co.*, 255 F.R.D. 37, 45 (D.D.C. 2008).

### C.    Massaroni's Unauthorized Practice of Law Vitiates Any Privilege.

California and Minnesota require that attorneys licensed elsewhere cannot practice as in-house counsel without registering with their State Bars. In-house lawyers also cannot represent anyone other than their employers. Cal. Rule of Court 9.46; Cal. Bar Rule 3.370, *et*

*seq.*; Minn. R. Admission 9.D, 9.J,  10.C & 10.H. Cal. Rule 9.46(b)(1), (c)(6) & (c)(8). Failure to register in California constitutes the unauthorized practice of law, a misdemeanor. Cal. Bus. Code §6126.

Seagate admits Massaroni violated those requirements. Seagate also does not dispute that Massaroni's Patent Bar membership does not insulate him from compliance with those state prohibitions. *Sperry v. Florida*, 373 U.S. 379 (1963); *Kroll v. Finnerty*, 242 F.3d 1359, 1365 (Fed. Cir. 2001); *In re Davis*, 264 N.W.2d 371 (Minn. 1978); 37 C.F.R. §10.

Communications with a lawyer who is not an active member of the Bar are not privileged. *Financial Technologies Int'l v. Smith*, 2000 U.S.Dist.LEXIS 18220 (S.D.N.Y. 2000). Thus, Massaroni's failure to comply with the requirements for in-house counsel makes his communications non-privileged.

Although Massaroni belonged to other bars, the privilege is not protected because it does not apply to communications with in-house patent counsel who were not admitted to the Bar of the state where they worked. *U.S. v. United Shoe Mach. Corp.,* 89 F.Supp. 357, 360 (D. Mass. 1950). That rule should apply here. Compare *Malco Mfg. v. Elco Corp.,* 45 F.R.D. 24, 26 (D. Minn. 1968).

Some authority holds that inventor communications with in-house Patent Bar attorneys are privileged even if those lawyers are not Bar members in the states where they are giving the advice. But, as noted in one of those cases, *Zenith Radio v. RCA,* 121 F.Supp. 792, 794 (D. Del. 1954), the situation is different where a State insists that an in-house counsel obtain admission to its Bar.

California and Minnesota insist that in-house counsel be registered and practice only for his employer. Massaroni violated both requirements.[3]

His unauthorized practice eliminates any privilege.

## D.    The Subject Matter Waiver Ruling Was Too Narrow.

The ruling on the scope of waiver was too narrow. (A61-66.)

The standard for scope of an attorney-client privilege waiver is that it applies to *all* communications relating to the same subject matter. *Fort James v. Solo Cup*, 412 F.3d 1340, 1349 (Fed. Cir. 2005).

This broad scope reflects principles of fairness and prevents a party from using the privilege as both a sword and a shield; that is, it

---

[3] *Gucci Am. v. Guess?*, 2011 U.S.Dist.LEXIS 15 (S.D.N.Y. 2011), *vacating* 2010 U.S.Dist.LEXIS 65871 (S.D.N.Y. 2010), is inapposite (footnote continued . . .)

59

prevents the inequitable result of a party disclosing favorable communications while asserting the privilege as to less favorable ones. *In re Seagate*, 497 F.3d at 1372.

This case is about inventorship. The waiver should include all communications about inventorship. *Winbond Elecs. v. ITC*, 2001 U.S. App. LEXIS 25113 (Fed. Cir. 2001); *Schering Corp. v. Mylan Pharms.* 2011 U.S.Dist.LEXIS 92362 (D.N.J. 2011); *Pei-Hreng v. Chu*, 2010 U.S.Dist.LEXIS 112777 (S.D. Tex. 2010); *Dey L.P. v. Ivax Pharms.*, 233 F.R.D. 567, 572 (C.D. Cal. 2005).

### E.    Conclusion.

These errors require a complete reversal of the entire case and a remand for production of the all the logged documents. *Metro. Life Ins. Co. v. Bancorp Servs., L.L.C.*, 527 F.3d 1330 (Fed. Cir. 2008); *Baron Servs., Inc. v. Media Weather Innovations LLC*, 717 F.3d 907, 912-13 (Fed. Cir. 2013); *Carman v. McDonnell Douglas Corp.*, 114 F.3d 790 (8th Cir. 1997).

---

(. . . footnote continued)
because it involved an in-house counsel who was an inactive member of the California Bar, but was solely practicing for his corporate client.

**IV.    THE RULINGS AGAINST DR. SHUKH'S CONTRACT AND TORT CLAIMS AND ENFORCING THE DOCUMENT RETURN PROVISIONS AGAINST HIM WRONGLY REWARDED SEAGATE'S FRAUDULENT CONDUCT.**

**A.    Because of Seagate's admitted wrongdoing, the Dismissal of Dr. Shukh's Contract, and Tort Claims was error.**

Based on the common ground of Seagate's inequitable conduct, Dr. Shukh appeals the March 30, 2010 Order dismissing Claims. (A2.)

The standard of review is *de novo. Rack Room Shoes v. U.S.*, 718 F.3d 1370, 1374 (Fed. Cir. 2013).

### *1.    Seagate Commited Serious Violations of the Patent Act.*

The District Judge's error was almost entirely based on his conclusion that

> Seagate does not have any obligation to protect [Dr. Shukh's] inventorship rights, nor is it clear that he has inventorship rights once his work has been assigned to Seagate. (A22.)

In fact, the omission of the true inventor from a patent application constitutes the most serious kind of inequitable conduct. *Advanced Magnetic Closures, Inc. v. Rome Fastener,* 607 F.3d 817, 828 (Fed. Cir. 2010); *Frank's Casing Crew & Rental Tools, Inc. v. PMR Techs., Inc.*, 292 F.3d 1363 (Fed. Cir. 2002).

Based on that wrongdoing, Dr. Shukh's state law claims should have survived and Seagate should not have been allowed to enforce the document return provisions.

## 2.    *Breach of Contract & Rescission.*

Paragraph 53 of the Amended Complaint alleged Seagate's omission of Dr. Shukh's omission from the applications violated the covenant of good faith and fair dealing implied by Minnesota law. (A542, ¶53.)

As in *Chou v. Univ. of Chicago*, 254 F.3d 1347 (Fed. Cir. 2001), Dr. Shukh therefore stated a claim for breach of contract by alleging that his omission as a co-inventor denied him certain benefits to which he was entitled–that is, inventorship.

Although the Minnesota Courts do not read the implied covenant into employment agreements in general, *Hunt v. IBM Mid America Employees Federal Credit Union*, 384 N.W.2d 853, 858 (Minn. 1986), that covenant is implied regarding actions an employer takes against an employee for the illegitimate purpose of depriving an employee of expected economic benefits. *Daum v. Planit Solutions, Inc.,* 619 F.Supp.2d 652, 659 (D. Minn. 2009) (citing *Buysse v. Paine, Webber, Jackson & Curtis, Inc.*, 623 F.2d 1244, 1249 (8th Cir. 1980). This duty

requires a party to not interfere with another party's rights under the contract. *Precision Pine & Timber, Inc. v. U.S.*, 596 F.3d 817, 828 (Fed. Cir. 2010). Restatement (Second) of Contracts §205 & cmt.d.

Seagate's fraudulent interference with Dr. Shukh's inventorship rights breached of the implied covenant of good faith and fair dealing and also entitles Dr. Shukh to rescission.

### 3.    *Seagate Breached its Fiduciary Duty.*

In Minnesota, breach of fiduciary duty includes: (1) the existence of a duty; (2) breach of that duty; (3) causation; and (4) damages. *Nat'l Minority Supplier Dev. Council Bus. Consortium Fund, Inc. v. Hessian & McKasy*, 2005 U.S.Dist.LEXIS 39986 (D. Minn. 2005).

"A fiduciary relation exists when confidence is reposed on one side and there is resulting superiority and influence on the other." *Kennedy v. Flo-Tronics, Inc.*, 143 N.W.2d 827, 830 (Minn. 1966). *See also Vacinek v. First Nat'l Bank of Pine City*, 416 N.W.2d 795, 799 (Minn. App. 1987); *Klein v. First Edina Nat'l Bank*, 196 N.W.2d 619, 623 (Minn. 1972). The existence of a fiduciary relationship is generally a question of fact. *Minnesota Timber Producers v. Am. Mut. Ins. Co. of Boston*, 766 F.2d 1261, 1268 (8th Cir. 1985).

As recognized by this Court in *Chou*, 254 F.3d at 1360-62, Dr. Shukh's detailed allegations of "Seagate's Legal and Fiduciary Duties to Dr. Shukh" (A549-56, ¶¶90-121), stated a claim for breach of fiduciary duty.

### 4.   Seagate's   Misconduct   Constituted   Unjust Enrichment.

In Minnesota, unjust enrichment is an implied quasi-contractual agreement. *Zirinsky v. Sheehan*, 413 F.2d 481, 488 (8th Cir. 1969); *Hollywood Dairy v. Timmer*, 411 N.W.2d 258, 259-260 (Minn. App. 1987). The elements are: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant knowingly accepted and appreciated the benefit; and (3) the circumstances render it inequitable for the defendant to retain the benefit without paying for it. *Day Distrib. Co. v. Nantucket Allserve, Inc.*, 2008 U.S.Dist.LEXIS 57334 *23-24 (D. Minn. 2008). A claim for unjust enrichment does not lie simply because one party benefits from the efforts or obligations of others, but instead it must be shown that a party was unjustly enriched in the sense that the term "unjustly" could mean illegally or unlawfully. *Id*.

Even though there is a contract in force between the parties, Dr. Shukh can frame a quasi-contractual theory of unjust enrichment

because "there has been such a breach of a contract by one party that the other may choose to rescind and recover in quasi-contract." *Roberge v. Cambridge Coop. Creamery*, 79 N.W.2d 142, 150 (Minn. 1956); *Stark v. Magnuson*, 2 N.W.2d 814 (Minn. 1942); *accord TCS Holdings, Inc. v. Onvoy Inc.*, 2008 U.S.Dist.LEXIS 88035, *20-21 (D. Minn. 2008).

That is this case. Dr. Shukh seeks rescission of the Agreement and once it is rescinded he will therefore be entitled to assert his claim for unjust enrichment. *See* Fed. R. Civ. P. 8(d)(3) (inconsistent claims permitted).

## B. The Confidentiality and Document Return Provisions of the Employment/Assignment Agreement Are Unenforceable Due to Seagate's Misconduct.

The District Judge's March 30, 2011 Order wrongly dismissed Dr. Shukh's Declaratory Judgment Claim that sought to invalidate the confidentiality and document return provisions. (A30-32.) Six months later, on November 30, 2011, the Judge enforced the document return provision against Dr. Shukh. Both orders were wrong. (A36; 2011 U.S.Dist.LEXIS 137402.)

The grounds are simple: Seagate's inequitable conduct justified the non-enforcement of the Agreement's confidentiality and document return provisions.

The standard of review of dismissal and summary judgment is *de novo. See* pp. 50 & 61.

### 1.    *Seagate Has Unclean Hands.*

Seagate's misconduct gave it unclean hands that should have prevented the enforcement of any provision of the Agreement. *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933); *Consol. Aluminum Corp. v. Foseco Int'l, Ltd.,* 910 F.2d 804, 810 (Fed. Cir. 1990) (quoting *Keystone*). *See also Metro Motors v. Nissan Motor Corp.,* 339 F.3d 746, 750 (8th Cir. 2003).

### 2.    *The Confidentiality and Document Return Clause is Unconscionable.*

Unconscionability is a question of law. *Zutz v. Case Corp.*, 2006 U.S.Dist.LEXIS 10207  *16 (D. Minn. 2006).

A contract is unconscionable if it is "such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other." *Estate of Hoffbeck*, 415 N.W.2d 447, 449 (Minn. App. 1987) (quoting *Hume v. U.S.*, 132 U.S. 406, 415 (1889)).

Minn. Stat. §336.2-302 empowers a court to refuse to enforce any contractual provisions it finds to be unconscionable.

To establish unconscionability, a party must demonstrate that it had no meaningful choice but to deal with the other party and to "accept the contract as offered." *Sports & Travel Marketing, Inc. v. Chicago Cutlery Co.*, 811 F.Supp. 1372, 1380 (D. Minn. 1993); *RJM Sales v. Prods.*, 546 F.Supp. 1368, 1374-75 (D. Minn. 1982), *disapproved on other grounds*, *LeNeave v. N. Am. Life Assurance Co.*, 854 F.2d 317, 320 (8th Cir. 1988).

Such is the case here: no clear thinking person would accept such a clause and allow Seagate to strip away his or her inventorship proof. This is because of the extremely high standard of proof imposed on someone claiming co-inventorship–clear and convincing evidence. *Hess v. Adv. Cardiovascular Sys., Inc.*, 106 F.3d 976, 980 (Fed. Cir. 1997). A co-inventor's own statements are inadequate to prove inventorship which thus must be corroborated by independent evidence. *Tavory v. NTP, Inc.*, 297 Fed. Appx. 976, 979 (Fed. Cir. 2008). And "[r]eliable corroboration preferably comes in the form of records made contemporaneously with the inventive process." *Gemstar-TV Guide Int'l, Inc. v. ITC*, 383 F.3d 1352, 1382 (Fed. Cir. 2004)

Dr. Shukh's desperate acceptance of Seagate's contract demonstrates the second element of unconscionability. Fleeing Belarus

with his family, he had no meaningful choice but to "accept the contract as offered." (A536-46, ¶¶33-75.)

### 3. Forcing Dr. Shukh to Surrender his Invention Documents Violates the Patent Clause of the Constitution.

The enforcement of any contract provision that degrades or interferes with the protection of inventorship rights of the Patent Clause of the Constitution, Art. I, Sec. 8, is unconstitutional.

Dr. Shukh incorporates by reference his Constitutional arguments above. *See* Section I above, p. 41.

## V. SEAGATE'S FRAUDULENT CONDUCT ENTITLED DR. SHUKH, NOT SEAGATE, TO SUMMARY JUDGMENT ON HIS FRAUD CLAIM.

The District Judge's March 25, 2013 summary judgment against Dr. Shukh on his Fraud Claim should be reversed. (A148.)

So too should the July 3, 2013 Order (A186) that denied as moot Dr. Shukh's timely-filed Summary Judgment Motion. This Court should enter summary judgment for Dr. Shukh on that Claim.

The standard of review of summary judgment is *de novo*. *See* Discussion, *supra*, p. 50.

The District Judge was required to accept Dr. Shukh's version of the facts. *Pye v. Nu Aire Inc.*, 641 F.3d 1011, 1022 (8th Cir. 2011).

### A.    The District Judge Should Have Considered the Cross-Motions on the Fraud Claim Together.

The District Judge should have considered the cross-motions together to facilitate this Court's review. *Max Arnold & Sons, LLC v. W.L. Hailey & Co.,* 452 F.3d 494, 505 (6th Cir. 2006), and cases cited therein.

That is the custom and method of fairly resolving cross-motions. *See, e.g., Mid Am. Bldg. Supply v. Schmidt Builders Supply*, 2013 U.S.Dist.LEXIS 45366 (D. Kan. 2013); *Ross Univ. Sch. of Med. v. Brooklyn-Queens Health Care*, 2013 U.S.Dist.LEXIS 45949, *21 (E.D.N.Y. 2013); *Great Am. Fid. Ins. Co. v. JWR Constr. Servs.*, 882 F.Supp.2d 1340, 1342 (S.D. Fla. 2012); *Accurate Controls, Inc. v. Cerro Gordo County Bd. of Supervisors*, 627 F.Supp.2d 976, 985 (N.D. Iowa 2009).

The District Judge's failure to do so was error.

### B.    It Was *Per Se* Reversible Error for the Judge to Refuse To Consider the Massaroni Testimony.

The Judge wrongly refused to consider Massaroni's admissions of wrongdoing that Seagate failed to notify the PTO of his inventorship claims. (A181, n.9.)

The Judge also incorrectly ruled that Dr. Shukh had not previously raised that contention in prior motions but had "manufactured" it late in the case to avoid summary judgment. (A182 n.18.) In fact, Dr. Shukh had raised that precise argument early in the case, also unsuccessfully. (A1069.)

This error was exacerbated by the denial of Dr. Shukh's request for a modest 90-day discovery extension.    (A103, A105; 2013 U.S.Dist.LEXIS 833.)

The Judge's refusal to consider timely-obtained evidence raised in a timely summary judgment motion is inexplicable error.

## C.    Dr. Shukh Adduced Conclusive Evidence of Reliance.

To establish fraudulent or intentional misrepresentation under Minnesota law, Dr. Shukh was required to establish that he acted in justifiable reliance on the misrepresentations or omissions. *Spiess v. Brandt*, 41 N.W.2d 561, 565 (Minn. 1950).

The question is whether the fraudulent misrepresentation or omission was reasonably calculated to deceive, not the average person, but "a person of the capacity and experience of the particular individual" who was deceived. *Id.* at 567; *see Murphy v. Country House, Inc.*, 240 N.W.2d 507, 512 (Minn. 1976).

It is "well-established law that the defrauded party may testify directly as to the effect of the representations on his mind and whether or not he acted in reliance upon them." *Witzig v. Philips*, 144 N.W.2d 266, 270-271 (Minn. 1966).

Moreover, it is a "well-established rule that in a business transaction the recipient of a fraudulent misrepresentation of a material fact is justified in relying upon its truth, although he might have ascertained its falsity had he made an investigation." *Id.* at 566. *Hoyt Props. v. Prod. Res. Group, L.L.C.*, 716 N.W.2d 366, 374-375 (Minn. App. 2006). When "a party to whom a representation has been made has not made an investigation adequate to disclose the falsity of the representation, the party whose misstatements have induced the act cannot escape liability by claiming that the other party ought not to have trusted him." *Davis v. Re-Trac Mfg. Corp.*, 149 N.W.2d 37, 39 (Minn. 1967).

There was extensive testimony and evidence of Dr. Shukh's reasonable reliance, most particularly his own testimony that the Judge simply brushed aside. To understand what Dr. Shukh might have done had he known the truth about Seagate's misconduct, one need only review what he did do when he found out he had been lied to. He

undertook extensive remedial efforts up the chain of command to Massaroni himself, by then Seagate's General Counsel.

Therefore, it was Dr. Shukh, not Seagate, who was entitled to partial summary judgment on reliance.

## D. Dr. Shukh Sustained Damages from Seagate's Fraud and Concealment.

The Judge wrongly ruled that Dr. Shukh suffered no reputational damages, a required element of any fraud claim. (A184-85.) That conclusion by the Judge was based entirely on his ruling on lack of inventorship standing that Shukh suffered no reputational injury. (A165-78.)

As Dr. Shukh has demonstrated above, the Judge's "lack of reputational standing" ruling was wrong. *See* Argument, *supra*, pp. 50-51. Dr. Shukh incorporates that argument herein.

The damage to Dr. Shukh's reputation fulfilled the damage element of his fraud claim.

## E. Dr. Shukh was Entitled to Summary Judgment on Fraud on Account of Seagate's Fraudulent Concealment of His Inventorship Claims from the PTO.

Seagate repeatedly lied to Dr. Shukh about the patenting of his inventions. It failed to include him on applications, and then failed to

notify the PTO of his inventorship claims. The wrongdoing reached to the highest levels of the company to Seagate's General Counsel. Such fraudulent inequitable conduct constitutes *per se* fraud.

An actionable misrepresentation includes concealing or failing to disclose facts that render facts previously disclosed misleading. *M.H. & J. v. Caritas Family Servs.,* 488 N.W.2d 282, 289 (Minn. 1992). Although one party to a transaction has no duty to disclose material facts to the other, *see L&H Airco, Inc. v. Rapistan Corp.*, 446 N.W.2d 372, 380 (Minn. 1989), there are three exceptions: (1) when a confidential or fiduciary relationship exists; (2) when disclosure is necessary to clarify misleading information already disclosed; or (3) when one party has "special knowledge" of material facts to which the other party does not have access. *Am. Computer Trust Leasing v. Boerboom Int'l*, 967 F.2d 1208, 1211-12 (8th Cir. 1992).

A plaintiff need not allege a direct misrepresentation. "The concealment of material and substantial facts . . . amounts to a fraud on the plaintiff." *See Peterson v. Arellono*, 185 N.W.2d 282, 284 (Minn. 1971); *see also Karlstad State Bank v. Fritsche,* 392 N.W.2d 615, 618 (Minn. App. 1986). If a party conceals a fact material to the transaction, and peculiarly within his own knowledge, knowing that the other party

73

acts on the presumption that no such fact exists, it is as much a fraud as if the existence of such fact was expressly denied, or the reverse of it expressly stated. *Richfield Bank v. Sjogren*, 244 N.W.2d 648, 650 (Minn. 1976). That is, possession of "special knowledge of material facts to which the other party does not have access" is, by itself, sufficient to generate a duty to disclose. *Klein v. First Edina Nat. Bank*, 196 N.W.2d 619, 622 (Minn. 1972).

Regulation Section 1.56(a) of the Patent Regulations, 37 C.F.R. §1.56(a), imposes an affirmative duty of disclosure on patent applicants and all individuals involved in the prosecution of the applications. Each person associated with the filing and prosecution of a patent application is held to the highest standards of honesty and candor. *Avid Identification Sys. v. Crystal Imp. Corp.*, 603 F.3d 967, 973 (Fed. Cir. 2010); *Bruno Indep. Living Aids v. Acorn Mobility Servs.*, 394 F.3d 1348, 1350 (Fed. Cir. 2005).

The duty of candor continues until the application is either denied, cancelled, withdrawn, or abandoned. *Evident Corp. v. Church & Dwight*, 399 F.3d 1310, 1316 (Fed. Cir. 2005). As a matter of law, competing claims of inventorship are material and fall within Section

74

1.56 because inventorship is "the most critical information." *Advanced Magnetic*, 607 F.3d at 830.

The individuals subject to this duty of disclosure include "[e]very other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application." 37 C.F.R. §1.56(a). "Substantively involved" means that "the involvement relates to the content of the application or decisions related thereto, and that the involvement is not wholly administrative or secretarial in nature." *Avid*, 603 F.3d at 974. Thus, all the persons in Seagate's IP Department and Massaroni himself were under that duty of disclosure.

Moreover, Seagate concealed the material fact from Dr. Shukh, peculiarly within its knowledge, that it had not notified the PTO of his claims. This is as much a fraud as if the existence of such fact were expressly denied, or the reverse of it expressly stated. *Richfield Bank* 244 N.W.2d at 650. Seagate possessed special knowledge of material facts to which Dr. Shukh did not have access. This, by itself, was sufficient to generate a duty to disclose to Dr. Shukh. *Klein*, 196 N.W.2d at 622.

It made no difference that Massaroni and Seagate might have disputed Dr. Shukh's inventorship claims because under the PTO's Manual of Patenting Examination Procedure ("MPEP") MPEP, §2001.04, p. 2000-3.[4]

This is *per se* fraud by concealment, and Dr. Shukh is entitled to an award by this Court of summary judgment on his Fraud and Concealment Claim.

### F.    Conclusion.

Dr. Shukh respectfully requests this Court to reverse the rulings against him (A149, A187) on his Fifth Claim for Relief for Fraud, enter Summary Judgment in his favor, and remand it for trial on damages.

---

[4] As MPEP Section 2004 states in part: So that "attorneys, agents, and other individuals may ensure compliance with the duty of disclosure, the items listed below are offered as examples of possible procedures which could help avoid problems with the duty of disclosure. . . . Who is the proper inventor? Are there disputes or possible disputes about inventorship? If there are questions, call them to the attention of the U.S. Patent and Trademark Office." (*Id.* at p. 2000-8.)

## VI.    THE DISTRICT JUDGE IGNORED PARTS OF DR. SHUKH'S RETALIATION EVIDENCE AND CONSTRUED THE REST AGAINST HIM.

Dr. Shukh does not appeal the summary judgment on his Discrimination Claims or the conclusion that he did not establish a "direct evidence" retaliation case. (A215.)

He does appeal the summary judgment (A215) on the indirect *McDonnell Douglas* retaliation of his Claims under Title VII and the MHRA.

The standard of review is *de novo*. *See* Discussion, *supra*, p. 50.

The facts must be viewed most favorably to Dr. Shukh and he is entitled to the benefit of all inferences. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The court is required to accept Dr. Shukh's version of the facts. *Pye*, 641 F.3d at 1022.

### A.    Dr. Shukh's *Prima Facie* Case Was Unrebutted Because Seagate Never Explained His Omissions from Patent Applications.

Dr. Shukh showed that his complaints that his omissions from patent applications were retaliation for his complaints of national origin discrimination. (A4293, ¶¶321 & 325.) *See* Facts, *supra*, pp. 10-12.

77

Seagate never explained those omissions.

Thus, Seagate has failed to meet its burden of production -- *i.e.*, "failed to introduce evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993); *Sisk v. Picture People*, 669 F.3d 896, 899-900 (8th Cir. 2012).

Dr. Shukh is entitled either to judgment as a matter of law or a jury trial without any requirement that he prove pretext. *Id.*

## B.     There Were Material Issues of Fact on Intent and Pretext.

"To defeat summary judgment on a retaliation claim, a plaintiff must produce either direct evidence of retaliation, or create an inference of retaliation under the *McDonnell Douglas* burden-shifting framework." *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011). 42 U.S.C. §2000e-3(a); Minn. Stat. §363A.15.

Dr. Shukh's retaliation claims included the indirect burden-shifting of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Harvey v. Anheuser-Busch, Inc.*, 38 F.3d 968, 971 (8th Cir. 1994).

The District Judge wrongly granted Seagate summary judgment on that claim.

He ignored the rule that a retaliatory hostile environment and specific retaliatory acts are shown if they were of the type as might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Id.*; *Littleton v. Pilot Travel Ctrs.*, 568 F.3d 641, 644 (8th Cir. 2009); *Burlington Northern & S.F. Ry. v. White*, 548 U.S. 53, 60, 68 (2006). This is a jury issue. *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 927 (8th Cir. 2004).

He ignored the rule that retaliation may consist of action less severe than outright discharge. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997); *Smith v. St. Louis Univ.*, 109 F.3d 1261, 1267 (8th Cir. 1997); *Turner v. Gonzales*, 421 F.3d 688 (8th Cir. 2005). Merely disadvantaging and interfering with an employee's ability to perform her job is retaliatory adverse action. "[A]s a matter of law," reduction in responsibilities, lower performance evaluations, and papering the personnel file with negative reports, including written reprimands, are "the kind of serious employment consequences that adversely affect[] or undermin[e an employee's] position, even if he [is] not discharged, demoted or suspended." *Kim*, 123 F.3d at 1046; *McClure v. Career Sys. Dev. Corp.*, 447 F.3d 1133, 1137 (8th Cir. 2006); *Phillips v. Collings*, 256 F.3d 843 (8th Cir. 2001).

79

He ignored the rule that, "the significance of any given act of retaliation will often depend upon the particular circumstances. Context matters." *Burlington Northern*, 548 U.S. at 69. Changes that affect an employee's future career prospects are sufficient to establish an adverse action. *MacGregor*, 373 F.3d at 928. " 'The real social impact of workplace behavior often depends on a constellation of surrounding circumstances….' " *Burlington Northern*, 548 U.S. 53 at 69:

> A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination….

Finally, the District Judge ignored the rule that the failure to investigate and remedy complaints of discrimination in and of itself constitutes retaliation. *Walsh v. Nat'l Computer Sys.*, 332 F.3d 1150, 1162 (8th Cir. 2003); *DeGrace v. Rumsfeld*, 614 F.2d 796, 804 (1st Cir. 1980); *see also Kientzy v. McDonnell Douglas Corp.*, 990 F.2d 1051, 1060 (8th Cir. 1993).

Furthermore, the District Judge misconstrued the evidence of the seriousness of the actions against Dr. Shukh, even though he ruled that a reasonable jury could determine that Seagate mistreated Dr. Shukh.

Dr. Shukh adduced evidence that after he complained about discrimination in late 2006, he was removed from his department, reassigned to another supervisor, isolated from his co-workers, subjected to extensive personal and professional criticism, excluded from important meetings, ordered to take remedial training on interpersonal skills, and then terminated in part because of his complaints and efforts to protect his rights and object to what he believed was discriminatory mistreatment. All of these actions fell within the above-stated rules of retaliation law. They were not petty slights.

These facts also establish Dr. Shukh's hostile environment retaliation claim. *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53 (2006); *Clegg v. Ark. Dep't of Corr.*, 496 F.3d 922, 928 (8th Cir. 2007).

Moreover, all this occurred ***after*** Dr. Shukh made his discrimination complaints to Allen and HR's Engelke in late 2006 and early 2007. The District Judge's conclusion that they occurred before was wrong.

## C.    Dr. Shukh Presented Ample Evidence of Pretext.

The District Judge wrongly ruled that Dr. Shukh did not offer sufficient evidence rebutting Seagate's articulated reason for the actions against him, that is, that he did not adduce evidence showing pretext. (A272.) *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011) (burden shifts back to employee to show pretext).

There are at least two ways to demonstrate a material question of fact regarding pretext: by showing that the defendant's explanation is unworthy of credence because it has no basis in fact, or by persuading the court that discriminatory animus more likely than not motivated the adverse employment action. "Either route amounts to showing that a prohibited reason, rather than [the defendant's] stated reason, actually motivated" the discriminatory action. *Torgerson*, 643 F.3d at 1047; *Onyiah v. St. Cloud State Univ.*, 684 F.3d 711, 716 (8th Cir. 2012).

Evidence showing both that an employer's articulated reason was false, and that discrimination is the reason for the adverse employment action is probative of pretext. *Bone v. G4s Youth Servs.*, 686 F.3d 948, 955 (8th Cir. 2012) (citing *St. Mary's*, 509 U.S. at 515-16).

Moreover, a substantial change or discrepancies in an employer's stated nondiscriminatory reason for its action may be probative of pretext. *See EEOC v. TransStates Airlines, Inc.*, 462 F.3d 987, 995 (8th Cir. 2006). Where employers "give two completely different explanations for their decisions to terminate their employees," such a substantial change is established. *Id.* (citing *Briscoe v. Fred's Dollar Store*, 24 F.3d 1026, 1027-28 (8th Cir. 1994) and *EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir. 1994). Although not every change raises an inference of pretext, substantial variations raise suspicion. *Baker v. Silver Oak Senior Living Mgmt. Co.*, 581 F.3d 684, 689 (8th Cir. 2009).

The District Judge partially grappled with these principles in rejecting Dr. Shukh's arguments concerning pretext, especially in the conclusion that Seagate had not changed its explanation for its actions and his termination. The Judge's central point was the conclusion that Dr. Shukh did not disprove that the Seagate supervisors "***believed***" that Dr. Shukh's conduct justified discharge. (A271.)

But Dr. Shukh presented extensive evidence that the supervisors ***could not have reasonably believed*** the reasons they advanced for the mistreatment of Dr. Shukh: his supposed inability to work with co-workers.

83

In fact, Dr. Shukh established that those reasons were objectively false, that he had long, friendly and productive teamwork relationships with co-workers that even Seagate itself recognized and awarded him for. How, for example, could Allen actually believe that Dr. Shukh could not work in a team, when it was Allen who presented him with two Team Work awards, the second in 2007 during the heat of the conflict. The District Judge's discussion completely omits any analysis of this important piece of evidence.

Thus, the District Judge's conclusion that Dr. Shukh offered nothing to rebut Seagate's assertion that it "***believed***" these reasons was completely wrong and was based on the drawing of inferences in Seagate's favor, the fatal error of summary judgment. While the Judge's inferences and conclusions about the evidence may be permissible, they are not the only inferences and conclusions, and on their face strain credulity.

This is so because, as stated in *Torgerson*, 643 F.3d at 1047, showing the explanation to be unworthy of credence "because it has no basis in fact," is sufficient to go to the jury on pretext. And, that is precisely what Dr. Shukh showed. All Seagate could come up with in terms of Dr. Shukh's supposed difficulties with others was three or four

incidents over a 12-year period, all of which Dr. Shukh objectively showed could not have been the legitimate basis of a charge that Dr. Shukh had difficulties with co-workers.

In any event, why would any rational business mistreat and then fire one of its most productive and innovative engineers whose inventions had generated hundreds of millions of dollars of profit. Because he was hard to work with?  Unlikely, in the extreme.

Next, the Judge construed Seagate's shifting explanations in Seagate's, not Dr. Shukh's, favor. (A268-72.) While his conclusions might be arguable, they equally support the inference that Seagate was shifting its explanation for the actions it took against Dr. Shukh, especially his termination. Seagate's first explanation in the case was that Dr. Shukh was terminated as part of a layoff after the 2008 Recession. (A638.) But, at the end of the case, that explanation changed to his inability to work with others. (A8863-66.) But even that was contradicted by Seagate's EEOC Response that Dr. Shukh was terminated in part because of his history of "combative and unproductive behavior." (A10913.) These story changes and discrepancies create a triable issue on pretext.

Next, the Judge mentioned in passing Seagate's failure to investigate Dr. Shukh's discrimination complaints, and then ignored the rule that such a failure to investigate in accordance with usual company policies is evidence of retaliation. *Rhines v. Salinas Constr. Techs., Ltd.,* 2014 U.S. App. LEXIS 11984, 10-11 (5th Cir. 2014); *Rahlf v. Mo-Tech Corp.*, 642 F.3d 633, 639 (8th Cir. 2011); *Floyd v. Missouri Dep't of Soc. Servs.*, 188 F.3d 932, 937 (8th Cir. 1999); *Young v. Warner-Jenkinson Co.*, 152 F.3d 1018, 1024 & n.6 (8th Cir. 1998).

Finally, the Judge ignored Seagate's false statement to the EEOC that Dr. Shukh never complained of national origin discrimination. (A10917.)

In the final analysis, there was ample evidence to go to a jury on pretext. The Judge wrongly ignored the central principle of summary judgment: materially conflicting evidence raises question of fact about the believability, not the propriety, of the proffered explanation. *Moschetti v. CCPRR,* 119 F.3d 707, 710 (8th Cir. 1997); *Gaworski v. ITT Comm. Fin. Corp.*, 17 F.3d 1104, 1110 (8th Cir. 1994)

The Summary Judgment ruling (A215) on retaliation was wrong.

# VII.    THE OTHER DISCOVERY RULINGS WERE WRONG.

The Orders stopping Dr. Shukh's discovery and not barring the expert Bajorek were error. (A131, A190.)

The standard of review for discovery rulings is abuse of discretion, but an error of law is an abuse of discretion and is reviewed *de novo*. *Davis v. U.S. Bancorp*, 383 F.3d 761, 765 (8th Cir. 2004); *Group One v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1307 (Fed. Cir. 2005); *PPG Industries v. Celanese Polymer Specialties*, 840 F.2d 1565, 1571 (Fed. Cir. 1988).

## A.    Bajorek's Testimony Should Be Barred.

Rule 26(a)(2)(B)(v) and 26(b)(2)(D)  required Seagate and Bajorek to list his expert cases in the prior 4 years at the time that the court ordered. It did not do so.

A party that fails to provide expert disclosures unfairly inhibits its opponent's ability to properly prepare, unnecessarily prolongs litigation, and undermines the district court's management of the case. *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 278-79 (4th Cir. 2005); *Campbell v. U.S.*, 470 Fed. Appx. 153, 157 (4th Cir. 2012).

Rule 26(a)(2)(B)(v) permits opponents "a reasonable opportunity to prepare for effective cross-examination and perhaps arrange for expert

testimony from other witnesses." Fed. R. Civ. P. 26 advisory committee note.

To enforce those requirements, Rule 37(c)(1) bars experts whose disclosures were not timely unless the failure was "substantially justified or harmless." The exclusion is "self-executing" and "automatic." Rule 37(c)(1) advisory committee's note. "[A]bsolute compliance with Rule 26(a)'s disclosure requirements is required." *Olmstead, Inc. v. CU Interface, LLC*, 606 F.3d 262, 271 (6th Cir. 2010). Its exclusion operates irrespective of bad faith or willfulness. *Yeti by Molly Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001); *Salgado by Salgado v. GMC*, 150 F.3d 735, 742 (7th Cir. 1998); *Finley v. Marathon Oil Co.*, 75 F.3d 1225, 1230 (7th Cir. 1996); *Wegener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008); *see also Trost v. Trek Bicycle Corp.*, 162 F.3d 1004, 1008 (8th Cir. 1998).

The burden was on Seagate to demonstrate a lack of harm or a substantial justification. *Wilson v. Bradlees of New England, Inc.*, 250 F.3d 10, 21 (1st Cir. 2001).

The District Judge wrongly concluded that Seagate's violations of the Rule were harmless. The expert discovery period was only two months long. The required disclosure finally came five weeks late, with

only three weeks left for expert discovery. Dr. Shukh's expert discovery was cut short; he never received Bajorek's expert reports and deposition testimony; and he could not investigate grounds to challenge Bajorek's opinion.

The District Judge's September 30, 2013 Order (A190) should be reversed and Bajorek's testimony should be barred.

## B.    Dr. Shukh's Expert Discovery Was Proper and Should Not Have Been Cut Short.

If Bajorek is not barred, Dr. Shukh was wrongly prevented from investigating his prior cases and employment background and Heitzman's prior cases. (A131, A190.)

 Courts have required parties to produce expert deposition testimony and opinions in other cases to assess the consistency of the expert's opinions and methodologies. *Jenks v. New Hampshire Motor Speedway*, 2011 U.S.Dist.LEXIS 113988, \*11 (D.N.H. Oct. 3, 2011) (collecting cases). This type of inquiry is expressly contemplated by Rule 26(a)'s requirement of disclosure of 4 years of prior expert cases. *Brown v. Overhead Door Corp.*, 2008 U.S.Dist.LEXIS 34879, \*5 (N.D. Ill. 2008); *Phillips v. The Raymond Corp.*, 213 F.R.D. 521 (N.D. Ill. 2003) (Plaintiff entitled to receive "chapter and verse" of Defendant's expert's prior

opinions); *Silgan Containers v. Nat'l Union Fire Ins.*, 2011 U.S.Dist.LEXIS 35010, *20 (N.D. Cal. 2011) ("expert witness services over the past five years is relevant to proving bias or prejudice and is therefore discoverable").

Dr. Shukh was properly investigating whether because of their prior work, including for Seagate and its law firm, Bajorek and Heitzman were nothing more than Seagate's shills–decoys hired to sell something while hiding their affiliations. *Oxford English Dictionary* (2d ed. 1989 & online version 2011). *See Mid-State Fertilizer Co. v. Exchange Nat'l Bank*, 877 F.2d 1333, 1340 (7th Cir. 1989).

Dr. Shukh's discovery was also proper into IBM's $1 million fraud claim against Bajorek, and his listed employment at Intematix, which may have been resume fraud.

Discovery is commonly allowed of information to impeach the credibility of opposition witnesses. Information showing a witness may not be worthy of belief is always relevant. *Ferguson v. N. Broward Hosp.*, 2011 U.S.Dist.LEXIS 52535, *12 (S.D. Fla. 2011) (quoting 8 *Federal Practice and Procedure* §2015, at 292-94 (3d ed. 2010)). *See also Davidson Pipe Co. v. Laventhol & Horwath*, 120 F.R.D. 455, 461 (S.D.N.Y. 1988); *Bolia v. Mercury Print Prods.*, 2004 U.S.Dist.LEXIS

22730, *4 (W.D.N.Y. 2004) (discovery particularly appropriate to uncover prior acts of deception); *Cabana v. Forcier*, 200 F.R.D. 9, 17 (D. Mass. 2001)

The lower court's orders stopping that discovery were wrong.

*Jurisdiction* – Those orders were also really orders quashing subpoenas issued in other Districts.

Rule 45(c)(3) is clear: only the issuing court can quash or modify a subpoena. *AF Holdings v. Doe*, 2012 U.S.Dist.LEXIS 17894, *7 (S.D. Fla. 2012); *In re Digital Equip. Corp.*, 949 F.2d 228, 231 (8th Cir. 1991) (issuing court has exclusive jurisdiction); 9-45 *Moore's Federal Practice* §45.50 [4] (2014) (same).

*Standing* – Only a "party or person from whom discovery is sought may move for a protective order in the court where the action is pending…." Fed. R. Civ. P. 26(c).

Therefore, Seagate did not have standing to object to the third-party subpoenas. 9-45 *Moore's Federal Practice* §45.50 [3] (2014) ("a party to the action does not have standing to assert any rights of the nonparty as a basis for a motion to quash or modify a subpoena.").

"Several Courts have concluded that a party does not have standing to file a Motion for a Protective Order, so as to prevent the

disclosure of information by a non-party in response to a Third Party Subpoena." *Floorgraphics, Inc. v. News Am. Mktg. In-Store Servs.*, 2007 U.S.Dist.LEXIS 37686, *8-9 (D. Minn. 2007). *See also Thomas v. Marina Assocs.*, 202 F.R.D. 433 (E.D. Pa. 2001).

"A party also lacks standing to challenge subpoenas issued to non-parties on the grounds of relevancy or undue burden." *Universitas Educ., LLC v. Nova Group, Inc.*, 2013 U.S.Dist.LEXIS 1720, *16 (S.D.N.Y. 2013). *AF Holdings*, 2012 U.S.Dist.LEXIS 17894, *9, n.1 (only subpoena recipient can assert undue burden).

The only exception is limited to instances where a party "claims some personal right or privilege relating to the documents sought." *Floorgraphic*s, *8-9. *See also Anglin v. Maxim Healthcare Servs.*, 2009 U.S.Dist.LEXIS 34562, *3 (M.D. Fla. 2009). Seagate made no such showing here.

*Waiver* – Finally, Seagate did not move for a Protective Order to stop the expert discovery until January 10, 2013.

Rule 45(c)(2)(B) requires that any objection be made 14 days after the subpoena is served.

Seagate waived objection to the IBM and Intematix subpoenas issued on December 17 and 18, 2012.

Requiring the withdrawal of the third party subpoenas was error.

## VIII.    DISMISSING THE TITLE VII PUNITIVE DAMAGE CLAIM AND DENYING LEAVE TO AMEND WERE ERROR.

The July 3, 2012 rulings on the punitive damage claim were error. (A91.)

Dismissal is reviewed *de novo*; denial of leave to amend is reviewed for abuse of discretion, but futility *de novo*. *Crooks v. Lynch*, 557 F.3d 846, 848 (8th Cir. 2009); *U.S. v. Hypoguard USA*, 559 F.3d 818, 822 (8th Cir. Minn. 2009).

The dismissal cannot be reconciled with the conclusion that "a reasonable jury could determine" that "Seagate may have mistreated Shukh." (A271.) Such conduct supports punitive damages. *Zappa v. Cruz*, 30 F.Supp.2d 123, 132 (D.P.R. 1998), *aff'd*, 238 F.3d 25 (1st Cir. 2001).

Second, failing to investigate complaints of discrimination is "reprehensible" and justifies punitive damages. *Walsh v. Nat'l Computer Sys.*, 332 F.3d 1150, 1162 (8th Cir. 2003).

So does Seagate's false EEOC Response that Dr. Shukh never complained of discrimination. (A10221-22.) *Rhines*, 2014 U.S.App. LEXIS 11984 at *10-11.

Moreover, dismissal and denial of amendment were premature given the December 1 closing of fact discovery and for seeking leave to plead punitive damages. (A3266.)

Given the evidence of mistreatment, the punitive damage allegations met *Iqbal/Twombly*'s without any further detail needed. (A3641-44, ¶¶229-243.) *Kademani v. Mayo Clinic, Inc.,* 2010 U.S.Dist.LEXIS 144660, *2 (D. Minn. 2010); *Dotson v. Avon Prods., Inc.*, 2011 U.S.Dist.LEXIS 25941, *19 (D.S.C. 2011); *Troyer v. I-Flow Corp.*, 2011 U.S.Dist.LEXIS 67042, *13 (S.D. Ohio 2011); *Clonch v. I-Flow*, 2010 U.S.Dist.LEXIS 121607, *12 (S.D. Ohio 2010); *Bowles v. Osmose Util. Srvs*, 443 F.3d 671 (8th Cir. 2006) (punitive damages proper even if not specifically pled in Complaint).

## CONCLUSION

Dr. Shukh respectfully prays that this Court:

(1)    Overrule *FilmTec*;

(2)    reverse the March 30, 2011 Opinion (A2);

(3)    reverse the November 30, 2011 Opinion (A36);

(4)    reverse the June 29, 2012 Opinion (A74) and underlying Order (A59);

(5)    reverse the July 3, 2012 Opinion (A91);

(6)    reverse the March 25, 2013 Opinion (A148), and the July 3, 2013 Order (A186), and enter summary judgment for Dr. Shukh on his Fraud Claim;

(7)    reverse the September 30, 2013 Opinion (A190) and the underlying Protective Order (A131), the January 3, 2012 Opinion (A114), and the underlying Orders (A103, A105);

(8)    reverse the March 31, 2014 Opinion and Order (A215) and the April 1, 2014 Judgment (A1);

(9)    remand the case for further proceedings.

\*    \*    \*    \*

September 9, 2014.                    Respectfully submitted,

                                       /s/ Constantine John Gekas
                                      Constantine John Gekas
                                       GEKAS LAW LTD.
                                      Suite 2220
                                      33 North LaSalle Street
                                      Chicago, Illinois 60602
                                      Tel: (312) 726-4501
                                      Fax: (312) 726-4505
                                      CJG@gekaslaw.com

                                      *Attorney for Appellant*
                                      *Alexander M. Shukh,*
                                      *Ph.D.*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

| Date Filed | Docket No. | Description | Apx. No. |
|---|---|---|---|
| 04/01/2014 | 515 | Judgment in a Civil Case | A1 |
| 03/30/2011 | 140 | Memorandum Opinion and Order | A2 |
| 11/30/2011 | 242 | Memorandum Opinion and Order | A36 |
| 12/15/2011 | 251 | Order and Memorandum | A57 |
| 06/29/2012 | 320 | Memorandum Opinion and Order Affirming the December 15, 2011 Order of the Magistrate Judge | A74 |
| 07/03/2012 | 322 | Memorandum Opinion and Order Granting Defendants' Motion to Dismiss Title VII Punitive Damages Claim | A91 |
| 09/24/2012 | 343 | Notice of Order Denying Plaintiff's Motion to Modify the Amended Scheduling Order (Doc. No.332) | A103 |
| 09/24/2012 | 344 | Order Plaintiff's Motion to Modify the Amended Scheduling Order (Doc. No. 332), is denied for lack of good cause shown and as further stated on the record. The oral ruling of the Court on the record following arguments of counsel is hereby incorporated by reference as if restated in full herein. | A104 |
| 10/16/2012 | 353 | September 24, 2012 Transcript of Oral Ruling Incorporated in the Order of the Court (Doc. No. 344) | A106 |
| 01/03/2013 | 387 | Memorandum Opinion and Order Affirming the September 24, 2102 Order of the Magistrate Judge | A115 |
| 01/18/2013 | 406 | Oral Order Ruling on Defendants' Motion for Protective Order (Doc. No. 388), is Granted in Part And Denied in Part, as Stated on the Record. | A130 |
| 01/18/2013 | 407 | Protective Order | A132 |
| 01/24/2013 | 409 | January 18, 2013 Transcript of the Oral Ruling Incorporated in the Order of the Court (Doc. No. 406) | A134 |

| Date Filed | Docket No. | Description | Apx. No. |
|---|---|---|---|
| 3/25/2013 | 439 | Memorandum Opinion and Order Granting Defendants' Motion for Summary Judgment on Plaintiff's Fraud Claim and Correction of Inventorship Claim | A149 |
| 07/03/2013 | 505 | Order on Plaintiff's Motion for Partial Summary Judgment | A187 |
| 09/30/2013 | 512 | Memorandum Opinion and Order | A191 |
| 03/31/2014 | 514 | Memorandum Opinion and Order Granting Defendants' Motion for Summary Judgment | A215 |

AO450 (Rev. 5/85)  Judgment in a Civil Case

# UNITED STATES DISTRICT COURT
## District of Minnesota

ALEXANDER M. SHUKH

V.

SEAGATE TECHNOLOGY, LLC, SEAGATE TECHNOLOGY, INC., SEAGATE TECHNOLOGY, UNKNOWN OWNERS AND ASSIGNEES, and SEAGATE TECHNOLOGY, PLC

### JUDGMENT IN A CIVIL CASE

Case Number:   10-cv-404 (JRT/JJK)

☐ **Jury Verdict.**  This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

☒ **Decision by Court.**  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

1. Defendants' Motion for Summary Judgment [Docket No. 465] is GRANTED. Counts nine, ten, eleven, and twelve of Plaintiff's Third Amended Complaint are DISMISSED with prejudice.

2. Defendants' Motion to Exclude the Expert Report and Opinions of Dr. Henry Lahmeyer [Docket No. 443] is DENIED as moot.

3. Defendants' Motion to Exclude the Expert Report and Opinions of Edward Grochowski, Ph.D. [Docket No. 448] is DENIED as moot.

4. Defendants' Motion to Exclude the Expert Report and Opinions of Howard B. Rockman [Docket No. 454] is DENIED as moot.

5. Plaintiff's Motion to Bar Expert Report and Testimony of Angela M. Heitzman [Docket No. 480] is DENIED as moot.

| April 1, 2014 | RICHARD D. SLETTEN, CLERK |
|---|---|
| Date | |
| | s/L. Brennan |
| | (By)          L. Brennan,   Deputy Clerk |

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ALEXANDER M. SHUKH, | Civil No. 10-404 (JRT/JJK) |
| Plaintiff, | |
| v. | |
| SEAGATE TECHNOLOGY, LLC, SEAGATE TECHNOLOGY, INC., SEAGATE TECHNOLOGY, and UNKNOWN OWNERS AND ASSIGNEES, | **MEMORANDUM OPINION AND ORDER** |
| Defendants. | |

Constantine Gekas and John Gekas, **GEKAS LAW, LLP**, 11 South LaSalle Street, Suite 1700, Chicago, IL 60603; James H. Kaster, Katherine A. Manuel, and Sarah W. Steenhoek, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402, for plaintiff.

Calvin L. Litsey, Chad Drown, Jeya Paul, Charles F. Knapp, Elizabeth Cowan Wright, and David J.F. Gross, **FAEGRE & BENSON LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, for defendants.

Plaintiff Dr. Alexander Shukh brought this case against his former employer asserting thirteen claims related to the termination of his employment. Defendants moved to dismiss the claims. In response, Shukh moved for summary judgment as to inventorship and declaratory judgment, and brought a motion for a preliminary injunction. The Court finds that Shukh has standing to sue due to an injury to his reputational interests, but grants defendants' motion to dismiss Shukh's claims for breach of contract, rescission, breach of fiduciary duty, unjust enrichment, interference with

business expectancy, and for declaratory judgment. The Court denies Shukh's motion for summary judgment, as genuine issues of material fact exist as to inventorship, and denies as moot Shukh's motion for summary judgment on his claim for declaratory judgment. The Court also denies Shukh's motion for a preliminary injunction as moot due to disclosures by defendants, and a lack of clarity regarding the Court's jurisdiction to award the relief requested.

**BACKGROUND**

## I.    EMPLOYMENT AT SEAGATE

Shukh was employed by defendants Seagate Technology, LLC, Seagate Technology, Inc., and Seagate Technology (collectively "Seagate") from September 1997 until early 2009. Shukh claims he was one of Seagate's most productive and distinguished scientists, and that he is a member of the Seagate Inventor Hall of Fame. (Shukh Decl. ¶ 11 Ex. A, Docket No. 71.) Shukh also claims that he holds thirty-five U.S. and foreign patents, ten of which he patented while at Seagate. Nine of his inventions have been incorporated into Seagate product lines of hard disk drives and related products.

In 1997, Seagate hired Shukh as Senior Advisory Development Engineer, and he signed a document titled "At-Will Employment and Invention Assignment Agreement." (Shukh Decl. ¶¶ 6, 9; Am. Compl. Ex. 1, Docket No. 7.) The agreement provided that Shukh assigned to Seagate "all [his] right, title, and interest in and to any and all inventions . . . which [he] may solely or jointly conceive . . . during the period of time [he

**A3**

is] in the employ of [Seagate]." (Am. Comp. Ex. 1 at 2.)  At the time of his termination

in 2009, his title was Development Principal Engineer.

The employment agreement also contained confidentiality provisions providing in

part that Shukh

> [agrees to,] at all times during . . . employment and thereafter, to hold in
> strictest confidence, and not to use, except for the benefit of the Company
> . . . any Confidential Information of the Company. . . . "Confidential
> Information" means any Company proprietary information, technical data
> . . . disclosed to me by the Company, either directly or indirectly . . . .

(Am. Compl. Ex. 1.)  Further, the agreement provided that at the "time of leaving the

employ of the Company, [Shukh] will deliver to the company (and will not keep in [his]

possession, recreate or deliver to anyone else) any and all devices, records, notes, [etc.]

developed by [him] pursuant to [his] employment with the Company or otherwise

belonging to the Company . . . ." (*Id.*)

On August 30, 2007, Shukh complained to Ken Massaroni, Seagate's then-Vice-

President of Intellectual Property and Chief Intellectual Property Counsel, about his

omission as an inventor on an issued patent and a patent application submitted to the

Patent and Trademark Office ("PTO").  (Shukh Decl. ("Shukh Decl. 13th Claim") Ex. A6,

Docket No. 81.)  Massaroni responded that an attorney met with individuals identified as

inventors of the patents Shukh referenced, and that none of those individuals identified

Shukh as contributing to the inventions.  (*Id.*)  Believing that he was fraudulently omitted

as an inventor on various applications, Shukh "gathered evidence of that fraud" from

Seagate's internal information sources that he claims he was fully authorized to access.

- 3 -

**A4**

In early 2008, Shukh consulted with attorneys about the potential for litigation related to his omission as an inventor from the patent and patent application.

On January 14, 2009, Shukh was notified by Karen Hason, Seagate LLC's Senior Vice President of Human Resources that he was being terminated, effective March 16, 2009, due to the recent economic downturn. When presented with the termination documents, Shukh says he told Ken Allen, Seagate's Vice-President of Transducer Development, that he would not sign because he was going to contact attorneys about his rights. Allen stated, and Shukh did not deny, that beginning on January 15, 2009, Shukh copied a large number of documents, including his engineering log book. He also made copies of documents related to his innovative activity at Seagate.

## II.    SHUKH'S INVENTIONS

On May 8, 2003, Shukh submitted an invention disclosure to Seagate's intellectual property ("IP") department entitled "Magnetic Head for Perpendicular Recording with Reduced Sidetrack Erasure," internally identified as STL 11473.00. (Shukh Decl. Ex. A2.)  Shukh's engineering log book entries for May 5 and 6, 2003, witnessed and signed by two other Seagate engineers, show his completed conception of that invention. (*Id.* Ex. A3.)

The invention disclosure and log book disclosures propose a solution to the problem of side-track erasure in hard drives arising from the fact that as information was written to one recording track on a hard drive, previously recorded information on

- 4 -

**A5**

adjacent tracks could be erased.  (*Id*. Exs. A2-3.)  The inventive concept included the use

of a

> main pole, a magnetic yoke positioned adjacent to the main pole, two
> antiferromagnetically biased return poles positioned on the opposite sides
> of the main pole, back vias positioned between the main pole and the return
> poles, a coil positioned in a gap formed by the main pole and the return
> poles and between an air bearing surface and the back vias, wherein the
> main pole, yoke, and back vias have an elliptical shape to reduce the
> erasure of data on the media.

(Shukh Decl. ¶ 22.)  On or about June 16, 2003, Shukh submitted another Employee

Patent Disclosure Form for his earlier invention, titled "Stable Magnetic Shield for High

Density Recording Head," internally identified as STL 11547.00.  (*Id*. Ex. A4.)  The form

related to an inventive refinement that the "magnetic reader shield received ellipse-like or

circle-like shape and laminated structure formed by alternative ferromagnetic and non-

magnetic layers with antiferromagnetic exchange coupling implemented between

adjacent ferromagnetic layers."  (*Id.* ¶¶ 33-34.)

On August 18, 2003, Anne Johnson, a representative of the IP department sent two

emails to Shukh about his inventions, informing him that the "Head Patent Review

Board" decided not to pursue the inventions, but would combine them with "STL

11583.00."  (*Id.* Exs. A5-6.)  Later that day, Johnson emailed Shukh again and said "The

Head Patent Review Board met and have decided to pursue this [STL 11583.00]

invention, you will be contacted by an attorney in due course to prepare a utility

application."  (*Id.* Ex. A7.)

## III.   DISPUTED PATENTS

This dispute involves the following issued patents which Shukh claims he invented or co-invented:

- U.S. Pat. No. 7,233,457
- U.S. Pat. No. 7,684,150
- U.S. Pat. No. 6,525,902
- U.S. Pat. No. 6,738,236

The motions raised by the parties largely deal with the '457 and '150 patents. Shukh also makes claims in the amended complaint related to five pending applications for patents.  (Am. Compl. ¶ 196.)

On July 9, 2003, before Anne Johnson sent emails to Shukh, Seagate filed a provisional patent application titled "Perpendicular Recording Writer Design for Side Erasure Solution."  (Shukh Decl. A8.)  The provisional application named ten inventors, but not Shukh.  The provisional application was based in part on results of work from various Seagate employees, including Shukh, that were summarized in a presentation entitled "Perpendicular writer design proposal," which was posted on Seagate's Advanced Transducer Database by Taras G. Pokhil, on January 22, 2003.

On June 30, 2004, Seagate filed a utility patent application that claimed priority to the July 9, 2003 provisional application and named the same ten inventors as listed on the provisional application.  (*Id.* Ex. A12.)  The utility patent application did not list Shukh as an inventor.  The application was titled "Recording Head for Reducing Side Track Erasure," the same title of the invention disclosure internally identified by Seagate as STL 11583.00, into which Shukh had been informed his disclosures STL 11473.00 and

- 6 -

**A7**

STL 11547.00 had been combined. The utility application issued as U.S. Patent No. 7,684,150 (the "'150 Patent") on March 23, 2010. (*Id*. Ex. A1.) The '150 Patent shows that Seagate LLC is the Assignee.

On November 4, 2004, Shukh was notified by email that he had been awarded an inventorship award pursuant to Seagate's Policy on Inventor Recognition for the invention in his two disclosures which had been combined into STL 11583.00. On June 30, 2004, Shukh also received a certificate from Seagate for his technological achievement for his contribution to the invention "Recording Head for Reducing Sidetrack Erasures."

Seagate's internal patent docketing system disclosed that he was a co-inventor of the invention that was the subject of the '150 Patent. (*Id*. Ex. A10.) Shukh claims he did not learn of his omission as an inventor on the application until approximately the fall of 2006.

Shukh claims he substantially contributed to the "Summary of the Invention" and to the concepts of Claims 1-5, 7, 9, 10-12, and 15 of the '150 Patent.

## IV.    EEOC CHARGES AND SUBSEQUENT ALLEGEDLY RETALIATORY CONDUCT

On March 17, 2009, the day after Shukh's termination took effect, Shukh filed charges of national origin discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Minnesota Department of Human Rights. On May 18, 2009, Seagate filed a response to the charges. On May 26, 2009, Seagate's Chief IP Counsel, William Zahrt, sent Shukh a letter stating in part:

> If you have any confidential information in your possession, including any
> data on portable storage devices, it must be returned to Seagate. Retention
> of any confidential information beyond your separation date . . . may be
> considered a violation of your employment agreement . . . .

(Shukh Decl. Ex. A16.) Further, on March 26, 2010, Chad Drown, one of Seagate's outside counsel, sent Shukh a letter citing the Confidentiality and Return of Documents provisions of Shukh's employment agreement and demanded the return of all material in Shukh's possession. (Gekas Decl. Ex. B5, Docket No. 81.)

Shukh alleges that though extremely well-qualified for positions he applied for when he began looking for a new job, including at Seagate in response to various posted vacancies, he was not hired. (Am. Compl. ¶¶ 259-262.) Shukh charges that this indicates he was "black-listed" by Seagate, in retaliation for filing the EEOC and Minnesota Human Rights Act ("MHRA") charges.

## ANALYSIS

## I. SEAGATE'S MOTION TO DISMISS

### A. Standard of Review[1]

In reviewing a complaint under a Rule 12(b)(6) motion to dismiss, the Court considers all facts alleged in the complaint as true, and construes the pleadings in a light most favorable to the non-moving party. *See, e.g.*, *Bhd. of Maint. of Way Emps. v.*

---

[1] The motions at issue are, variously, to dismiss and for summary judgment. Because the majority of the arguments are brought under Rule 12(b)(6), that rule is set forth as the overarching standard by which the motions were evaluated. The Court has noted and set forth the standard for summary judgment where appropriate below.

*Burlington N. Santa Fe R.R.*, 270 F.3d 637, 638 (8th Cir. 2001) (per curiam). To survive a motion to dismiss, however, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action . . . .'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). That is, to avoid dismissal, a complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and therefore, must be dismissed. *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

### B.     Claim Two: Correction of Inventorship

Seagate challenges Shukh's standing to correct inventorship under Rule 12(b)(1), and Shukh moved for summary judgment on inventorship.

### 1.     Standing to Correct Inventorship

Though Seagate's motion was brought generally under Rule 12(b)(6) for failure to state a claim, Seagate also challenges Shukh's subject matter jurisdiction under Rule 12(b)(1), which requires the Court to examine whether it has authority to decide the claims. *Uland v. City of Winsted*, 570 F. Supp. 2d 1114, 1117 (D. Minn. 2008). A party invoking federal subject matter jurisdiction has the burden of proving by a preponderance

of the evidence that jurisdiction exists. *V S Ltd. P'ship v. Dep't of Hous. and Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000). In resolving a motion to dismiss under Rule 12(b)(1), the Court is not limited to a consideration of the face of the complaint, but may also consider evidence submitted by the parties if the essence of the motion is a factual attack. *Gilmore v. Nw. Airlines, Inc.*, 504 F. Supp. 2d 649, 653 (D. Minn. 2007).

Seagate asserts that Shukh does not have standing under 35 U.S.C. § 256 ("the Patent Act") to correct inventorship of U.S. Patent Nos. 7,684,150, 7,233,457, 6,525,902, 6,548,114, and 6,738,236, because the employment agreement created an automatic assignment of all right, title, and interests in any invention Shukh created during his employment, thus: (1) Shukh has no ownership interest in anything he invented at Seagate; (2) he has no financial interest in anything he invented at Seagate; and (3) reputational interests cannot be a basis for standing.

The Patent Act expressly provides a private right of action to correct inventorship:

> Whenever through error . . . an inventor is not named in an issued patent and such error arose without any deceptive intention on his part, the Director may . . . issue a certificate correcting such error. . . . The court before which such matter is called in question may order correction of the patent on notice and hearing of all parties concerned . . . .

35 U.S.C. § 256.

Though Shukh has brought a variety of state law claims, "[b]ecause inventorship is a unique question of patent law, the cause of action arises under § 1338(a)." 28 U.S.C. § 1338(a) ("The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents . . . . Such jurisdiction shall be exclusive of the courts of the states in patent . . . cases."); *see Christianson v. Colt Indus. Operating*

*Corp.*, 486 U.S. 800, 809 (1988) (holding that § 1338(a) jurisdiction extends to a cause of action in which "patent law is a necessary element"); *HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co., Ltd.*, 600 F.3d 1347, 1353 (Fed. Cir. 2010). The Federal Circuit "expressly hold[s] that . . . [o]nce a patent issues, . . . 35 U.S.C. § 256 provides a private right of action to challenge inventorship . . . ." *HIF Bio, Inc.*, 600 F.3d at 1354 (citing *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1324-25 (Fed. Cir. 2009)).

Seagate argues that the employment agreement created an automatic assignment of all right, title, and interests in any invention Shukh created during his employment, thus he has no ownership or financial interest in any patent, and no standing. For a plaintiff to have standing to correct inventorship, the plaintiff must allege facts sufficient to show an "ownership interest" or a "concrete financial interest" in the patent in question. *Larson*, 569 F.3d at 1324-26.

Although state law governs the interpretation of contracts generally, the question of whether a patent assignment clause creates an automatic assignment, or merely an obligation to assign, is bound up with the question of standing in patent cases, thus it is treated as a matter of federal law. *DDB Tech., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008). The Federal Circuit has held that "whether an assignment of patent rights in an agreement . . . is automatic, requiring no further act on the part of the assignee, or merely a promise to assign depends on the contractual language." *Id.* at 1290. "If the contract expressly grants rights in future inventions, no further act is required once an invention comes into being, and the transfer of title occurs by operation of law." *Id.* (alterations and internal quotation marks omitted) (quoting

- 11 -

*Filmtec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568, 1573 (Fed. Cir. 1991)). "Contracts that merely obligate the inventor to grant rights in the future, by contrast, 'may vest the promisee with equitable rights in those inventions once made,' but do not by themselves 'vest legal title to patents on the inventions in the promise.'" *Id.* (emphases omitted) (quoting *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1581 (Fed. Cir. 1991)).

Shukh's employment agreement provides: "I agree . . . and hereby assign to the Company . . . all my right, title, and interest in and to any and all inventions . . . ." (Am. Compl. Ex. 1.) The *DDB Techs* court interpreted almost identical present-tense language, finding that the assignment was automatic. *DDB Techs.*, 517 F.3d at 1287 ("Employee agrees to and does hereby grant and assign . . . ."). Taking the facts in a light most favorable to either party (Shukh on the motion to dismiss, and Seagate on the motion for summary judgment), there is no path to arrive at the conclusion that the parties have co-ownership of the patent: Seagate is the sole owner.

The employment agreement further provides that:

> [Shukh] agree[s] to assist the Company . . . to secure the Company's rights in the Inventions . . . including . . . the execution of all applications, specifications, oaths [and] assignments . . . which the Company shall deem necessary . . .

(Am. Compl. Ex. 1.) The *DDB Techs* court also evaluated nearly identical language in an employment contract, holding "we see nothing in this clause that conflicts with the clear language of the present, automatic assignment provision in the agreement." *DDB Techs.*, 517 F.3d at 1290 n.3 ("Employee agrees to execute specific assignments and do anything else properly requested by company . . . to secure such rights."). As a result, the Court

finds the provisions of the employment agreement created an automatic assignment of rights because that language of the employment agreement does not conflict with the present, automatic assignment provision, thus Shukh cannot derive standing from ownership of the patents.

Financial interests can also convey standing to challenge inventorship. "[A]n expectation of ownership of a patent is not a prerequisite for a putative inventor to possess standing to sue to correct inventorship under § 256. The statute imposes no requirement of potential ownership in the patent on those seeking to invoke it." *Larson*, 569 F.3d at 1326 (quoting *Chou v. Univ. of Chi.*, 254 F.3d 1347, 1358 (Fed. Cir. 2001)). In *Chou*, the Federal Circuit found that "concrete financial interests" in the patents, due to the inventor's relationship with the university, were enough to satisfy standing under Article III. *Chou*, 254 F.3d at 1355.

In contrast to *Chou*, *Larson* involved a situation similar to Shukh's, in that Larson "assigned away all of his patent rights [to defendants]." 569 F.3d at 1321. Larson's "only path to financial reward . . . involves him . . . obtaining rescission of the patent assignments." *Id.* at 1326–27. The court held that

> [w]ithout first voiding his patent assignments, Larson has no ownership interest in the . . . patents. . . . Larson's financial stake in the patents is contingent on him obtaining relief that a federal court has no jurisdiction . . . to provide. Because [he] lacks an ownership interest, and because being declared the sole inventor will not generate any other direct financial rewards . . . Larson has no constitutional standing to sue for correction of inventorship in federal court.

*Id.* at 1327. Here again, the facts in a light most favorable to Shukh provide no possibility that he could have a financial interest in any of the patents at issue.

- 13 -

**A14**

Finally, in *Larson*, the Federal Circuit discussed, but declined to hold, whether a reputational interest alone was enough to confer standing. The court noted that it was "not implausible" for reputational interests to confer standing, as it had previously held in *Chou*, but did not expressly analyze the issue. *Id.*; *Chou*, 254 F.3d at 1359 ("[B]eing considered an inventor of important subject matter is a mark of success in one's field, comparable to being an author of an important scientific paper. **Pecuniary consequences may well flow from being designated as an inventor**." (emphasis added)). Shukh argues that reputational interests should give him standing, and that he has adequately alleged such damage. For instance, in the amended complaint Shukh alleges that he is "one of the world's leading scientists and engineers in the area of computer hard disk drives." (Am. Compl. ¶ 1.) Further, he claims that "[d]uring and after Dr. Shukh's employment at Seagate, his inventions were incorporated into several hundred millions (probably closer to 1.1 billion) of product units sold by Seagate." (*Id.* ¶ 2.)

It is clear that a failure to be designated as an inventor of a patent that is widely known in an industry is an important mark of success, and in the Court's view, *Chou* is correct that pecuniary and reputational consequences could easily flow from being named or omitted as an inventor. Further, Shukh alleges that he has had difficulty finding new employment, and while he attributes some of this to "black-listing" and rumors instigated by Seagate, it is also logical that omission from important patents could affect his ability to get a new job.

- 14 -

**A15**

Thus, the Court finds Shukh has standing to challenge inventorship under 35 U.S.C. § 256 due to potential harm to his reputational interests and Seagate's motion to dismiss Claim Two for failure to state a claim is denied.

### 2.     Shukh's Motion on Inventorship

Shukh also brought a motion for summary judgment on the issue of inventorship. A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Shukh has not demonstrated that there are no genuine issues of material fact that he contributed to the inventions embodied in the patents he challenges. Specifically, although he provides a large number of documents detailing his work, without expert testimony describing exactly how his work was incorporated into each claimed invention, the Court cannot simply compare his work to a different product and know to what extent his work was a part. Further, there is insufficient evidence demonstrating that Shukh's work was not predicated on the work of anyone else, and that he was in fact inventing, or contributing to a new invention. Overall, while Shukh has demonstrated standing to correct inventorship, and has alleged sufficient facts to overcome a motion to dismiss, he

has fallen well short of the standard required to be granted summary judgment on the issue of inventorship. Thus the Court denies Shukh's motion for summary judgment on Claim Two.

### C. Claims Three and Four: Rescission and Breach of Contract

Claims Three and Four of the amended complaint both relate to an alleged breach of Shukh's employment agreement by Seagate's failure to protect and recognize his inventorship rights.

Seagate first argues that Shukh has failed to state a claim for breach of contract. *See* Fed. R. Civ. P. 12(b)(6). The amended complaint alleges that Seagate breached the employment agreement by "failing and refusing to protect Dr. Shukh's inventorship rights and by refusing to recognize his inventorship rights, and by interfering with his inventorship rights." (Am. Compl. ¶ 292.) Shukh acknowledges that he has not alleged Seagate expressly agreed to protect his inventorship rights. Instead, Shukh argues that the obligations of 35 U.S.C. §§ 111, 115, and 116 (provisions of the Patent Act) are incorporated into the employment agreement impliedly and by Minnesota law, including the implied covenant of good faith and fair dealing.

Incorporation by reference is a matter of law. *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d 1339, 1343 (Fed. Cir. 2008). "To incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents identified." *Id.* at 1344 (alternations and internal quotation marks omitted).

- 16 -

The employment agreement is governed by Minnesota law pursuant to its choice-of-law provision, which Minnesota traditionally enforces.  (Am. Compl. Ex. 1); *Hagstrom v. Am. Circuit Breaker Corp.*, 518 N.W.2d 46, 48 (Minn. Ct. App. 1994).  "[W]hen a contractual provision is clear and unambiguous, courts should not rewrite, modify, or limit its effect by a strained construction."  *Travertine Corp. v. Lexington-Silverwood*, 683 N.W.2d 267, 271 (Minn. 2004).

The employment agreement nowhere states, or even implies, that the Patent Act's obligations will be incorporated into the agreement, nor that a private right of action exists under the patent laws for the breach of contract Shukh alleges.  The employment agreement states:

> I agree to assist the Company . . . at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents . . . relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications . . . and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the company . . . the sole and exclusive rights, title and interest in and to such Inventions . . . .

(Am. Compl. Ex. 1. at 3.)  Though §§ 111, 115, and 116 of the Patent Act include similar language to the employment agreement provision, the Court finds nothing in the employment agreement suggesting that it expects any, much less all, of the Patent Act to be incorporated by reference.

Next, Seagate argues that Shukh has failed to state a claim for breach because the patent laws and regulations are not implied through the covenant of good faith and fair dealing.  "Minnesota does not recognize an implied duty of good faith and fair dealing in

- 17 -

**A18**

employment contracts." *Brozo v. Oracle Corp.*, 324 F.3d 661, 668 (8th Cir. 2003); *see Hunt v. IBM Mid. Am. Emps. Fed. Credit Union*, 384 N.W.2d 853, 858 (Minn. 1986) ("[W]e have not read an implied covenant of good faith and fair dealing into employment contracts."). Shukh has not cited any authority suggesting that a contract can be read in separate parts, such that a portion of the agreement governing inventions and the parties' rights regarding those inventions are considered not related to employment and can thus be sheltered from the rule that Minnesota does not imply good faith and fair dealing into employment contracts. Further, the employment agreement's first paragraph states "[i]n consideration of my employment with the Company . . . I agree to the following: . . ." (Am. Comp. Ex. 1.) This language suggests that the entire document is an employment agreement, and the various provisions are specifically written as obligations of, and related to, employment.

Further, the amended complaint does not suggest Seagate frustrated or hindered Shukh's performance under the employment agreement, which is what the implied covenant prohibits. "Under Minnesota law, every contract includes an implied covenant of good faith and fair dealing requiring that one party not 'unjustifiably hinder' the other party's performance of the contract." *In re Hennepin Cty. 1986 Recycling Bond Litig.*, 540 N.W.2d 494, 502 (Minn. 1995).

The Court grants Seagate's motion to dismiss Claim Three, as Shukh has not alleged sufficient facts to state a claim for breach of contract. Because Seagate did not breach the contract, any arguments that the agreement could be rescinded, or was ratified

at a time it could be rescinded, are moot. Thus, Seagate's motion to dismiss Count Four

for rescission is also granted.

### D.    Claim Five:  Fraud

In Minnesota, a claim for fraud requires:

> [A] false representation regarding a past or present fact, the fact was material and susceptible of knowledge, the representer knew it was false or asserted it as his or her own knowledge without knowing whether it was true or false, the representer intended to induce the claimant to act or justify the claimant in acting, the claimant was induced to act or justified in acting in reliance on the representation, the claimant suffered damages, and the representation was the proximate cause of the damages.

*Martens v. Minn. Mining & Mfg. Co.*, 616 N.W.2d 732, 747 (Minn. 2000).  Seagate

argues that Shukh has failed to plead reliance and damages, and has otherwise failed to

support his claims of fraud.  Fed. R. Civ. P. 9(b) ("In alleging fraud . . . , a party must

state with particularity the circumstances constituting fraud . . . .").  A review of the

complaint in the light most favorable to Shukh suggests that the complaint may allege

that it was a material misrepresentation for Seagate to file various patent applications

omitting Shukh as an inventor.  It additionally could be a material misrepresentation

because according to the complaint and various emails, Shukh was informed that his

inventions STL 11473.00 and 11547.00 were to be incorporated into STL 11583.00, but

he was not listed as an inventor in the final patent application, thus Seagate

acknowledged a role for his inventions in the patent, but failed to credit them.  (Am.

Compl. ¶¶ 124-131.)

- 19 -

Further, it can be inferred from the complaint that Shukh relied on Seagate's "representations" to protect his inventorship rights, that is, the actions of its IP department in receiving and applying for patents, and that he was damaged by doing so. (Am. Compl. ¶ 297) ("Seagate . . . knew that Dr. Shukh was relying on their candor and honesty to protect his inventorship rights and they further knew he was acting on the presumption that Seagate . . . would not interfere [with] his inventorship rights . . . .").

Although Shukh has not alleged specific damages except as to his reputation, and various inventorship rights that are in dispute, because the Court finds standing predicated at least in part on Shukh's allegation that his reputational interests were harmed, the Court also finds that Shukh has alleged sufficient facts to overcome a motion to dismiss for failure to state a claim of fraud, and denies Seagate's motion to dismiss Claim Five.

### E.    Claim Six:  Fiduciary Duty

Minnesota recognizes two types of fiduciary relationships, *per se* and *de facto*. *Swenson v. Bender*, 764 N.W.2d 596, 601 (Minn. Ct. App. 2001).  Shukh does not claim that a fiduciary relationship and duty arises from the employment agreement, thus the only relevant analysis is under a *de facto* fiduciary relationship and duty.

A fiduciary relationship may arise "when one person trusts and confides in another who has superior knowledge and authority."  *Id.*  However, the Minnesota Supreme Court "has concluded that a fiduciary relationship cannot arise even out of a long, close, and

trusting relationship when the purportedly trusting party 'should have known the [other party] was representing adverse interests.'" *Id.* at 602 (alteration in original).

Shukh relies heavily on *Chou* to suggest that a fiduciary duty existed between Seagate and Shukh. 254 F.3d at 1347. In *Chou*, a former graduate student sued her professor, university, and patent licensee and assignee seeking correction of inventorship, and alleging, among other claims, a breach of fiduciary duty. The court found that a fiduciary duty existed when Chou's professor had a position of superiority over her, and had specifically represented to her that he would protect and giver her proper credit for her inventions. *Id.* at 1362-63. Thus, Chou "adequately pleaded the existence of circumstances that place on [the professor] a fiduciary duty . . . ." *Id.* Unlike *Chou*, Shukh has not alleged that Seagate explicitly or implicitly represented that it would protect his rights and give him proper credit for his inventions. Though Seagate is bound to abide by the Patent Act, Shukh has pointed to no provision of the Act suggesting that filing a patent to which Shukh contributed creates a fiduciary relationship between the inventor and assignee.

Seagate also suggests that assuming a fiduciary relationship existed, there was still no duty for Seagate to perfect and protect Shukh's "legally cognizable inventorship rights." Even reading the complaint in a light most favorable to Shukh, Seagate does not have any obligation to protect his inventorship rights, nor is it clear that he has inventorship rights once his work has been assigned to Seagate. Thus, the Court finds Seagate had no duty to protect Shukh's inventorship rights beyond properly naming him as an inventor, and grants Seagate's motion to dismiss Claim Six.

## F.     Claim Seven:  Unjust Enrichment

Shukh's claim for unjust enrichment alleges that Seagate failed to perfect his inventorship and thus wrongfully reaped the benefits of his inventions.  (Am. Comp. ¶ 305.)  To establish a claim for unjust enrichment, a party must show that another party knowingly received something of value to which he was not entitled.  *Mon-Ray Inc. v. Granite Re, Inc.*, 677 N.W.2d 434, 440 (Minn. Ct. App. 2004).  "Unjustly" could mean "unfairly" or "illegally."  *Id.*  "Minnesota does not allow recovery under an unjust enrichment theory when there is an express contract which governs the parties' relations."  *Nw. Airlines, Inc. v. Astraea Aviation Servs*., Inc., 111 F.3d 1386, 1392 n.4 (8th Cir. 1997) (citing *Sharp v. Laubersheimer*, 347 N.W.2d 268, 271 (Minn. 1984)).  However, "where there has been such a breach of a contract by one party that the other may choose to rescind and recover in quasi-contract," recovery on the theory of quasi-contract is permitted.  *Roberge v. Cambridge Co-op. Creamery*, 79 N.W.2d 142, 150 (Minn. 1956).

The complaint states "the circumstances render it inequitable for [Seagate] to retain the benefit [of his inventorship] without paying for it  . . . either in the disgorgement of profits or payment of a fair license fee."  (Am. Compl. ¶ 305.)  As discussed earlier, by its terms, Shukh's employment agreement provides **no** right to profits, or licensing fees for inventions.  Instead, Shukh was paid a salary and agreed to assign all of his inventions, and his rights to those inventions, to Seagate.  There can be no claim for unjust enrichment.  Further, because the Court has determined that Shukh

- 22 -

**A23**

has not adequately pled a claim for breach of the employment agreement, Shukh cannot base a claim for unjust enrichment on a theory of recovery in quasi-contract. *See Roberge*, 79 N.W.2d at 150. Though Shukh's standing is derivative of harm to his reputational interests, unlike *Chou*, and similar to *Larson*, there are simply no expectations or promises of financial gain anticipated by the employment agreement, thus the Court grants Seagate's motion to dismiss Claim Seven.

### G.      Claim Eight:  Interference with Business Expectancy

A claim for tortious interference with prospective economic advantage under Minnesota law must allege:

> (1) the existence of a reasonable expectation of economic advantage or benefits belonging to the plaintiff; (2) that Defendants had knowledge of that expectation of economic advantage; (3) that Defendants wrongfully and without justification interfered with Plaintiffs' reasonable expectation of economic advantage or benefit; (4) that in the absence of the wrongful acts of Defendants, it is reasonably probable that Plaintiffs would have realized their economic advantage or benefit; and (5) that Plaintiffs sustained damages as a result of this activity.

*Steinhauser v. City of St. Paul*, 595 F. Supp. 2d 987, 1019–20 (D. Minn. 2008) (citing *Harbor Broad., Inc. v. Boundary Waters Broad, Inc.*, 636 N.W.2d 560, 569 (Minn. Ct. App. 2001)) *partially reversed on other grounds*.

Shukh does not allege what business expectancy was interfered with, that Seagate knew about such expectancy, why it is probable he would have realized such expectancy, or specific damages resulting from Seagate's actions.   Thus, there was no realistic expectation of economic benefit that Seagate could have violated.  Shukh's employment agreement clearly assigned all rights, title, and interest in his inventions to Seagate, with

no expectation that he would receive compensation other than his salary. The Court grants Seagate's motion to dismiss Claim Eight.

### H.    Claims Nine and Ten:    Title VII and State Law National Origin Discrimination

Shukh's ninth and tenth claims for relief allege national origin discrimination under Title VII and the Minnesota Human Rights Act ("MHRA"). 42 U.S.C. § 2000e-2(a)(1); Minn. Stat. § 363A.08. Shukh argues that he need not plead discrimination with greater than usual particularity, and that an employment discrimination claim need not contain specific facts establishing a prima facie case of discrimination. The Supreme Court

> has never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss. . . . [The Court has rejected] the argument that a Title VII complaint requires greater particularity, because this would too narrowly constrict the role of the pleadings.

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (alterations, citations, and internal quotation marks omitted); *see also Twombly*, 550 U.S. at 570 (in the employment discrimination context the Supreme Court does not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."). As a result "[a]n employment discrimination plaintiff need only give the defendant 'fair notice' of what the plaintiff's claims are and the grounds upon which they rest." *Martin v. Reliastar Life Ins. Co.*, 710 F. Supp. 2d 875, 887 (D. Minn. 2010).

In the amended complaint Shukh alleges that he was discriminated against based on national origin, and that the discrimination included disparate treatment in pay, promotions, and denial of recognition and inventorship.

Shukh's pleadings related to discrimination in pay, promotions, and failure to be recognized for achievements, consist of little more than bare statements that such events occurred. However, taking the facts in a light most favorable to Shukh, and given that he was terminated despite being a very successful inventor and a member of the Seagate Inventor Hall of Fame, the pleadings are not so deficient they fail to state a claim that is plausible on its face. *Martin*, 710 F. Supp. 2d at 888 ("Unlike their white coworkers, Plaintiffs claim that they received lower pay, had unequal access to promotion opportunities . . . and were refused overtime opportunities. These are not conclusory statements, but rather assertions of fact that put the Defendants on fair notice of the basis for this lawsuit."); *see also Swanson v. Citibank, N.A*, 614 F.3d 400, 405 (7th Cir. 2010) ("[The] complaint identifies the type of discrimination that [plaintiff] thinks occurs (racial), by whom . . . and when (in connection with [plaintiff's] effort in early 2009 to obtain a home-equity loan). This is all that [plaintiff] needed to put in the complaint.").

Next, Seagate argues that Shukh's Title VII claim is time barred because to properly bring such a claim, a charge of discrimination must be filed with the EEOC within 300 days of the alleged unlawful employment practice.[2] 42 U.S.C. § 2000e-

---

[2] If the charge had been filed **only** with the EEOC, then the time limits for filing would have been 180 days, however, because Shukh concurrently instituted proceedings with a state agency, the relevant limitations period is 300 days. 42 U.S.C. § 2000e-5(e)(1) ("[the period for

(Footnote continued on next page.)

5(e)(1). A Minnesota Human Rights Act ("MHRA") claim must be filed with the Minnesota Department of Human Rights within one year after the alleged discriminatory conduct. Minn. Stat. § 363A.28. Shukh filed his charge of discrimination with both agencies on March 17, 2009. (Am. Comp. § 244.) Thus, if nothing tolls the time limitations, Shukh may only pursue claims for discrimination under Title VII that occurred from May 21, 2008-March 17, 2009, and under the MHRA from March 17, 2008-March 17, 2009. Seagate argues that if the discriminatory activity is defined as filing patents without including Shukh as an inventor, then they must be dismissed as beyond the statutory limitations period of Title VII and the MHRA.

"A charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Nat. R.R. Passenger Corp v. Morgan*, 536 U.S. 101, 122 (2002); *Walsh v. Nat'l Computer Sys.*, 332 F.3d 1150, 1157 (8th Cir. 2003). Courts have allowed plaintiffs to bring claims well after the statutory limitation period has passed when the claim is for a "hostile work environment." *Morgan*, 536 U.S. at 122; *Mems v. City of St. Paul, Dept. of Fire and Safety Servs.*, 327 F.3d 771, 785 (8th Cir. 2003). Though Shukh has not explicitly alleged that his work

_____

(Footnote continued.)

filing a charge under this section is 180 days except] in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred.").

environment was "hostile," a plain reading of the complaint suggests that it is, in essence, what he claims. Shukh alleges that the discrimination he faced at Seagate was ongoing and represented continuing violations, and that it was not limited only to a failure to be named on patents to which he contributed, but was also manifested through failures to be promoted and obtain increases in pay. Further, Shukh argues that even if certain acts are outside the limitation period, they can be used as background evidence in support of a timely claim.

Viewing the complaint in a light most favorable to Shukh, he has sufficiently alleged continued violations of state and federal law, tolling the relevant statutes of limitations. The Court thus denies Seagate's motion to dismiss Claims Nine and Ten.

## I.      Claims Eleven and Twelve:  Retaliation

Shukh's claims for retaliation under Title VII and the MHRA relate to actions that occurred prior to, and after, he filed his discrimination charges on March 17, 2009.

Shukh's allegation of retaliation **before** he filed his EEOC and MHRA actions were that "Seagate retaliated against him for his complaints" about "an extreme pattern of discrimination against him, because of his national origin, and accent . . . ." (Am. Compl. ¶¶ 229-30.)  The Court finds that Shukh adequately pled retaliation for pre-termination conduct based on allegations relating to his failure to be promoted, and to have his pay increased.

After filing his discrimination complaints, Shukh brought these claims, alleging that in retaliation for the EEOC and MHRA actions, Seagate or Seagate's counsel sent

him a letter reminding him of his obligations under the employment agreement to return documents to Seagate, sent Shukh's counsel a letter requesting return of the documents, refused to rehire Shukh for jobs to which he applied after being terminated, and spread rumors about Shukh preventing him from obtaining other employment. (Am. Compl. ¶¶ 247-62.) These claims were brought under the MHRA. (*Id.*) Unlike under Title VII, the MHRA does not require discrimination plaintiffs to exhaust their administrative remedies before bringing a lawsuit in a court. Minn. Stat. § 363A.33 ("[A] person may bring a civil action seeking redress for an unfair discriminatory practice directly to district court."). Shukh's MHRA claim did not need to be exhausted to be properly brought, and the post-EEOC-complaint retaliatory conduct claim was only brought under the MHRA, not Title VII, thus Seagate's exhaustion arguments are irrelevant. (Am. Compl. ¶ 258.)

Seagate argues that retaliation requires an adverse employment action that would have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("The antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm."). However, courts have held illegal employer retaliation can encompass materially adverse actions unrelated to plaintiff's employment. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 346 (1997) (negative employment reference of a former employee was a prohibited retaliatory material adverse action); *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 200 (3d Cir. 1994) (post-employment threat to a teacher's license who was pursuing Title VII discrimination

claims was a prohibited action subject to suit). Shukh has alleged that statements and rumors from Seagate have affected his ability to be hired elsewhere and that he was not rehired for available positions at Seagate despite being well-qualified for them. Taking these allegations as true, the Court finds that he has stated a claim for relief for retaliation that is plausible on its face. As a result, the Court denies Seagate's motion to dismiss as to claims Eleven and Twelve.

### J. Claim Thirteen: Declaratory Judgment Regarding Confidentiality Provisions

Shukh sought and was granted leave to file an amended complaint (Docket No. 6), in which he added a claim seeking a declaratory judgment that provisions in the employment agreement requiring Shukh to return certain documents be declared unenforceable. (Am. Compl. ¶ 327.) Seagate moved to dismiss, and Shukh brought a motion for summary judgment on the claim.

Seagate argues that as a condition of his employment, Shukh agreed to maintain the confidentiality of Seagate's confidential information, and to return all of Seagate's property upon termination of his employment. The relevant contract provision states:

> Returning Company Documents: I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all . . . records, notes, [and] other documents . . . developed by me pursuant to my employment with the Company.

(Am. Compl. Ex. 1.) Seagate notes that before being escorted from Seagate on March 16, 2009, Shukh took 49,607 documents, which the Magistrate Judge ordered be disclosed to Seagate. (Hearing Tr. at 36:10-14, Sept. 28, 2010, Docket No. 64.) Seagate argues that

- 29 -

Shukh has not asserted facts excusing him from compliance with the employment agreement.

Shukh alleges that during the course of his employment, and after "discovering Seagate's theft" of his ideas and inventions, he created and maintained his own records evidencing his work and inventorship. (Am. Compl. ¶ 329.) Claim Thirteen requests a declaration that Shukh need not comply with the document return provisions of the employment agreement. As support for this claim, Shukh argues that Seagate's fraudulent omission of Shukh as an inventor and filing of allegedly false patent applications demonstrates unclean hands. *Wind Turbine Indus. Corp. v. Jacobs Wind Elec. Co., Inc.*, No. 09-36, 2010 WL 4723385, at *12 (D. Minn. Nov. 16, 2010) ("The doctrine of unclean hands will be invoked only to deny equitable relief to a party whose conduct has been unconscionable by reason of a bad motive."). Shukh then argues that the Court should not enforce a contractual provision, such as the document return provision, that is in violation of public policy. The public policy Shukh is concerned with is Seagate's alleged violation of the Patent Act, which, Shukh argues, the Court should not condone. Finally, Shukh argues that the contract is unconscionable. To establish unconscionability, a party must demonstrate it had no meaningful choice but to deal with the other party and to accept the contract as offered. *Sports and Travel Mktg., Inc. v. Chi. Cutlery Co.*, 811 F. Supp. 1372, 1380 (D. Minn. 1993).

Seagate argues that the provision is not unconscionable or against public policy because Shukh cannot violate a contractual duty not to take confidential materials simply

because he needs them to support his claims. Seagate points to *JDS Uniphase Corp. v. Jennings*, in which the court said

> By no means can [public] policy fairly be said to authorize disgruntled employees to pilfer a wheelbarrow full of an employer's proprietary documents in violation of their contract merely because it might help them blow the whistle on an employer's violations of law . . . . Endorsing such theft or conversion would effectively invalidate most confidentiality agreements, as employees would feel free to haul away [documents] knowing they could later argue they needed the documents to pursue suits against employers . . . .

473 F. Supp. 2d 697, 702 (E.D. Va. 2007). Additionally, Seagate argues that the disputed provision is routinely accepted by reasonable people, and suggests that hundreds of Seagate employees have accepted the provision, thus rendering it reasonable, and not unconscionable.

The Court finds no evidence of unconscionability, or bad faith, and finds that public policy does not militate in favor of issuing a declaratory judgment that the document return provisions of Shukh's employment agreement are unenforceable. Thus, Seagate's motion to dismiss Claim Thirteen is granted, Shukh's motion for summary judgment is denied as moot.

## II. MOTION FOR INJUNCTIVE RELIEF

Shukh also filed a motion for a mandatory injunction requiring Seagate to make disclosures Shukh alleges are mandated by the PTO's "Manual of Patent Examining Procedure" (MPEP"), and 37 C.F.R. § 1.56. These provisions combine to require that the PTO be informed of litigation relating to pending or issued patents, by the applicants. 37 C.F.R. § 1.56; MPEP § 2001.06(c) ("Where the subject matter for which a patent is being

sought is or has been involved in litigation, the existence of such litigation and any other material information arising therefrom must be brought to the attention of the [PTO].").

Shukh filed his original complaint on October 12, 2010, and alleges that after monitoring the "public File Wrappers" on the PTO's website, he found no indication that Seagate had disclosed the fact of the litigation as it related to the five patents at issue in this case. Shukh wrote to Seagate asking whether it had informed the PTO and other co-inventors about the litigation. On October 29, 2010, Seagate filed a "Notice of Information from Related Litigation" with the PTO, disclosing the existence of this litigation and Shukh's claims of inventorship for each pending Seagate patent application. (Drown Decl. Exs. 1-5, Docket No. 102.)

Seagate argues that this Court does not have the power to order the requested relief. The Federal Circuit has previously found that a district court exceeded its authority when it ordered parties to disclose information to the PTO in the context of a reexamination proceeding. *Emerson Elec. Co. v. Davoil, Inc.*, 88 F.3d 1051, 1054 (Fed. Cir. 1996); *see also In re Cont'l Gen. Tire, Inc.*, 81 F.3d 1089, 1093 (Fed. Cir. 1996) (compelling a district court to vacate an order requiring an alleged infringer in a patent suit to file a request for reexamination with the PTO). In *Emerson*, the Federal Circuit said that the district court is "not authorize[d] . . . to direct that [plaintiff] must include [defendant's] documents in its filings in the [PTO] in the reexamination proceedings." *Emerson Elec. Co.,* 88 F.3d at 1054. Shukh has not cited **any** case supporting the idea that this Court has the authority to issue a writ mandating that a litigant file something with the PTO in the context of patent litigation and other litigation related thereto.

- 32 -

**A33**

Seagate also argues that its filing of five "Notice[s] of Information from Related Litigation" renders the subject of this motion moot. *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000) ("[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." (alteration in original) (internal quotation marks omitted)).

Seagate's disclosures include the following language:

> Alexander M. Shukh filed a lawsuit in United States District Court . . . asserting claims for . . . Correction of Inventorship . . . Fraud and Fraudulent Concealment, Breach of Fiduciary Duty, Unjust Enrichment . . . .

(Drown Decl. Exs. 1-5.) Tellingly, Shukh has not cited **any** case setting forth a standard of materiality, or describing what specific information would meet the requirements he alleges must be met. Shukh has failed to detail the deficiencies in Seagate's attempt to comply with his request, and has not suggested what Seagate should have done. Further, Shukh has failed to identify what he wants the Court to order Seagate to do, unless it is to turn over all documents relating to this litigation, Shukh's employment with Seagate, and any other peripherally related materials, to the PTO. Though Seagate **could** have filed more documents with the PTO, it has not breached any identified rule or law requiring more. Even if the Court has the authority to require Seagate to provide additional documents to the PTO, which is uncertain at best, it will not issue such an order because Seagate has rendered the issue moot by disclosing the litigation to the PTO.

## ORDER

Based upon all the files, records and proceedings herein **IT IS HEREBY ORDERED** that:

1.     Defendants' Motion to Dismiss the Amended Complaint [Docket No. 14] is **GRANTED in part** and **DENIED in part** as follows:

      a.     The motion is **GRANTED** as to Claims Three, Four, Six, Seven, Eight, and Thirteen and those claims are **DISMISSED with prejudice**.

      b.     The motion is **DENIED** in all other respects.

2.     Plaintiff's Motion for Partial Summary Judgment on His Second Claim for Relief [Docket No. 57] is **DENIED.**

3.     Plaintiff's Motion for Partial Summary Judgment on Plaintiff's Thirteenth Claim for Relief For a Declaratory Judgment Regarding the Unenforceability of The Confidentiality and Document Return Provisions of His Employment Agreement [Docket No. 78] is **DENIED as moot**.

4.     Plaintiff's Motion for a Preliminary Injunction [Docket No. 65] is **DENIED.**

DATED:  March 30, 2011
at Minneapolis, Minnesota.

                       s/ John R. Tunheim
                       JOHN R. TUNHEIM
              United States District Judge

# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| ALEXANDER M. SHUKH, | Civil No. 10-404 (JRT/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| SEAGATE TECHNOLOGY, LLC, SEAGATE TECHNOLOGY, INC., SEAGATE TECHNOLOGY, and UNKNOWN OWNERS AND ASSIGNEES, | |
| Defendant. | |

Constantine John Gekas and John C. Gekas, **GEKAS LAW, LLP**, 11 South LaSalle Street, Suite 1700, Chicago, IL 60603; and James H. Kaster, Katherine M. Vander Pol, and Sarah W. Steenhoek, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402, for plaintiff.

Chad Drown, Calvin L. Litsey, Elizabeth Cowan Wright, Joseph A. Herriges, David J. F. Gross, and Jeya Paul, Charles F. Knapp, **FAEGRE & BENSON LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, for defendants.

Plaintiff Alexander M. Shukh filed this action against defendants Seagate Technology, LLC, Seagate Technology, Inc., and Seagate Technology (collectively "Seagate"), alleging claims arising out of Seagate's employment and termination of Shukh. Seagate counterclaimed against Shukh for breach of the parties' employment agreement, conversion, and replevin. Seagate's claims arise out of Shukh's duplication

and retention of over 49,000 documents owned by Seagate. Shukh moves to dismiss the counterclaims. Seagate moves for summary judgment on all of its counterclaims, or, in the alternative, for a preliminary injunction on the breach of contract counterclaim or for the return of documents pursuant to the Court's inherent authority. Because there is no material issue of fact as to Shukh's breach of the document return provision of the employment agreement, the Court will grant Seagate's motion for summary judgment as to the breach of contract claim. The Court will grant Shukh's motion to dismiss as to the conversion and replevin counterclaims because the heart of those claims lies in the breach of contract claim. The Court will deny the remaining motions made by Shukh and Seagate.

## BACKGROUND

Shukh worked at Seagate from around September 15, 1997 until sometime after he was notified of his termination on January 14, 2009, to be effective March 16, 2009. (Am. Compl. ¶¶ 33, 34, April 7, 2010, Docket No. 7.) Shukh signed an agreement entitled At-Will Employment, Confidential Information and Invention Assignment Agreement on September 15, 1997. (Am. Compl., Ex. 1.) Seagate alleges Shukh breached the following provision of the agreement:

> Returning Company Documents: I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, software, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or

assigns. In the event of the termination of my employment, I agree to sign
and deliver the "Termination Certification" attached hereto as <u>Exhibit C</u>.

(Am. Compl., Ex. 1 at 3.)  Prior to Shukh's termination and immediately following his

notice of termination, Shukh made copies of approximately 49,607 pages of Seagate's

documents.[1]  (Mots. Hr'g Tr. at 36:10-16, Sept. 28, 2010, Docket No. 64.)  Shukh alleges

that the documents are proof of his inventorship rights at issue in his claims against

Seagate.  (Am. Compl. ¶ 330.)

Seagate repeatedly requested the return of the documents, but Shukh has refused.

First, on January 15, 2009, after Shukh received his notice of termination, Shukh's

supervisor was informed that Shukh was copying and taking documents from Seagate.

(Allen Decl. ¶ 4, June 13, 2011, Docket No. 166.)  When Shukh's supervisor requested

the return of the documents, Shukh refused.  (Allen Decl. ¶¶ 4-5.)  On May 26, 2009,

Seagate sent a letter to Shukh, again requesting the return of the documents, but no

documents were returned.  (Mem. in Supp., Ex. H, Docket No. 163-8.)  Later that year,

Shukh's attorney indicated that he had possession of about twelve documents.  (Mem. in

Opp'n to Mot. for Summ. J., Exs. B-4, B-6, Docket No. 189-2.)  Seagate first learned that

Shukh had taken many more documents in February of 2010, when Shukh filed his

complaint, referencing numerous Seagate documents.  (Reply Mem. 4, Aug. 2, 2011,

Docket No. 195.)  Seagate sent a letter to Shukh the following month, once more

---

[1] Shukh copied 4,544 documents onto physical pieces of paper using Seagate's copier and paper, and digitally copied 45,063 documents onto electronic media.  (Am. Countercl. ¶ 20, June 3, 2011, Docket No. 155.)

requesting the return of Seagate's documents, citing the terms of the employment agreement (Mem. in Supp., Ex. J, June 13, 2011, Docket No. 163-10); Shukh refused.

Seagate prepared a motion for the return of documents and initially scheduled a hearing on the motion for June 2, 2010. (Stipulation 2, May 17, 2010, Docket No. 12.) As a result of a trial in which Shukh's counsel was involved, the parties agreed to delay the hearing until after August 16, 2010. (*Id.* at 3.) Seagate moved for return of its documents in August. (Mot. to Disqualify Counsel and for Return of Documents, Aug. 30, 2010, Docket No. 25.) A hearing was held before the Magistrate Judge on September 28, 2010, and Shukh's counsel admitted that Shukh had taken approximately 50,000 documents. (Mots. Hr'g Tr. at 36:10-14, Sept. 28, 2010.) At that hearing the Magistrate Judge ordered Shukh to copy all of the documents and provide them to Seagate, so that Seagate could examine them and determine whether there are any privilege concerns. (Docket No. 61.) Seagate alleges that this hearing was the first time it learned the extent of the documents taken, and it subsequently counterclaimed against Shukh on April 15, 2011, seeking the return of all of the documents. (Ans. and Countercl., Apr. 15, 2011, Docket No. 142.) Shukh made copies of the documents, and gave those additional copies to Seagate. (Am. Countercl. ¶ 20.) However, to date, none of Shukh's own copies of Seagate's documents appear to have been returned to Seagate.

Shukh moved to dismiss Seagate's counterclaims for failure to state a claim on May 13, 2011. (Mot. to Dismiss, May 13, 2011, Docket No. 150.) Seagate moved for summary judgment on its counterclaims on June 13, 2011. (Mot. for Summ. J., June 13, 2011, Docket No. 169.) In support of its motion, Seagate submitted a DVD containing a

copy of the documents at issue under protective seal.  (Drown Decl., Ex. P, June 13, 2011, Docket No. 163-16.)  Additionally, Seagate has produced many of the documents at issue in discovery, but withheld approximately 392 documents under assertions of privilege.  (Letter to Dist. Judge, Sept. 23, 2011, Docket No. 202.)  Those documents are now the subject of a motion to compel made by Shukh, which will be decided by the Magistrate Judge.  (Am. Mot. to Compel, Oct. 7, 2011, Docket No. 206.)  Shukh later moved to dismiss Seagate's counterclaims for lack of jurisdiction.  (Mot. to Dismiss, Oct. 14, 2011, Docket. No. 214.)

## ANALYSIS

## I.    STANDARD OF REVIEW

### A.    Motion to Dismiss

Shukh moves to dismiss Seagate's counterclaims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  Although a complaint need not contain "detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility" and must be dismissed.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal quotation marks omitted).  In reviewing a complaint on a motion to dismiss, the Court

takes as true all allegations in the complaint, and construes it in the light most favorable to the nonmoving party. *Carton v. Gen. Motors Acceptance Corp.*, 611 F.3d 451, 454 (8th Cir. 2010).

### B.      Seagate's Motion for Summary Judgment

Seagate moves for summary judgment pursuant to Federal Rule of Civil Procedure 56. Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trustees*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.     BREACH OF CONTRACT

### A.      Shukh's Motions to Dismiss the Breach of Contract Claim

Shukh moves to dismiss Seagate's breach of contract claim for failure to state a claim. Specifically, Shukh argues that Seagate has not adequately pleaded the elements

of damages and satisfaction of conditions precedent. Seagate amended its counterclaim to address these concerns and the Court finds that Seagate has adequately pleaded these elements, as discussed in further detail below. For these reasons, the Court will deny Shukh's motion to dismiss for failure to state a claim as to the breach of contract counterclaim.

Additionally, Shukh moves to dismiss Seagate's breach of contract claim under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction, arguing that Seagate's production of documents in discovery mooted its claim for breach of contract. Seagate did not, however, produce all of the documents at issue; it withheld approximately 392 documents due to privilege claims. At the hearing on this matter, counsel for Shukh admitted that not all documents were produced in discovery, and Shukh has a motion to compel pending before the Magistrate Judge. (Mots. Hr'g Tr. at 6:16-22, Nov. 3, 2011, Docket No. 231.) The Court concludes it has jurisdiction at this time and will deny the 12(b)(1) motion because it finds at least some documents have not yet been produced.

### B.  Seagate's Motion for Summary Judgment on Breach of Contract

Seagate moves for summary judgment on its counterclaim for breach of contract. To establish a breach of contract claim under Minnesota law, the plaintiff must prove that (1) an agreement was formed, (2) the plaintiff performed any conditions precedent, and (3) the defendant breached the agreement. *Nicollet Cattle Co. v. United Food Group, LLC*, No. 08-5899, 2010 WL 3546784, at *7 (D. Minn. Sept. 7, 2010) (citing *Commercial*

*Assocs., Inc. v. Work Connection, Inc.*, 712 N.W.2d 772, 782 (Minn. Ct. App. 2006)).  In addition, some Minnesota cases hold that damages are a required element, *see, e.g., Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000), while others indicate that specific performance may be requested in lieu of damages.  *See Loppe v. Steiner*, 699 N.W.2d 342, 349 (Minn. Ct. App. 2005).

Seagate argues that there is no genuine issue of fact on any of the elements required to prove a breach of contract claim.  Seagate supports its claim with ample record evidence that Shukh does not dispute.[2]  First, an agreement was formed when Shukh signed the employment agreement.  (Am. Compl. ¶ 287 (admitting the existence of the agreement).)  The consideration exchanged included Seagate's promises of at-will employment and compensation and Shukh's promise to comply with the terms of the Employment Agreement.  (Am. Compl., Ex. 1 at 1.)

Second, any conditions precedent have been satisfied.  A condition precedent "is one which is to be performed before the agreement of the parties becomes operative." *Lake Co. v. Molan*, 131 N.W.2d 734, 740 (Minn. 1964).  The agreement generally required Shukh to agree to its terms "[a]s a condition of [his] employment with Seagate." (Am. Compl., Ex. 1 at 1.)  Additionally, the document return provision was to be

_____

[2] Rule 56(e) provides:

> If a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion; [or] (3) grant summary judgment if the motion and supporting materials – including the fact considered undisputed – show that the movant is entitled to it . . . .

Fed. R. Civ. P. 56(e).  In reaching its decision, the Court considered the supporting materials provided by both parties in the light most favorable to Shukh.

complied with "at the time of leaving the employ of" Seagate. (Am. Compl., Ex. 1 at 3.) There is no material issue of fact that Seagate employed Shukh nor that Shukh has left the employ of Seagate. (Am. Compl. ¶¶ 33, 34.)

Finally, there is no issue of fact that Shukh breached the contract. The terms of the employment agreement are clear: upon Shukh's termination he was to return Seagate's "records, data, notes, reports, . . . correspondence, specifications, drawings, blueprints, sketches, . . . other documents or property, or reproductions of any aforementioned items . . . ." (Am. Compl., Ex. 1 at 3.) Shukh admitted that he took and retained Seagate's documents. (Stipulation 2; Mots. Hr'g Tr. 26-27, Sept. 28, 2010; *see also* Am. Compl. ¶¶ 241, 250, 252.)

A review of the evidence submitted in this action indicates that there is no genuine issue of material fact on the elements of breach of contract. However, Shukh has raised a number of defenses to Seagate's breach of contract claim which the Court now addresses.

### C. Shukh's Defenses to Breach of Contract

Shukh asserts that the counterclaims are moot because Seagate attached a copy of the documents to its motion, that the counterclaims are preempted by federal patent law and the Constitution, that he needs additional time for discovery, that Seagate's request for equitable remedies is barred by its unclean hands, and that Seagate has waived its rights under the contract due to its delay in seeking legal relief. The Court considers each of these defenses in turn.

### 1.    Mootness

Shukh argues that Seagate's counterclaims are moot because Seagate later disclosed all of the documents at issue in support of its summary judgment motion. Shukh cites to cases that involve parties who initially disclosed materials in discovery and later attempted to obtain a protective order or assert a privilege.[3]    The Court finds that these cases are inapposite.  By producing documents as part of the litigation process in 2011, Seagate did not condone Shukh's unauthorized taking of the documents in 2009. Further, the parties have a legally cognizable interest in the outcome, because lawful possession of the documents is relevant for this action and for future use of the documents.[4]    *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000).  The Court finds that Seagate did not moot its breach of contract claims by submitting a copy of the documents in support of its motions.

---

[3] *See United States ex rel. Schweizer v. Oce, N.V.*, 577 F. Supp. 2d 169, 176 (D.D.C. 2008) (a party must jealously guard its privilege to retain it); *Door Direct, Inc. v. Nationwide Delivery Sys., Inc.*, 2005 U.S. Dist. LEXIS 35236 (W.D. Tex. 2005) (a party may use information obtained through discovery); *Cruz v. Coach Stores, Inc.*, 196 F.R.D. 228, 230 (S.D.N.Y. 2000) (party had disclosed material in related litigation without a protective order and therefore could not assert a privilege over same material in a different action); *McGreevy v. CSS Indus.*, 1996 U.S. Dist. LEXIS 10244 (E.D. Pa. 1996) (no privilege where information was inadvertently disclosed if no reasonable attempt made to safeguard information or prompt steps taken to correct disclosure).

[4] The documents exchanged in this litigation are currently protected under seal.  Seagate is concerned that Shukh will use the documents for a competitive advantage in his new business, Spingate Technology, LLC, which develops memory technology designed to replace the type of products made by Seagate.  (Mem. in Supp., Ex. Q, June 13, 2011, Docket No. 163-17.)

## 2.      Preemption and Constitutionality

Shukh also defends against Seagate's counterclaims by arguing that they are preempted by federal patent law because he needs the documents to prove his inventorship claims.  In addition, he argues that the return of the documents would conflict with the Patent Clause of the Constitution, U.S. Const. art. I, § 9, cl. 8, and therefore may not be ordered.[5]  These arguments rest on the premise that Shukh is unable to prove his inventorship claims without these documents and that he cannot obtain the documents in another manner.  To the contrary, Seagate has already provided nearly all of these documents in discovery, and Shukh is currently challenging Seagate's assertion of privilege over the documents not produced.  (Letter to Dist. Judge 1-2, Sept. 20, 2011, Docket No. 201; Am. Mot. to Compel.)  It is clear that there are other lawful methods of obtaining such proof, such as discovery governed by the Federal Rules of Civil Procedure.  This Court will not sanction an employee's breach of contract merely because the employee finds it inconvenient to follow the rules of discovery to obtain evidence supporting its claims against an employer.

---

[5] The patent clause states that "Congress shall have Power . . . [t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries . . . ." U.S. Const. art. I, § 9, cl. 8.  Shukh's argument as to this clause is not clear, but it appears that he creates a distinction between ownership and inventorship, and argues that inventorship cannot be transferred, even though ownership of a patent may be assigned.  Because, pursuant to his reading, the patent clause primarily protects inventor's rights, he argues that any theories that detract from the right of inventorship run afoul of the Constitution.

### 3.     Additional Time for Discovery

Shukh submits a declaration seeking additional time for discovery on its defenses and claims against Seagate.  A "party opposing summary judgment is required to file an affidavit . . . showing what specific facts further discovery might uncover."  *Roark v. City of Hazen*, 189 F.3d 758, 762 (8th Cir. 1999).   In *Anuforo v. Commissioner*, the district court denied a party's request for additional time to take a witness's testimony because the request lacked specific facts and a description of "what information further discovery might reveal."[6]   614 F.3d 799, 808 (8th Cir. 2011) (affirming).   Similarly, Shukh's assertions lack specificity.  He claims that he must investigate "[t]he true facts behind Seagate's failure to move promptly to seek the return of documents" and take additional depositions.  (Mem. in Opp'n to Mot. for Summ. J., Ex. D ¶ 4, July 12, 2011, Docket No. 189-4.)  Shukh does not indicate what information might be uncovered or how the "true facts" of Seagate's purported delay might be relevant to the counterclaims.  Accordingly, the Court finds that Shukh has not adequately supported his request for additional time for discovery.

### 4.     Unclean Hands

Shukh also raises the equitable defense of unclean hands to bar Seagate's request of specific performance of the contract.  "The doctrine of unclean hands will be invoked

---

[6] The Eighth Circuit reached similar holdings in *Ray v. Am. Airlines, Inc.*, 609 F.3d 917, 923 (8th Cir. 2010) (denying request because non-moving party failed to articulate how facts sought were relevant to rebuttal of motion for summary judgment); and *Marksmeier v. Davie*, 622 F.3d 896, 903 (8th Cir. 2011) (denying request because non-moving party's statement that depositions were "necessary to test the veracity of and refute the allegations made" was not specific enough).

only to deny equitable relief to a party whose conduct has been unconscionable by reason of a bad motive." *Wind Turbine Indus. Corp. v. Jacobs Wind Elec. Co., Inc.*, No. 09-36, 2010 WL 4723385, at *12 (D. Minn. Nov. 16, 2010).   Shukh argues that his claims against Seagate of correction of inventorship and fraud support a finding that Seagate has unclean hands.   This Court addressed Shukh's argument of unclean hands in its Order dated March 30, 2011 when it dismissed Shukh's request for a declaration that the document return provisions of the employment agreement are unenforceable.[7]   (Mem. Op. and Order at 29-31, Mar. 30, 2011, Docket No. 140.)   Shukh has not submitted additional evidence to persuade the Court to reconsider this decision.

A party may not merely raise the defense of unclean hands to contest a motion for summary judgment without providing any evidentiary support.[8]   Shukh had the burden to show that there was a factual dispute as to his defense of unclean hands, and has failed to point to a single fact outside of the allegations contained in his complaint.   For this

---

[7] Shukh had argued that Seagate's fraudulent omission of his name as inventor and its filing of false patent applications demonstrated unclean hands. (*Id.* at 30.) This Court reviewed his arguments and found "no evidence of unconscionability, or bad faith" that would require this Court to declare the document return provisions unenforceable, and the Court dismissed the claim for declaratory judgment. (*Id.* at 31.)

[8] Courts have repeatedly dismissed the defense of unclean hands when it is unsupported. *See, e.g., Minn. Specialty Crops, Inc. v. Minn. Wild Hockey Club, LP*, No. 00-2317, 2002 U.S. Dist. LEXIS 13991, at *36 (D. Minn. July 26, 2002) (dismissing unclean hands defense when defendants presented no specific evidence showing plaintiff sought trademark registrations in bad faith); *Metro Networks Communs., Ltd. P'ship v. Zavodnick*, No. 03-6198, 2003 U.S. Dist. LEXIS 22685, at *22 (D. Minn. Dec. 12, 2003) (dismissing unclean hands defense when defendant did not show plaintiff's conduct was "unconscionable either as a result of a 'bad motive' or in the benefits to [plaintiff] or injury to others"); *Pedersen v. Akona*, 429 F. Supp. 2d 1130, 1143-44 (D. Minn. 2006) (declining to apply unclean hands doctrine in correction of inventorship action because plaintiff had not produced evidence showing defendant acted with bad motive and plaintiff had not established elements of fraud).

reason, the Court finds that Seagate's demand for specific performance is not barred by Shukh's defense of unclean hands.[9]

### 5.    Waiver

Shukh asserts that Seagate waived its rights to enforce the document return provision of the contract, because Seagate first asked Shukh to return the documents on his last day in January 2009, but waited sixteen months to take any legal action to retrieve the documents and two and a half years before moving for summary judgment on this issue.  Waiver requires "an intentional relinquishment of a known right, and it must clearly be made to appear from the facts disclosed."  *Citizens Nat'l Bank v. Mankato Implement, Inc.*, 441 N.W.2d 483, 487 (Minn. 1989) (internal quotation marks omitted). Mere unexplained delay is not construed as a voluntary relinquishment of contractual rights.  *Har-Mar, Inc. v. Thosen & Thorshov, Inc.*, 218 N.W.2d 751, 756 (Minn. 1974). The waiving party must also have had "full knowledge of the facts."  *Freitag v. Wolf*, 226 N.W.2d 868, 870 (Minn. 1975).

The Court concludes that Seagate's delay in seeking legal enforcement does not constitute waiver.  Seagate showed that it sought enforcement of the document return provision at regular intervals since Shukh's termination in 2009.  Seagate has made numerous requests for the documents and all of them have been refused or ignored by Shukh.  Further, Seagate could not have waived its rights prior to knowing how many

---

[9] Shukh clearly may continue to pursue his original claims of fraud, correction of inventorship, discrimination, and retaliation.  This portion of the opinion concerns only unclean hands in the context of the breach of contract, which is unsupported.

documents were involved, and Seagate claims that it did not have full knowledge of the facts until a hearing held September 28, 2010. After the hearing, Seagate timely filed its counterclaim for the return of the documents. Additionally, Seagate also notes that the employment agreement included a clause requiring "any waiver of rights under this agreement" to be "in writing signed by the party to be charged." (Am. Compl., Ex. 1 at 4.) Because Seagate showed no intention of relinquishing its rights by repeatedly asking for the documents, and because Shukh's employment agreement clearly required the return of the documents at issue, the Court finds that the defense of waiver does not bar Seagate's enforcement of the contract.[10]

In sum, the Court finds none of the defenses that Shukh raised against Seagate's counterclaims are adequate to defeat Seagate's motion for summary judgment on the breach of contract claim. Shukh has not disputed Seagate's proof of the elements of the breach claim, and his defenses are insufficient. The Court will grant summary judgment in favor of Seagate as to the breach of contract claim and will order specific performance in the form of Shukh returning the relevant documents.

---

[10] Similar to his argument on mootness, Shukh cites numerous cases in which courts have held that a party has waived work product and attorney-client privileges because it failed to take adequate and reasonable steps to protect its privileges. *See Bowles v. Nat'l Ass'n of Home Builders*, 224 F.R.D. 246, 253 (D.D.C. 2004); *IMC Chems., Inc. v. Niro, Inc.*, No. 98-2348, 2000 U.S. Dist. LEXIS 22850, at *80-81 (D. Kan. July 19, 2000). The Court finds these cases inapplicable because Seagate's assertion of privilege is not at issue in the present motions before this Court and will be determined by the Magistrate Judge. (Am. Mot. to Compel.) Seagate is seeking to enforce an employment agreement that explicitly required the return of any documents at the termination of Shukh's employment.

## C.      Preliminary Injunction

Seagate moved in the alternative for a preliminary injunction on the breach of contract claim, asking this Court to order the return of the documents pending the resolution of the action.  The Court denies Seagate's motion for a preliminary injunction because it is rendered moot by the Court's grant of summary judgment on the breach of contract claim.[11]

## III.    CONVERSION AND REPLEVIN

Seagate has also asserted counterclaims of conversion and replevin against Shukh based on his appropriation of its documents.  Under Minnesota law, conversion is "an act of willful interference with personal property, done without lawful justification by which any person entitled thereto is deprived of use and possession."  *DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997) (internal quotation marks omitted).  Punitive damages for conversion may be awarded under Minn. Stat. § 549.20.  *Goodwin v. Harmon*, No. 97-1123, 1997 WL 769491, at *2 (Minn. Ct. App. Dec. 16, 1997).  "A replevin action seeks to regain possession of items" and is governed by Minnesota statute.  *B-Kam, LLP v. Floding*, No. 08-5168, 2011 U.S. Dist. LEXIS 34683, at *26 (D. Minn. Mar. 30, 2011); *see* Minn. Stat. §§ 565.21-23.  A judgment in replevin may include "damages for the detention, or the taking and withholding."  Minn. Stat. § 548.04.

---

[11]Although the Court is not resolving this issue, it appears that there is no strong basis for a finding of irreparable harm at this time.  A court may deny a preliminary injunction solely on the ground that the movant did not show a threat of irreparable harm to the movant. *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003).

Shukh moves to dismiss Seagate's conversion and replevin claims on two theories: one, that the heart of the action is a breach of contract and there is no distinct tort; and, two, that he did not take original documents, but only copies. Seagate moves for summary judgment on both claims.

## A.     Heart of the Action

Shukh moves to dismiss Seagate's conversion and replevin claims on grounds that the heart of the action is a breach of contract. "Minnesota law does not recognize an independent tort for conduct that merely constitutes a breach of contract." *First Integrity Bank, N.A. v. Ohio Cas. Ins. Co.*, Civ. No. 05-2761, 2006 WL 1371674, at *6 (D. Minn. May 15, 2006). If the "actions at the heart" of a tort claim "are identical to those which constitute a breach of contract," there is no separate tort cause of action. *Id*. "A tort is independent from a breach of contract if a relationship would exist which would give rise to the legal duty without enforcement of the contract promise itself." *Best Buy Stores, L.P. v. Developers Diversified Realty Corp.*, No. 05-2310, 2007 U.S. Dist. LEXIS 86283 (D. Minn. Nov. 21, 2007) (internal quotations marks omitted). In order for the plaintiff to recover under a breach of contract **and** a tort claim, the "plaintiff must prove separate damages for [the tort] and for breach." *Hanks v. Hubbard Broad., Inc.*, 493 N.W.2d 302, 308 (Minn. Ct. App. 1992).

In this case, the actions at the heart of the conversion and replevin claim (Shukh's taking and retention of Seagate's documents) are the same as those giving rise to the breach of contract. Minnesota courts have not recognized a separate legal duty to return

an employer's documents.[12]   Seagate has not requested a specific amount of damages at this stage, and it is unlikely that it could prove separate damages for conversion and breach.   Seagate has enumerated no extraordinary circumstances that would allow it to pursue both a breach of contract action and an action in tort.   Because the actions at the heart of the claims are the same and Seagate has not proven separate damages for the separate claims, the Court will grant Shukh's motion to dismiss the conversion and replevin counterclaims.[13]

## B.     Conversion of Copies of Documents

Shukh also moves to dismiss the conversion and replevin claims on grounds that Seagate only alleged that Shukh took copies, and making copies does not amount to conversion because it does not deprive the owner of the original documents.   Seagate counters that Shukh took Seagate's physical property by using its paper, ink, and photocopier to make the copies at issue.   It is not clear whether Minnesota law acknowledges an action in conversion or replevin for copies of documents when the

---

[12]  Case law from other districts is inconsistent.   Although the Eastern District of Pennsylvania has held several times that an employee has an independent legal duty to return documents to its employer upon termination, *see Brown & Brown, Inc. v. Cola*, 745 F. Supp. 2d 588, 623 (E.D. Pa. 2010); *Orthovita, Inc. v. Erbe*, No. 07-2395, 2008 WL 423446, at *6 (E.D. Pa. Feb. 14, 2008); *Integrated Waste Solutions, Inc. v. Goverdhanam*, No. 10-2155, 2010 WL 4910176, at *13 (E.D. Pa. Nov. 30, 2010); other district courts have held that, absent a contractual provision requiring the return of documents, an employee is under no such duty.   *See Bowles v. Nat'l Ass'n of Home Builders*, 224 F.R.D. at 260; *IMC Chems., Inc. v. Niro, Inc.*, No. 98-2348, 2000 U.S. Dist. LEXIS 22850, at *80-82.

[13]  Seagate moves for summary judgment on conversion and replevin.   Because the Court will grant Shukh's motion to dismiss the conversion and replevin counterclaims, the Court will deny Seagate's motion for summary judgment on these claims.

claimant retains the originals.  The Court finds that it need not reach that determination because Shukh's heart of the action argument effectively disposes of Seagate's counterclaims for conversion and replevin.  Because the Court will grant Shukh's motion to dismiss as to conversion and replevin, Seagate's motion for summary judgment on those claims is rendered moot.

## IV.    COURT'S INHERENT POWER TO COMPEL RETURN OF DOCUMENTS

Seagate argues that the Court has inherent power to compel the return of its documents.  In support, it cites cases from other districts and state courts wherein a court ordered a party that obtained documents outside the course of discovery to return the documents.   Shukh contends the request is improper because Federal Rule of Civil Procedure 65 governs motions for the return of documents.  The Supreme Court has held that

> when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 50, (1991).   Because the Court has other sufficient bases upon which to order the return of documents, the Court will deny Seagate's motion requesting the Court to exercise its inherent powers.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff's Motion to Dismiss Counterclaims for Lack of Subject Matter Jurisdiction on the Grounds of Mootness Based on Changed Circumstances [Docket No. 214] is **DENIED.**

2.      Plaintiff's Motion to Dismiss Counterclaims [Docket No. 150] is **GRANTED in part** and **DENIED in part** as follows:

     a.      The motion is **DENIED** as to defendants' counterclaim for breach of contract.

     b.      The motion is **GRANTED** as to defendants' counterclaims for conversion and replevin.

3.      Defendants' motions for summary judgment, a preliminary injunction, and the return of documents [Docket No. 169] are **GRANTED in part** and **DENIED in part** as follows:

     a.      The motion for summary judgment is **GRANTED** as to defendants' counterclaim for breach of contract.

     b.      The motion for summary judgment is **DENIED as moot** as to defendants' counterclaims for conversion and replevin.

     c.      The motion for a preliminary injunction is **DENIED as moot**;

     d.      The motion for the return of documents under the inherent authority of the Court is **DENIED**.

Based upon the Court's granting Defendants' motion for summary judgment as to its counterclaim for breach of contract, **IT IS HEREBY FURTHER ORDERED** that Shukh return all documents at issue within twenty-one (21) days from the date of this Order.

DATED:  November 30, 2011
at Minneapolis, Minnesota.

s/ John R. Tunheim

JOHN R. TUNHEIM
United States District Judge

**Chris Gekas**

| | |
|---|---|
| **From:** | ecf-notice@mnd.uscourts.gov |
| **Sent:** | Thursday, December 15, 2011 3:56 PM |
| **To:** | mndecfnotifications@mnd.uscourts.gov |
| **Subject:** | Activity in Case 0:10-cv-00404-JRT-JJK Shukh v. Seagate Technology, LLC et al Order on Motion to Alter/Amend/Supplement Pleadings |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Minnesota**

## Notice of Electronic Filing

The following transaction was entered on 12/15/2011 at 3:56 PM CST and filed on 12/15/2011

**Case Name:**      Shukh v. Seagate Technology, LLC et al
**Case Number:**    0:10-cv-00404-JRT-JJK
**Filer:**
**Document Number:** 250(No document attached)

**Docket Text:**
**TEXT ONLY ORDER ON MOTION; VERBAL RULING ON Plaintiff's Motion for Leave to File Second Amended Complaint Under Seal (Doc. No. [243]), is GRANTED IN PART and DENIED IN PART. On December 30, 2011, Plaintiff may file an Amended Complaint that adds Seagate Technology, PLC, as a Defendant successor in interest, that adds a request for punitive damages for the Title VII claim, that moves those inventions previously referenced by application that have now issued as patents to the issued patent portion of the Complaint and Claim Two, and that eliminates allegations that have been disposed of. This Amended Complaint shall not reference, quote from, or rely on Seagate's documents that have been returned to Seagate and that Seagate still asserts privilege over (i.e., that Seagate still asserted privilege over at the time Plaintiff filed his motion). Plaintiff's request to allege punitive damages for his state law Minnesota Human Rights Act claim is denied. Plaintiff has failed to comply with Minn. Stat. §§ 549.191, 549.20, subd. 1(a), and has not made a prima facie showing of clear and convincing evidence of deliberate disregard for the rights or safety of others with regard to that claim. See Maroko v. Werner Enterprises, Inc., Civ. No. 10-63, Doc. No. 47 (D. Minn. Jan. 24, 2011). Signed by Judge Magistrate Judge Jeffrey J. Keyes. (MMP)**

**0:10-cv-00404-JRT-JJK Notice has been electronically mailed to:**

Calvin L Litsey       clitsey@faegre.com, couellette@faegre.com, tconn@faegre.com

Chad Drown      cdrown@faegre.com, mdilorenzo@faegre.com

Charles F Knapp    cknapp@faegre.com, lkoenig@faegre.com

Constantine John Gekas    cjg@gekaslaw.com

David J F Gross    dgross@faegre.com, degan@faegre.com

Elizabeth Cowan Wright    ewright@faegre.com, mdilorenzo@faegre.com

James H Kaster    kaster@nka.com, geving@nka.com

Jeya Paul    jpaul@faegre.com, degan@faegre.com

John C Gekas    jgekas@gekaslaw.com

Joseph A Herriges    jherriges@faegre.com, lhonse@faegre.com

Katherine M Vander Pol    vanderpol@nka.com, awendt@nka.com

Sarah W Steenhoek    ssteenhoek@nka.com, awendt@nka.com

**0:10-cv-00404-JRT-JJK Notice has been delivered by other means to:**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Alexander M. Shukh,                                     Civ. No. 10-404 (JRT/JJK)

    Plaintiff,

v.

Seagate Technology, LLC, a Delaware
Limited Liability Company; Seagate
Technology Inc., a Delaware
corporation; Seagate Technology, a
holding company of the Cayman
Islands; and Unknown Owners and
Assignees;

    Defendants,

and                                                     **ORDER AND**
                                                        **MEMORANDUM**

Seagate Technology, LLC, a Delaware
Limited Liability Company; Seagate
Technology, a holding company of the
Cayman Islands; and Seagate
Technology Inc., a Delaware
corporation,

    Counter-Claimants,

v.

Alexander M. Shukh,

    Counter-Defendant.

Constantine John Gekas, Esq., and John C. Gekas, Esq., Gekas Law LLP; and
James H. Kaster, Esq., Katherine M. Vander Pol, Esq., and Sarah W. Steenhook,
Esq., Nichols Kaster, PLLP, counsel for Plaintiff/Counter-Defendant.

Calvin L. Litsey, Esq., Chad Drown, Esq., Charles F. Knapp, Esq., David J. F. Gross, Esq., Elizabeth Cowan Wright, Esq., Jeya Paul, Esq., and Joseph A. Herriges, Esq., Faegre & Benson LLP, counsel for Defendants/Counter-Claimants.

This matter is before the Court on Plaintiff's Motion to Compel Production of Documents and to Permit Questioning about Those Documents (Doc. No. 206). A hearing was held on the matter on November 9, 2011. (Doc. No. 232.) Appearances are noted on the record. One of the arguments raised by Plaintiff at the hearing (which was raised only in a cursory fashion in his brief) was that because Defendants Seagate Technology, LLC, Seagate Technology, Inc., and Seagate Technology (collectively "Seagate") waived privilege to five invention disclosures, there should be a subject-matter waiver as to any documents relating to the patents at issue in those disclosures. After the hearing, the Court requested further briefing on this issue. Plaintiff's supplemental brief was thereafter filed on November 22, 2011 (Doc. No. 239), and Defendants' supplemental response was filed on December 7, 2011. (Doc. No. 247.) Based on all the files, records, and proceedings herein, the Court grants in part Plaintiff's motion with respect to a limited subject-matter waiver, and denies in part Plaintiff's motion in all other respects.

Accordingly, **IT IS HEREBY ORDERED** that:

1.     Plaintiff's Motion to Compel Production of Documents and to Permit Questioning about Those Documents (Doc. No. 206), is **GRANTED IN PART** to the extent that the Court finds a narrow subject-matter waiver based on

2

Seagate's waiver of its privilege as to Dr. Shukh's five invention disclosures. The scope of the subject-matter waiver is limited, however, to only those communications between Dr. Shukh and Seagate that were made subsequent to Dr. Shukh's submission of the invention disclosures to Defendant and relate to those invention disclosures. Plaintiff's motion is otherwise **DENIED**; and

    2.    The attached Memorandum is incorporated herein by reference.

Date: December 15, 2011

 s/ Jeffrey J. Keyes
JEFFREY J. KEYES
United States Magistrate Judge

**MEMORANDUM**

    The District Court has set forth the relevant background facts of this case in its November 30, 2011 Order (Doc. No. 242); thus, the Court will not iterate them here. The Court, however, adds the following relevant additional facts.

    In its November 30, 2011 Order, the District Court granted Seagate's motion for summary judgment as to its counterclaim for breach of contract and ordered that Plaintiff return all of the documents that Dr. Shukh had copied and taken from Seagate prior to and immediately following his notice of termination. In response to discovery requests from Plaintiff, Seagate has produced documents to Plaintiff, some of which include documents that were from the group of documents that Dr. Shukh had taken from Seagate. Particularly important here, Seagate produced Dr. Shukh's five invention disclosures over

3

**A61**

which Seagate previously had asserted privilege. But Seagate has continued to

withhold a total of 575 documents on the basis of privilege, which are recorded

on two privilege logs (the first privilege log corresponds to Seagate's

reproduction of certain documents Dr. Shukh had taken from Seagate in violation

of his employment agreement, and the second privilege log corresponds to

Seagate's production of certain documents on Dr. Shukh's hard drive).

Plaintiff's motion pending before this Court seeks an order compelling

Seagate to produce the privileged documents and to permit questioning about

them. Plaintiff does not dispute the sufficiency of Seagate's privilege logs or that

the 575 documents identified on the logs are relevant and privileged in the first

instance. Instead, Plaintiff assumes for the purposes of this motion that they are

relevant and privileged, but asks the Court to compel their production based on

various theories, most which he argues would require a blanket waiver or

production of all of the documents on the privilege logs. Seagate opposes the

production of the privileged documents listed on its logs under all of Plaintiff's

theories.

Based on the following explanations, the Court concludes that Plaintiff's

Motion to Compel Production of Documents and to Permit Questioning about

Those Documents (Doc. No. 206), is granted in part only with respect to a limited

subject-matter waiver, and denied in all other respects.

## I.    Subject-Matter Waiver

Plaintiff argues that Seagate's intentional waiver of any attorney-client privilege covering Dr. Shukh's five invention disclosures constitutes a waiver as to the subject matter of "inventorship regarding the inventions involved in this case."  (Doc. No. 239, Supplemental Mem. in Supp. of Mot. to Compel ("Pl.'s Suppl. Mem.") 16.)  Seagate, on the other hand, argues that subject-matter waiver occurs only in the "unusual situation" where a party intentionally waives the privilege to gain strategic advantage in litigation and fairness requires disclosure of additional privileged documents, and that such situation is not present here.  And even if subject-matter waiver is found, Seagate asserts that the scope of the subject-matter wavier should be very narrow.  The Court concludes that under the circumstances here, Seagate's intentional production of the five Invention Disclosures does call for subject-matter waiver, but one that is limited only to those communications between Dr. Shukh and Seagate about the five invention disclosures.

Federal Rule of Evidence 502 states:

When the disclosure is made in a Federal proceeding or to a Federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a Federal or State proceeding only if:

(1) the waiver is intentional;

(2) the disclosed and undisclosed communications or information concern the same subject matter; and

(3) they ought in fairness to be considered together.

Fed. R. Evid. 502(a).  Each of these three elements is met here.  As to the first and second elements, it is undisputed that Seagate intentionally waived the privilege as to Dr. Shukh's five invention disclosures, and that at least some of the undisclosed communications concern the same subject matter.  As to the third element, however, Seagate does dispute that fairness dictates a waiver.

The purpose of the subject-matter waiver doctrine is "to prevent a party from using the advice he received as both a sword, by waiving privilege to favorable advice, and a shield, by asserting privilege to unfavorable advice."  *In re EchoStar Commc'ns Corp.*, 448 F.3d 1294, 1303 (Fed. Cir. 2006) (stating that "the overarching goal of waiver" is to prevent a party from using advice as both a sword and a shield); *see also In re Seagate Tech.*, 497 F.3d 1360, 1372 (Fed. Cir. 2007) ("[Subject-matter waiver serves to] prevent . . . the inequitable result of a party disclosing favorable communications while asserting the privilege as to less favorable ones.").  Here, like in *Eden Isle Marina, Inc. v. United States*, "[e]ssentially, the court's analysis boils down to determining whether fairness dictates the expansion of defendant's waiver[.]"  89 Fed. Cl. 480, 520 (2009).

Seagate argues that it is unfair to apply subject-matter waiver because Dr. Shukh breached his employment contract by taking these documents in the first instance.  But the remedy for the breach has already been given by the District Court.  (*See* Doc. No. 242, 11/30/11 Order at 11 (granting summary judgment in favor of Seagate as to the breach of contract claim and ordering

6

**A64**

"specific performance in the form of Shukh returning the relevant documents"). The District Court also denied Seagate's motion for summary judgment (and granted Plaintiff's motion for summary judgment) as to Seagate's claims for conversion and replevin on the grounds that the heart of the action is a breach of contract. In so doing, the Court cut off Seagate's attempt to recover any separate damages for Dr. Shukh's action in taking the documents at issue from Seagate. This Court will not extend the remedy that the District Court has already provided Seagate for Dr. Shukh's actions in this privilege motion. In other words, this Court will not allow Seagate to selectively waive its privilege by producing Dr. Shukh's communications to Seagate disclosing his invention but then withhold Seagate's subsequent communications with Dr. Shukh about those same invention disclosures because of Dr. Shukh's breach of contract.

Seagate, however, also argues that it is unfair to apply subject-matter waiver because this "is not a situation where a party . . . deliberately disclosed documents in an attempt to gain a tactical advantage." (Doc. No. 247, Seagate's Resp. to Shukh's Supplemental Br. ("Seagate Suppl. Resp.") 8 (quoting *In re United Mine Workers of Am. Emp. Benefit Litig.*, 159 F.R.D. 307, 312 (D.D.C. 1994).) This Court, however, is not so convinced. When Seagate waived privilege as to the five invention disclosures, it stated:

> Because Dr. Shukh already has actively inserted these invention
> disclosures into this case by disclosing them in pleadings, motions,
> and other proceedings in this case, Seagate has been left with no
> choice but to rely on these disclosures in responding to Dr. Shukh's
> claims.

7

(Doc. No. 224, Decl. of Joseph Herriges in Supp. of Seagate's Opp'n to Shukh's

Mot. to Compel ("Herriges Decl.") ¶ 2, Ex. G.)  If this were true, then Seagate

likewise would have "no choice" but to also rely on the other privileged

documents that Plaintiff has referenced throughout this litigation.  Yet Seagate

has not offered to waive privilege as to any other privileged documents in this

case.  Therefore, this Court finds Seagate's argument somewhat disingenuous.

Further, although Seagate states over and over that the invention disclosures are

evidence that Dr. Shukh believes are "favorable to him," Seagate has not

declared that it does not intend to rely on those very documents to support its

case.  In fact, Seagate indicates the opposite:  "Seagate, of course, is permitted

to rely on the Invention Forms to respond to Shukh's claims[.]"  (Seagate Suppl.

Resp. 10.)  Because it appears that Seagate intends to use the five invention

disclosures to support its case, this Court concludes that it is only fair to find a

subject-matter waiver based on their disclosure.

The next question, however, is what should the scope of that subject-

matter waiver be.  "The widely applied standard for determining the scope of a

waiver of attorney-client privilege is that the waiver applies to all other

communications relating to the same subject matter."  *Fort James Corp. v. Solo*

*Cup Co.*, 412 F.3d 1340, 1349 (Fed. Cir. 2005).  "The waiver extends beyond the

document initially produced out of concern for fairness, so that a party is

prevented from disclosing communications that support its position while

simultaneously concealing communications that do not." *Id.* However, "[t]here is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures." *Id.* at 1349–50.

Plaintiff asserts that the scope of the waiver "should at least include all communications, whether internal or external to Seagate in regard to the consideration and treatment of inventorship – whether the inventorship of Dr. Shukh or of any other inventor, whether included on the patent applications or not." (Pl.'s Suppl. Mem. 16.) Plaintiff's suggested scope for the waiver is much too broad. *See Rowe Int'l Corp. v. Ecast, Inc.*, 241 F.R.D. 296, 302 (N.D. Ill. 2007) (stating that "in determining the scope of a waiver of the attorney-client privilege, the Court must consider the overriding issue of fairness," and concluding that "expanding the scope of the waiver to include virtually every privileged communication related to all the patents-in-suit could be fundamentally unfair"); *United States v. Skeddle*, 989 F. Supp. 905, 909 n.2 (N.D. Ohio 1997) ("Realizing that fairness is at the heart of the waiver issue, courts have generally held that the 'same subject matter' is to be viewed narrowly."). The "subject matter" of Seagate's intentional disclosure is Dr. Shukh's communications to Seagate in which he sent the company the five record of invention forms (each for a different invention). Seagate was able to utilize these invention disclosures in deciding whether to apply for patent protection and to keep a record of when

9

the invention occurred.  The Court concludes that the scope of the subject-matter

waiver here is limited to only those communications between Dr. Shukh and

Defendants that were made subsequent to Dr. Shukh's submission of the

invention disclosures to Defendant and relate to those invention disclosures.

As explained above in the Court's order, the only waiver that this Court

finds is the narrow subject-matter waiver just described.  The Court denies

Plaintiff's motion with respect to the various other waiver theories presented, as

described below.

## II.  Common-Interest Privilege

Plaintiff argues that he and Seagate had a common interest in patenting

the inventions, and therefore while Plaintiff and Seagate have joint privilege

against the rest of the world, there is no privilege as between Plaintiff and

Seagate.  Seagate asserts that the common-interest privilege only applies as an

exception to the rule that the privilege is waived when a disclosure is made to a

third party.  Seagate contends that Plaintiff is actually making a joint-

representation argument.

The attorney-client privilege does not attach absent an attorney-client

relationship.  The Court agrees with Seagate that its attorneys were not

Dr. Shukh's attorneys at the time that Dr. Shukh worked for Seagate.  And "the

Federal Circuit has consistently held that a firm prosecuting a patent application

on behalf of a company does not form an attorney-client relationship with any

individual inventor required to assign his rights to the company."  *Emory Univ. v.*

10

*Nova Biogenetics, Inc.*, No. 1:06-CV-0141-TWT, 2006 WL 2708635, at *5 (N.D. Ga. Sept. 20, 2006) (citing *Univ. of W. Va. v. Vanvoorhies*, 278 F.3d 1288, 1304 (Fed. Cir. 2002)).  Here, Dr. Shukh assigned his rights to any inventions to Seagate in his employment agreement.  Therefore, the privilege to the documents at issue is Seagate's privilege, and it need not now disclose those documents to Dr. Shukh based on any interest he might have had in the patent prosecution.  The common-interest doctrine would come into play if Seagate would have decided to share its privileged documents to a third party who shared a common interest with it.  In that situation, the attorney-client privilege that Seagate retained would not have been waived.  *See Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 211 n.4 (S.D.N.Y. 2009) (stating that the common-interest doctrine "permits the disclosure of a privileged communication without waiver of the privilege provided the party claiming an exception to waiver demonstrates that the parties communicating" had the necessary common interest under the law).

III.    **"At-Issue" Privilege**

Plaintiff argues that because Seagate disputes that Dr. Shukh is an inventor to the inventions, it put the inventorship of the inventions at issue, and therefore cannot claim privilege on the only probative evidence available. Seagate argues that the "at-issue" exception does not apply because all it has done is deny Plaintiff's allegations.  Seagate asserts that this denial is not an

"affirmative act" and that it should be able to answer a complaint without risking waiver.

The at-issue exception applies where, "through [an] affirmative act, the asserting party has placed the protected information at issue by making it relevant." *Medtronic, Inc. v. Intermedics, Inc.*, 162 F.R.D. 133, 134–35 (D. Minn. 1995). The Court concludes that Seagate has not put inventorship at issue here. To "waive the attorney-client privilege by voluntarily injecting an issue in the case, a defendant must do more than merely deny a plaintiff's allegations." *Lorenz v. Valley Forge Ins. Co.*, 815 F.2d 1095, 1098 (7th Cir. 1987). This is all that Seagate has done – it has merely denied Dr. Shukh's allegation that he is the inventor. Accordingly, Plaintiff's motion is denied as to this ground.

## IV.  Waiver by Delay

Plaintiff argues that because Seagate did not claim privilege for sixteen months, it should not be allowed to do so now. Seagate argues that it only delayed about six months, and that in any event it took reasonable measures to protect its documents. Seagate also argues that privilege cannot be waived in the case of employee theft.

For the same factual reasons that the District Court concluded in its November 30, 2011 Order (*see* Doc. No. 242, 11/30/11 Order at 14–15) that Seagate's delay in seeking legal enforcement did not constitute waiver of its rights to enforce the document return provision of the employment contract, the Court concludes that Seagate's delay does not constitute waiver of its privilege

12

over the documents at issue. *See Bowles v. Nat'l Ass'n of Home Builders*, 224 F.R.D. 246, 256 n.13 ("Those courts that have preserved the privilege in documents retained by a former employee have generally done so where there are at least some facts in the record to indicate that the employer had taken reasonable measures to prevent the disclosure of the document."). Further, "[t]o the extent documents can be viewed as stolen . . . they should not lose the protection of the privilege." *In re Grand Jury Proceedings Involving Berkley and Co.*, 466 F. Supp. 863, 869 (D. Minn. 1979).

## V. Unauthorized Practice of Law

Plaintiff argues that state rules require in-house counsel such as Seagate's General Counsel Ken Massaroni to be a member of the state bar in the state where he works. Plaintiff asserts that Mr. Massaroni is not registered or licensed to practice law in California or Minnesota, and therefore no privilege exists between Mr. Massaroni and the corporate client Seagate. Seagate argues that privilege attaches as long as the lawyer is a member of the bar any jurisdiction, and asserts that Mr. Massaroni is admitted to the bar of the District of Columbia and the U.S. Patent Office, as well as the Indiana bar.

A company "may assert the privilege with respect to correspondence to or from its patent counsel despite the fact that that counsel was not admitted to the bar of the state in which he was located." *Paper Converting Mach. Co. v. FMC Corp.*, 215 F. Supp. 249, 251 (E.D. Wis. 1963). Accordingly, Plaintiff's motion to compel is denied on this basis.

13

**A71**

## VI.    Failure to Advise

Plaintiff argues that Seagate's lawyers had a duty to advise him to get his own lawyer.  Because no one at Seagate advised him of this, Plaintiff says that any privilege that attached to conversations or communications that included Dr. Shukh also belonged to Dr. Shukh.  Seagate argues that it had no affirmative duty to advise Dr. Shukh to find his own lawyer.  And even if it did have a duty, Seagate argues that its lawyer's failure to do so may have been a violation of the rules of professional responsibility, but in any event it would not constitute a waiver of privilege.

The Court concludes that Seagate's attorneys had no duty to advise Dr. Shukh that they only represented Seagate because at the time of the various communications at issue, Seagate would not have known that Dr. Shukh's interests were adverse to Seagate's.  Both Seagate's and Dr. Shukh's interests were aligned in that they both wanted to get the inventorship of the patents right.  In addition, even if Seagate's attorneys should have clarified that they did not represent Dr. Shukh at some point, the fact that they failed to do so does not waive the company's privilege.  *See United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 217 (2d Cir. 1997) (concluding that the failure to clarify had no effect on the company's privilege).

## VII.    Constitutional Argument

Plaintiff argues that Federal Rule of Evidence 501 is unconstitutional to the extent that it deprives inventors of the constitutional right to their inventions.  In response, Seagate asserts that there is no legal basis for Plaintiff's argument.

There is no legal authority that supports Plaintiff's argument.  And as Judge Tunheim stated in his November 30, 2011 Order:

> These arguments rest on the premise that Shukh is unable to prove his inventorship claims without these documents and that he cannot obtain the documents in another manner.  To the contrary, Seagate has already provided nearly all of these documents in discovery[.]

(Doc. No. 242, 11/30/11 Order at 11.)  By the time Plaintiff's motion was filed, Seagate had produced over 87,000 pages of documents to Plaintiff.  The Court is not convinced that Dr. Shukh cannot sufficiently make his case without the subset of documents that remain privileged.  Accordingly, the Court rejects Plaintiff's argument.

**JJK**

15

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

| | |
|---|---|
| ALEXANDER M. SHUKH, | Civil No. 10-404 (JRT/JJK) |
| Plaintiff, | |
| v. | |
| SEAGATE TECHNOLOGY, LLC, SEAGATE TECHNOLOGY, INC., SEAGATE TECHNOLOGY, and UNKNOWN OWNERS AND ASSIGNEES, SEAGATE TECHNOLOGY, PLC, | **MEMORANDUM OPINION AND ORDER AFFIRMING THE DECEMBER 15, 2011 ORDER OF THE MAGISTRATE JUDGE** |
| Defendants. | |

---

Constantine John Gekas and John C. Gekas, **GEKAS LAW, LLP**, 11 South LaSalle Street, Suite 1700, Chicago, IL 60603; James H. Kaster and Katherine M. Vander Pol, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402, for plaintiff.

Calvin L. Litsey, Chad Drown, Charles F. Knapp, David J. F. Gross, Elizabeth Cowan Wright, and Jeya Paul, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, and Sarah E Benjes, **FAEGRE BAKER DANIELS L.L.P.**, 1700 Lincoln Street, Suite 3200, Denver, CO 8020, for defendants.

Shukh objects to the Magistrate Judge's Order (Docket No. 251) granting in part and denying in part his motion to compel document production. The Court has carefully considered Shukh's timely objections. Because the Court finds that the Magistrate Judge's conclusions are neither clearly erroneous nor contrary to law, the Court will overrule Shukh's objections. *See* Fed. R. Civ. P. 72(a).

# BACKGROUND[1]

Shukh worked at Seagate from 1997 until 2009. (Am. Compl. ¶¶ 33, 34, Apr. 7, 2010, Docket No. 7.) Following his notice of termination, Shukh made copies of over 49,000 pages of Seagate's documents. (Hr'g Tr. at 36:10-16, Sept. 28, 2010, Docket No. 64.) Shukh alleges that these documents are proof of his inventorship rights at issue in claims against Seagate. (Am. Compl. ¶ 330.) On November 30, 2011 the Court ordered Shukh to return all of the documents that he had copied and taken from Seagate prior to and following his termination notice. (Mem. Op. & Order at 21, Docket No. 242.) In response to discovery requests, Seagate produced documents to Shukh including some that Shukh had taken from Seagate. Among the documents Seagate produced were Shukh's five invention disclosures over which Seagate had previously asserted privilege.

Seagate, however, continued to withhold 575 documents that Shukh requested on the basis of privilege. Shukh moved to compel Seagate to produce the allegedly privileged documents, and the Magistrate Judge granted that motion in part. (Order and Mem., Dec. 15, 2011, Docket No. 251 [hereinafter "Order"].) Specifically, the Magistrate Judge found that – in light of Seagate's production of Dr. Shukh's invention disclosures – Seagate had waived privilege over communications related to the subject matter of the invention disclosures. (*Id.* at 10.) The Magistrate Judge rejected Shukh's other wavier theories. Shukh now objects.

---

[1] For a more complete factual recitation, see the Court's November 30, 2011 Opinion at 2-5. (Docket No. 242.)

**ANALYSIS**

## I.   STANDARD OF REVIEW

The Court must set aside those portions of the Magistrate Judge's order that are "clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a).  "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Chakales v. Comm'r*, 79 F.3d 726, 728 (8th Cir. 1996) (quotation marks and citation omitted).  "A decision is 'contrary to law' when it 'fails to apply or misapplies relevant statutes, case law or rules of procedure.'"  *Knutson v. Blue Cross and Blue Shield of Minn.*, 254 F.R.D. 553, 556 (D. Minn. 2008).

## II.   SUBJECT MATTER WAIVER

The Magistrate Judge held that Seagate's production of the disclosure forms constituted waiver of privilege over the subject matter of those disclosures.  Arguing on appeal that the scope of this waiver was too narrow, Shukh continues to seek "all communications regarding inventorship for all inventions," whether Shukh's or others'. (Pl.'s Objections at 16-17, Dec. 28, 2011, Docket No. 252.)  Shukh, however, offers no legal argument as to why the scope of subject matter waiver articulated by the Magistrate Judge is contrary to law.  Rather, Shukh simply states that because the case involves inventorship, wavier should include all communications about inventorship.   (Pl.'s Objections at 17.)

- 3 -

**A76**

Federal common law governs privilege issues with respect to federal claims. Fed. R. Evid. 501. The proper scope of subject matter waiver is a fact-intensive inquiry. *Fort James Corp. v. Solo Cup*, 412 F.3d 1340, 1349-50 (Fed. Cir. 2005) ("There is no bright line test for determining what constitutes the subject matter of a waiver, rather courts weigh the circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties of permitting or prohibiting further disclosures."). The Magistrate Judge carefully weighed the circumstances and competing interests at stake in concluding that a limited subject-matter waiver was appropriate. (Order at 5-10.) After reviewing the record, the Court is convinced that the Magistrate Judge's conclusion is neither clearly erroneous nor contrary to law. The invention disclosures that Seagate produced describe inventions that Shukh claims he made while at Seagate. It is far from clear why, as Shukh argues, that limited subject matter should be expanded to embrace **all** inventions. Moreover, Federal Rule of Evidence 502(a) speaks in terms of the subject matter of the disclosed and undisclosed communications, not – as Shukh would have it – the subject matter of the case as a whole. Shukh's request to expand the scope of waiver to include "all communications about inventorship – Plaintiff's or other[s]'," (Pl.'s Objections at 17), will therefore be denied.

### A.    Common Interest Doctrine

The Magistrate Judge found the common interest doctrine and joint representation privilege inapplicable to Shukh's motion. (Order at 10-11.) Shukh appears to argue that the Magistrate Judge's observation, in a different part of the Order, that Shukh and

Seagate's interests were "aligned" means that they shared a common legal interest entitling Shukh to the documents he requests.[2]

Two concepts are at play here. First, in order to implicate the joint representation privilege, two or more clients must consult an attorney on matters of common interest; the communications between the clients and the attorney are privileged as against third parties, but not among the joint clients. *Cavallaro v. United States*, 284 F.3d 236, 249-50 (1st Cir. 2002). This privilege only attaches if an attorney-client relationship is formed. *Mass. Eye & Ear Informary v. QLT Phototherapeutics, Inc.*, 167 F. Supp. 2d 108, 116 (D. Mass. 2001). The "common interest" doctrine, by contrast, is "an exception to the general rule that the attorney-client privilege is waived when privileged information is disclosed to a third party," *Cavallaro*, 284 F.3d at 250, and it applies if the privilege-holder discloses privileged documents to a third party with which it shared a common interest. *Merck Eprova AG v. ProThera, Inc.*, 670 F. Supp. 2d 201, 211 (S.D.N.Y. 2009). The doctrine permits disclosure without waiver as long as the party claiming the exception demonstrates that the parties communicating: "(1) have a common legal, rather than commercial, interest; and (2) the disclosures are made in the course of formulating a common legal strategy." *Merck Eprova AG*, 670 F. Supp. 2d at 211; *see also* 24 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5505 (1st ed.

---

[2] The Court notes, however, that Shukh's argument is far from clear, and at times seems deliberately opaque: "whether as a privilege, exception, or waiver, Dr. Shukh's access to his own disclosures must arise from that common interest." (Pl.'s Reply at 4, Feb. 9, 2012, Docket No. 285.)

1986) (discussing difference between common interest doctrine and joint representation, and courts' increased blurring of the distinction and nomenclature).

Disentangling these two concepts, the Magistrate Judge held that Shukh did not have an attorney-client relationship with Seagate's attorneys, and thus no joint privilege attached. That decision was not clearly erroneous or contrary to law. An employee-inventor required to assign his patent rights does not generally have an attorney-client relationship with the company's patent counsel. *Univ. of W. Va. v. VanVoorhies*, 278 F.3d 1288, 1303-04 (Fed. Cir. 2002) (law firm's representation of university, and prosecution of patent in inventor's name, did not give rise to an attorney-client relationship between law firm and the inventor); *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 836 F.2d 1332, 1336-37 (Fed. Cir. 1988) (no attorney client relationship where inventor-employee merely assisted company's attorneys in prosecuting the patent application"). This Court has previously determined that Shukh's employment agreement automatically assigned his patent rights to Seagate. (Mem. Op. & Order at 12, Mar. 30, 2011, Docket No. 140.) And Shukh has not demonstrated that he sought or received legal advice from Seagate's lawyers in an individual capacity giving rise to an attorney-client relationship outside the patent prosecution context. *See Magion v. Nagin*, 394 F.3d 1062, 1069 (8th Cir. 2005) (finding attorney-client relationship between employee and corporate counsel where, among other reasons, attorney advised employee on personal issues); *United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 216 (2d Cir. 1997) (discussing circumstances under which an attorney-client relationship may be formed between a corporate employee and the corporation's counsel). The privilege was

therefore Seagate's alone, and Shukh falls squarely within these cases holding that an inventor-employee assisting the company in prosecuting a patent is not a client of the company's lawyers.  The joint representation privilege does not apply.

The common interest doctrine is also inapplicable.  That doctrine would operate to preserve privilege if the privilege-holder – here Seagate – decided to share privileged documents with a third party with which it shared a common interest.  Shukh's argument that the Magistrate Judge's observation of Shukh and Seagate's alignment of interest **requires** disclosure confuses the common interest doctrine and the joint representation privilege.[3]  The common interest doctrine would preserve privilege, not compel Seagate to share otherwise privileged documents.  As to the joint representation privilege, even if Shukh and Seagate's interests were aligned for the purpose of applying for patents, this kind of commonality of interest does not create an attorney-client relationship between Shukh and Seagate's lawyers in which to root compelling disclosure of the documents for lack of privilege.  *See e.g.*, *Van Voorhies*, 278 F.3d at 1304 (prosecuting patent in name of inventor did not give rise to attorney-client relationship between institution's lawyers and inventor).  To summarize, the absence of an attorney-client relationship is dispositive

---

[3] In the context of Shukh's failure-to-advise argument, the Magistrate Judge held:

The Court concludes that Seagate's attorneys had no duty to advise Dr. Shukh that they only represented Seagate because at the time of the various communications at issue, Seagate would not have known that Dr. Shukh's interests were adverse to Seagate's.  Both Seagate's and Dr. Shukh's interests were aligned in that they both wanted to get the inventorship of the patents right.

(Order at 14.)

of the joint representation privilege, and the common interest doctrine does not apply.[4]
Shukh's objections are overruled.

### B.    At-Issue Waiver

The Magistrate Judge held that Seagate did not waive privilege by placing the
protected information at issue.  (Order at 11-12.)  A waiver of privilege may be implied
where "through [an] affirmative act, the asserting party has placed the protected
information at issue by making it relevant."  *Medtronic, Inc. v. Intermedics, Inc.*, 162
F.R.D. 133, 134-35 (D. Minn. 1995).  At issue waiver is commonly found where either
proof of a party's legal contention implicates privileged information (as in, for example, a

---

[4] Shukh insists that *In re Regents of University of California* dictates a contrary outcome.
101 F.3d 1386, 1389 (Fed. Cir. 1996) ("A community of legal interests may arise between
parties jointly developing patents; they have a common legal interest in developing the patents to
obtain greatest protection and in exploiting the patents.") (quoting *Baxter Travenol Labs., Inc. v.
Abbot Labs.*, No. 84-C-5103, 1987 WL 12919, *1 (N.D. Ill. June 19, 1987)).  *In re Regents* dealt
with the common interest doctrine, though the case speaks in terms of the "joint client doctrine."
*See* 24 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5505
at 556 (1st ed. 1986) (noting courts' increasing conflation of terminology).  In that case Genetech
sought discovery of privileged documents from Lilly on the ground that Lilly had waived
privilege by sharing the documents with a third party.  *In re Regents*, 101 F.3d at 1388-89.  The
issue was thus whether Lilly and the third party shared a common interest – i.e. were functionally
joint clients – such that sharing the documents did not amount to waiver of privilege.  *Id.* at
1389-90.  Because Lilly and the third party had a "potentially and ultimately exclusive . . .
license agreement[,]" the Federal Circuit held that their interests were substantially identical, and
therefore that the documents remained privileged.  *Id.* at 1390.

*In re Regents* thus stands for the proposition that sharing privileged documents with a
third party with which the privilege-holder has a common legal interest does not necessarily
waive the privilege.  It does not suggest that the privilege holder must share documents with any
party with which it has a common interest.  In any event, the case is inapplicable because Shukh
has no ownership interest in the patent akin to the licensor/licensee relationship in *Regents*.
(Order, Docket No. 140, at 12. ("[T]here is no path to arrive at the conclusion that the parties
have co-ownership of the patent: Seagate is the sole owner."))

legal malpractice action), or a client's testimony refers to a specific privileged document. *Baker v. General Motors Corp.*, 209 F.3d 1051, 1055 (8th Cir. 2000). But merely denying a plaintiff's allegations does not place privileged information at issue. *See Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851, 863 (3d Cir. 1994) (explaining that a party places privileged information in issue by affirmatively asserting a claim or defense and attempting to prove it by disclosing or describing privileged communications). Shukh argues on appeal that "Seagate has done more than merely deny [Shukh's] allegations" because Seagate has asserted affirmative defenses and opposed Shukh's summary judgment motion. (Pl.'s Objections at 6.)

The Magistrate Judge's determination that Seagate had not put inventorship in issue but merely denied Shukh's allegations was correct; Shukh does not point to any privileged communications placed in issue by Seagate's mere denial. None of Seagate's affirmative defenses puts the substantive question of inventorship at issue, (Am. Answer and Counterclaims at 122-24, June 3, 2011, Docket No. 155), and Shukh does not point to any protected documents that Seagate allegedly placed at issue. As to Seagate's opposition to Shukh's summary judgment motion, Seagate opposed the motion on inventorship principally because it believed Shukh had failed to meet his burden. (Seagate's Mem. in Opp'n to Pl.'s Mot. for Partial Summ. J. at 1, Nov. 15, 2010, Docket No. 104.) This opposition does not affirmatively place privileged information in issue,

and is thus insufficient to waive attorney-client privilege.[5]   The Magistrate Judge's decision is not clearly erroneous or contrary to law and Shukh's objections will therefore be overruled.

### C.      Unauthorized Practice of Law

The Magistrate Judge rejected Shukh's argument that Seagate waived privilege because its General Counsel was not a member of the California or Minnesota bars. "[F]or purposes of the privilege," a lawyer is a "person authorized, or reasonably believed by the client to be authorized to practice law in any state or nation."   3 Weinstein's Federal Evidence § 503.12[1] (Joseph M. McLaughlin, ed., 2d ed. 2002.)   A party "may assert the privilege with respect to correspondence to or from its patent counsel despite the fact that that counsel was not admitted to the bar of the state in which he was located."   *Paper Converting Mach. Co. v. FMC Corp.*, 215 F. Supp. 249, 251 (E.D. Wis. 1963); *see also Panduit Corp. v. Burndy Corp.*, 172 U.S.P.Q. 46 (N.D. Ill. 1971).   It is not disputed that Seagate's General Counsel, though not admitted in California or Minnesota, is admitted to practice in multiple states.   (Pl.'s Objections at 8.)

---

[5] The inequitable conduct cases Shukh cites are inapposite because in each case the party affirmatively placed privileged communications at issue.  *See e.g.*, *Starsight Telecast v. Gemstar Dev. Corp.*, 158 F.R.D. 650, 653-54 (N.D. Cal. 1994).

Shukh has not shown that any of the cases on which he relies should alter the Magistrate Judge's conclusion.[6]  Because the Magistrate Judge's conclusion is not contrary to law, Shukh's objections will be overruled.

### D.  Waiver by Delay

The Magistrate Judge rejected Shukh's argument that Seagate waived its privilege by delaying sixteen months before seeking legal enforcement of return of the documents "for the same factual reasons that the District Court concluded in its November 30, 2011 Order."  (Order at 12.)  Shukh now argues that the factual basis of that Order was clearly

---

[6] For example, the attorney in *Financial Technologies International* was not admitted to the bar in any state.  *Fin. Techs. Int'l v. Smith*, 49 Fed. R. Serv. 3d 961, 2000 U.S. Dist. Lexis 18220, *10, 11-20 (S.D.N.Y. Dec. 19, 2000) (dealing principally with whether a client's reasonable belief that she was speaking with an attorney was sufficient to trigger privilege under New York law).  And *United Shoe v. United Shoe Mach. Corp.* does not conclude, as Shukh argues, that communications with in-house patent counsel not admitted to the bar of the state where they worked fall outside the privilege. 89 F. Supp. 357, 360 (D. Mass. 1950).  Rather, *United Shoe* merely reasoned that lawyers resident in one state but barred elsewhere, and who had never received a license to practice in the state of their residence, were not acting as the defendant's attorneys there.  *Id.*  In other words, the issue was whether the lawyers were acting as lawyers in the state, not the relevance of their state of bar admission to the privilege inquiry.  *See id.*  Indeed, the Court observed that the privilege may well apply to a visiting attorney from another state.  *Id.*

Finally, Shukh focuses on dicta from *Zenith Radio Corp v. Radio Corp of America* which states that while bar membership should generally be of the court of the area where services are rendered, it is not a requirement for visiting corporate counsel "for which local authorities do not insist on admission to the local bar." 121 F. Supp. 792, 794 (D. Del. 1954).  Shukh reasons that because California **does** require bar admission for corporate counsel, which Seagate's corporate counsel did not obtain, the privilege does not apply.  The Magistrate Judge's refusal to adopt this apparently novel interpretation of *Zenith Radio* was not contrary to law.  *See, e.g.*, *Panduit Corp.*, 172 U.S.P.Q. at 47, ("While it appears that defendant's house counsel is not admitted to practice law in the state of his employment, Connecticut, he is admitted to the bar of New York. This is sufficient for the purpose of the attorney-client privilege."); *Paper Converting Mach. Co.*, 215 F. Supp. at 251 ("We believe that the defendant may assert the privilege with respect to correspondence to or from its patent counsel despite the fact that that counsel was not admitted to the bar of the state in which he was located").

erroneous because Shukh "does not believe that there is any evidentiary support in the record" for the idea that Seagate lawyers didn't know how many documents Shukh retained. (Shukh's Reply on His Objection to Magistrate Judge's Opinion at 5, Feb. 9, 2012, Docket No. 285.)

In its November 2011 Order, the Court concluded that Seagate's delay in seeking judicial enforcement did not waive its right to enforce the document return provision of the contract because (1) Seagate "sought enforcement of the document return provision of the contract at regular intervals since Shukh's termination in 2009," (2) Seagate made numerous requests for return of the documents which Shukh refused, and (3) Seagate claimed that it was unaware it did not have full knowledge of how many documents were involved until a September 2010 hearing, after which it timely filed a counterclaim for the return of documents. (Mem. Op. & Order at 14-15, Docket No. 242.)

Even accepting Shukh's sole evidentiary objection as true – that no record evidence supports Seagate's assertion that it was unaware of how many documents Shukh took until September 2010 – the Court finds that Seagate's regular attempts to enforce the document return provision, numerous requests for the return of documents, and attempt to prevent Shukh from taking the documents following his termination notice constitute sufficient measures to preserve privilege under the circumstances.

The cases Shukh cites do not direct a contrary outcome. Unlike in *Bowles*, where the employer took **no** measures to preserve confidentiality of its documents before the employee took them, *Bowles v. Nat'l Ass'n of Home Builders*, 224 F.R.D. 246, 256

(D.D.C. 2004),[7] Shukh's employment contract contained a document return provision and Shukh's supervisor confronted him about taking confidential information prior to his last day in the office. (Aff. of Kenneth Allen, Feb. 9, 2012, Docket No. 286-2.) Shukh also does not dispute that, since 2009, Seagate has repeatedly attempted to enforce the document return provision of Shukh's contract. Because some evidence in the record shows that Seagate took reasonable measures to prevent disclosure of the privileged documents, the Court declines to find that Seagate's delay in seeking legal remedies constituted waiver of privilege. *See Bowles*, 224 F.R.D. at 256 n.13 ("Those courts that have preserved the privilege in documents retained by a former employee have generally done so where there are at least some facts in the record to indicate that the employer had taken reasonable measures to prevent the disclosure of the document."); *compare United States ex rel. Mayman v. Martin Marietta Corp.*, 886 F. Supp. 1243, 1246 (D. Md. 1995) (declining to find waiver where employer kept documents in secure location, only allowed access to employees legally obligated to maintain confidentiality, and executed termination statement containing document return provision); *with IMC Chems., Inc. v. Niro Inc.*, No. 98-2348, 2000 U.S. Dist. LEXIS 22850, at *80-81 (D. Kan. July 19, 2000) (finding waiver where employment agreement did **not** contain a document return provision, and employer took "limited, if any" precautions to maintain confidentiality). Moreover, the Court also agrees with the Magistrate Judge that to the extent the

---

[7] Crucially, the employer "did not even take the simple precaution of placing a provision in its executive employment agreement requiring the surrender of any documents obtained in the course of employment." *Bowles*, 224 F.R.D. at 256.

documents can be seen as stolen, they should not lose the protection of privilege. *See In re Grand Jury Proceedings Involving Berkley and Co., Inc.*, 466 F. Supp. 863, 867 (D. Minn. 1979). For the foregoing reasons, Shukh's objections are overruled.

### E.     Conflict of Interest

The Magistrate Judge rejected Shukh's argument that Seagate's lawyers' failure to advise him to get his own lawyer waived privilege. (Order at 14.)  This conclusion rested in part on the determination that Seagate did not know that Shukh's interests were adverse to Seagate's at the time of the relevant communications. (*Id.*)  Absent such knowledge, the Magistrate Judge reasoned, Seagate's attorneys had no duty to advise Shukh that they only represented Seagate. (*Id.*)  Shukh now disputes that Seagate did not know Shukh's interests were adverse, and proffers new evidence not presented to the Magistrate Judge purporting to show that Seagate **was** aware that Shukh's interests were adverse to Seagate's at the time of the communications. (Pl.'s Reply at 6-7.)[8]

It is not necessary to resolve this dispute.  Regardless of whether Seagate's lawyers knew of any adversity of interests, and were thus under an ethical duty to advise Shukh to secure his own counsel, failure to do so did not waive the company's privilege. *See United States v. Int'l Bhd. of Teamsters*, 119 F.3d 210, 217 (2d Cir. 1997) (observing that employer's potential violation of ethical rules to clarify potential conflict between the

---

[8] Seagate, meanwhile, argues that Shukh's statements to the effect that he was concerned about inventorship of the patents because it was important "to the company business" and that "jeopardize[ing] the validity of these patents . . . is obviously not good for the company" are sufficient to support the Magistrate Judge's conclusion. (Seagate's Mem. in Opp'n at 8.)

organization and its employee does not impact analysis of attorney-client privilege). None of the cases Shukh cites stand for the proposition that failure to advise an employee to seek independent counsel – even if in violation of a state's ethical rules – waives privilege. The Magistrate Judge's rejection of Shukh's failure-to-advise theory of waiver was therefore not contrary to law, and Shukh's objections will be overruled.

### F. Constitutional Argument

The Magistrate Judge rejected Shukh's argument that Federal Rule of Evidence 501 is unconstitutional to the extent it deprives inventors of the constitutional right to their inventions because no legal authority supports that position. (Order at 15.) Shukh now argues that while "[t]his precise issue may not have been decided by a Court before, . . . the Constitution and implementing decisions of the Supreme Court supply the constitutional standard of decision urged by the Plaintiff." (Pl.'s Objections at 14.)

The Court is not persuaded. Shukh seems to argue in broad strokes that because the patent clause primarily protects inventor's rights, any law detracting from the right of inventorship is unconstitutional. The Court declines to adopt this novel reading of the patent clause,[9] and the Magistrate Judge's rejection of the argument was manifestly not contrary to law.

---

[9] Shukh's supplemental authority, which makes the unremarkable observation that "inventorship and ownership are separate issues" does little to clarify the matter. *Beech Aircraft Corp. v. Edo Corp.*, 990 F.2d 1237, 1248 (Fed. Cir. 1993). Rather, *Beech* appears to be irrelevant because this Court has not relied – nor is it now relying – on the distinction between inventorship and ownership to reject Shukh's argument.

(Footnote continued on next page.)

## III.    CERTIFICATION OF APPEAL

Shukh requests certification for interlocutory appeal to the Federal Circuit under 28 U.S.C. § 1292(b).   A party seeking an interlocutory appeal must establish that (1) there is a controlling question of law, (2) there is a substantial ground for difference of opinion as to that controlling question of law, and (3) an immediate appeal may materially advance the ultimate termination of litigation.  *Fenton v. Farmers Ins. Exch.,* No. 07-4864, 2010 WL 1006523, at *1 (D. Minn. Mar. 16, 2010).   A motion for certification of interlocutory appeal "must be granted sparingly, and the movant bears the heavy burden of demonstrating that the case is an exceptional one in which immediate appeal is warranted."  *White v. Nix*, 43 F.3d 374, 376 (8th Cir. 1994).

Shukh makes no effort whatsoever to satisfy this standard.   He simply "respectfully asks that the matter be certified."  (Pl.'s Reply at 7.)  The Court declines to certify this Order for appeal to the Federal Circuit because Shukh has failed to carry his burden to establish the above elements.

---

(Footnote continued.)

The Court previously rejected Shukh's constitutionality argument in its Order on Seagate's motion for summary judgment.  (Mem. Op. at 11.)  The Court there observed that the constitutionality argument rests on the premise that Shukh is unable to prove his inventorship claims without the documents he requested, and that he cannot obtain them in any other manner. The Court, however, found that Seagate had already provided nearly all of the requested documents in discovery. (*Id.*)

**ORDER**

Based on the foregoing, and the records, files, and proceedings herein, the Court

**OVERRULES** plaintiff's objection [Docket No. 252] and **AFFIRMS** the Magistrate

Judge's Order dated December 15, 2011.

DATED:   June 29, 2012
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____

JOHN R. TUNHEIM
United States District Judge

# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| ALEXANDER M. SHUKH, | Civil No. 10-404 (JRT/JJK) |
| Plaintiff, | |
| v. | |
| SEAGATE TECHNOLOGY, LLC, SEAGATE TECHNOLOGY, INC., SEAGATE TECHNOLOGY, UNKWNOWN OWNERS AND ASSIGNEES, and SEAGATE TECHNOLOGY, PLC, | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS TITLE VII PUNITIVE DAMAGES CLAIM** |
| Defendants. | |

Katherine M. Vander Pol and James Kaster, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402; Constantine John Gekas and John C. Gekas, **GEKAS LAW, LLP**, 11 South LaSalle Street, Suite 1700, Chicago, IL 60603, for plaintiff.

Calvin L. Litsey, Chad Drown, Charles F. Knapp, David J. F. Gross, Elizabeth Cowan Wright, and Jeya Paul, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, and Sarah E Benjes, **FAEGRE BAKER DANIELS L.L.P.**, 1700 Lincoln Street,. Suite 3200, Denver, CO 8020, for defendants.

Defendants (collectively "Seagate") move to dismiss or strike Alexander M. Shukh's Title VII request for punitive damages from his Third Amended Complaint. The Court previously found that Shukh's allegations of discrimination and retaliation were little more than bare assertions that such events had occurred; Shukh has added no further

factual allegations of discrimination or retaliation beyond those the Court assessed at that time.  Because Shukh's Third Amended Complaint is insufficient to state a claim for punitive damages under Title VII, the Court will dismiss the request for punitive damages.

## BACKGROUND

Shukh filed suit in February 2010.  (Docket No. 1.)  He filed a First Amended Complaint in April 2010.  (Docket No. 7.)  Seagate moved to dismiss the First Amended Complaint, and the Court denied that motion.  (Mem. Op. and Order, March 30, 2011, Docket No. 140.)  The Court noted, however, that "Shukh's pleadings related to discrimination in pay, promotions, and failure to be recognized for achievements, consist of little more than bare statements that such events occurred." (*Id.* at 25.)

Shukh moved for leave to file a Second Amended Complaint on December 1, 2011.  (Docket No. 243.)  The proposed Second Amended Complaint did not add any new allegations of discrimination or retaliation; it did, however, add what Shukh called "pro forma language regarding actual and punitive damages to the Prayers for Relief on the Discrimination and Retaliation Claims." (*Id.* at 1.)  The Magistrate Judge allowed Shukh to amend the complaint to add a punitive damages claim under Title VII. (Dec. 15, 2011, Docket No. 250.)  Shukh filed the Second Amended Complaint at the end of December 2011.  (Docket No. 255.)

Five days later, Shukh moved for leave to file a Third Amended Complaint. (Motion, Jan. 4, 2012, Docket No. 257.)  The parties stipulated to the filing of the Third Amended Complaint with the understanding that Seagate could move to dismiss or strike Shukh's Title VII punitive damages claim.  (Stipulation at 2, Jan. 13, 2012, Docket No. 264.)  The Third Amended Complaint contained no new allegations relating to discrimination or retaliation not included in the first two complaints.

## ANALYSIS

## I.    STANDARD OF REVIEW

Although a complaint need not contain "detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citations omitted).  The complaint must plead facts that render a defendant's liability plausible – not merely possible.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In reviewing a complaint on a motion to dismiss the Court takes as true all allegations in the complaint, which it construes in the light most favorable to the nonmoving party.  *Carton v. Gen. Motors Acceptance Corp.*, 611 F.3d 451, 454 (8th Cir. 2010).  It must not, however, give effect to conclusory allegations of law.  *Stalley ex rel. United States v. Catholic Health Initiatives*, 509 F.3d 517, 521 (8th Cir. 2007).

## II.     SEAGATE'S MOTION TO DISMISS[1]

Seagate moves to dismiss Shukh's punitive damages claim on the ground that the Third Amended Complaint pleads insufficient facts from which to conclude that Seagate discriminated with malice or reckless indifference.  Plaintiffs seeking punitive damages in employment discrimination cases must show that the employer intentionally discriminated "with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  42 U.S.C. § 1981a(b)(1); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529-30 (1999).  That is, "Congress . . . sought to impose two standards of liability – one for establishing a right to compensatory damages and another, higher standard that a plaintiff must satisfy to qualify for a punitive award."  *Kolstad*, 527 U.S. at 534.  "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination."  *Id.* at 535.  To be liable in punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law . . . ."  *Id.* at 536.

---

[1] Seagate argues in the alternative that the request for punitive damages should be stricken from the complaint pursuant to Federal Rule of Civil Procedure 12(f).  While the Court has liberal discretion under Rule 12(f), such motions are typically viewed with disfavor.  *Stanbury Law Firm v. I.R.S.*, 221 F.3d 1059, 1063 (8th Cir. 2000).  Moreover, many courts are properly reluctant to strike matter from a complaint.  *See, e.g.*, *Gilbee v. RJW Transport, Inc.*, 2010 WL 4974863, at *2 (E.D. Mo. Nov. 24, 2010) (observing that "[m]atter in a complaint will not be stricken unless it clearly can have no possible bearing on the subject matter of the litigation").  In view of its conclusion that Rule 12(b)(6) is an appropriate vehicle to resolve this motion, the Court need not exercise its Rule 12(f) discretion.

Before turning to the question of whether the Third Amended Complaint plausibly states a claim for punitive damages, the Court must address Shukh's threshold objection that the *Iqbal / Twombly* standard does not apply to the punitive damages claim. At least some courts question the applicability to the expression of damages of *Iqbal / Twombly*'s requirement that a complaint contain sufficient factual matter to render entitlement to relief plausible. *See Dotson v. Avon Prods., Inc.*, No. 10-881, 2011 WL 891863, at *6 (D.S.C. Feb. 8, 2011) (observing that it is "unclear" whether *Iqbal* and *Twombly* extend to the expression of damages). And in arguing that his pro forma request for punitive damages is sufficient, Shukh points to a number of cases that he claims stand for the proposition that there is no "heightened" pleading requirement for punitive damages.

But the cases do not suggest that claims for punitive damages are exempt from *Iqbal* and *Twombly*'s pleading requirements. In each of the cases on which Shukh relies the court observed that the fact-finder could plausibly infer from plaintiff's factual allegations that the standard for punitive damages was met. *See Troyer v. I-Flow Corp.*, No. 11-0045, 2011 WL 2517031, at *5 (S.D. Ohio June 23, 2011) (quoting *Iqbal* and *Twombly* as applicable and stating that the Court "can very plausibly infer" that the standard for punitive damages was met); *Clonch v. I-Flow Corp.*, No. 10-0348, 2010 WL 4806769, at *5 (S.D. Ohio Nov. 17, 2010) (same); *Kademani v. Mayo Clinic, et al.*, No. 09-00219, Docket No. 132 at 2 (D. Minn. Nov. 2, 2010) (observing that "Plaintiff need not specifically plead punitive damages **so long as the complaint alleges conduct**

**that would support a claim for punitive damages** and defendants have notice that Plaintiff intends to seek punitive damages[,]" and finding that the complaint alleged sufficient facts to support such a claim) (emphasis added).

In short, Shukh's suggestion that Seagate's motion is an attempt to force him to prove up his claims at the pleading stage rings hollow in the wake of *Iqbal* and *Twombly*. The Court finds that the requirement emerging from those cases that a complaint's allegations support a plausible inference of entitlement to relief applies to the expression of punitive damages under Title VII. Shukh's complaint, therefore, must allege sufficient factual matter to permit the reasonable inference that Seagate engaged in intentional discrimination with malice or reckless indifference to Shukh's federally protected rights. *See Iqbal*, 556 U.S. at 662; *Kolstad*, 527 U.S. at 526.

Having determined that *Iqbal* applies, the Court now turns to whether Shukh's request for punitive damages meets the pleading standard. The Court's prior observation that "Shukh's pleadings related to discrimination in pay, promotions, and failure to be recognized for achievements, consist of little more than bare statements that such events occurred" provides a useful starting point. (Mem. Op. and Order at 25.) The Court declined to dismiss the national origin discrimination claims because "taking the facts in a light most favorable to Shukh, and given that he was terminated despite being a very successful inventor and a member of the Seagate Inventor Hall of Fame, the pleadings [were] not so deficient they fail to state a claim that is plausible on its face." (*Id.*)

But obtaining punitive damages under Title VII requires more than mere intentional discrimination. This "higher" standard requires Shukh to show that Seagate intentionally discriminated "with malice or with reckless indifference" to his federally protected rights. 42 U.S.C. § 1981a(b)(1); *Kolstad*, 527 U.S. at 529-30, 534. Yet the Third Amended Complaint contains no new allegations relating to discrimination or retaliation that were not included in the First Amended Complaint. (*Compare* Third Amended Complaint, ¶¶ 228-262, 311-326, Jan. 17, 2012, Docket No. 269 *with* First Amended Complaint, ¶¶ 228-262, 311-326, Apr. 7, 2010, Docket No. 7). If the First Amended Complaint was barely sufficient to clear the Rule 12(b)(6) hurdle as to intentional discrimination, Shukh's claim for punitive damages plainly does not: the allegations in the Complaint do not sufficiently speak to Seagate's state of mind so as to permit a reasonable inference of malice or reckless disregard of Shukh's rights.

True, many of the cases analyzing the "malice or reckless indifference" requirement address motions brought after the plaintiff had ample opportunity to develop the record and obtain the information necessary to establish that the defendant acted with the requisite state of mind. *See, e.g.*, *Dominic v. DeVilbiss Air Power Co.*, 493 F.3d 968 (8th Cir. 2007) (post-trial motion challenging punitive damages award). Here, months of discovery remain. It is of course **possible** that Shukh could unearth evidence in discovery that would get at Seagate's management's state of mind. And Shukh is correct that some courts have allowed plaintiffs to file an amended complaint adding a punitive

damages claim where "facts in [the] amended complaint . . . **might** support a claim for punitive damages . . . ." *Coller v. Doucette*, No. 4:09-780, 2010 WL 319652, at * 2 (E.D. Mo. Jan. 20, 2010) (emphasis added). But, as described below, the facts in Shukh's Third Amended Complaint do not render it **plausible**, as *Iqbal* requires, that Seagate discriminated against Shukh with malice or reckless disregard to his rights.

*Iqbal* delineates the procedure for interrogating the sufficiency of a claim. First, the Court must note the elements a plaintiff must plead to state a claim for punitive damages in a discrimination case. *Iqbal*, 556 U.S. at 675. As determined above, a claim for punitive damages under Title VII requires factual allegations that suggest intent beyond what is required for a basic Title VII discrimination claim. "Section 1981a(a)(1) limits compensatory and punitive awards to instances of intentional discrimination, while § 1981a(b)(1) requires plaintiffs to make an additional 'demonstrat[ion]' of their eligibility for punitive damages." *Kolstad*, 527 U.S. at 534. Specifically, the plaintiff must show that the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference." *Id.* (quoting 42 U.S.C. § 1981a(b)(1)). Shukh must therefore plead sufficient facts to render it plausible that Seagate engaged in intentional discrimination with malice or with reckless indifference to Shukh's federally protected rights.

Second, the Court must identify the allegations in the complaint not entitled to the assumption of truth. *Iqbal*, 556 U.S. at 680. The Third Amended Complaint's

allegations of illegality, (Compl. ¶ 234), and an "extreme pattern of discrimination," (Compl. ¶ 229), are not entitled to the presumption of truth because they are conclusory. *Iqbal*, 556 U.S. at 681.

Third, the Court must consider the Complaint's factual allegations to determine if they plausibly suggest entitlement to relief. *Id.* The relevant paragraphs are 228-243 and 249-262. The Court finds that these paragraphs do not allege sufficient facts relating to Seagate's state of mind. Among other facts, the complaint alleges that Shukh's compensation was lower than that of non-foreign employees; that he was denied promotions granted to less qualified, non-foreign employees; that his name was improperly omitted as an inventor from various patent applications; that Shukh was "illegally" selected for termination; that he was "completely isolated" from the organization; that he received a false poor performance review; and that Seagate made various retaliatory threats following Shukh's termination. (Third Am. Compl. ¶¶ 228-43, 247-62.)

As the Court previously observed, these allegations are "little more than bare statements that such events occurred." (Mem. Op. and Order at 25.) And none of the factual allegations – together or in isolation – reasonably permits the conclusion that Seagate discriminated or retaliated against Shukh with malice or reckless disregard to Shukh's federally protected rights. As in *Iqbal* itself, Shukh's complaint simply does not contain enough factual information to plausibly suggest the requisite state of mind – here

that the employer discriminated in the face of a perceived risk that its actions will violate federal law. *Iqbal*, 556 U.S. at 683; *Kolstad*, 527 U.S. at 526. Shukh "would need to allege more by way of factual content to 'nudg[e]' his claim of purposeful discrimination 'across the line from conceivable to plausible.'" *Iqbal*, 556 U.S. at 683 (citing *Twombly*, 550 U.S. at 570). In sum, the Court finds that Shukh's allegations are insufficient to allow the fact-finder reasonably to draw the conclusion that Seagate discriminated or retaliated against Shukh "with malice or reckless indifference," that is, with knowledge that its actions may have been violative of federal law. *See Kolstad*, 527 U.S. 536. Shukh's request for punitive damages will therefore be dismissed.[2]

## III.    SHUKH'S REQUEST TO AMEND

In the alternative, Shukh requests leave to file a Fourth Amended Complaint to add several allegations regarding the punitive damages claim. While courts are to "freely give[]" leave to amend when "justice so requires," Fed. R. Civ. P. 15(a)(2), "[a] district court may appropriately deny leave to amend where there are compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." *Moses.com Sec., Inc. v. Comprehensive Software Sys, Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005) (internal quotation marks omitted).

---

[2] The Court will, however, entertain a future request for permission to add a claim for punitive damages from Shukh should he unearth in discovery a firm factual basis for it.

The Court will not grant Shukh leave to amend the complaint for two reasons. First, Shukh has repeatedly failed to cure deficiencies with previously allowed amendments. Shukh could have properly pled a Title VII punitive damages claim in the original complaint or the First Amended Complaint if there were a factual basis for it. Shukh could, moreover, have included the language he now seeks to add in his Second Amended Complaint or the Third Amended Complaint. He did not. The Court will not reward this kind of "repeated failure to cure deficiencies by amendments previously allowed." *See id.*

Second, and perhaps more importantly, the proposed amendments do not cure the deficiencies, and so must be denied as futile. *See id.* Shukh seeks to add language stating that "because Defendants engaged in discriminatory [and retaliatory] practices with malice or reckless indifference, Dr. Shukh is entitled to punitive damages." But this is the kind of "threadbare recital[] of the elements" devoid of factual enhancement that the Supreme Court has declared to be insufficient. *See Iqbal*, 556 U.S. at 678. Indeed, this addition is very similar to the language the Court rejected as conclusory in *Iqbal*. *See id* at 681. For these reasons, the Court will deny Shukh's request for leave to file a Fourth Amended complaint.

# ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that Seagate's Motion to Dismiss or Strike Shukh's Title VII Punitive Damages Claim is **GRANTED** [Docket No. 270].

DATED:  July 3, 2012
at Minneapolis, Minnesota.

s/ John R. Tunheim
JOHN R. TUNHEIM
United States District Judge

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

# MOTION HEARING

| | |
|---|---|
| Alexander M. Shukh, | **COURT MINUTES** |
| | BEFORE: Tony N. Leung |
| Plaintiff, | U.S. Magistrate Judge |
| | |
| v. | Case No: 10cv404 (JRT/JJK) |
| | Date: September 24, 2012 |
| Seagate Technology, LLC, a Delaware Limited | Location: St. Paul, Courtroom 3A |
| Liability Company; Seagate Technology, Inc., a | Court Reporter: N/A |
| Delaware corporation; Seagate Technology, a | CD Number: 9/24/12 (10:11 - 10:58) |
| holding company of the Cayman Islands; Unknown | Time Commenced: 10:09 a.m. |
| Owners and Assignees; and Seagate Technology | Time Concluded: 10:56 a.m. |
| plc, an Irish public limited company; | Time in Court: 47 Minutes |
| | |
| Defendants. | |

APPEARANCES:

    For Plaintiff:      Constantine John Gekas, Esq., Gekas Law, LLP
    For Defendants:   Chad Drown, Esq., and Jeya Paul, Esq., Faegre Baker Daniels LLP

    Hearing on:    Plaintiff's Motion to Modify the Amended Scheduling Order (Doc. No. 332).

    IF MOTION IS RULED ON PLEASE INCLUDE DOCUMENT NUMBER AND TITLE APPEARING IN CM/ECF:

    Plaintiff's Motion to Modify the Amended Scheduling Order (Doc. No. 332), is **DENIED** for lack of good cause shown and as further stated on the record. The oral ruling of the Court on the record following arguments of counsel is hereby incorporated by reference as if restated in full herein. This Minute Order constitutes an Order of the Court.

    **Text only order needed.**

**ORDER TO BE SUBMITTED BY:**        ☐ **COURT**    ☐ **PLAINTIFF**   ☐ **DEFENDANT**

Motions taken under advisement as of:     n/a

☐ ORDER TO BE ISSUED X NO SEPARATE ORDER TO BE ISSUED    ☐ R&R TO BE ISSUED ☐ NO R&R TO BE ISSUED
☐ Exhibits retained by the Court    ☐ Exhibits returned to counsel

                                           s/ Danielle M. Mair
                                         Signature of Law Clerk

**A103**

---

**From:** ecf-notice@mnd.uscourts.gov
**Sent:** Monday, September 24, 2012 12:56 PM
**To:** mndecfnotifications@mnd.uscourts.gov
**Subject:** Activity in Case 0:10-cv-00404-JRT-JJK Shukh v. Seagate Technology, LLC et al Order on Motion for Extension of Time to Complete Discovery

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Minnesota**

**Notice of Electronic Filing**

The following transaction was entered on 9/24/2012 at 12:55 PM CDT and filed on 9/24/2012

**Case Name:** Shukh v. Seagate Technology, LLC et al
**Case Number:** 0:10-cv-00404-JRT-JJK
**Filer:**
**Document Number:** 344(No document attached)

**Docket Text:**
**TEXT ONLY ORDER Plaintiff's Motion to Modify the Amended Scheduling Order (Doc. No. [332]), is DENIED for lack of good cause shown and as further stated on the record. The oral ruling of the Court on the record following arguments of counsel is hereby incorporated by reference as if restated in full herein. Signed by Magistrate Judge Tony N. Leung on 09/24/2012. (jz)**

**0:10-cv-00404-JRT-JJK Notice has been electronically mailed to:**

Calvin L Litsey    calvin.litsey@faegrebd.com, claire.ouellette@faegrebd.com, terry.conn@faegrebd.com

Chad Drown    chad.drown@faegrebd.com, miriam.soppeland@faegrebd.com

Charles F Knapp    chuck.knapp@faegrebd.com, linda.koenig@faegrebd.com

Constantine John Gekas    cjg@gekaslaw.com

David J F Gross    david.gross@faegrebd.com, degan@faegre.com

Elizabeth Cowan Wright    elizabeth.cowanwright@faegrebd.com, miriam.soppeland@faegrebd.com

James H Kaster    kaster@nka.com, geving@nka.com

Jeya Paul    jeya.paul@faegrebd.com, degan@faegre.com

John C Gekas    jgekas@gekaslaw.com

Katherine M Vander Pol    vanderpol@nka.com, jmckinney@nka.com

Sarah E Benjes    sarah.benjes@FaegreBD.com, sandy.oconnell@FaegreBD.com

**0:10-cv-00404-JRT-JJK Notice has been delivered by other means to:**

```
 1                    UNITED STATES DISTRICT COURT
                           DISTRICT OF MINNESOTA
 2
       ------------------------------------------------------------
 3                                    )
       Alexander M. Shukh,            )   File No. 10-404
 4                                    )            (JRT/JJK)
                Plaintiff,            )
 5                                    )
       vs.                            )   St. Paul, Minnesota
 6                                    )   September 24, 2012
       Seagate Technology, LLC,       )   10:11 a.m.
 7     Seagate Technology, Inc.,      )   DIGITAL RECORDING
       Seagate Technology,            )
 8     Unknown Owners and Assignees,  )
       And Seagate Technology PLC,    )
 9                                    )
                                      )
10              Defendants.
       ------------------------------------------------------------
11
                   BEFORE THE HONORABLE TONY N. LEUNG
12          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                          (MOTIONS HEARING)
13
       APPEARANCES
14      For the Plaintiff:        GEKAS LAW, LLP
                                  Constantine John Gekas, ESQ.
15                                11 South LaSalle Street
                                  Suite 1700
16                                Chicago, IL 60603

17      For the Defendants:       FAEGRE BAKER DANIELLS LLP
                                  Chad Drown, ESQ.
18                                Jeya Paul, ESQ.
                                  90 South Seventh Street
19                                Suite 2200
                                  Minneapolis, MN 55402
20      Transcriber:
                                  STACI A. MCGINTY
21                                RMR, CRR, CBC, CCP
                                  1005 U.S. Courthouse
22                                300 South Fourth Street
                                  Minneapolis, Minnesota 55415
23

24
            Proceedings recorded by digital recording; transcript
25     produced by computer.
```

**Pages Omitted**

**See entire transcript at App. __.**

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | **IN OPEN COURT** |
| 3 | THE COURT:  This is the United States District |
| 4 | Court for the District of Minnesota.  The case before the |
| 5 | bench this morning is captioned as filed -- sir, could you |
| 6 | sit down for a second? |
| 7 | MR. GEKAS:  Sure. |
| 8 | THE COURT:  Is captioned as filed Alexander M., I |
| 9 | apologize if I mispronounce the name, Shukh versus Seagate |
| 10 | Technology, et al.  It is Case No. 10-CV-404.  And we are |
| 11 | here on a motion relating to a request for amendment of a |
| 12 | pre-trial scheduling order.  And counsel representing |
| 13 | plaintiff, if you could state your name and identify |
| 14 | yourself for the record, please. |
| 15 | MR. GEKAS:  Yes, Your Honor.  Good morning.  My |
| 16 | name is Chris Gekas. |
| 17 | THE COURT:  Could you get to the center mike and |
| 18 | speak -- |
| 19 | MR. GEKAS:  Right. |
| 20 | THE COURT:  -- into it so we make a -- |
| 21 | MR. GEKAS:  I guess we're recorded.  Good morning, |
| 22 | again, Your Honor.  My name is Chris Gekes, G-E-K-A-S, and I |
| 23 | am counsel for Alexander M. Shukh who is here with us in |
| 24 | court today in the back of the courtroom.  And we're |
| 25 | prepared to proceed on the motion. |

 1                THE COURT:  Okay.  Identification of counsel for

 2      defendant.

 3                MR. DROWN:  Your Honor, good morning.  Chad Drown

 4      from Faegre Baker Daniels on behalf of the Seagate

 5      defendants.

 6                MS. PAUL:  And Jeya Paul from Faegre Baker and

 7      Daniels as well.

 8                THE COURT:  Thank you.  Let's -- it's about ten

 9      after, 15 minutes each side, you don't have to use all the

10      time if you don't need, but each side is limited to

11      15 minutes, and keep your own time in terms of what you want

12      for rebuttal and so forth.  It's about -- well, I'd say

13      about 12 after right now, so go ahead, Mr. Gekas.

14                MR. GEKAS:  Thank you, Your Honor.  Good morning

15      again, may I please the Court, Dr. Shukh.

16                THE COURT:  Counsel, let me just start by asking

17      you, what's the state -- any idea what's going on with that

18      writ of mandamus?

19                MR. GEKAS:  Your Honor, I check every morning and

20      I haven't seen, as of last Friday, there's no action on it

21      by the Federal Circuit.  So no news is new news, basically,

22      on that.

23                I think that there's another development that's

24      related to the case.  Last week we were before, on Thursday

25      morning -- Thursday afternoon we were before Judge Tunheim

1    included extraordinarily broad requests such as all files

2    relating or pertaining in any way whatsoever to his work,

3    any way, not just the patents, not these inventions, any way

4    related to his work at Seagate.  That's why we have such a

5    broad production, and that's why we have documents that we

6    believe are not related in any way to the claims in this

7    case on a privilege log because we were simply complying

8    with his request.  Thank you, Your Honor.

9          THE COURT:  Okay.  Thank you.

10          First of all, thank both sides for being well

11   prepared and presenting their client's positions and

12   arguments to the Court.  I see the lawyers prepared for

13   this, and the Court appreciates it obviously.

14          This Court's view of the motion before us is that

15   while we can make some, you know, variations of arguments,

16   it seems to me that essentially the only brand new issue

17   here from what was argued in I believe May in front of Judge

18   Keyes is the fact that there has been a filing of a motion

19   for partial summary judgment.  Now, I say that but it's, you

20   know, obviously it's more nuanced on that.  There are new

21   arguments, as plaintiff has articulated here on the record;

22   one is that, you know, in essence, at this point there's a

23   writ of mandamus petition pending before the Federal

24   Circuit, and then I'm not sure what the actual difference is

25   in argument relating to the document because it seems like

1    that's the same issue that was previously decided.

2         So while -- and I guess going back to the issue of

3    the pending petition in front of the Federal Circuit, in

4    essence, it is the same issue too as before in that it's not

5    pending before Judge Tunheim at this point but it's pending

6    before the Federal Circuit.  And obviously, you know, it's

7    the plaintiff's prerogative to make those petitions.  It

8    seems to me that's sort of the same issue as addressed

9    before, just as the argument of the document, you know, of

10   hundreds of thousands of pages in March or approximately

11   March.

12        As I look at the issue, then, of the filing of a

13   new motion for partial summary judgment, it's the view of

14   the Court that that in itself doesn't create the good cause

15   to provide an extension, nor have there been additional

16   arguments that would support the extension of good cause

17   based on the fact that there's a filing for a motion for a

18   partial summary judgment.

19        So essentially this is the same motion that was

20   argued before Judge Keyes in many respects, and I don't see

21   a reason to change Magistrate Judge Keyes' decision with

22   respect to the document, which I note which is one of three

23   prongs, that was articulated in the written submission by

24   plaintiff in support of the motion for an extension.  That

25   was addressed and the decision was three months and it's

1    three months.  I don't see a reason or good cause to change

2    that.

3          With respect to the fact that plaintiff is

4    concerned about the privilege rulings and has filed a

5    petition, again, that's the same situation where we're

6    waiting for a decision.  In fact, we've got a good -- we

7    have more developments and there is more finality in

8    that -- you know, before there was a decision by a U.S.

9    Magistrate Judge that plaintiff didn't like and appealed

10   and/or asked for review by the Article III, the Article III

11   has now rendered its decision and plaintiff doesn't like

12   that decision and now its prerogative to petition for the

13   Federal Circuit.  Well, it's the same position, and I don't

14   see it showing good cause on that ground.

15         And the filing of the partial motion for summary

16   judgment does not provide good cause, especially under the

17   circumstances of this case.  This case has been around for

18   two years, and it looks like it's around February at least,

19   early part of 2013, it's going to hit the three-year mark.

20         There's some additional arguments about the fact

21   that a summary judgment motion is -- the oral argument today

22   included assertion of a new document in that there's an oral

23   argument that's occurred now in the last week, and I think

24   we knew about that oral argument for some time now.  I don't

25   see that that changes the analysis or develops good cause in

1   that sense.

2         And I gather there is a request for certification

3   from the U.S. Supreme Court on a separate case that may have

4   an impact and decided one way or the other if review is

5   granted and goes a certain way does not provide the good

6   cause for the extension either.

7         So in the view of this Court -- well, actually, I

8   need to supplement that a little bit more.  There is two, a

9   little over two months left of discovery, and discovery ends

10   December 1st, I believe.  You know, going to the document --

11   and you know, parts of the Court's concern sometimes is

12   well, it doesn't matter who's at fault or who waited or what

13   strategy was employed, you know, a lot of times we want

14   people to have a practical chance to get, you know, get

15   together and get ready for trial and develop the record,

16   argue these things on the merits.  Here, you know, these

17   documents have been available since about March.  The

18   decision was made to not extend it more than three months.

19   And we're still with two months left of discovery.  And the

20   fact that plaintiff decided not to -- you know, to only take

21   one deposition to this point doesn't seem that much progress

22   has occurred on the document analysis.

23         Well, whatever position the plaintiff is in now,

24   is, you know, your own strategic decision, and that's not

25   good cause.  And this is a very old case.  There's a lot of

1    stuff just sitting there.  And therefore, no good cause has

2    been shown and therefore I'm denying the motion of plaintiff

3    to extend on a separate basis, even though I don't believe

4    that is required, but it's a separate supporting basis.

5         There is a corresponding prejudice to defendant

6    and as articulated by counsel for defendant here this

7    morning; therefore, based on this record and the record

8    before the Court, the findings, the motion is denied.  We'll

9    enter a minute order on this, and incorporate by reference

10   the entirety of the findings of the Court here as if

11   incorporated in the restatement in the formal order.  Thank

12   you.  Thank you, everyone.

13        (Court adjourned.)

14              *     *     *

15

16

17        I, Staci A. McGinty, certify that the foregoing is

18   a correct transcript to the best of my ability from the

19   digital recording in the above-entitled matter.

20

21        Certified by:  *s/ Staci A. McGinty*

22                       Staci A. McGinty,
                         RMR, CRR, CBC, CCP

23

24

25

# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| ALEXANDER M. SHUKH, | Civil No. 10-404 (JRT/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER AFFIRMING THE SEPTEMBER 24, 2012 ORDER OF THE MAGISTRATE JUDGE** |
| SEAGATE TECHNOLOGY, LLC, SEAGATE TECHNOLOGY, INC., SEAGATE TECHNOLOGY, UNKNOWN OWNERS AND ASSIGNEES, and SEAGATE TECHNOLOGY PLC, | |
| Defendants. | |

Constantine John Gekas and John C. Gekas, **GEKAS LAW LLP**, 11 South LaSalle Street, Suite 1700, Chicago, IL 60603; James H. Kaster and Katherine M. Vander Pol, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402, for plaintiff.

Calvin L. Litsey, Chad Drown, Charles F. Knapp, David J. F. Gross, Elizabeth Cowan Wright, and Jeya Paul, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402; Sarah E. Benjes, **FAEGRE BAKER DANIELS LLP**, 1700 Lincoln Street, Suite 3200, Denver, CO 80203, for defendants.

Plaintiff Alexander M. Shukh objects to the Magistrate Judge's order denying his motion to modify the amended scheduling order and extend the time to complete discovery. (Order, Sept. 24, 2012, Docket No. 344.) The Court has carefully considered Shukh's timely objections. Because the Court finds that Shukh has had adequate time to

complete discovery, and the Magistrate Judge's conclusions are neither clearly erroneous nor contrary to law, the Court will overrule Shukh's objections.

## BACKGROUND[1]

This case has been the subject of extensive litigation. Shukh filed suit in February 2010, raising numerous claims related to the termination of his employment with Defendants (collectively "Seagate"). In the first year of litigation alone, the parties filed a combined total of twenty motions seeking, among other things, amendments to the complaint, dismissal, summary judgment, a preliminary injunction, surreply briefing, and disqualification of counsel. After a year of litigation, six of Shukh's thirteen claims survived a motion to dismiss, and the Court allowed Shukh's claims based on correction of inventorship for six United States patents, fraud, and employment discrimination to go forward. (Order, Mar. 30, 2011, Docket No. 140.)

On June 28, 2011, United States Magistrate Judge Jeffrey J. Keyes entered a pretrial scheduling order, setting fact discovery to be completed by September 1, 2012, and expert discovery to be completed by November 1, 2012. (Pretrial Scheduling Order, June 28, 2011, Docket No. 185.) Shukh served interrogatories and requests for production of documents to which Seagate timely responded. Seagate has produced documents on a rolling basis, with its largest production being 287,858 pages on

---

[1] The Court recites the facts here only to the extent necessary to rule on Shukh's objections. A more thorough factual background is available in the Court's earlier orders in this case. (*See* Order, Mar. 30, 2010, Docket No. 140; Order, Nov. 30, 2011, Docket No. 242.)

March 23, 2012.  (Third Decl. of Jeya Paul ¶ 2, Oct. 22, 2012, Docket No. 357.)  Shukh claims that the March 23, 2012 document production was incoherent and included mislabeled tiff files, each containing more than one document.  Shukh has not raised any formal objections to Seagate's document production with the Court, nor has he requested that the Court require Seagate to reproduce the documents in a different format. Additionally, Magistrate Judge Keyes has found that all of the documents produced by Seagate in response to Shukh's broad document requests "were produced in the ordinary course." (Third Paul Decl., Ex. A at 12.)

Shortly after discovery commenced, Seagate claimed attorney-client privilege protection of certain documents and testimony sought by Shukh relating to internal Seagate communications regarding inventorship of the patents at issue.  Seagate claimed the privilege over 575 invention records and communications, and also asserted the privilege during a deposition, after which Shukh suspended all deposition discovery. Shukh brought a motion to compel production of the materials over which Seagate had claimed privilege.  (Am. Mot. to Compel, Oct. 7, 2011, Docket No. 206.)

On December 15, 2011, Magistrate Judge Keyes granted Shukh's motion to compel in part.  (Order, Dec. 15, 2011, Docket No. 251.)  Magistrate Judge Keyes found a narrow subject-matter waiver of privilege with respect to five invention disclosures Seagate had produced to Shukh, and granted Shukh's motion to compel only with respect to communications related to the subject matter of those invention disclosures.  (*Id.* at 2-3.)  Shukh filed timely objections to Magistrate Judge Keyes' order.  (Pl.'s Objections, Dec. 28, 2011, Docket No. 252.)  While those objections were pending before the Court,

Shukh continued to submit additional materials in support of his objections. (*See* Reply, Feb. 9, 2012, Docket No. 285; Letter, Mar. 29, 2012, Docket No. 296.)

In April 2012, Shukh brought a motion seeking a six month extension of the time to complete discovery, citing Seagate's March 23, 2012 document production and the privilege dispute as the bases for such an extension. (Mot. to Modify Scheduling Order, Apr. 2, 2012, Docket No. 299.) Seagate agreed to stipulate to a three month extension. (Opp. to Pl.'s Mot. to Modify Scheduling Order at 6, Apr. 24, 2012, Docket No. 305.) Magistrate Judge Keyes granted Shukh's motion in part, extending the discovery deadlines by three months, setting fact discovery to be completed by December 1, 2012, and expert discovery by February 1, 2013. (Am. Pretrial Scheduling Order, May 2, 2012, Docket No. 309.) Shukh did not appeal Magistrate Judge Keyes' decision.

In June 2012, the Court affirmed Magistrate Judge Keyes' order regarding Shukh's motion to compel the production of documents over which Seagate had asserted privilege. (Order, June 29, 2012, Docket No. 320.) In the order, the Court denied Shukh's request to certify the privilege issue for interlocutory appeal to the Federal Circuit, finding that Shukh had made "no effort whatsoever to satisfy [the] standard" for certifying an interlocutory appeal. (*Id.* at 16.) Shukh then filed a petition for a writ of mandamus with the Federal Circuit, seeking to vacate the Court's order denying in part Shukh's motion to compel the production of privileged documents. (Notice from the USCA for the Federal Circuit, July 23, 2012, Docket No. 326.) The Federal Circuit has since denied Shukh's petition. (Order, Oct. 22, 2012, Docket No. 358.) In denying his petition, the Federal Circuit found that Shukh had not demonstrated that review of the

Court's privilege ruling was an extraordinary situation demanding mandamus relief. Specifically, the Federal Circuit found that Shukh's petition did not raise an important issue of first impression and that "Shukh has not shown that he has no other adequate remedy to attain the desired relief, i.e., he has not shown that he could not raise issues concerning his requests to compel documents within any timely appeal to this court from a final district court decision." (*Id.* at 2.)

On June 29, 2012, Seagate brought a motion for partial summary judgment on Shukh's fraud and correction of inventorship claims. (Mot. for Summ. J., June 29, 2012, Docket No. 313.) This Court held a hearing on September 20, 2012, and Seagate's motion for summary judgment is currently under advisement. (Minute Entry, Sept. 20, 2012, Docket No. 342.)

On September 10, 2012, Shukh brought a motion seeking another modification of the scheduling order to further extend the time to complete discovery. (Mot. to Modify Am. Scheduling Order, Sept. 10, 2012, Docket No. 332.) Shukh provided three grounds in support of his request for a three month extension: Seagate's March 23, 2012 document production; the pending petition for a writ of mandamus related to the privilege issue; and Seagate's partial summary judgment motion pending before the Court. (Pl's Memo. at 1-2, Sept. 10, 2012, Docket No. 333). At the hearing before Magistrate Judge Leung, Shukh also suggested that a petition for a writ of certiorari pending in front of the United States Supreme Court in a different case raised issues related to Shukh's claims and weighed in favor of an extension. (Hr'g Tr. ("Tr.") at 6, Oct. 16, 2012, Docket No. 353.)

Magistrate Judge Leung denied Shukh's motion to amend the scheduling order, finding that Shukh had failed to demonstrate good cause for such an amendment. Specifically, Magistrate Judge Leung rejected each of Shukh's grounds for an extension and found that Shukh's failure to conduct discovery in the time prescribed by the amended scheduling order was his "own strategic decision." (*Id.* at 30.) Shukh filed timely objections, and contends that Magistrate Judge Leung abused his discretion when he determined that none of the bases proffered by Shukh in support of modifying the scheduling order demonstrated good cause.

## ANALYSIS

## I. STANDARD OF REVIEW

The standard of review applicable to an appeal of a Magistrate Judge's order on nondispositive pretrial matters is extremely deferential. *Roble v. Celestica Corp.*, 627 F. Supp. 2d 1008, 1014 (D. Minn. 2007). This Court will reverse such an order only if it is clearly erroneous or contrary to law. 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Minn. LR 72.2(a). "A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Lisdahl v. Mayo Found.*, 633 F.3d 712, 717 (8th Cir. 2011) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)). "A decision is contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure." *Knutson v. Blue Cross & Blue Shield of Minn*, 254 F.R.D. 554, 556 (D. Minn. 2008) (internal quotation marks omitted).

## II.    AMENDMENT OF SCHEDULING ORDER

Federal Rule of Civil Procedure 16 provides that a scheduling order "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4); *see also* D. Minn. LR 16.3(b)(1). "The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements." *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 716 (8th Cir. 2008) (internal quotations omitted); Fed R. Civ. P. 16(b), advisory committee note (explaining that "the court may modify the schedule on a showing of good cause if it cannot reasonably be met despite the diligence of the party seeking the extension"). The "exacting" standard set by Rule 16(b) requires that a moving party first make the requisite good cause showing. *E.E.O.C. v. Hibbing Taconite Co.*, 266 F.R.D. 260, 265 (D. Minn. 2009). Even then, however "the district court retains discretion as to whether to grant the motion." *Bradford v. DANA Corp.*, 249 F.3d 807, 809 (8th Cir. 2001). Because scheduling orders are "a vehicle designed to streamline the flow of litigation through [the Court's] crowded docket," the Court does not take such orders lightly, and where good cause to modify has not been shown, "will enforce them." *Id.*

### A.    March 23, 2012 Document Production

Magistrate Judge Leung found that Seagate's March 23, 2012 production of over 280,000 documents did not establish good cause to extend the discovery deadline. Magistrate Judge Leung specifically found that the issue of the voluminous March 23, 2012 document production had already been argued to Magistrate Judge Keyes in

Shukh's first motion to modify the scheduling order, and warranted only the original three month extension granted by Magistrate Judge Keyes. (Tr. at 27-28.) Furthermore, in his October 2012 ruling, Magistrate Judge Leung found that Shukh had failed to exercise diligence, explaining that even though the documents had been available since March 2012, "the fact that plaintiff decided . . . to only take one deposition to this point doesn't seem [to indicate] that much progress has occurred on the document analysis." (Tr. at 30.) Shukh objects to Magistrate Judge Leung's conclusion, arguing that due to the volume of documents produced, he has been substantially delayed in preparing for depositions.

This Court concludes that Seagate's March 23, 2012 document production does not provide good cause to extend the discovery deadlines. Shukh has not demonstrated why seven months (from the time the documents were produced until the time Magistrate Judge Leung ruled on the motion to modify the scheduling order) was an insufficient period of time in which to review the documents, and his continued failure to review the documents and conduct depositions demonstrates a lack of diligence. If there were, as Shukh suggests, problems with the manner in which Seagate produced its documents, Shukh should have been diligent in seeking to correct those problems immediately, rather than requesting multiple extensions of the discovery deadlines. *See Hernandez v. Mario's Auto Sales, Inc.*, 617 F. Supp. 2d 488, 495 (S.D. Tex. 2009) (declining to grant

an extension where the plaintiffs never sought the aid of the court in obtaining adequate responses to their discovery requests).[2]

Additionally, Shukh made an identical argument about the burdensome nature of Seagate's March 23, 2012 document production in his first motion for an amended scheduling order. (Pl.'s Memo. in Supp. of Mot. to Modify Scheduling Order at 1-2, Apr. 17, 2012, Docket No. 302.) Magistrate Judge Keyes agreed that the volume of the March 23, 2012 document production warranted a three month extension to the discovery deadlines, and specifically noted that the three month extension did not foreclose a future extension "if **unforeseen additional** problems arise." (Third Paul Decl., Ex. A at 12 (emphasis added).) In support of his second motion to extend the discovery deadlines, Shukh brought no new facts or unforeseen additional problems to Magistrate Judge Leung's attention which would indicate that the production of documents over seven months ago warrants a further extension. Rather, Shukh's continued failure to review these documents after Magistrate Judge Keyes granted a three month extension in which to do so, demonstrates a lack of diligence. *See Hernandez*, 617 F. Supp. 2d at 495 ("Plaintiffs were already granted an extension of the discovery period for this very reason. That they seek another extension for the exact same reason shows a lack of diligence on Plaintiffs' part." (internal citation omitted)). Accordingly, the Court finds

---

[2] *See also Smith v. BCE Inc.*, 225 Fed. Appx. 212, 217 (5th Cir. 2007) (declining to find good cause to extend a discovery deadline when the party seeking the extension alleged that the opposing party had failed to respond to discovery requests, holding that rather than seeking an extension "[a] diligent party attempts to compel discovery through the presiding court after opposing counsel unjustly refuses to provide responses").

that Magistrate Judge Leung's conclusion that the March 23, 2012 document production did not establish good cause to modify the discovery deadlines in the scheduling order was not clearly erroneous.

### B. Petition for Writ of Mandamus

Magistrate Judge Leung concluded that Shukh's pending petition for a writ of mandamus related to the privilege issue did not establish good cause to modify the scheduling order. Magistrate Judge Leung concluded that the privilege argument had already been addressed to, and considered by, Magistrate Judge Keyes in granting the original three month extension to the discovery deadlines and that Shukh had presented no new evidence establishing good cause for further extension. Magistrate Judge Leung found that Shukh's argument based on privilege provided less basis for modification of the scheduling order in his current motion than it did in his original motion for an extension. In the time between Shukh's two motions for extensions, the privilege issue had become even more final because the Court had affirmed the Magistrate Judge's order. Shukh objects to Magistrate Judge Leung's conclusion, arguing that the uncertainty of the privilege issue has impeded his ability to conduct discovery.

The Court concludes that Shukh's continued failure to conduct depositions consistent with the privilege ruling of Magistrate Judge Keyes that was affirmed by this Court demonstrates a lack of diligence. Shukh has characterized the privileged documents as "relevant to his proof of inventorship and fraud." (Pl.'s Objections at 4, Oct. 8, 2012, Docket No. 350.) Yet Shukh has failed to demonstrate how a pending

petition for a writ of mandamus affected his ability to depose non-Seagate employees unconnected with the privileged documents or conduct discovery relevant to his discrimination claims. Additionally, Shukh has failed to demonstrate good cause for his failure to conduct discovery more generally with respect to non-privileged information. Shukh makes only a sweeping generalization that all of his proposed discovery is so intertwined that no discovery could proceed without a final privilege determination. Shukh's argument misapprehends the fact that there was, at all times since Magistrate Judge Keyes' December 15, 2011 order, a privilege determination governing the case. The Federal Circuit's order denying Shukh's petition for mandamus specifically indicated that "Shukh has not shown that he has no other adequate remedy to attain the desired relief, i.e., he has not shown that he could not raise issues concerning his requests to compel documents within any timely appeal to this court from a final district court decision." (Order at 2, Oct. 22, 2012, Docket No. 358.) In other words, that Shukh may ultimately have grounds for appeal from a final decision of the Court does not constitute good cause to extend discovery deadlines where Shukh has failed to diligently pursue discovery within the confines of the privilege determinations governing this case. Therefore, the Court concludes that Magistrate Judge Leung did not err in concluding that the petition for a writ of mandamus did not establish good cause to modify the scheduling order.

## C.    Pending Motion for Partial Summary Judgment

Magistrate Judge Leung also found that Seagate's motion for partial summary judgment pending before the Court did not provide good cause to modify the discovery deadlines.  Magistrate Judge Leung characterized Shukh's failure to take discovery as a "strategic decision."  (Tr. at 30.)  Shukh objects to this conclusion, arguing that he should be allowed to wait and see how the Court will rule on Seagate's motion before incurring discovery costs related to the fraud and correction of inventorship claims which may ultimately be dismissed.[3]

Shukh has not shown that good cause exists to modify the scheduling order due to the pending summary judgment motion.  Rather, the "wait and see" approach is a tactical decision, and does not demonstrate diligent pursuit of discovery.  *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 759-60 (8th Cir. 2006) (holding that "tactical decision[s]" do not provide good cause to modify case management orders); *cf. Watt v. All Clear Bus. Solutions, LLC*, 840 F. Supp. 2d 324, 326 (D.D.C. 2012) (rejecting as a basis for extending a discovery deadline the plaintiff's assertion that he expected the case to settle prior to the need for incurring the additional costs of deposing an expert, finding "no authority for the proposition that merely hoping for or anticipating settlement and

---

[3] Shukh also seems to suggest that Seagate's motion for summary judgment was in some way improper because it was brought before the close of discovery.  Federal Rule of Civil Procedure 56(b) allows a party to move for summary judgment "at any time until 30 days after the close of all discovery."  Thus, there was nothing facially improper about the timing of Seagate's motion.  Furthermore, the appropriate mechanism to deal with a premature summary judgment motion is not amending the scheduling order, but rather through an affidavit under Fed. R. Civ. P 56(d), which Shukh has submitted in connection with the summary judgment motion and is currently under consideration by the Court.

stipulations excuses [plaintiff's] failure to meet court-ordered deadlines"). That Shukh anticipates the Court may dismiss some of his claims due to Seagate's motion for summary judgment does not provide a good cause basis to extend the discovery deadlines. If Shukh does not wish to conduct the discovery necessary to support his fraud and correction of inventorship claims, he is free to move for their dismissal. Furthermore, Shukh's argument that the resolution of the summary judgment motion will substantially reduce the discovery he expects to take is belied by his argument with respect to privilege that he has been unable to conduct any discovery because discovery for all of his claims is inextricability intertwined. The Court could not find that Seagate's filing of summary judgment caused Shukh to stop conducting discovery, when the record suggests that Shukh was not diligently pursuing discovery before the motion was filed. Because Seagate's pending motion did not establish good cause, the Court concludes that Magistrate Judge Leung did not err in denying Shukh's motion to modify the scheduling order.

### D.     Petition for Writ of Certiorari

Finally, Magistrate Judge Leung found that a pending petition for a writ of certiorari in a separate case did not establish good cause to amend the scheduling order. Shukh argues that the pending petition relates to the legal viability of one of the bases for Shukh's correction of inventorship claim, which basis the Court previously dismissed. Shukh contends that if the Supreme Court grants the petition, and overturns the Federal

Circuit case upon which the Court relied, the current case "will be drastically changed," and Shukh will be required to conduct more discovery.

Shukh has failed to demonstrate that the pending petition establishes good cause for extending the discovery deadline. Scheduling orders would be meaningless indeed if discovery was halted every time there was a mere possibility that, sometime in the future, the Supreme Court would grant a petition for a writ of certiorari which could result in an opinion that might ultimately bear upon some of the legal issues in the case. The link between the pending petition for certiorari and Shukh's ability to conduct discovery is simply too tenuous to establish good cause. Furthermore, Shukh only requested a three month extension to discovery deadlines, suggesting that the petition for certiorari is not a true basis of his motion for an extension. In three months, it is impossible that the Supreme Court, even if it accepted certiorari of the case in question, would have rendered an opinion in the case. As with the privilege determination, after this case is resolved, Shukh is free to appeal the Court's legal determination regarding his correction of inventorship claim. The ability to appeal does not, however, establish good cause to postpone discovery. Therefore, the Court concludes that Magistrate Judge Leung did not err in denying Shukh's motion to modify the scheduling order. [4]

---

[4] Because the Court concludes that Magistrate Judge Leung did not err in finding that Shukh had not shown good cause to extend the discovery deadlines, the Court need not address whether Seagate demonstrated that the extension would cause it to be prejudiced. Magistrate Judge Leung correctly concluded that Seagate did not need to show prejudice in order for Shukh's request to extend the scheduling order to be denied, and properly only relied on prejudice as another, independent reason to deny Shukh's motion. *See Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 717 (8th Cir. 2008) ("While the prejudice to the nonmovant

(Footnote continued on next page.)

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, the Court **OVERRULES** plaintiff's objections [Docket No. 350] and **AFFIRMS** the Magistrate Judge's Order dated September 24, 2012 [Docket No. 344].

DATED:   January 3, 2013
at Minneapolis, Minnesota.

s/ John R. Tunheim
_____
JOHN R. TUNHEIM
United States District Judge

---

(Footnote continued.)

resulting from modification of the scheduling order may also be a relevant factor, generally, we will not consider prejudice if the movant has not been diligent in meeting the scheduling order's deadlines.").

| | |
|---|---|
| **From:** | ecf-notice@mnd.uscourts.gov |
| **To:** | mndecfnotifications@mnd.uscourts.gov |
| **Subject:** | Activity in Case 0:10-cv-00404-JRT-JJK Shukh v. Seagate Technology, LLC et al Order (Text Only) |
| **Date:** | Friday, January 18, 2013 4:37:43 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Minnesota

### Notice of Electronic Filing

The following transaction was entered on 1/18/2013 at 4:36 PM CST and filed on 1/18/2013

**Case Name:**       Shukh v. Seagate Technology, LLC et al

**Case Number:**    0:10-cv-00404-JRT-JJK

**Filer:**

**Document Number:** 406(No document attached)

**Docket Text:**
**TEXT ONLY ENTRY. Oral ORDER ruling on Defendants' Motion for Protective Order (Doc. No. 388), is GRANTED IN PART and DENIED IN PART, as stated on the record. Signed by Magistrate Judge Jeffrey J. Keyes on 1/18/13. (jam)**

**0:10-cv-00404-JRT-JJK Notice has been electronically mailed to:**

Calvin L Litsey      calvin.litsey@faegrebd.com, claire.ouellette@faegrebd.com, laura.johnson@faegrebd.com, terry.conn@faegrebd.com

Chad Drown      chad.drown@faegrebd.com, miriam.soppeland@faegrebd.com

Charles F Knapp      chuck.knapp@faegrebd.com, linda.koenig@faegrebd.com

Constantine John Gekas      cjg@gekaslaw.com

Cristina Parra Herrera      cparra@nka.com, drexler@nka.com

David J F Gross      david.gross@faegrebd.com, degan@faegre.com

Elizabeth Cowan Wright      elizabeth.cowanwright@faegrebd.com,

miriam.soppeland@faegrebd.com

James H Kaster    kaster@nka.com, geving@nka.com

Jeya Paul    jeya.paul@faegrebd.com, degan@faegre.com

John C Gekas    jgekas@gekaslaw.com

Katherine M Vander Pol    vanderpol@nka.com, jmckinney@nka.com

Sarah E Benjes    sarah.benjes@FaegreBD.com, sandy.oconnell@FaegreBD.com

**0:10-cv-00404-JRT-JJK Notice has been delivered by other means to:**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| **ALEXANDER M. SHUKH**, | Civ. No. 10-404 (JRT/JJK) |
| Plaintiff, | |
| v. | |
| **SEAGATE TECHNOLOGY LLC, SEAGATE TECHNOLOGY, INC., SEAGATE TECHNOLOGY, SEAGATE TECHNOLOGY PLC, and UNKNOWN OWNERS AND ASSIGNEES,** | |
| Defendants. | |
| **SEAGATE TECHNOLOGY LLC and SEAGATE TECHNOLOGY**, | **PROTECTIVE ORDER** |
| Counterclaimants, | |
| v. | |
| **ALEXANDER M. SHUKH** | |
| Counterclaim Defendant. | |

The above-entitled matter came before the undersigned United States

Magistrate Judge on Seagate's Motion for Protective Order (Doc. No. 388).

Based on all the files, records, and proceedings herein, **IT IS HEREBY**

**ORDERED** that:

Seagate's Motion for Protective Order (Doc. No. 388), is **GRANTED IN**

**A132**

**PART** and **DENIED IN PART** as follows:

Shukh shall withdraw his following subpoenas:

1. the December 28, 2012 subpoena to Dr. Bajorek (Bajorek Decl. Ex. C);
2. the January 4, 2012 subpoena to Ms. Heitzman (Heitzman Decl. Ex. B);
3. the December 18, 2012 subpoena to Intematix (Wright Decl. Ex. C);
4. the January 7, 2013 subpoena to the AAA (Wright Decl. Ex. F); and
5. the December 17, 2012 and December 18, 2012 subpoenas to IBM (Wright Decl. Exs. B, D).

In addition, Seagate need not produce documents pursuant to Shukh's

Rule 34 request regarding Dr. Bajorek's previous expert reports and testimony.

Seagate's request to preclude Shukh from serving further written expert

discovery absent leave of the Court is DENIED.

Seagate's request to have Shukh compensate Dr. Christopher Bajorek and

Angela Heitzman for their time, at their standard expert hourly rate, and costs

incurred in responding to the subpoenas issued to them, is DENIED AS MOOT.


Date: January 18, 2013          *s/ Jeffrey J. Keyes*
                                JEFFREY J. KEYES
                                United States Magistrate Judge

```
 1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
 2

 3       ------------------------------------------------------------
                                       )
         Alexander M. Shukh,           )    File No. 10-404
 4                                     )                (JRT/JJK)
               Plaintiff,              )
 5                                     )
         vs.                           )    St. Paul, Minnesota
 6                                     )    January 18, 2013
         Seagate Technology, LLC,      )    2:32 p.m.
 7       Seagate Technology, Inc.,     )    DIGITAL RECORDING
         Seagate Technology,           )
 8       Unknown Owners and Assignees, )
         And Seagate Technology PLC,   )
 9       ------------------------------------------------------------
                   BEFORE THE HONORABLE Jeffrey J. Keyes
10           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                            (MOTIONS HEARING)
11
         APPEARANCES
12         For the Plaintiff:        NICHOLS KASTER, PLLP
                                     James H. Kaster, ESQ.
13                                   4600 IDS Center
                                     80 South Eighth Street
14                                   Minneapolis, MN 55402

15         (via telephone)          GEKAS LAW, LLP
                                     Constantine John Gekas, ESQ.
16                                   John C. Gekas, ESQ.
                                     11 South LaSalle Street
17                                   Suite 1700
                                     Chicago, IL 60603
18
           For the Defendants:      FAEGRE BAKER DANIELS LLP
19                                   Elizabeth Cowan Wright, ESQ.
                                     Calvin L. Litsey, ESQ.
20                                   90 South Seventh Street
                                     Suite 2200
21                                   Minneapolis, MN 55402

22         Transcriber:             STACI A. HEICHERT
                                     RMR, CRR, CBC, CCP
23                                   1005 U.S. Courthouse
                                     300 South Fourth Street
24                                   Minneapolis, Minnesota 55415

25            Proceedings recorded by digital recording;
         transcript produced by computer.
```

1          **P R O C E E D I N G S**

2              **IN OPEN COURT**

3          THE COURT:  All right.  Welcome, everybody.  We

4     have a motion for a protective order in Shukh versus

5     Seagate.  Let's start with counsel's appearances, please,

6     starting with plaintiff's counsel, present and on the phone.

7     Mr. Kaster.

8          MR. KASTER:  Good afternoon, Your Honor.  Jim

9     Kaster.  Mr. Constantine J. Gekas, Chris Gekas, is also on

10     the phone.  We were just chatting when the Court came in

11     about the football game.

12          THE COURT:  All right.  Very good.  Good

13     afternoon, Mr. Gekas.

14          MR. GEKAS:  Good afternoon, Your Honor.  And my

15     partner John Gekas is here.  Thank you for letting us

16     participate by phone.

17          THE COURT:  Absolutely.  We'll have no -- you'll

18     be able to get -- you'll be able to have this recorded even

19     though you're on the telephone, so we'll have no problem

20     with that.  And for the defendant.

21          MS. WRIGHT:  Good afternoon, Your Honor, Elizabeth

22     Cowan Wright representing the Seagate entities, and with me

23     here today is Cal Litsey.

24          THE COURT:  Good afternoon.  All right.  I guess

25     that Seagate is up.  It's your motion.

**Pages Omitted**

**See entire transcript at App. __.**

1    it is the burden of Dr. Shukh to make a threshold showing of

2    relevance, and I would just remind Your Honor and -- that

3    the issues that Dr. Bajorek has opined on in this case are

4    very specific issues relating to six patents and who is an

5    inventor on those patents, and nothing that's in the brief

6    and none of the argument that we've heard has made any

7    showing of relevance of any of the discovery that is sought

8    to those specific issues.  Thank you.

9          THE COURT:  Thank you.  All right.  Here's what

10    we're going to do.  I'll put my ruling on the record.  I

11    want to get this done right away so that you have it because

12    I know you're in the middle of finishing up expert discovery

13    in this case.

14          First of all, let me start by overarching comment

15    with respect to the authority of the Court in connection

16    with this matter.  The -- I conclude that the Court does

17    have the authority to require a party to withdraw subpoenas

18    in this -- in this type of setting because of the authority

19    that we have under the rules of civil procedure with respect

20    to both the issuance of protective orders and our power with

21    respect to the -- -- or control of discovery in the case

22    that is before us.  Rule 26(c) provides, in relevant part,

23    that "the Court may, for good cause, issue an order to

24    protect a party or person from annoyance, embarrassment,

25    oppression, or undue burden or expense, including one or

1    more of the following."  And subpart (D) is "forbidding

2    inquiry into certain matters, or limiting the scope of

3    disclosure or discovery to certain matters."  That's in Rule

4    26(c)(1).

5            The party seeking the order bears the burden of

6    establishing on the requisite good cause for the protective

7    order.  Where a party has improperly issued subpoenas to a

8    third party, a motion for a protective order under

9    Rule 26(c) is an appropriate procedural mechanism by which

10   the opposing party can challenge the improperly issued

11   subpoena.

12           The -- and that brings us, then, to the issue of

13   the Court's obligation to confine discovery as it pertains

14   to experts in accordance with what is permitted by the

15   rules.

16           With respect to experts who may testify, the rules

17   contemplate only limited discovery, and that is set forth in

18   Rule 26(a)(2), where a party is entitled to receive an

19   opposing party's expert identity along with the written

20   report containing, among other things, a list of all cases,

21   all other cases in which, during the previous four years,

22   the witness testified as an expert at trial or by

23   deposition.

24           In addition, under Rule 26(b)(4), a party may

25   depose any person who has been identified as an expert whose

1   opinions may be presented at trial.  That's in Federal Rule

2   of Civil Procedure Rule 26(b)(4)(A).  The limited expert

3   discovery provided by the rules is discovery that is

4   designed to allow for the disclosure of facts known or

5   opinions held by an expert.  See 26(b)(4)(B).

6        And, of course, then, discovery that is sought

7   pursuant to a subpoena that is not relevant to a core claim

8   or defense in the under case but is instead relevant only

9   minimally to a collateral issue in the case regarding

10  impeachment, including impeachment of an expert, may, of

11  course, be denied.

12       Rule 26(b)(4) limits the discovery of material

13  relevant to the impeachment of an expert to materials

14  possessed by an expert and related to the case at hand.

15  26(b)(4)(A) was -- was designed to prevent abusive, costly

16  fishing expeditions into the background of a testifying

17  expert.

18       The focus of information to be gathered under the

19  rule, either for general understanding of an

20  expert -- expert's position or for impeachment, is on the

21  events giving rise to the litigation at hand and the

22  opinions to be received in evidence during that litigation.

23       So with that backdrop, let me turn to the item by

24  item specific issues that we have before us with respect to

25  the attempt that's being made to seek various items in

1    discovery as it relates to these experts who are about to be

2    deposed in the case.

3         First of all, let me turn to, in Dr. Bajorek's

4    situation, the attempt that's being made to obtain his

5    testimony, reports and other related material with respect

6    to three other cases.  First of all, with respect to the

7    *Western Digital* matter, the case -- a case involving the

8    theft of trade secrets from Seagate by a -- by a Dr. Mao, I

9    conclude that the -- that the attempt by Dr. Shukh to obtain

10   that material should be denied; that it is improper and it's

11   outside the bounds of appropriate discovery -- expert

12   discovery.

13        And the reason I come to that conclusion is that

14   in *Western Digital*, we do have the -- attached to

15   Dr. Shukh's materials on this motion, we do have the opinion

16   and findings of arbitrator, former Judge Schumacher in that

17   case, which describes the trade secret litigation and what

18   was involved in that case, and we do have the fact that

19   Dr. Bajorek testified in that case about the -- about the

20   specific issue of trade secrets and whether the information

21   that was -- was involved in that case was a trade secret.

22        The -- it is clear that there has been no showing

23   made that in the *Western Digital* case that Dr. Bajorek

24   testified about inventorship or issues relating to

25   inventorship which is the subject of his expert opinion in

1    this case.  I have compared the report of Dr. -- of

2    Dr. Bajorek in this case to the issues that were involved in

3    *Western Digital,* and I conclude that to require in this case

4    the turning over of what apparently is classified,

5    confidential information in that case would be outside the

6    bounds of appropriate discovery and that the appropriate

7    remedy here is to require any subpoena that was issued to

8    obtain that information to be withdrawn so that we can

9    properly cabin the discovery that is done in this case.

10          That is not to say that in all instances, just

11   because something is labeled as confidential and proprietary

12   in another case that it could not be obtained in discovery,

13   but here the core issue that we have is that the -- the

14   information being sought is simply too collateral to and

15   outside the bounds of appropriate expert discovery that

16   would be involved in this case.

17          The same is true with respect to the *Marvell*

18   litigation.  There we have the public testimony of

19   Dr. Bajorek in that case is available and apparently it is

20   in the hands of Dr. Shukh in this case, and there has been

21   no showing made that there is -- that it would be proper to

22   go beyond that public testimony and to require or to allow

23   the production of the reports that did underline

24   Dr. Bajorek's testimony in that case.  Again, there was no

25   showing that there was anything in that case where

1    Dr. Bajorek testified about the type of inventorship issues

2    or other issues that are the subject of his expert report in

3    this case.  The testimony in that case was about the HDD

4    industry.  Apparently there was a report that may have gone

5    beyond simply that type of industry testimony to technical

6    issues, but there was no indication that there's anything

7    that would indicate there was a close enough link between

8    Dr. Bajorek's testimony in that case and the report in this

9    case that would warrant this type of discovery.

10           With respect to the *Siemens* case, again, the

11   testimony in the *Siemens* case that is at issue is available

12   because it was public testimony and, in that case,

13   Dr. Bajorek testified about damages.  Again, there was no --

14   and the testimony is available, but there has been no

15   showing made that there was any testimony about inventorship

16   or the other type of issues that are the subject of the

17   Bajorek report in this case and the discovery of which would

18   be necessary in order to have proper expert discovery under

19   the rules in this case.

20           The -- turning to other issues, the IBM matter, I

21   conclude that the issue with respect to the -- about

22   Bajorek's stock option dispute with IBM is far too removed

23   from the issue of this case to allow that to become the

24   subject of discovery.  The -- the -- there is nothing to

25   indicate that there is anything having to do with that stock

1     option dispute that goes to Dr. Bajorek's qualifications as

2     an expert in this case.  Those issues had to do with a

3     dispute that he had about his stock option rights when he

4     left IBM.  There were -- obviously the record shows that

5     apparently there was some allegations made with respect to

6     fraud, but I conclude that this is the type of far removed

7     type of issue that may be, the attempt is being made to use

8     this to perhaps impeach this expert, but I conclude that

9     it's not appropriate discovery in this matter and therefore

10    I'm going to confine the discovery in a way that requires

11    that that subpoena to IBM to be withdrawn.

12         With respect to the personnel file at Intematrix,

13    another employer of Dr. Bajorek's where he worked, this, I

14    conclude, is an example of a situation where an attempt is

15    made, in fact, to engage in a fishing expedition to try to

16    find information that may be used to impeach Dr. Bajorek,

17    but it is -- there is no threshold showing to be made that

18    would permit this type of discovery at this stage in the

19    litigation before a deposition even has been taken of

20    Dr. Bajorek, and, again, I'm going to exercise our authority

21    to issue the protective order to require the withdrawal of

22    that subpoena to Intematrix.

23         Finally, with respect to the expert Heitzman,

24    there has been some -- as the record now stands, there

25    doesn't appear to be any dispute that -- and this is before,

1    of course, Heitzman's deposition has even been taken, at

2    this stage, it appears that the rule has been complied with

3    and that the -- there has been a disclosure of the instances

4    in the last four years where Heitzman has testified either

5    at trial or in a deposition.  There has been no threshold

6    showing made that would warrant discovery beyond, at this

7    point, beyond that of disclosure that went with the report.

8    The -- the issue in this case that Heitzman is testifying

9    about is the reasonableness of the job -- of the job search

10   or searches that Dr. Shukh went on, and there's nothing to

11   indicate that in those -- that in those prior cases that

12   were disclosed there is any sort of testimony that would be

13   necessary to bear upon, to understand or to bear upon the

14   expert testimony that she's proffering in this case.  So

15   that, at least as this stage, before her deposition is even

16   taken, I'm not going to require any -- any discovery beyond

17   what is required to be disclosed by -- by the rules in this

18   matter.

19        I do note that -- that -- that Dr. Shukh has

20   raised a troubling fact with respect to Seagate's

21   disclosures in this case and the lack of their timely

22   provision all of the required disclosures about the expert

23   and with very little explanation of why there was foot

24   dragging with respect to that, other than inadvertence and

25   the -- and this, of course, was in the face of this Court's

1    admonishment to counsel that it would not put up with any

2    delays and that expert -- all discovery must be done in a

3    prompt and timely fashion.  But we don't have any motion

4    before us today dealing with that issue.  There is an

5    indication that -- that Seagate's -- the way in which they

6    dealt with that may be the subject of a future motion before

7    Judge Tunheim, so there's nothing to rule on for this Court

8    with respect to that matter today.

9    What this Court is not going to do is to use any

10    failure of Seagate to comply with its obligations to make

11    those disclosures in a timely fashion, it's not going to use

12    that as an excuse to allow what would be improper discovery

13    that would open the door to -- to what this Court would not

14    allow to permit this case to get out of hand or to let the

15    expert discovery get out of hand and then to require some

16    type of improper discovery as a remedy for the late

17    disclosures that were made by Seagate with respect to

18    background material about the expert.

19    That's my ruling.  You'll get a written order.

20    Let me through the elements here so that you have -- and

21    this will be set forth in what we will put in writing that

22    you'll get that you can use with respect to a protective

23    order.  The protective order is going to be that is sought

24    by Seagate is going to be granted in part as follows:

25    That plaintiff Shukh shall withdraw his following

1    subpoenas:

2         Number 1, the December 28th, 2012, subpoena to

3    Dr. Bajorek.

4         Number 2, the January 4th, 2012, subpoena to

5    Ms. Heitzman.

6         Number 3, the December 18th, 2012, subpoena to

7    Intematrix.

8         Number 4, the January 17th, 2013, subpoena to the

9    Triple A.

10        And Number 5, the December 17th, 2012, and the

11   December 18th, 2012, subpoenas to IBM.

12        The -- also, the Court is granting Seagate's

13   motion for a protective order that it not be required to

14   produce documents pursuant to Shukh's Rule 34 request

15   regarding about Bajorek's previous expert reports and

16   testimony.

17        The Court is going to deny the

18   plaintiff's -- strike that, deny Seagate's motion where it

19   seeks to preclude the serving of further written expert

20   discovery absent leave of Court.  Obviously the -- there has

21   been -- there's no other issue pending with respect to any

22   further written discovery, and the Court's not going to be

23   issuing some kind of a blanket order that would bar any

24   additional discovery that might be permissible.

25        And the -- the Court is also going to deny the

1    request to compensate Dr. Bajorek and Ms. Heitzman for their

2    time because that was -- that is mooted because of the

3    remainder of the decision.

4            Anything further, counsel?

5            MR GEKAS:  Your Honor, I understand the scope of

6    your ruling to prevent us from independently acquiring the

7    public exhibits of Dr. Bajorek in the *Marvell* and *Siemens*

8    case, and I don't understand the scope of your opinion, your

9    ruling just now to prevent us from utilizing his public

10   testimony in his deposition.  I wanted to make sure that

11   I --

12           THE COURT:  Sure.

13           MR. GEKAS:  I state that that of record.  I hope I

14   said that in a way that makes sense.

15           THE COURT:  I can't give you any advisory rulings

16   now, obviously, but I am -- my ruling is confined to what I

17   said.  The -- obviously if there is public -- any public

18   documents, testimony or other documents, that this doesn't

19   apply to that.  And the -- I'm not making any ruling with

20   respect to the -- the testimony in the deposition.  This

21   ruling only relates to the matters that are before the

22   Court.  So with respect to what you ask and what you cover

23   in your deposition, that will have to be the subject of that

24   proceeding.  If issues rise with respect to that, we'll deal

25   with that at that time.

```
 1              MR. GEKAS:  Thank you for that clarification, Your

 2     Honor.

 3              THE COURT:  Okay.  Very good.  We'll stand

 4     adjourned.

 5              (Court adjourned.)

 6                         *     *     *

 7

 8

 9          I, Staci A. Heichert, certify that the foregoing is

10     a correct transcript to the best of my ability from the

11     digital recording in the above-entitled matter.

12

13              Certified by:  s/ Staci A. Heichert

14                             Staci A. Heichert,
                               RMR, CRR, CBC, CCP
15

16

17

18

19

20

21

22

23

24

25
```

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ALEXANDER M. SHUKH, | Civil No. 10-404 (JRT/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S FRAUD CLAIM AND CORRECTION OF INVENTORSHIP CLAIM** |
| SEAGATE TECHNOLOGY, LLC, SEAGATE TECHNOLOGY, INC., SEAGATE TECHNLOGY, UNKNOWN OWNERS AND ASSIGNEES, and SEAGATE TECHNOLOGY, PLC, | |
| Defendants. | |

Constantine John Gekas, **GEKAS LAW, LLP**, 11 South LaSalle Street, Suite 1700, Chicago, IL 60603; and James H. Kaster, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402, for plaintiff.

Chad Drown, Calvin L. Litsey, Elizabeth Cowan Wright, and Jeya Paul, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402, for defendants.

Plaintiff Alexander M. Shukh filed this action against Defendants Seagate Technology, LLC, Seagate Technology, Inc., Seagate Technology, and Seagate Technology, PLC (collectively, "Seagate"), alleging numerous claims arising out of Seagate's employment and termination of Shukh. In particular, Shukh brought claims for correction of inventorship and fraud[1] resulting from Seagate's filing of patent

---

[1] The Court previously dismissed Shukh's claims for declaratory judgment regarding the enforceability of an arbitration agreement, rescission, breach of contract, breach of fiduciary duty, unjust enrichment, interference with business expectancy, and declaratory judgment regarding the confidentiality provisions of Shukh's employment contract. (*See* Order on Stipulation of Dismissal, Sept. 14, 2010, Docket No. 40); *Shukh v. Seagate Tech., LLC*, Civ.

(Footnote continued on next page.)

applications from which Shukh alleges he was wrongfully omitted as an inventor. Seagate now moves for summary judgment on Shukh's correction of inventorship and fraud claims. Because no issue of material fact remains, the Court will grant Seagate's motion for summary judgment.

## BACKGROUND[2]

Shukh was employed by Seagate from September 1997 until he was terminated in early 2009. (Fourth Decl. of Elizabeth Cowan Wright, Ex. 1 (Dep. of Alexander Shukh ("Shukh Dep.") 31:3-9), June 29, 2012, Docket No. 316.) Shukh held various positions at Seagate as an engineer involved in the development of magnetic recording heads for hard disk drives. (Shukh Dep. 492:14-493:2; Fourth Decl. of Constantine John Gekas, Exs. 12, 13 at 1, July 20, 2012, Docket No. 324.) Shukh's correction of inventorship and fraud claims that are the subject of the present motion arise out of six issued Seagate patents and four Seagate patent applications on which Shukh alleges he was wrongfully omitted as an inventor. (Shukh Dep. 48:21-50:24; Third Am. Compl. ¶¶ 122, 196, Jan. 17, 2012, Docket No. 268.)

---

(Footnote continued.)

No. 10-404, 2011 WL 1258510, at *17 (D. Minn. Mar. 30, 2011). Seagate has not moved for summary judgment on Shukh's claims for discrimination and retaliation under Title VII and the Minnesota Human Rights Act. (Third Am. Compl., 59-60, Jan. 17, 2012, Docket No. 268.)

[2] The Court recites the background only to the extent necessary to rule on the instant motion. A more complete recitation of the facts surrounding Shukh's termination and his employment at Seagate appear in the Court's previous orders. *See, e.g.*, *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2011 WL 6003951 (D. Minn. Nov. 30, 2011); *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2011 WL 1258510 (D. Minn. Mar. 30, 2011).

## I.  SEAGATE'S PATENT APPLICATION PROCESS

Shukh's employment with Seagate was governed by an Employment Agreement.

(Fourth Gekas Decl., Ex. 9.)  Pursuant to this agreement, Shukh assigned to Seagate his

> right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade secrets, whether or not patentable . . . which [Shukh] may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time [Shukh is] in the employ of the Company.

(*Id.*, Ex. 9 at 2.)  This provision prohibited Seagate employees from filing patent

applications for their own inventions.  (*Id.*; *see also* Third Am. Compl. ¶ 107.)  Instead,

Seagate employees were required to disclose inventions to Seagate by submitting an

Employee Invention Disclosure Form to Seagate's Intellectual Property ("IP")

Department.  (Fourth Gekas Decl., Ex. 10.)  The IP Department would then forward the

form "to the appropriate Patent Review Board which [would] determine whether the

invention w[ould] be pursued as a patent application, protected as a trade secret, or

otherwise."  (*Id.*, Ex. 10 at 1.)  If the Patent Review Board determined that an application

would be pursued for patenting, Seagate attorneys, with the cooperation of the employee

inventor or inventors, would draft and file the necessary patent application.  (*Id.*, Ex. 10

at 1-2.)  Once Seagate decided to file a patent application, every individual who qualified

as an inventor under patent law was legally entitled to be named as an inventor on the

application.[3]

---

[3] *See Stark v. Advanced Magnetics, Inc.*, 119 F.3d 1551, 1553 (Fed. Cir. 1997) ("Title 35 requires that an applicant for a patent disclose the names of all inventors.  The patent statute also authorizes correction of the inventors' names in applications and in patents." (citations omitted)).

## II.    THE DISPUTED PATENTS

Shukh alleges that Seagate wrongfully omitted Shukh as an inventor on six issued patents and four pending patent applications.  With respect to some of the disputed patents, Seagate's IP Department informed Shukh that it had decided not to pursue his inventions for patenting, but filed patent applications that allegedly contained Shukh's inventions and failed to name Shukh as an inventor.  (Fourth Wright Decl., Ex. 4 at 16-17, 19, 23, 26.)  For some of the disputed patents, Seagate's IP Department informed Shukh that although it had decided not to pursue his particular invention for patenting, Shukh's work would be incorporated with other inventions for which Seagate would pursue patenting.  (*Id.*, Ex. 4 at 16-17; Shukh Dep. 719:5-8.)  Seagate did not, however, list Shukh as an inventor in the final patent applications into which Seagate had represented it would incorporate Shukh's work.  (Fourth Wright Decl., Ex. 4 at 16-17.)  With respect to other disputed patents, Seagate did not communicate its intentions regarding Shukh's inventions, but filed patent applications that allegedly contained Shukh's inventions and failed to name Shukh as an inventor.  (*Id.*, Ex. 4 at 20-21.)  Seagate never told Shukh that it had filed applications for any of the disputed patents, or that it had omitted Shukh as a co-inventor on the applications.  (*Id.*, Ex. 4 at 16-17, 20.)  Seagate did, however, present Shukh with inventorship awards, apparently recognizing Shukh for his work on at least two of the disputed patents.  (*Id.*, Ex. 4 at 17, 19; Ex. 5.)

In 2006, while searching the United States Patent and Trademark Office ("USPTO") website, Shukh discovered that he had not been named as an inventor on one of the disputed patents.  (Shukh Dep. 61:6-7; Fourth Gekas Decl., Ex. 13 ¶ 16.)  In July

2007, Shukh discovered the omission of his inventorship on another of the disputed patents. (Fourth Gekas Decl., Ex. 13 ¶ 16.)

On August 30, 2007, Shukh sent an e-mail to Kenneth Massaroni, the Vice President of Seagate's IP Department, notifying Massaroni that Shukh believed he had been wrongfully omitted as an inventor on at least one of the disputed patents. (Shukh Dep. 255:18-24; Fourth Gekas Decl., Ex. 13 ¶ 18; Fourth Wright Decl., Ex. 4 at 8.) Shukh requested that Massaroni correct this omission. (Fourth Wright Decl., Ex. 4 at 18.) In March 2008, Massaroni allegedly responded to Shukh's requests by informing Shukh that the stated inventorship on the disputed patent was correct, because Shukh was not an inventor of the patented invention. (Shukh Dep. 255:18-24; Fourth Gekas Decl., Ex. 13 ¶ 22.) Seagate did not notify the USTPO of Shukh's complaints. (Exs. in Supp. of Pl's Surreply, Ex. C (Dep. of Kenneth M. Massaroni ("Massaroni Dep.") 59:25-60:4), Oct. 23, 2012, Docket No. 360.)[4] After receiving Massaroni's response, Shukh searched the USTPO website for other patents embodying his inventions, and discovered the other disputed patents. (Fourth Gekas Decl., Ex. 13 ¶ 23.) With respect to all of the disputed patents, Shukh testified that upon discovering the patents he knew immediately that the stated inventorship was inaccurate and that Seagate should have listed him as a co-inventor. (Shukh Dep. 250-57.)

---

[4] Shukh filed two sets of exhibits in support of his two surreply briefs, but labeled the exhibits consecutively as a single set. Therefore, where reference is made to "Exs. in Supp. of Pl's Surreply," exhibits A and B can be found at Docket Number 360, filed on October 23, 2012, and exhibits C through P can be found at Docket Number 383, filed on December 14, 2012.

## III.   SHUKH'S FRAUD CLAIM

With respect to reliance, Shukh stated that he "truly relied" on the representations of Seagate's IP Department.  (*Id.* 924:18-22.)  But Shukh was unable to testify to any actions he had taken in reliance on Seagate's alleged misrepresentations, or anything he refrained from doing in reliance on Seagate's statement that it would not be pursuing patent applications for Shukh's inventions.  (*Id.* 63:25-64:6; 925:17-25.)

Shukh also submitted expert testimony from Howard Rockman, an intellectual property attorney, in support of his fraud claim.  (Exs. in Supp. of Pl's Surreply, Ex. A.)  For purposes of his opinion, Rockman assumed "that Seagate had knowledge that the documents filed with the USPTO that failed to name Dr. Shukh as an inventor were untrue, and that Seagate purposefully intended to deceive Dr. Shukh that his inventorship interests were being protected."  (*Id.*, Ex. A at 7.)  Rockman then opined that "Dr. Shukh justifiably relied on the [IP] department of Seagate to protect his inventorship interests. . . . As a result of Seagate's failure to protect, or even recognize Dr. Shukh's inventorship rights, Dr. Shukh was injured as to his standing and reputation as an inventor in the technology community to which the subject inventions pertain."  (*Id.*)  Finally, Rockman concluded "it is my opinion that the inequitable conduct of Seagate before the United States Patent and Trademark Office has risen to the level of fraudulent conduct that has injured Dr. Shukh."  (*Id.*)

## IV.    SHUKH'S REPUTATION[5]

Shukh is recognized as one of the leading scientists in his field, and his reputation

has been one of an extremely successful innovator in the hard disk drives engineering

community.  (Fourth Wright Decl., Ex. 4 at 28.)  Before joining Seagate, Shukh had over

twenty-three years of experience in his field and was "recognized internationally as

outstanding in the field of hard disk drive magnetic recording."  (Fourth Gekas Decl.,

Ex. 14.)  In 1998, colleagues and peers described Shukh as "an excellent scientist," "an

innovative engineer," "an outstanding researcher in th[e] field," "a hard worker,"

someone with "outstanding capabilities and knowledge of a critical high technology

---

[5] As an initial matter, the parties dispute the types of damages that Shukh seeks in his correction of inventorship and fraud claims.  Seagate asked Shukh in an interrogatory to "Separately for each Claim for Relief pled in the Amended Complaint (and any amendments thereto) describe fully and in complete detail all damages that you contend should be awarded to you for that Claim, including the types of damages you contend should be awarded for each Claim, the amount of damages you contend should be awarded for each specific type of damage listed, and the complete factual and legal basis for each specified claim of damages."  (Fourth Wright Decl., Ex. 6 at 3.)  Shukh responded by incorporating his complaint and the damage computations of his Rule 26(a) disclosure by reference.  (Id., Ex. 6 at 4.)  In the prayer for relief in his third amended complaint, Shukh seeks an order from the court to correct the inventorship of the disputed patents and "[j]udgment and an award of damages" on his fraud claim.  (Third Am. Compl. at 61.)  In his Rule 26(a) disclosures, which require "a computation of each category of damages claimed by the disclosing party," Fed. R. Civ. P. 26(a)(1)(A)(iii), Shukh asserted that he would seek "reputational damages" to be "computed on the basis of usual and reasonable royalty rates" for his correction of inventorship claim.  (Fourth Wright Decl., Ex. 2 at 5.)  In the following paragraph, with respect to "fraud and concealment" Shukh disclosed that "he expect[ed] to seek the same measure of damages."  (Id., Ex. 2 at 6.)

Federal Rule of Civil Procedure 37(c) provides that "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  Shukh did not supplement his Rule 26(a) disclosures or interrogatory answers to reveal damages he intends to seek other than those to his reputation.  Therefore, to the extent Shukh's submissions in opposition to summary judgment can be characterized as seeking damages other than reputation damages, the Court will not consider these damages.  The only damages Shukh may seek with respect to his correction of inventorship and fraud claims are damages to Shukh's reputation.

area," and one of the "very few people in the world with a solid understanding of this important area." (*Id.*, Ex. 14 at 3, 5-6; *see also id.*, Ex. 16.) Shukh is the author of numerous research papers, has been awarded twenty United States patents and fifteen patents of the former Soviet Union, and is currently listed on several pending patent applications. (*Id.*, Exs. 12, 13 ¶¶ 12-13.)

During his tenure at Seagate, Shukh was named as an inventor on seventeen Seagate patents, and several of his inventions have been incorporated into Seagate products. (Shukh Dep. 415:9-13; Fourth Gekas Decl., Ex. 13 ¶¶ 14-15.) Shukh has also received numerous awards, including awards from Seagate for outstanding achievement and innovation. (Fourth Gekas Decl., Ex. 12 at 2.) One of Shukh's managers, Kenneth Allen, testified that prior to 2005 he viewed Shukh "as an important contributor" to Seagate inventions, and a "[c]lever guy" with "[s]ome very good ideas." (Fourth Decl. of Jeya Paul, Ex. 4 (Dep. of Kenneth D. Allen ("Allen Dep.") 121:17-23), Dec. 21, 2012, Docket No. 386.) Allen also testified that even after the disputed patents became an issue between Shukh and Seagate, Allen viewed Shukh as having "excellent technical skills," and explained that Allen made a special effort to keep Shukh at Seagate because Allen had never "had another employee who generated the amount of trouble who also had enough skills to be worth saving." (*Id.* 162:6-19.)

Shukh's former co-workers testified that, even after Seagate terminated his employment, they held a high opinion of Shukh's reputation as a scientist in his field. (Fourth Paul Decl., Ex. 7 150:18-22, Ex. 8 189:25-190:2.) Two co-workers, who left Seagate to work for Hitachi prior to Shukh's termination, assisted Shukh in applying for various positions at Hitachi. (Fourth Paul Decl., Ex. 6 (Deposition of Vladyslav Vas'ko

("Vas'ko Dep.) 48:6-13); Ex. 7 28:15-20, 150:18-22.) Vladyslav Vas'ko testified that he was willing to assist Shukh in finding employment because Shukh "is a very qualified engineer, and he is known as one of the best inventors in the hardware industry. And he contributed a lot to a successful hardware industry in general." (*Id.* 55:16-24.) Vas'ko testified that other scientists in the field shared this view of Shukh's reputation. (*Id.* 137:12-24.) Vas'ko further testified that as of January 2009, he believed Shukh was a "genius" and "prolific inventor" with "an outstanding ability when it came to technological skills." (*Id.* 138:2-23.)

Shukh's evidence regarding reputation focuses on three issues: (1) poor performance reviews and the perception at Seagate that Shukh inappropriately took credit for the work of others; (2) the inability to secure other employment after his termination; and (3) the importance to an inventor's reputation of the number of patents to which he is attributed.

## A. Performance Review

In an August 2007 performance review, evaluating Shukh's performance for the previous year,[6] Allen, noted that Shukh needed to improve his ability to "see[] this design review as part of the team effort and . . . not overly stress that it is his work alone." (Fourth Gekas Decl., Ex. 11 at 1-2.) Additionally Allen commented:

> [Shukh's] insistence on getting appropriate credit for all design ideas and implementations stifles open discussion and adoption of his ideas. Since this issue has become more important to [Shukh] as time goes on, and since

---

[6] Allen completed his work on the performance review sometime in July 2007, and the review then would have been sent for approval to another level of management. The review was likely finalized in the first week of August 2007. (Allen Dep. 189:19-190:2.)

he believes he has not been fairly recognized for his past contributions, it's an emotional issue. Most unfortunately, it appears to others that Alex is more interested in being right and in getting credit than in ensuring that Seagate wins. [Shukh] will become more effective, and his contributions will increase significantly, if he can find ways to let others see that he truly is interested primarily in Seagate's success, rather than in his own advancement or preventing theirs.

(*Id.*, Ex. 11 at 5.) Allen also gave Shukh unsatisfactory ratings in the "Respect for People" and "Teamwork" categories, explaining:

I do understand [Shukh]'s concerns about credit for past work. He has made a number of contributions over the years, and I have come to see over the past 6 months that he sometimes doesn't receive proper credit for work he has done in the past. What Alex needs to understand is that much of this is self-inflicted. For example, Alex often insists that full design credit be give[n] to modeled optimization of head geometries – clearly, geometries are critical; however, they are not high-level intellectual concepts and generally must be optimized experimentally. He has also repeatedly accused a number of different people of stealing his work – I have learned that several members of the design community now refuse to read his highlights or modeling work; they believe their only defense against accusations of plagiarism is to remain ignorant of his work. If Alex learns to collaborate more effectively, he will become more effective and get more credit for his work because he will be able to leverage the skills and efforts of many others, rather than work in isolation.

(*Id.*, Ex. 11 at 6.) Allen testified that these problems with Shukh's teamwork were prevalent in 2005, and that several of Shukh's previous managers had "a similar set of issues" as those described in Allen's 2007 evaluation. (Allen Dep. 118:16-25, 120:6-16, 121:4-6.) Other Seagate inventors perceived Shukh as quick to accuse others of stealing his inventions, and even refused to attend presentations by Shukh in order to "avoid future accusations of plagiarism." (Shukh Dep. 738:6-12.)

## B.     Post-Seagate Employment

Since his 2009 termination, Shukh has submitted 135 job applications, but has been unable to secure employment. (Fourth Wright Decl., Ex. 4 at 31, 37-57.) These applications resulted in only two interviews. (Shukh Dep. 570:20-571:4.) Shukh testified that the hiring manager at Hitachi, a company to which Shukh applied, contacted a Seagate employee to discuss rumors the hiring manager had heard about Shukh. (*Id.* 534:9-21.) Shukh attributes these rumors to a statement made by Massaroni prior to Shukh's termination, wherein Massaroni instructed Shukh to stop talking about his designs, stating "[t]his is your last chance to work at [Seagate], otherwise you will not find a job anywhere." (*Id.* 543:22-544:2.) Additionally, during Shukh's interview at Hitachi, a Hitachi engineer allegedly told Shukh that "[w]ith your reputation you will not find employ[ment] here." (*Id.* 541:23-542:11.)

## C.     Number of Patents as Evidence of Reputation

The record also contains evidence that, as a general matter, inventorship on a greater number of patents typically improves an inventor's reputation in his or her field. In statements and recommendations accompanying Shukh's green card application, Seagate and Shukh's scientific peers often referenced Shukh's "numerous publications and patents" as one basis for their conclusion that he was internationally recognized as an outstanding scientist. (Fourth Gekas Decl. Exs. 14-16.) However, Shukh's former co-workers also testified that whether Shukh had "15" "25 or 30" patents would not affect their opinion of Shukh, and they would not think either more or less highly of him

regardless of the number of patents on which he was listed as an inventor. (Vas'ko Dep. 139:17-140:11; Fourth Paul Decl., Ex. 8 189: 15-21, Ex. 9 195:1-4.)

Additionally, in the August 2007 performance review, Allen suggested that the number of patents associated with an inventor is an element of job performance, stating "I am concerned that the number of patent applications has been reduced over the last two years. . . . I'd like to see [Shukh] increase his patent portfolio." (Fourth Gekas Decl., Ex. 11 at 5.) Despite this comment, Allen gave Shukh an Outstanding rating, the highest rating for innovation, a category that evaluates an employee's ability to "seek new ideas . . . welcome change for the opportunities it brings us." (*Id.*) Allen later told Shukh "I'm concerned about the decrease in your patent submissions over the past few years." (Exs. in Supp. of Pl's Surreply, Ex. P at SEA0145382.) Allen testified that his concern about the number of patent applications expressed in both the August 2007 performance review and the follow-up communication was based on the number of inventions Shukh disclosed to Seagate, not the number of Shukh's inventions which were ultimately incorporated into Seagate patent applications. (Allen Dep. 190:5-19, 193:1-25.) Allen further testified that an increase in the number of patent applications submitted by Shukh may have had a positive effect on Shukh's performance at Seagate. (*Id.* 196:3-19.)

Additionally, Shukh submitted two export reports related to reputation. Based on his interactions with inventors during his career as a patent attorney, Rockman stated that "inventors take great pride in their inventorship abilities and accomplishments." (Exs. in Supp. of Pl's Surreply, Ex. A at 7.) Rockman further stated that:

> It is also my understanding that contributions as named inventors on patents [are] considered positively when a technology professional is being considered for a promotion. . . . [B]eing a named inventor on a patent

provides the technology professional with the understanding that the patent symbolizes their inventive achievement, and that their standing and reputation in the related technology community has been enhanced, including among their employers or potential employers, their professional peers in the technology community, and members of their professional societies and organizations. Therefore, it is my conclusion that being named as an inventor in a patent directed to an invention to which they contributed is very important to an inventor.

(*Id.*, Ex. A at 7-8.) With respect to Shukh specifically, Rockman stated "[a]s a result of Seagate's failure to protect, or even recognize Dr. Shukh's inventorship rights, Dr. Shukh was injured as to his standing and reputation as an inventor in the technology community to which the subject inventions pertain." (*Id.*, Ex. A at 7.) Similarly, John Benson, an immigration attorney, indicated that the United States Citizenship and Immigration Services considers the number of patents bearing the inventor's name when determining whether an inventor can be classified as an "outstanding professor or researcher" for purposes of obtaining a green card. (*Id.*, Ex. B at 5.)

### D. Shukh's Deposition Testimony

Finally, Shukh testified at his deposition that his reputation was not harmed. First, Shukh testified that reputation "means how well you're accepted in the scientific society you belong to as a specialist." (Shukh Dep. 241:11-13.) Then Shukh identified the numerous personal qualities which he believed formed his reputation as a scientist. These qualities include honesty, good organization, openness and straightforwardness, communications, good technical abilities, innovation, and extreme competitiveness. (*Id.* 244-48.) Shukh agreed that as of 2002 he had a reputation for all of those qualities. (*Id.* 247:1-8.) Seagate's counsel then asked "[s]o . . . your reputation for each of those personal qualities of honesty, good organization, openness, straightforwardness and

communications, good technical abilities, innovation and extreme competitiveness, did not change from 2002 until today?" to which Shukh responded, "[i]t seems to me it didn't change since 1997 when I joined Seagate up to now." (*Id.* 249:23-250:6.)

## V.    PROCEDURAL HISTORY

The Court has previously considered Shukh's correction of inventorship and fraud claims in the context of arguments almost identical to those made by Seagate in the instant motion.   In 2010, Seagate brought a motion to dismiss Shukh's correction of inventorship and fraud claims, and Shukh also sought partial summary judgment on his claim for correction of inventorship.   (Am. Mot. to Dismiss, May 18, 2010, Docket No. 14; Mot. for Partial Summ. J., Sept. 27, 2010, Docket No. 57.)   On March 30, 2011, the Court issued an order that, among other things, denied Seagate's motion to dismiss Shukh's correction of inventorship and fraud claims and denied Shukh's motion for partial summary judgment.   *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2011 WL 1258510, at *17 (D. Minn. Mar. 30, 2011).

As to the correction of inventorship claim, Seagate argued that Shukh did not have standing to bring a correction of inventorship claim under 35 U.S.C. § 256 because Shukh had no ownership, financial, or reputational interest in the disputed patents.   The Court denied Seagate's motion to dismiss, concluding that Shukh had alleged standing sufficient to survive a motion to dismiss.   *Shukh*, 2011 WL 1258510, at *8.   The Court first determined that pursuant to the employment agreement between Seagate and Shukh, Seagate "is the sole owner" of the patents at issue.   *Id.* at *6.   Therefore the Court concluded that "Shukh cannot derive standing from ownership of the patents."   *Id.*

Additionally the Court found that "the facts in a light most favorable to Shukh provide no possibility that he could have a financial interest in any of the patents at issue." *Id.* at *7. However, the Court went on to consider whether a reputational interest alone is sufficient to confer standing, and reasoned that being

> designated as an inventor of a patent that is widely known in an industry is an important mark of success, and in the Court's view [the Federal Circuit] is correct that pecuniary and reputational consequences could easily flow from being named or omitted as an inventor. Further, Shukh alleges that he has had difficulty finding new employment, and while he attributes some of this to "black-listing" and rumors instigated by Seagate, it is also logical that omission from important patents could affect his ability to get a new job.

*Id.* Thus, the Court found that Shukh's complaint sufficiently alleged "standing to challenge inventorship under [the Patent Act] due to potential harm to his reputational interests," and consequently denied Seagate's motion to dismiss Shukh's correction of inventorship claim. *Id.* at *8.[7]

With respect to Shukh's fraud claim, Seagate argued in its motion to dismiss that Shukh had failed to plead reliance and damages, and had otherwise failed to plead any misrepresentation with particularity. After reviewing the complaint in the light most favorable to Shukh, the Court concluded that Shukh had properly pleaded a material misrepresentation, explaining that

> the complaint may allege that it was a material misrepresentation for Seagate to file various patent applications omitting Shukh as an inventor. It additionally could be a material misrepresentation because according to the complaint and various e-mails, Shukh was informed

---

[7] The Court also denied Shukh's motion for summary judgment on his correction of inventorship claim, finding that although Shukh "has alleged sufficient facts to overcome a motion to dismiss, he has fallen well short of the standard required to be granted summary judgment on the issue of inventorship." *Shukh*, 2011 WL 1258510, at *8.

> that his inventions . . . were to be incorporated into [another invention], but he was not listed as an inventor on the final patent application . . . .

*Id.* at *10. With respect to reliance, the Court held that "it can be inferred from the complaint that Shukh relied on Seagate's 'representations' to protect his inventorship rights, that is, the actions of its IP department in receiving and applying for patents, and that he was damaged by doing so." *Id.* at *10. Finally the Court found that "[a]lthough Shukh has not alleged specific damages except as to his reputation," these alleged reputational damages were sufficient to overcome a motion to dismiss. *Id.*

The case is now before the Court on Seagate's motion for summary judgment on Shukh's correction of inventorship and fraud claims.[8]

---

[8] In his initial response brief to Seagate's motion for summary judgment, Shukh argued that summary judgment was premature, because he had not had a fair and adequate opportunity to complete discovery. (Pl's Opp. to Mot. for Summ. J. at 3-8, July 20, 2012, Docket No. 323.) Seagate filed its motion for summary judgment on June 29, 2012, approximately five months before the December 1, 2012 deadline for fact discovery in the case to be completed. (*See* Mot. for Summ. J., June 29, 2012, Docket No. 313; Am. Pretrial Scheduling Order, May 2, 2012, Docket No. 309.) Under Federal Rule of Civil Procedure 56(d) "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." The affidavit or declaration must "show[] what specific facts further discovery might uncover." *Roark v. City of Hazen, Ark.*, 189 F.3d 758, 762 (8th Cir. 1999). Pursuant to Rule 56(d), Shukh submitted a declaration identifying co-inventors, Seagate IP Department personnel, and experts whom Shukh would need to depose in order to raise genuine issues of material fact with respect to his claims. (Fourth Gekas Decl., Ex. 5.)

Fact discovery has now closed, and the Court has twice permitted Shukh to file surreply briefs supplementing the record with expert reports and deposition testimony. (Pl's Surreply, Oct. 23, 2012, Docket No. 359; Pl's Second Surreply, Dec. 14, 2012, Docket No. 382.) The Court therefore finds that, even if the summary judgment motion may initially have been premature, a continuance is no longer warranted. At this time, Shukh has had adequate time for discovery, and has had the opportunity to present that evidence in support of his claims. *See Ray v. Am. Airlines, Inc.*, 609 F.3d 917, 923 (8th Cir. 2010) ("[S]ummary judgment is proper only after the nonmovant has had adequate time for discovery" (internal quotation marks omitted)). Additionally, the majority of the discovery identified in Shukh's initial Rule 56(d) declaration has now been completed. (*See* Pl.'s Second Surreply at 1-2 ("Plaintiff argued that he intended to

(Footnote continued on next page.)

# ANALYSIS

## I.     STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial."  *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

_____

(Footnote continued.)

depose several witnesses on essential facts likely relevant to the summary judgment motion. . . . Plaintiff has so done[.]")).)   The Court finds that, in the absence of the discovery already completed, the original declaration no longer shows specific facts which further discovery might uncover, and is consequently insufficient to satisfy the standard for a continuance under Rule 56(d).  *See Roark*, 189 F.3d at 762.  Therefore, the Court finds that it is proper to consider the summary judgment motion based on the evidence currently in the record.

## II.   COUNT TWO: CORRECTION OF INVENTORSHIP

Seagate seeks summary judgment on Shukh's correction of inventorship claim, contending that Shukh has no standing, having failed to demonstrate harm to his reputational interests.  The Court must determine whether Shukh has presented evidence of damage to his reputation sufficient to confer standing to pursue his correction of inventorship claim.

### A.   Standing Based on Reputational Damage

"Once a patent issues . . . 35 U.S.C. § 256 provides a private right of action to challenge inventorship."  *HIF Bio, Inc. v. Yung Shin Pharm. Indus. Co.*, 600 F.3d 1347, 1354 (Fed. Cir. 2010).  To establish standing to sue under Section 256, a plaintiff must demonstrate (1) an actual or imminent, concrete injury in fact; (2) a causal relationship between the injury and the conduct complained of; and (3) that the injury is capable of being redressed by a decision of the court.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also Chou v. Univ. of Chicago*, 254 F.3d 1347, 1357 (Fed. Cir. 2001) (applying the *Lujan* factors to determine whether a plaintiff had standing to sue under Section 256).

Standing under Section 256 is typically established when a plaintiff has either an expectation of ownership of a patent or a concrete financial interest in the patent.  *See Chou*, 254 F.3d at 1358-59.   As described above, however, the Court previously determined that, pursuant to his employment agreement, Shukh has no ownership or financial interest in the disputed patents.  *Shukh*, 2011 WL 1258510, at *8. Therefore

Shukh's standing to sue for correction of inventorship can only derive from his reputational interests in the disputed patents. *Id.*[9]

Reputational harm may be sufficient to confer standing under Section 256, and flows from the underlying premise that "being considered an inventor of important subject matter is a mark of success in one's field." *Chou*, 254 F.3d at 1359. Therefore, reputational harm may give a plaintiff standing to challenge the omission of inventorship where, for example, the failure to be named as an inventor caused the plaintiff to lose

---

[9] The Court previously determined that Shukh's complaint alleged **potential** harm to his reputational interests sufficient to survive Seagate's motion to dismiss for lack of standing. *Shukh*, 2011 WL 1258510, at *8. Because the Court was determining Shukh's standing in the context of a motion to dismiss, "general factual allegations of [reputational] injury" were sufficient to establish Shukh's standing at that stage of the litigation. *See City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007) (quoting *Lujan*, 504 U.S. at 561). But "the manner and degree of evidence required" to establish standing changes when the Court considers a motion for summary judgment. *Lujan*, 504 U.S. at 561. "In response to a motion for summary judgment, 'the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence[,] specific facts, which for purposes of the summary judgment motion will be taken as true.'" *City of Clarkson Valley*, 495 F.3d at 569 (quoting *Lujan*, 504 U.S. at 561); *see also Kilper v. City of Arnold, Mo.*, No. 4:08cv0267, 2009 WL 2208404, at *9 (E.D. Mo. July 23, 2009) (considering standing on a motion for summary judgment and requiring "'a factual showing of perceptible harm'" (quoting *Eckles v. City of Corydon*, 341 F.3d 762, 767 (8th Cir. 2003)).

"[S]tanding is a jurisdictional prerequisite that must be resolved before reaching the merits of a suit." *City of Clarkson Valley*, 495 F.3d at 569. As such, the Court can consider standing and dismiss a claim at any point in the proceedings when it becomes apparent that a plaintiff lacks standing to bring the claim. *See South Dakota v. U.S. Dep't of Interior*, 665 F.3d 986, 989-91 (8th Cir. 2012); *see also Ark. ACORN Fair Hous., Inc. v. Greyston Dev. Ltd.*, 160 F.3d 433, 434 (8th Cir. 1998) (considering a question of standing on summary judgment). Because standing is a jurisdictional question for the Court, not a jury, the Court must resolve any issues of fact necessary to make a standing determination. *See Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 485 U.S. 59, 72 (1978); *see also United States v. 1998 BMW "I" Convertible*, 235 F.3d 397, 399-400 (8th Cir. 2000). "When standing is challenged on summary judgment, '[t]he court shall [not] grant summary judgment if the movant shows that there is [a] genuine dispute as to any material fact. . . .' Therefore, if there is a genuine issue of material fact, then summary judgment is inappropriate without the district court resolving the factual dispute." *In re ATM Fees Antitrust Litig.*, 686 F.3d 741, 747 (9th Cir. 2012) (quoting Fed. R. Civ. P. 56(a)). Because the Court ultimately concludes that no genuine issue of material fact remains with respect to Shukh's reputational damage, this case does not require the Court to resolve any factual disputes in order to determine that Shukh lacks standing.

"standing within the scientific community," be denied "the reputational benefits associated with being named as an inventor," and to suffer "a loss of prestige within the scientific community resulting from his inventions being recognized as another's." *Czarnik v. Illumina, Inc.*, 437 F. Supp. 2d 252, 256 (D. Del. 2006) (internal quotation marks omitted).

It is not enough, however, for a plaintiff to allege a reputational interest in a patent generally, rather, the plaintiff must point to specific facts which demonstrate reputational damage. *See Cole v. Gummow*, No. 3-02-CV-0705, 2003 WL 22455387, at * 3 (N.D. Tex. Oct. 22, 2003) (granting defendant's motion to dismiss a correction of inventorship claim where the only evidence of plaintiff's reputational interest was "his bald assertion that 'I have a reputational interest as inventor of the [patents]'"). These specific facts will often take the form of evidence demonstrating "[p]ecuniary consequences" flowing from the reputational damage that resulted from the failure to be named as an inventor. *See Chou*, 254 F.3d at 1359 (concluding that it "is not implausible" that reputational interest may confer standing under Section 256 because "[p]ecuniary consequences may well flow from being designated as an inventor"). For example, showing that reputational damage has caused the plaintiff to lose employment opportunities may be enough to confer standing. *See Czarnik*, 437 F. Supp. 2d at 256 (denying a motion to dismiss where "[p]laintiff has alleged that he has suffered harm to his reputation and standing in the scientific community. As a result, Plaintiff alleges that he has been unable to secure a

position at a start-up company and earn a salary comparable to his [previous] salary . . . .").[10]

Any pecuniary consequences stemming from reputational damage must be redressable by the court in order to satisfy the requirements of standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement."). In an action to correct inventorship the court is only empowered to order correction of the patent to reflect the plaintiff's inventorship and cannot alter contractual agreements regarding ownership of the patent. *See* 35 U.S.C. § 256(b). Therefore, where a plaintiff can only rely on reputational interests to form the basis of standing under Section 256 – because he has no ownership or pecuniary interest in the disputed patent – any pecuniary consequences alleged by a plaintiff to have flowed from his damaged reputation cannot be tied to a financial or ownership interest in the patent itself, as the court is powerless to address such consequences. *See Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1327-28 (Fed. Cir. 2009) (distinguishing between "a purely reputational interest" and financial harms associated with a plaintiff's ownership of an inventor such as "the right to license or assign his interest, the right to manufacture, use, and sell the subject matter of the patents to his inventions").

---

[10] *See also Hoang v. Abbott Labs.*, No. 08 C 189, 2009 WL 1657437, at *3 (N.D. Ill. June 12, 2009) (explaining that to show reputational standing, a plaintiff would have to at least allege "that she lost employment opportunities due to her omission from the three patents").

### B.    Undisputed Testimony

The Court finds that Shukh has failed to present evidence of reputational damage sufficient to raise a genuine issue of material fact with respect to his standing to pursue correction of inventorship claims for the disputed patents.   The record is replete with undisputed evidence that prior to beginning his employment with Seagate, Shukh was internationally recognized as a leading scientist in his field, with a reputation as an extremely successful inventor, named on at least 35 patents.   Shukh has not presented evidence that the failure to be named on the six disputed patents[11] damaged his undisputed reputation as a leading scientist in his field.   Indeed, Shukh's own deposition testimony reflects the opposite proposition – that his reputation as a leading scientist in his field and an extremely successful inventor was not damaged as a result of Seagate's omission of Shukh as an inventor on six patents.   Shukh stated repeatedly in his deposition that his reputation for "honesty, good organization, openness and straightforwardness and communications, good technical abilities, innovation and extreme competitiveness did not change from 2002 until [2012]."   (Shukh Dep. 244-

---

[11]    In determining whether Shukh has presented evidence of reputational damage sufficient to confer standing, the Court considers only the allegations regarding the six disputed patents, and not the allegations regarding the four disputed patent applications.   Unlike Section 256, which expressly authorizes district courts to make changes to inventorship on issued patents, 35 U.S.C. § 116, which governs patent applications, vests authority to make changes to pending applications solely in the Direction of the Patent and Trademark Office.   *HIF Bio, Inc. v. Yung Shin Pharms. Indus. Co.*, 600 F.3d 1347, 1353 (Fed. Cir. 2010).   Therefore, Section 116 "does not provide a private right of action to challenge inventorship of a pending patent application."   *Id.* at 1354.   The Court would, however, reach the same conclusion on standing even if it considered the patent applications.

50.)[12]   Inventorship may have reputational consequences precisely because being recognized as an inventor on a particular patent may provide the inventor with a reputation for the good communication, organizational skills, innovation, excellent technical skills, and competitive drive that resulted in the patent.  Shukh's testimony establishes that his own reputation for possessing the traits associated with inventorship of a patent that make inventorship a mark of success in a particular field remained unchanged during his tenure with Seagate.  Therefore, the omission of Shukh's name on the six disputed patents could not have damaged his reputation.

The only other evidence in the record directly bearing upon Shukh's reputation as an inventor confirms Shukh's deposition testimony that his reputation as an internationally renowned inventor in his field did not change after he was not named as an inventor on the six disputed patents.  During his tenure at Seagate, Shukh received numerous awards for outstanding innovation.  Shukh's manager, Allen, also regarded Shukh as "an important contributor" to Seagate inventions and having "excellent technical skills," both before and after the six disputed patents were issued.  Multiple former co-workers testified that they consider Shukh to be a very qualified engineer, and

---

[12] Shukh does not contend that his deposition testimony was incorrect, but instead argues that the deposition testimony is irrelevant, as it pertains to "personality traits, [which] although desirable, are not at issue."  (Pl.'s Memo. in Opp. to Summ. J. at 36, July 20, 2012, Docket No. 323.)  Shukh's argument is belied by his own testimony stating that the personality traits of honesty, good organization, openness, straightfowardness and communications, good technical abilities, innovation, and extreme competitiveness are the very traits he considers to comprise a scientist's reputation, or a measure of "how well you're accepted in the scientific society you belong to as a specialist."  (Shukh Dep. 241:11-13.)  If an inventor's reputation is damaged by his omission as an inventor on a patent, it seems that such damage would necessarily be to the inventor's reputation for traits directly associated with inventorship, such as, "good technical abilities," "innovation," and "extreme competitiveness."

one of the best inventors in his field. These co-workers testified that their opinion of Shukh did not change after Seagate terminated Shukh. Indeed two of these co-workers helped Shukh apply for jobs at their company, specifically because they consider him to be a prolific inventor with outstanding technical skills. Additionally, Vas'ko testified that his high opinion of Shukh was shared by other non-Seagate scientists in Shukh's field. The deposition testimony of Shukh, his manager, and his coworkers establishes that Shukh did not lose standing or prestige in his field and did not suffer a loss of reputational benefits associated with inventorship when Seagate omitted Shukh as an inventor on the six disputed patents. Instead, Shukh retained his reputation as a leading inventor in his field with excellent technical skills throughout his employment with Seagate. In light of the deposition testimony of Shukh and his co-workers, none of the other evidence presented by Shukh regarding his performance reviews, his employment prospects after leaving Seagate, or the number of patents attributable to Shukh creates a genuine issue of material fact regarding damage to Shukh's reputation.

### C. Shukh's Other Reputational Evidence

#### 1. Performance Review

Shukh relies upon the August 2007 performance review to support his argument that he suffered reputational damage. Specifically, Shukh argues that he developed a negative reputation for taking credit for work that was not his own, and that this reputation would not have developed had Shukh's work on the six disputed patents been properly attributed to him. In the August 2007 performance review, Allen indicated that Shukh demonstrated unsatisfactory teamwork skills because he "repeatedly accused"

other Seagate employees of "stealing his work." Allen also expressed concern regarding Shukh's "insistence on getting appropriate credit for all design ideas." The performance review does not establish an issue of material fact with respect to damage to Shukh's reputation, because the reputational harm on which Shukh focuses is not the type of reputational harm needed to confer standing to pursue a correction of inventorship claim.

Reputational interest in a patent is based on the understanding that "being considered an inventor of important subject matter is a mark of success in one's field, comparable to being an author of an important scientific paper." *Chou*, 254 F.3d at 1359. Therefore, failure to be named on an important patent could negatively affect a scientist's reputation, as the inventor in question could be considered less innovative, creative, and technically skilled in the absence of inventorship on the patent in question. Subsequent correction of inventorship could redress the reputational damage, as the inventor would be considered more innovative, creative, and technically skilled as a result of being named on the patent.

Shukh is instead describing a reputation for being antagonistic toward his employer and coworkers regarding ownership of patents. Although this reputation may be tangentially related to being named as an inventor on the six disputed patents, the relationship is too attenuated to confer standing because an order from the Court correcting inventorship on the patents would not rehabilitate the reputation Shukh has obtained. In other words, even if the Court corrected inventorship on the six disputed patents, this action would not change Shukh's reputation for "insist[ing] on getting appropriate credit for all design ideas," appearing "more interested in being right and in getting credit than in ensuring that [his employer] wins," and "repeatedly accus[ing]"

- 25 -

**A173**

others of "stealing his work."[13]  Because this reputational harm cannot be redressed in an action for correction of inventorship, it cannot confer standing upon Shukh.  *See Chou*, 254 F.3d at 1359 (determining that plaintiff had standing under Section 256 because the loss of royalty benefits suffered by plaintiff could be redressed by naming her as an inventor on the disputed patent).[14]

Additionally, even if the type of reputational harm claimed by Shukh was sufficient to establish standing, the timing of the August 2007 performance review indicates that Shukh had the reputation described in the review before Shukh ever alerted Seagate to his concerns about the six disputed patents.  Allen's undisputed testimony indicates that Shukh had this reputation in 2005, at least a year before Shukh discovered that he had been omitted as an inventor on the disputed patents.  The performance review

---

[13] Shukh has never alleged that the named inventors on the six disputed patents are not actually inventors of the patents in question.  Rather, Shukh alleges that he should be added as a co-inventor on these patents.  Therefore, correcting inventorship on the six disputed patents would not seem to dispel Shukh's reputation for accusing others of stealing his work in a manner that disrupts effective collaboration.

[14] Shukh also makes a generic allegation that he was passed over for promotions, denied salary raises, bonuses, additional stock options, and inventor awards by Seagate because he was not listed as an inventor on the six disputed patents and because he developed a reputation for antagonism regarding ownership of patents.  The Court finds that these allegations do not raise a genuine issue of material fact with respect to Shukh's reputation for several reasons.  First, most of these allegations – such as the denial of promotions, salary raises, and stock options – are entirely speculative, and Shukh has not identified any particular benefits that he was denied or presented any evidence that denial of those benefits was linked in any way to his omission as an inventor on the six disputed patents.  Second, with respect to some of the allegations – such as bonuses and awards associated with particular inventions – Shukh's argument is belied by the fact that he actually did receive inventor awards and bonuses for some of the disputed patents.  Third, Shukh attributes all of the alleged negative financial consequences to his reputation for taking credit for the work of others.  As explained above, this aspect of Shukh's reputation is irrelevant to standing to pursue correction of inventorship, and, in any case, was well-developed before any conflict over the disputed patents surfaced between Seagate and Shukh.  Finally, Shukh has not presented any evidence that receiving or failing to receive inventorship awards with respect to the disputed patents had any effect on his reputation.

was finalized in early August 2007, and reflected Shukh's work for the previous year, but Shukh did not alert Seagate to his concerns about inventorship on the six disputed patents until August 30, 2007, when he sent an e-mail to Kenneth Massaroni. Therefore Shukh's reputation was not damaged **because** he tried to vindicate his right to be named as an inventor on the six disputed patents. Shukh's reputation for insisting on appropriate credit and accusing others of plagiarism documented in the August 2007 performance review was established prior to the dispute over the six patents, and cannot have been a product of seeking to correct inventorship on those patents or a product of the fact that he was omitted from the patents. Because Shukh's reputation for accusing others of stealing his work and insisting on credit for all of his ideas was established well before the disputed patents became an issue between Shukh and Seagate, the Court finds that any reputational injury claimed by Shukh is not traceable to Seagate's conduct in omitting Shukh as an inventor and therefore cannot confer standing upon Shukh. *See Chou*, 254 F.3d at 1359 (determining plaintiff had standing under Section 256, because the loss of royalties was directly traceable to defendant's conduct in omitting plaintiff as a co-inventor of the patent).

## 2. Post-Seagate Employment

The Court does not consider Shukh's inability to obtain employment after submitting 135 applications to be sufficient evidence of damage to reputation to defeat summary judgment because Shukh has offered no evidence that he has not been hired due to damage to his professional reputation resulting from the failure to be named on the six disputed patents. For example, Shukh has presented no evidence that any of the jobs he

applied for required unique technical skills that Shukh could have demonstrated through named inventorship on the six disputed patents. Indeed, Shukh and numerous Seagate co-workers testified that Shukh's reputation as a leading inventor in his field with excellent technical skills did not change during and after his employment with Seagate.

Instead, Shukh attributes his failure to be hired to blacklisting and rumors instigated by Seagate. Specifically, Shukh references Massaroni's statement to Shukh that "you will not find a job anywhere." In its previous Order, the Court indicated that Shukh's failure to find new employment because of "'black-listing' and rumors instigated by Seagate," was distinct from failure to find new employment as a result of damage to Shukh's reputation because of omission from important patents. *Shukh*, 2011 WL 1258510, at *7. Therefore, Shukh's failure to obtain other employment as a result of rumors instigated by Seagate is irrelevant to the question of whether Shukh's reputation was damaged when he was not named as an inventor on the six disputed patents. Because Shukh has presented no evidence indicating that being omitted from six patents resulted in his inability to find other employment, the Court finds that evidence of Shukh's post-Seagate job applications does not create an issue of material fact with respect to Shukh's reputation.

### 3. Number of Patents as Evidence of Reputation

The Court also finds that Shukh's general evidence that more patents are typically associated with a better reputation as an inventor, does not create a genuine issue regarding whether Shukh's reputation was damaged by omission as an inventor on the six disputed patents. Although the number of patents attributed to Shukh is one factor which

has contributed to his reputation as an outstanding internal scientist, it is insufficient to demonstrate standing to sue for correction of inventorship for Shukh to allege generally that inventorship on more patents may improve the reputation of an inventor. Shukh has presented no evidence demonstrating how inventorship on the six disputed patents at issue would have altered his own reputation. Rather, the undisputed testimony of three of Shukh's former co-workers establishes that with respect to Shukh specifically, his reputation as an excellent inventor with good technical skills would not have changed whether Shukh was an inventor on 15, 25, or 30 patents.

Shukh's reliance on Allen's statements expressing concern about the number of Shukh's patent submissions is similarly misplaced. Allen clarified in his deposition testimony that he was concerned with the decrease in the number of invention disclosures that Shukh made to Seagate, and not concerned with the decrease in the total number of patent applications filed with the USTPO that listed Shukh as an inventor. Therefore, Allen's statements are irrelevant to the question of whether omission of inventorship on the six disputed patents damaged Shukh's reputation, because Shukh submitted invention disclosures for inventions allegedly embodied in all six of the disputed patents. Moreover, despite the comment about the decrease in Shukh's patent submissions, Allen still gave Shukh an "outstanding" rating for innovation on the performance review section where the comment was made, suggesting that the decrease in patent submissions did not affect Shukh's reputation as an outstanding inventor.

Finally, to the extent Shukh seeks to rely on the expert testimony of Rockman and Benson, the Court finds that, in light of the undisputed evidence that Shukh's reputation as an internationally recognized inventor in his field did not change, neither of these

expert reports creates a genuine issue of material fact as to whether Shukh suffered reputational damage. Rockman's report concludes that when an inventor is named on a patent the inventor's "standing and reputation in the related technology community has been advanced." Rockman also stated, without analysis, that "Shukh was injured as to his standing and reputation as an inventor." Benson concludes generally that the number of patents bearing an inventor's name is considered by immigration officials when determining whether a green card applicant is an outstanding professor or researcher.

The opinions of both experts are essentially "more is better" statements with respect to the relationship between patents and an inventor's reputation. Neither of these opinions raises an issue of material fact with respect to whether Shukh's reputation was affected by Seagate's failure to name Shukh as an inventor on the six disputed patents. Neither expert appears to have reviewed or considered Shukh's professional credentials, Shukh's career, the disputed patents, the importance of the disputed patents to Shukh's field, or the importance of the disputed patents in light of other patents on which Shukh is a named inventor. Additionally, neither expert interviewed Shukh or reviewed Shukh's deposition testimony, indicating that these experts lack the proper basis to opine about Shukh's reputation. *See Sykes v. Napolitano*, 634 F. Supp. 2d 1, 7 (D.D.C. 2009) (determining that expert opinion on a plaintiff's reputation lacked foundation because the expert did "not provide any basis for knowing [plaintiff's] reputation before, or after," the relevant event).[15] Instead, the experts offer only conclusory, general statements about

---

[15] *See also Pfannenstiel v. Osborne Publ'g Co.*, 939 F. Supp. 1497, 1502 (D. Kan. 1996) (finding that affidavits did not raise a genuine issue of fact with respect to reputation where the affiants "had no personal knowledge of plaintiff's reputation").

reputation, which are ultimately insufficient to establish that Shukh actually suffered reputational harm in this case. *See Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1304 (8th Cir. 1993) ("Conclusory affidavits, even from expert witnesses, do not provide a basis upon which to deny motions for summary judgment."). Finally, the opinions of both experts contradict Shukh's own undisputed deposition testimony that his reputation did not change during his teunure at Seagate. Because the expert opinions are contradicted by the record evidence, they cannot create a genuine issue of material fact with respect to Shukh's reputation. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the [expert] opinion unreasonable it cannot support a jury's verdict.").

Because no issue of material fact remains with respect to Shukh's lack of standing to bring correction of inventorship claims, the Court will grant Seagate's motion for summary judgment as to those claims.

## III.   COUNT FIVE: FRAUD

To establish a claim for fraud under Minnesota law, Shukh must prove: (1) a false representation by Seagate of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce Shukh to act in reliance thereon; (4) that the representation caused Shukh to act in reliance thereon; and (5) that Shukh suffered pecuniary damages as a result of the reliance. *See Valspar Refinish, Inc.*

*v. Gaylord's Inc.*, 764 N.W.2d 359, 368 (Minn. 2009). A plaintiff's failure to demonstrate a genuine issue of material fact on even a single element of fraud is sufficient for a court to grant summary judgment in defendant's favor. *See id.* at 368-69

### A. Characterization of Fraud Claim

As an initial matter, the parties dispute the scope of Shukh's fraud claim. In his complaint, Shukh alleges that Seagate defrauded him "by affirmative acts and by acts of fraudulent concealment" by:

a. preparing false documents and records that failed to include or list him as an inventor of those inventions;

b. filing with or submitting to the United States Patent Office falsified documents failing to list Dr. Shukh as an inventor or co-inventor of those inventions, including documents with false oaths;

c. concealing from Dr. Shukh that he would not be listed as an inventor, and that instead defendants, and Seagate and its IP Agents intended to and in fact did interfere and destroy Dr. Shukh's inventorship rights;

d. by concealing from Dr. Shukh that the applications and oaths required of him to apply for patents would not be requested from him; and

e. at least as to the invention patented by Patent No. 7,233,457, and the invention for which defendants and Seagate and its IP Agents filed Application No. 10/881,015 . . . by falsely denying to Dr. Shukh that he was entitled to any inventorship rights to those inventions.

(Third Am. Compl. ¶ 114; *see also id* ¶¶ 132, 148, 168-69, 183-84, 190-91.) Shukh also alleges that Seagate fraudulently concealed the fact that the patent applications were filed, and also the fact that Shukh "had been omitted as a co-inventor in the application[s]." (*Id.* ¶¶ 133, 149.)

In responding to a motion for summary judgment, a plaintiff is only entitled to rely on facts supporting the fraud theory that were pled with particularity in the complaint. *Stowell v. Huddleston*, Civ. No. 09-192, 2010 WL 2733179, at *7 n.12 (D. Minn. July 9, 2010) (declining to consider misrepresentations forming the basis of a fraud claim that were "raised for the first time in response to a motion for summary judgment"). A plaintiff must also identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). Therefore, when a defendant moves for summary judgment on a fraud claim and the plaintiff fails to identify evidence supporting a particular fraud theory, even if that theory appears in the complaint, summary judgment on any theories unsupported by the plaintiff is appropriate. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 734 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument); *Roders v. City of Des Moines*, 435 F.3d 904, 908 (8th Cir. 2006) ("Without some guidance, we will not mine the summary judgment record searching for nuggets of factual disputes to gild a party's arguments.").

Seagate argues that, based upon the allegations in the third amended complaint, Shukh's fraud claim is limited to the allegation that "it was a material misrepresentation for Seagate to file various patent applications omitting Shukh as an inventor."[16] Shukh denied that this was his theory of fraud. Instead, in his opening brief in response to the

---

[16] (Def.s' Memo. in Supp. of Mot. for Summ. J. at 9, 12, June 29, 2012, Docket No. 315.)

current motion Shukh repeatedly[17] explained his theory of fraud as "Seagate falsely told Dr. Shukh that it would not be filing patent applications for his inventions and then did precisely that – filed patent applications for his inventions that omitted him as an inventor – and then concealed those filings from him."[18]   The Court concludes that it need not determine if Shukh's theory of his fraud claim was pled with particularity in the third amended complaint, or whether Shukh's claim is limited to Seagate's characterization, because under either version of his fraud claim Shukh has failed to create a genuine issue of material fact with respect to reliance or damages.

---

[17] (Pl.'s Memo. in Opp. to Mot. for Summ. J. at 12-13, July 20, 2012, Docket No. 323.) The Court finds that this is the only fraud theory that Shukh articulated in its opening brief. Shukh exclusively described his fraud claim in this manner, and did so consistently throughout his opening brief.  (*See id.* at 16, 17, 19, 21-22, 24-25, 34 ("Seagate repeatedly told [Shukh] that it would not be seeking to patent his inventions, but then did so without ever informing or otherwise notifying him that it had done so.").)

[18] In his second surreply brief, however, Shukh asserted, for the first time, that his fraud claim was based on events occurring after Shukh sent Massaroni the August 30, 2007 e-mail indicating that Shukh believed he had been wrongfully omitted as an inventor on one of the disputed patents.  Specifically, Shukh argued that Seagate's failure to notify the USTPO of Shukh's complaint to Massaroni that Shukh was improperly omitted as an inventor on the disputed patent applications was a fraud on the patent office and a fraudulent concealment from Shukh.  (Pl's Second Surreply at 5, 8, Dec. 14, 2012, Docket No. 382.)  The Court will not consider this claim because Shukh made no mention of these allegations in his initial brief or first surreply brief pertaining to this motion.  Additionally these allegations do not appear in Shukh's third amended complaint.  *See N. States Power Co. v. Fed. Transit Admin.*, 358 F.3d 1050, 1057 (8th Cir. 2004) (explaining that the Federal Rules "do not entitle parties to manufacture claims, which were not pled, late into the litigation for the purpose of avoiding summary judgment"); *Scott v. Wells Fargo Bank, N.A.*, Civ. No. 10-3368, 2011 WL 3837077, at *10 (D. Minn. Aug. 29, 2011) (preventing a plaintiff from relying on four alleged misrepresentations which were not contained in plaintiff's complaint, amended complaint, or previous motions in the case, but were instead raised for the first time "in his opposition to Defendants' motion for summary judgment"); *Plumbers & Pipefitters Local Union No. 630 v. Allscripts-Misys Healthcare Solutions, Inc.*, 778 F. Supp. 2d 858, 882 (N.D. Ill. 2011) (limiting plaintiff's fraud claim to the "actual allegations in the complaint").

## B.    Reliance

A plaintiff's detrimental reliance "is an essential element of a common law fraud claim."  *Popp Telecom, Inc. v. Am. Sharecom, Inc.*, 361 F.3d 482, 491 (8th Cir. 2004); *see also Nilsen v. Farmers' State Bank of Van Hook, N.D.*, 228 N.W. 152, 153 (Minn. 1929). "In defending a motion for summary judgment, the nonmoving party must come forward with some evidence demonstrating a genuine issue as to the actual reliance and the reasonableness of the reliance."  *Hoyt Props., Inc. v. Prod. Res. Grp., L.L.C.*, 736 N.W.2d 313, 321 (Minn. 2007).  Actual reliance "means that the plaintiff took action, resulting in some detriment, that he would not have taken" if the defendant had not made a misrepresentation, or that plaintiff "failed, to his detriment, to take action that he would have taken" had the defendant been truthful.  *Greeley v. Fairview Health Servs.*, 479 F.3d 612, 614 (8th Cir. 2007).

Shukh has presented only two pieces of evidence related to reliance.[19]  First, Shukh identifies his deposition testimony in which he stated that he "truly relied" on the representations of Seagate's IP Department.  Second, Shukh identifies Rockman's report stating that "Dr. Shukh justifiably relied on the [IP] department of Seagate to protect his

---

[19] Shukh has made other arguments regarding reliance, but these arguments relate only to the **reasonableness** of Shukh's reliance, and not to whether Shukh actually relied.  The parties do not dispute that it may have been reasonable for Shukh to rely on the representations of the Seagate IP Department regarding his inventorship rights.  *See Berg v. Xerxes-Southdale Office Bldg. Co.*, 290 N.W.2d 612, 616 (Minn. 1980) (describing relevant inquiries in determining whether a plaintiff's reliance was reasonable).  Both actual and reasonable reliance are required, however, to maintain a fraud claim.  *See Hoyt Props., Inc.*, 736 N.W.2d at 321. Therefore the Court cannot rely upon evidence of whether reliance would have been reasonable to create a genuine issue of material fact with respect to whether Shukh actually took any action or failed to take any action in reliance upon Seagate's alleged misrepresentations.

inventorship interests."[20]  The Court finds that this evidence is insufficient to create a genuine issue of material fact with respect to reliance, because Shukh has at no time identified any particular actions he took, or failed to take in reliance either on Seagate's representation that it would not be filing patent applications for his inventions or Seagate's filing of patent applications that failed to list Shukh as an inventor.[21]  Shukh was unable to identify in his deposition, answers to interrogatories, three briefs related to this motion, or oral argument something that he would have done differently had Seagate told Shukh that it would file patent applications for his inventions and alerted Shukh that he would not be listed as an inventor on these applications.  Instead, Shukh has consistently maintained that if Seagate had told him the truth – that it would be filing patent applications for his inventions and omitting him as an invention – there was no

---

[20] The Court finds that Rockman's statement additionally fails to create a genuine issue of material fact for all of the reasons outlined in the previous section discussing Rockman's report. Rockman's statement about reliance lacks a factual foundation and is too conclusory to provide a basis to deny Seagate's motion for summary judgment.  *See Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1304 (8th Cir. 1993) ("Conclusory affidavits, even from expert witnesses, do not provide a basis upon which to deny motions for summary judgment.").  Moreover, Rockman's opinions regarding fraud appear to be little more than legal conclusions, suggesting that the report would be inadmissible.  *See Schmidt v. City of Bella Villa*, 557 F.3d 564, 570 (8th Cir. 2009).

[21] Similarly, the Court finds that Shukh's claims for fraudulent concealment fail for the same lack of reliance.  A fraud theory based on concealment still requires evidence of reliance. Nondisclosure can constitute fraud "when disclosure would be necessary to clarify information already disclosed, which would otherwise be misleading."  *L&H Airco, Inc. v. Rapistan Corp.*, 446 N.W.2d 372, 380 (Minn. 1989).  Minnesota has adopted the Restatement in defining the tort of fraudulent nondisclosure. *See id.*  The Restatement explicitly requires reliance for nondisclosure of the type alleged by Shukh.  The Restatement provides that "[o]ne who, having made a representation which when made was true or believed to be so, remains silent after he has learned that it is untrue and that the person to whom it is made is relying upon it in a transaction with him, is morally and legally in the same position as if he knew that his statement was false when made."  Restatement (Second) Torts § 551 (1976).  Because Shukh has demonstrated no evidence of reliance upon Seagate's statements that they would not file patent applications for his inventions, his fraudulent concealment also fails.

action Shukh could or would have taken. It is possible to present a theory of reliance based on the type of misrepresentations that Shukh alleges Seagate made. *See Czarnik v. Illumina, Inc.*, 437 F. Supp. 2d 252, 260 (D. Del. 2006) (denying a motion to dismiss a fraud claim which alleged that plaintiff relied upon his employer's concealment of patent applications "by failing to take action to ensure his name was on other patents and applications containing his inventions").[22] However, in the absence of any evidence presented by Shukh that there was some action he did or did not take because of Seagate's misrepresentations, the Court will not speculate as to what his reliance may have been. *See Greeley*, 479 F.3d at 615 (finding that the plaintiff "failed to make a showing of detrimental reliance" because the plaintiff "offered no evidence that he changed his course of conduct or otherwise relied on the" misrepresentations (internal quotation marks omitted)).[23] Therefore the Court concludes that Shukh has failed to put forward evidence creating a genuine issue of material fact with respect to a necessary element of his fraud claim.

## C. Pecuniary Damages

Finally, the Court concludes that even if Shukh had presented evidence of reliance, he has failed to create a genuine issue of material fact with respect to pecuniary damages,

---

[22] *See also Univ. of Colo. Found., Inc. v. Am. Cyanamid Co.*, 196 F.3d 1366, 1373 (Fed. Cir. 1999) (stating in dicta that inventors relied upon the fraudulent concealment of patent applications because they "did not either seek recognition as inventors on the application or prevent the issuance of the patent with [another scientist] named as the inventor").

[23] *See also In re Digi Int'l, Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1103 (D. Minn. 1998) (finding insufficient evidence of actual reliance where the plaintiff "allege[d] generally that it directly or constructively relied," upon the misrepresentations (internal quotation marks omitted)).

"an essential element of fraud." *Nodland v. Chirpich*, 240 N.W.2d 513, 517 (Minn. 1976). In the Court's previous Order, it determined that the only damages supporting Shukh's fraud claim were potential damages to Shukh's reputation, stating:

> Although Shukh has not alleged specific damage except as to his reputation and various inventorship rights that are in dispute, because the Court finds standing predicated at least in part on Shukh's allegation that his reputational interests were harmed, the Court also finds that Shukh has alleged sufficient facts to overcome a motion to dismiss for failure to state a claim of fraud[.]

*Shukh*, 2011 WL 1258510, at *10. Because the Court has concluded that Shukh has not raised an issue of material fact with respect to damage to his reputation caused by the omission of his name from the disputed patents, he cannot rely on such damages for purposes of allowing his fraud claim to defeat a motion for summary judgment. Therefore, the Court finds that Seagate is entitled to summary judgment on Shukh's fraud claim on this basis as well.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED that** Defendants' Motion for Summary Judgment on Plaintiff's Fraud Claim (Claim Five) and Correction of Inventorship Claim (Claim Two) [Docket No. 313] is **GRANTED**. Count two and count five of Plaintiff's Third Amendment Complaint are **DISMISSED with prejudice**.

DATED: March 25, 2013
at Minneapolis, Minnesota.

s/ *John R. Tunheim*

JOHN R. TUNHEIM
United States District Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ALEXANDER M. SHUKH, | Civil No. 10-404 (JRT/JJK) |
| Plaintiff, | |
| v. | **ORDER ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| SEAGATE TECHNOLOGY, LLC, SEAGATE TECHNOLOGY, INC., SEAGATE TECHNOLOGY, UNKNOWN OWNERS AND ASSIGNEES, and SEAGATE TECHNOLOGY PLC, | |
| Defendants. | |

Constantine John Gekas and John C. Gekas, **GEKAS LAW LLP**, 11 South LaSalle Street, Suite 1700, Chicago, IL 60603; James H. Kaster, Katherine M. Vander Pol, and Cristina Parra Herrera **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402, for plaintiff.

Calvin L. Litsey, Chad Drown, Charles F. Knapp, David J. F. Gross, Elizabeth Cowan Wright, and Jeya Paul, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402; Sarah E. Benjes, **FAEGRE BAKER DANIELS LLP**, 1700 Lincoln Street, Suite 3200, Denver, CO 80203, for defendants.

Plaintiff Alexander M. Shukh filed this action against Defendants Seagate Technology, LLC, Seagate Technology, Inc., Seagate Technology, and Seagate Technology, PLC (collectively, "Seagate"), bringing numerous claims arising out of Seagate's employment and termination of Shukh. In particular, Shukh brought a claim for fraud based upon Seagate's filing of patent applications from which Shukh alleges he was wrongfully omitted as an inventor. Seagate also brought a counterclaim, alleging

that Shukh breached his employment contract when he removed confidential documents from Seagate. This matter is now before the Court on Shukh's motion for partial summary judgment on (1) his fraud claim; and (2) the damages portion of Seagate's breach of contract counterclaim.

On June 29, 2012, Seagate moved for summary judgment on Shukh's fraud claim. After full briefing, a hearing on the motion, and two rounds of surreply briefing requested by Shukh, the Court granted Seagate's motion. (Order, Mar. 25, 2013, Docket No. 439.) Shortly before the Court issued the order granting summary judgment in Seagate's favor, Shukh filed the present motion for summary judgment on all but the damages element of his fraud claim. (Mot. for Summ. J., Mar. 7, 2013, Docket No. 426.)

Although Shukh agrees that his motion for summary judgment on his fraud claim is moot in light of the Court's March 25 Order, he "objects" to the denial of his motion. Shukh argues that he is entitled to summary judgment as requested because the Court did not consider the merits of and rule upon his motion in its order addressing Seagate's motion for summary judgment on the same claim. Shukh has pointed to no authority, and the Court has found none, which requires the Court to rule simultaneously upon motions filed nine months apart. Instead, the Court properly exercised its authority "to manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R.*, 370 U.S. 626, 630-31 (1962).

Furthermore, Shukh is incorrect to suggest that by not ruling on the summary judgment motions simultaneously the Court failed to create an adequate appellate record on Shukh's arguments regarding his fraud claim. In support of his motion for summary judgment on his fraud claim Shukh makes two main arguments. First, Shukh argues that

- 2 -
**A188**

he reasonably and justifiably relied upon Seagate's representations. Second, Shukh argues that Seagate committed fraud when it failed to notify the United States Patent and Trademark Office that Shukh disputed inventorship of various inventions for which Seagate had filed patent applications. The Court addressed both of these arguments in its March 25 Order. With respect to his first argument, the Court concluded that Shukh's arguments about the reasonable and justifiable nature of any reliance were correct, but beside the point, because he presented no evidence of actual reliance. (Order at 35 n.19.) The Court also rejected Shukh's second argument, finding that Shukh had not pled the version of the fraud claim he now seeks to rely upon in his motion for summary judgment. (*Id.* at 34 n.18.) After considering these specific arguments and the parties' other arguments regarding Shukh's reliance, the Court found that Shukh had not raised a genuine issue of material fact with respect to the reliance element of his fraud claim. (*Id.* at 35-37.) Because the Court has granted summary judgment and dismissed Shukh's fraud claim with prejudice, it will deny his motion for summary judgment on that claim as moot. *See Minn. Voters Alliance v. Ritchie*, 890 F. Supp. 2d 1106, 1118 (D. Minn. 2012) ("Because the Court grants the motions to dismiss, the Court denies as moot Plaintiffs' motion for summary judgment.").

Finally, Shukh moves for summary judgment with respect to the damages portion of Seagate's counterclaim for breach of contract. The Court previously granted summary judgment in favor of Seagate on its breach of contract counterclaim and ordered Shukh to return Seagate's documents. (Order at 20-21, Nov. 30, 2011, Docket No. 242.) As part of its breach of contract counterclaim, Seagate also requested monetary damages – an issue the parties did not address in connection with the Court's November 30 Order.

Seagate has now agreed to withdraw its request for monetary damages for Shukh's breach of contract. (Defs.' Opp. to Mot. for Summary J. at 3, Mar. 28, 2013, Docket No. 441.) Once a motion for summary judgment has been filed, a claim may not be voluntarily dismissed without a court order, and then only "upon such terms and conditions as the court deems proper." *Hamm v. Rhone-Poulenc Rorer Pharms., Inc.*, 187 F.3d 941, 950 (8th Cir. 1999) (citing Fed. R. Civ. P. 41(a)(1)(i)). The Court concludes that dismissal with prejudice is appropriate here, and therefore will grant Shukh's motion and dismiss Seagate's request for monetary damages in connection with its breach of contract counterclaim.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Partial Summary Judgment [Docket No. 426] is **GRANTED in part** and **DENIED in part** as follows:

1. Plaintiff's motion for summary judgment with respect to his fraud claim (Count V) is **DENIED as moot**.

2. Plaintiff's motion for summary judgment with respect to Seagate's request for monetary damages in connection with its breach of contract counterclaim is **GRANTED**. The claim for monetary damages is **DISMISSED with prejudice**.

DATED: July 3, 2013
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____
JOHN R. TUNHEIM
United States District Judge

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| ALEXANDER M. SHUKH, | Civil No. 10-404 (JRT/JJK) |
| Plaintiff, | |
| v. | |
| | **MEMORANDUM OPINION** |
| SEAGATE TECHNOLOGY, LLC, | **AND ORDER** |
| SEAGATE TECHNOLOGY, INC., | |
| SEAGATE TECHNLOGY, | |
| UNKNOWN OWNERS AND | |
| ASSIGNEES, and SEAGATE | |
| TECHNOLOGY, PLC, | |
| Defendants. | |

Constantine John Gekas, **GEKAS LAW, LLP**, 11 South LaSalle Street, Suite 1700, Chicago, IL 60603; James H. Kaster and Cristina Parra Herrera, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402, for plaintiff.

Calvin L. Litsey, Chad Drown, Charles F. Knapp, David J. F. Gross, and Elizabeth Cowan Wright, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402; Sarah E. Benjes, **FAEGRE BAKER DANIELS LLP**, 1700 Lincoln Street, Suite 3200, Denver, CO 80203, for defendants.

In February 2010, Plaintiff Alexander M. Shukh filed this action against Defendants Seagate Technology, LLC, Seagate Technology, Inc., Seagate Technology, and Seagate Technology, PLC (collectively, "Seagate"), alleging numerous claims arising out of Seagate's employment and termination of Shukh. After a year of litigation, six of Shukh's thirteen claims survived a motion to dismiss, and the Court allowed Shukh's claims based on correction of inventorship for six United States patents, fraud, and

employment discrimination to go forward.  The parties then served expert reports related to Shukh's alleged damages and his claims that he invented certain patented items while working for Seagate.

In December 2012 and January 2013 Shukh served thirteen subpoenas on two of Seagate's experts – Dr. Christopher H. Bajorek and Ms. Angela Heitzman – and other third parties, seeking discovery related to testimony given by Dr. Bajorek and Ms. Heitzman in other matters as well as information about Dr. Bajorek's interactions with his past employers.  Seagate moved for a protective order with respect to five of these subpoenas as well as a request for documents under Federal Rule Civil Procedure 34.  United States Magistrate Judge Jeffrey J. Keyes granted Seagate's motion, finding that the discovery sought by Shukh's subpoenas and Rule 34 request was not relevant to the issues remaining in Shukh's case and exceeded the bounds of appropriate expert discovery.  Shukh objects to the Magistrate Judge's entry of a protective order requiring Shukh to withdraw the challenged subpoenas and Rule 34 request.  Shukh also brings a separate motion to exclude the expert report and testimony of Dr. Bajorek.

The Court will affirm the Magistrate Judge's decision to grant a protective order, because the determination that the information sought is not relevant and is outside the scope of appropriate expert discovery was neither clearly erroneous nor contrary to law. Additionally, the Court will deny Shukh's motion to exclude the report and testimony of Dr. Bajorek because Seagate's failure to initially disclose other cases in which Dr. Bajorek provided expert testimony was timely corrected and harmless.

# BACKGROUND[1]

In 1997 Shukh left Belarus, his country of national origin, to work for Seagate. (Third Am. Compl. ¶¶ 22-23, 33, 49-50, Jan. 17, 2012, Docket No. 268.) Shukh was employed by Seagate from September 1997 until he was terminated in early 2009. (Fourth Decl. of Elizabeth Cowan Wright, Ex. 1 (Dep. of Alexander Shukh ("Shukh Dep.") 31:3-9), June 29, 2012, Docket No. 316.) Shukh held various positions at Seagate as an engineer involved in the development of magnetic recording heads for hard disk drives. (Shukh Dep. 492:14-493:2; Fourth Decl. of Constantine John Gekas, Exs. 12, 13 at 1, July 20, 2012, Docket No. 324.) During his tenure at Seagate, Shukh was named as an inventor on seventeen Seagate patents, and several of his inventions have been incorporated into Seagate products. (Shukh Dep. 415:9-13; Fourth Gekas Decl., Ex. 13 ¶¶ 14-15.) Shukh's claims in the present litigation arise primarily out of his alleged uncredited invention of several Seagate patents and the circumstances surrounding his termination. (Shukh Dep. 48:21-50:24; Third Am. Compl. ¶¶ 122, 196.)

---

[1] The Court recites the background only to the extent necessary to rule on the instant motion. A more complete recitation of the facts surrounding Shukh's termination and his employment at Seagate appear in the Court's previous orders. *See, e.g.*, *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2013 WL 1197403 (D. Minn. Mar. 25, 2013); *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2011 WL 6003951 (D. Minn. Nov. 30, 2011); *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2011 WL 1258510 (D. Minn. Mar. 30, 2011). A more thorough description of the subpoenas and the discovery dispute at issue in the present motion can be found in the transcript of the proceedings held before the Magistrate Judge. (Tr., Jan. 24, 2013, Docket No. 409.)

# I.  SEAGATE'S EXPERT REPORTS

After a year of litigation, six of Shukh's thirteen claims survived a motion to dismiss, and this Court allowed Shukh's claims for correction of inventorship of six United States patents, fraud based on misrepresentations about whether Shukh's alleged inventions would be the subject of Seagate patents, national origin discrimination, and retaliation to go forward.  *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2011 WL 6003951 (D. Minn. Nov. 30, 2011).  Pursuant to an amended scheduling order, Seagate disclosed expert reports from Dr. Christopher H. Bajorek and Ms. Angela Heitzman related to these claims on November 30, 2012.  (Am. Pretrial Scheduling Order, May 2, 2012, Docket No. 309.)

## A.  Dr. Bajorek

Seagate retained Dr. Bajorek as a rebuttal expert to provide opinions relating to the inventorship of the United States patents at issue.  (Decl. of Christopher H. Bajorek ¶ 1, Jan. 10, 2013, Docket No. 394.)

On November 30, 2012, Seagate served Shukh with Dr. Bajorek's rebuttal expert report.  (*See* Fifth Decl. of Constantine John Gekas, Ex. 7, Jan. 16, 2013, Docket No. 402.)  The report failed to list the three cases in which Dr. Bajorek had previously been retained as an expert, as required by Federal Rule of Civil Procedure 26(a)(2)(B)(v). (*See* Fifth Gekas Decl., Ex. 5.)  On December 5, 2012, Seagate amended its disclosures to correct a mislabeling of one copy of Dr. Bajorek's report as non-confidential.  (*Id.*,

Ex. 8.)  On December 21, 2012, Seagate sent Shukh an electronic version of the relabeled report.  (*Id.*, Ex. 9.)[2]

On January 2, 2013, after discovering the omission of the cases in which Dr. Bajorek had previously been retained as an expert, Seagate supplemented Dr. Bajorek's report with an addendum listing the three cases.  (*Id.*, Ex. 15; Second Decl. of Calvin L. Litsey ¶¶ 3-4, Feb. 15, 2013, Docket No. 424.)  Seagate's January 2, 2013 letter accompanying the addendum stated that the addendum had been omitted "inadvertently."  (Fifth Gekas Decl., Ex. 15; *see also* Second Litsey Decl. ¶ 2.)  The addendum was served within the window for expert discovery, which was scheduled to close February 1, 2013.  (Am. Pretrial Scheduling Order.)  Additionally, Seagate disclosed the list of Dr. Bajorek's previous cases before Dr. Bajorek's deposition, which occurred on January 24, 2013.  (Fifth Decl. of Jeya Paul, Ex. 8, Feb. 15, 2013, Docket No. 425.)  Shukh did not seek an extension of time for discovery based on the delayed disclosure of Dr. Bajorek's previous expert cases.  Shukh did, however, ask questions at Dr. Bajorek's deposition related to the cases disclosed on January 2, 2013.  (*Id.*, Ex. 8 at 19-34, 67-90, 101-04.)

---

[2] Shukh refers to each of these submissions as a different "version" of Dr. Bajorek's report, in an attempt to show intentional concealment of information by Seagate, but he has not identified any aspect of the December 5 or 21 reports that was different from the originally served report other than the confidentiality designation.

### B.     Heitzman

Seagate retained Ms. Heitzman as an expert to render an opinion on the nature and extent of Shukh's damages.  In particular, Shukh claims as part of this lawsuit that he was damaged by Seagate's conduct in terminating his employment and allegedly blacklisting him, because he was unable to secure other, comparable employment.  (*See, e.g.*, Third Am. Compl. ¶¶ 259-262.)   Ms. Heitzman's expert report examined whether Shukh engaged in an effective job search after Seagate terminated his employment.  (Eighth Decl. of Constantine John Gekas, Ex. 3 at 5, Apr. 19, 2013, Docket No. 482.)   After reviewing Shukh's qualifications, the efforts he undertook to find employment, and available jobs, Ms. Heitzman concluded that "Dr. Shukh's job search effort was not reasonable," and had he "engaged in a reasonable job search, he should have been able to locate employment paying at a similar rate to his Seagate earnings within 6-12 months of his layoff."  (*Id.*, Ex. 3 at 18.)

Heitzman's report also included the disclosures required of expert witnesses by Federal Rule of Civil Procedure 26(a)(2), including a list of cases from the past four years in which Heitzman had given either in court or deposition expert testimony.  (*Id.*, Ex. 1 at 14-15.)

## II.     SUBPOENAS AND MOTION FOR PROTECTIVE ORDER

After receiving Seagate's expert reports, Shukh served thirteen subpoenas and a document request under Rule 34, directed at obtaining extensive amounts of information regarding Dr. Bajorek's and Ms. Heitzman's backgrounds as well as their prior expert

opinions in unrelated cases. Five of those subpoenas and the Rule 34 request, described below, are the subject of the current objections.

After the disclosure of expert testimony, Shukh learned that Dr. Bajorek and IBM, one of Dr. Bajorek's previous employers, had been involved in a dispute in 1996 regarding Dr. Bajorek's exercise of certain stock options. (Decl. of Christopher J. Bajorek ¶ 19, Jan. 10, 2013, Docket No. 394.) Dr. Bajorek sought a declaratory judgment that he was in compliance with IBM's stock option agreement after he began working for a different company. (*Id.*) IBM then sued Dr. Bajorek for breach of contract and fraudulent misrepresentation. (*Id.*) Both cases settled on confidential terms. (*Id.*) The IBM cases regarding the stock options did not involve patents or technical subject matter, and Dr. Bajorek provided no expert opinions in those cases. (*Id.* ¶ 20.) On December 17, 2012, Shukh, believing the IBM cases to be relevant for impeachment purposes, served a subpoena on IBM requesting any and all documents related to the lawsuits between IBM and Bajorek that resulted from the dispute over stock options. (Sixth Decl. of Elizabeth Cowan Wright, Exs. B, D, Jan. 10, 2013, Docket No. 392.)[3]

On December 18, 2012, Shukh also served a subpoena on Intematix, another of Dr. Bajorek's former employers, seeking "[a]ll documents, [electronically stored information] and/or other things relating to or pertaining in any way to any and all personnel files of Dr. Christopher H. Bajorek, including anything related or pertaining in any way whatsoever to his hiring and/or termination." (Sixth Wright Decl., Ex. C at 6.)

---

[3] Shukh served an amended subpoena on IBM seeking the underlying stock option agreements, but later withdrew the request. (*See* Sixth Wright Decl., Exs. D, O.)

Intematix develops technology that is unrelated to the technical subject matter of Shukh's patent-based claims in the present case. (Bajorek Decl. ¶ 22.)

On December 28, 2012, Shukh served a subpoena on Dr. Bajorek seeking documents related to the IBM cases and their settlement. (Bajorek Decl., Ex. C at 6-7.) Specifically, the subpoena sought copies of all stock option agreements with IBM, all documents related to the cases or their settlement, transcripts of any depositions given by Bajorek related to the cases and accompanying exhibits, and any "declarations, affidavits or other statements, sworn or unsworn, and all exhibits thereto, given by Dr. Bajorek" in the IBM cases. (*Id.*, Ex. C at 7.) Additionally, the December 28 subpoena requested a variety of documents related to other cases in which Dr. Bajorek had been retained as an expert. (*Id.*) The subpoena sought all reports authored by and all depositions given by Dr. Bajorek in the *Marvell* case, in which Dr. Bajorek was retained as an expert to supply opinions on the hard disk drive sales cycle and supply chain, as well as standard business practices in the field. (*Id.* ¶ 15, Ex. C at 7.) In *Marvell*, the district court precluded Dr. Bajorek from testifying about signal processing and sequence detection technology, technology which is not involved in the present case. (*Id.* ¶ 16.) The subpoena also broadly requested "[a]ny and all expert or other types of reports rendered at any time by Dr. Bajorek in any cases, arbitration or other proceedings" as well as deposition transcripts from any such cases. (*Id.*, Ex. C at 7.)

On January 4, 2013, Shukh served a Rule 34 request on Seagate seeking "all files, records, documents, [electronically stored information] and any other things of any kind relating or pertaining in any way to" expert reports or testimony of Dr. Bajorek in two

cases – *Siemens* and *Western Digital* – in which Seagate was a party. (Sixth Wright Decl., Ex. E at 6-7.) Dr. Bajorek provided expert testimony about damages in *Siemens* and trade infringement in *Siemens* on behalf of Seagate. (Bajorek Decl. ¶¶ 7, 11.) Dr. Bajorek did not provide expert testimony on patent inventorship, patent infringement, or patent invalidity in either case. (*Id.*)

After serving the Rule 34 request, on January 7, 2013, Shukh served a subpoena on the American Arbitration Association ("AAA") seeking "the entire case file" for the arbitration relating to the trade secrets *Western Digital* case, including

> all filings, exhibits, transcripts, and recordings in that proceeding as well as all documents, electronically stored information, and other things of any kind whatsoever relating or pertaining in any way to the Arbitration that are in your possession, custody or control, including but not limited to any reports, transcripts of testimony, motions, briefs or other things related in any way to Dr. Christopher H. Bajorek, who was supposedly an expert for SEAGATE TECHNOLOGY LLC.

(Sixth Wright Decl., Ex. F at 6-7.)

Finally, of relevance to the present objections, Shukh served a subpoena on Ms. Heitzman on January 4, 2013. (Decl. of Angela Heitzman, Ex. B, Jan. 10, 2013, Docket No. 393.) The subpoena sought "[a]ll documents . . . relating or pertaining in any way to" four presentations given by Ms. Heitzman in 2011 and 2012. (*Id.*, Ex. B at 6-7.) This request was duplicative of a subpoena issued to the International Association of Rehabilitation Professionals, Inc. ("IARP") that was not challenged. (Sixth Wright Decl., Ex. G.) With respect to Ms. Heitzman's prior expert testimony, the January 4 subpoena requested all reports rendered and transcripts of any testimony given in *Kenyata Woods*, a case involving allegations of employment discrimination. Additionally the subpoena

sought a list of cases in which Ms. Heitzman had testified in court as an expert witness, any and all reports or testimony given in cases in which Ms. Heitzman had opined on the reasonableness of a job search, and any reports in any type of contested proceeding in which Ms. Heitzman was retained by Faegre & Benson LLP, Baker Daniels LLP, and/or Faegre Baker Daniels LLP. (Heitzman Decl., Ex. B at 7.)

Seagate moved for a protective order with respect to these five subpoenas pursuant to Federal Rules of Civil Procedure 16 and 26. (Mot. for Protective Order, Jan. 10, 2013, Docket No. 388.) Specifically Seagate requested a protective order requiring Shukh to withdraw: (1) the December 17, 2012 subpoena to IBM as amended by a December 19, 2012 subpoena; (2) the December 18, 2012 subpoena to Intematix; (3) the December 28, 2012 subpoena to Dr. Bajorek; (4) the January 7, 2013 subpoena to the AAA; and (5) the January 4, 2012 subpoena to Ms. Heitzman. (*Id.* at 2.) Seagate also requested that it not be required to produce documents pursuant to Shukh's Rule 34 request regarding Dr. Bajorek's previous expert reports and testimony. (*Id.*) Seagate argued that the information Shukh sought was irrelevant and imposed an undue burden on the parties to whom the subpoenas were served.

## III.  THE MAGISTRATE JUDGE'S RULING

On January 18, 2013, the Magistrate Judge held a hearing on Seagate's motion for a protective order, and granted the motion in part,[4] requiring Shukh to withdraw the five

---

[4] The Magistrate Judge denied Seagate's request to issue an order barring Shukh from serving any additional written expert discovery without express leave of the Court. (Tr. at 46,

(Footnote continued on next page.)

subpoenas described above. (Minute Entry, January 18, 2013, Docket No. 405; Protective Order at 2, Jan. 18, 2013, Docket No. 407.) Additionally, the Court ordered that Seagate did not need to produce documents pursuant to Shukh's Rule 34 request. (Protective Order at 2.)

The Magistrate Judge began by noting that the Court had the authority to require Shukh to order that the subpoenas be withdrawn under Federal Rule of Civil Procedure 26(c), allowing the Court to issue protective orders; Federal Rule of Civil Procedure 26(b)(2), vesting the court with authority to limit the frequency or extent of discovery otherwise allowed by the Rules; and Federal Rule of Civil Procedure 16(a)(3) empowering the court to manage the scope of discovery on its own. (Tr. at 37, Jan. 24, 2013, Docket No. 409.) Additionally, with respect to expert testimony, the Magistrate Judge noted that the Federal Rules "contemplate only limited discovery," with respect to experts, and limit discovery related to impeachment to "events giving rise to the litigation at hand and the opinions to be received in evidence during that litigation." (Tr. at 38.)

With respect to the discovery sought regarding Dr. Bajorek's testimony in the *Western Digital*, *Marvell*, and *Siemens* cases the Magistrate Judge determined that the issues involved in those cases were not closely related to the issues upon which Dr. Bajorek was retained to testify in the present case and therefore concluded that "the

_____

(Footnote continued.)

Jan. 24, 2013, Docket No. 409.) The Magistrate Judge also denied as moot Seagate's request that Shukh compensate Dr. Bajorek and Ms. Heitzman for time spent responding to the challenged subpoenas. (Tr. at 46-47.)

information being sought is simply too collateral to and outside the bounds of appropriate expert discovery that would be involved in this case." (Tr. 41-42.)

As for the dispute over stock options involving IBM, the Magistrate Judge found that "there is nothing to indicate that there is anything having to do with that stock option dispute that goes to Dr. Bajorek's qualifications as an expert in this case." (Tr. 43.) Although the lawsuit filed by IBM against Dr. Bajorek had contained some allegations of fraud, the Magistrate Judge determined that the fraud allegations were too "far removed" as a topic of impeachment to constitute appropriate expert discovery. (Tr. 43.) Similarly, the Magistrate Judge found that the request for the personnel files from Dr. Bajorek's employment at Intematix

> is an example of a situation where an attempt is made, in fact, to engage in a fishing expedition to try to find information that may be used to impeach Dr. Bajorek but . . . there is no threshold showing to be made that would permit this type of discovery at this stage in the litigation before a deposition even has been taken of Dr. Bajorek.

(Tr. 43.)

Finally, the Magistrate Judge considered the subpoena served on Ms. Heitzman requesting a list of every case in which she testified as an expert. The Magistrate Judge began by noting that Ms. Heitzman's expert disclosures complied with the Federal Rules, which require experts to disclose "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition." Fed. R. Civ. P. 26(a)(2)(B)(v). The Magistrate Judge then concluded that "[t]here has been no threshold showing made that would warrant discovery beyond . . . that of disclosure that went with the report," and declined to permit such discovery at this stage in the litigation. (Tr. 44.)

Consequently, the Magistrate Judge ordered Shukh to withdraw the five challenged subpoenas as well as his Rule 34 request for documents.  (Tr. 45-46; Protective Order at 2.)[5]

## ANALYSIS

## I.    OBJECTIONS TO GRANT OF PROTECTIVE ORDER

### A.    Standard of Review

The standard of review applicable to an appeal of a Magistrate Judge's order on nondispositive pretrial matters is extremely deferential.  *Roble v. Celestica Corp.*, 627 F. Supp. 2d 1008, 1014 (D. Minn. 2007).  This Court will reverse such an order only if it is clearly erroneous or contrary to law.  28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); D. Minn. LR 72.2(a).  "A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  *Lisdahl v. Mayo Found.*, 633 F.3d 712, 717 (8th Cir. 2011) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985)).  "A decision is contrary to law when it fails to apply or misapplies relevant statutes, case law or rules of procedure."  *Knutson v. Blue Cross & Blue Shield of Minn*, 254 F.R.D. 554, 556 (D. Minn. 2008) (internal quotation marks omitted).

---

[5] After the Magistrate Judge granted Seagate's protective order, this Court granted summary judgment in Seagate's favor on Shukh's claims for fraud and correction of inventorship.  (Mem. Op. & Order, Mar. 25, 2013, Docket No. 439.)

## B. Standing

Shukh objects to the Magistrate Judge's order on the basis that Seagate lacked standing to challenge the subpoenas. First, Shukh argues that Seagate lacked standing because its motion for a protective order was essentially a motion to quash the subpoenas. Second, Shukh argues that the subpoenas were not served on Seagate, and therefore Seagate is not a "party or any person from whom discovery is sought," and cannot bring a motion for a protective order pursuant to Rule 26(c).

Federal Rule of Civil Procedure 45 provides that "the issuing court must quash or modify a subpoena that" among other things "requires disclosure of privileged or other protected matter" or "subjects a person to undue burden." Fed. R. Civ. P. 45(c)(3). Under this Rule, parties to whom subpoenas are not directed lack standing to quash or modify such subpoenas on the basis that the subpoenas impose an undue burden. *See, e.g.*, *W. Coast Prods., Inc. v. Does 1-5829*, 275 F.R.D. 9, 16 (D.D.C. 2011) (explaining that the party receiving the subpoena is the proper party to raise a challenge based on undue burden); *Malibu Media, LLC v. Johns Does 1-15*, Civ. No. 12-2077, 2012 WL 3089383, at *8 (E.D. Pa. July 30, 2012) ("First, and fatal to this claim, Defendant is not faced with an undue burden because the subpoena is directed at the internet service provider and not the Defendant. It is the service provider that is compelled to disclose the information, and thus, its prerogative to claim an undue burden. In this case, there is no burden on Defendant to produce **any** information." (internal citations omitted) (emphasis in original)). Because Seagate was not the subject of the challenged subpoenas Shukh is correct that Seagate would have lacked standing to bring a motion to quash.

But Seagate did not bring a motion to quash; instead it sought a protective order pursuant to Rules 16[6] and 26. Rule 26(c) provides that "[a] party or any person from whom discovery is sought may move for a protective order in the court where the action is pending." Fed. R. Civ. P. 26(c)(1). The Rule also provides the Court with the authority to issue "for good cause . . . an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." *Id.* "The explicit mention of 'a party' in the rule has been interpreted to provide standing for a party to contest discovery sought from third-parties." *Underwood v. Riverview of Ann Arbor*, No. 08-CV-11024, 2008 WL 5235992, at *2 (E.D. Mich. Dec. 15, 2008); *see also Fleet Bus. Credit Corp. v. Hill City Oil Co.*, No. 01-2417, 2002 WL 1483879, at *2 (W.D. Tenn. June 26, 2002) ("Many district courts have acknowledged [Rule 26(c)] allows a party to file a motion for protective order on behalf of a non-party.").

The Court finds that the Magistrate Judge correctly concluded that Seagate had standing to bring a motion for a protective order pursuant to Rule 26. Although the relief obtained by Seagate in its motion for a protective order is similar to the relief that could have been obtained by the individuals and entities named in the subpoenas had they brought motions to quash under Rule 45, courts have recognized an important distinction between requests to quash a subpoena and motions for protective orders requesting the court to control discovery more generally under Rules 16 and 26. *See Underwood*, 2008

---

[6] Because the Court concludes that Seagate's motion for a protective order was properly brought pursuant to Rule 26 and the Magistrate Judge correctly granted the motion pursuant to that Rule, it need not consider whether Rule 16 would have provided adequate authority for either Seagate's motion or the Magistrate Judge's ruling.

WL 5235992, at *1-2 (E.D. Mich. Dec. 15, 2008). The mere fact that subpoenas are the type of discovery at issue does not limit parties and the court to the relief provided for in Rule 45. Instead subpoenas issued under Rule 45 are subject to the same "constraints that apply to all of the other methods of formal discovery." *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 177 F.R.D. 443, 443 (D. Minn. 1997) (applying the time limits of Fed. R. Civ. P. 26(a)(5) to subpoenas issued under Rule 45). Rule 26, for example, provides the constraint that discovery is limited to "any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). The Rule also provides that the court "on motion or on its own . . . must limit the frequency or extent of discovery otherwise allowed" by the Rules if "the discovery sought is unreasonably cumulative or duplicative" or "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(C). Where a party, such as Seagate, contends that subpoena requests are irrelevant, cumulative, and burdensome, they are not simply asserting the rights of the third party, but their own right to reasonable discovery and efficient disposition of the case. *See* Fed. R. Civ. P. 1. ("These rules . . . should be construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding."). Furthermore, unlike undue burden, which is a fact potentially best known to the party receiving the subpoena, Seagate, as a party to the present litigation, is the only entity as between itself and third parties with the appropriate knowledge to assert an objection based on relevance or cumulative discovery. Therefore, where a party does not seek to quash a subpoena under Rule 45(c) "the issue is not one of privity between a party and the subpoenaed third-person, but is one of case management

under Rules 16 and 26." *Marvin Lumber*, 177 F.R.D. at 444. Because the Court finds that Seagate is entitled, as a party to the litigation, to limit irrelevant and cumulative discovery, the Court concludes that the Magistrate Judge did not err in finding that Seagate had standing to bring its motion for a protective order.[7]

## C.      Burden of Proof

Shukh also objects to the Magistrate Judge's ruling on the basis that the Magistrate Judge applied the wrong burden of proof. Specifically, Shukh argues that the Magistrate Judge imposed upon him the burden of making a threshold showing of relevance rather than requiring Seagate to demonstrate good cause for the issuance of the protective order.

Rule 26(c) provides that "[t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Under this rule, the movants bears the burden of demonstrating the necessity of a protective order. *See Gen. Dynamics Corp. v. Selb Mfg. Co.*, 481 F.2d 1204, 2012 (8th Cir. 1973). However, "a showing of irrelevancy of proposed discovery can satisfy the 'good cause' requirement of Rule 26(c)." *Smith v. Dowson*, 158 F.R.D. 138, 140 (D. Minn. 1994). Information is generally discoverable "unless it is clear that the

---

[7] Shukh also objects to the Magistrate Judge's ruling on the ground that the court lacked jurisdiction over three of the subpoenas issued by courts outside the District of Minnesota and that Seagate waived its right to challenge the subpoenas by failing to do so within the fourteen days after service provided by Fed. R. Civ. P. 45(c)(2)(B). Both of these objections are premised on Shukh's mistaken belief that the Magistrate Judge entered the protective order pursuant to Rule 45, rather than Rule 26. Because the Court has concluded that the Magistrate Judge properly considered Seagate's motion as one for a protective order under Rule 26, it will overrule Shukh's objections.

information sought has no bearing upon the subject matter of the action." *Sinco, Inc. v. B&O Mfg., Inc.*, Civ. No. 03-5277, 2005 WL 1432202, at *1 (D. Minn. May 23, 2005). The Eighth Circuit has held that the proponent of the discovery must make a "threshold showing of relevance . . . before parties are required to open wide the doors of discovery," in order to limit "fishing expeditions in discovery." *Hofer v. Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992).

In its brief in support of its motion for a protective order, Seagate advanced numerous arguments that the discovery sought by Shukh in the subpoenas was irrelevant to any claim or issue in the case. Shukh was therefore required to make some threshold showing that the material was relevant. Having failed to do so, the Magistrate Judge properly concluded that the irrelevancy of the information sought satisfied the good cause requirement of Rule 26(c).

Additionally, even if the Magistrate Judge had failed to apply the burden of proving entitlement to a protective order appropriately, the Court would affirm his order, because the Magistrate Judge had the authority to require Shukh to withdraw the subpoenas under Rule 26(b)(2)(C), another rule explicitly invoked in Seagate's motion. (Br. in Supp. of Mot. for Protective Order at 3, Jan. 10, 2013, Docket No. 391.) Rule 26(b)(2)(C) requires the court "[o]n motion or on its own" to "limit the frequency or extent of discovery otherwise allowed by" the Rules if "the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(C)(iii). As explained more fully below, Shukh sought vast quantities of information that relate only tangentially to resolution of any of the issues in the case. The Magistrate Judge would

therefore have been well within his authority to limit the discovery sought in Shukh's subpoenas, even if Seagate had failed to make a showing of good cause.

### D. Relevance

Finally, Shukh objects to the Magistrate Judge's determination that the information sought in the subpoenas was irrelevant, arguing that the Magistrate Judge applied an inappropriately restrictive standard of relevancy as it related to Seagate's experts. Specifically, Shukh argues that the Magistrate Judge erred by finding that information pertaining to experts that was outside the scope of initial disclosures required of experts under Rule 26(a)(2) was automatically irrelevant.

As an initial matter, the Court reiterates that its review of the protective order is not *de novo*. The Magistrate Judge has broad discretion to supervise the discovery matters before him. *See McGowan v. Gen. Dynamics Corp.*, 794 F.2d 361, 363 (8th Cir. 1986). Where a magistrate judge has carefully examined the proposed discovery, the Court will defer to the magistrate judge's "broad discretion . . . to manage and define appropriate discovery" unless the Magistrate Judge's determinations were clearly erroneous or contrary to law. *Williams v. Ehlenz*, Civ. No. 02-978, 2004 WL 742076, at *3 (D. Minn. Mar. 30, 2004).

The Court concludes that the Magistrate Judge did not clearly err in determining that the information Shukh sought in the subpoenas was irrelevant. Like all other discovery, information sought in connection with expert testimony must be relevant to the claim or defense. *See* Fed. R. Civ. P. 26(b)(1). Rule 26 specifically provides for

certain disclosures that must be made regarding an expert witness such as "a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition." Fed. R. Civ. P. 26(a)(2)(B)(v). But any information sought above and beyond the required disclosures must meet the Rules' requirement of relevance in order to be discoverable. *See Hofer*, 981 F.2d at 380 (affirming denial of motion to compel where plaintiff sought detailed design plans and "minutiae" for models of trucks that were sufficiently dissimilar from the model in issue such that plaintiff did not make threshold showing of relevance to warrant production of the design plans); *see also United States v. Morse*, Civ. No. 07-226, 2007 WL 4233075, at *2 (D. Minn. Nov. 28, 2007) (upholding the magistrate judge's refusal to compel the disclosure of certain evidence because the party seeking the discovery had not demonstrated relevance, and in his appeal stated only that "such evidence is relevant and material to the charge and elements of fraud").

As to information about Dr. Bajorek's stock options dispute with IBM and his employment at Intematix, the Court finds that the Magistrate Judge did not clearly err in requiring Shukh to withdraw his subpoenas. It was not clear error to determine that Dr. Bajorek's personnel files and information about previous lawsuits that occurred in 1996 would not have bearing on his expert testimony about the inventorship of the patents on which Shukh allegedly was not named. Shukh makes only general arguments that Dr. Bajorek's personnel file and previous lawsuit containing allegations of fraud are relevant for impeachment purposes. Shukh's interpretation of relevance is far too broad, and would allow unbounded discovery into any and all aspects of Dr. Bajorek's life that

could possibly bear on his truthfulness. Shukh has demonstrated no connection between Dr. Bajorek's personnel file or the dispute with stock options that bears directly upon the issues presented in this case.

With respect to the information sought about Dr. Bajorek's previous expert testimony in *Marvell*, *Siemens*, and *Western Digital*, the Court finds that the Magistrate Judge did not err in concluding that Shukh failed to make a threshold showing of relevance. Shukh argues only generally that "Dr. Bajorek's prior testimony concerned various technical features concerning hard disk drives, which is the technology at issue in this case." (Pl.'s Obj. at 11, Feb. 1, 2013, Docket No. 412.) But Dr. Bajorek did not provide expert testimony about the issues that he has been retained to testify about in the present case – patent inventorship, patent infringement, or patent invalidity –in any of the three cases identified by Shukh. Therefore, the opinions in the previous cases will not, as Shukh claims, help him establish bias and consistency, because the opinions are not germane to the topics at issue in the present lawsuit. Furthermore, Shukh failed to demonstrate the relevance of receiving all information and documents related to any "cases, arbitration or other proceeding" in which Dr. Bajorek was retained as an expert. Instead, the Magistrate Judge properly concluded that such broad discovery requests constituted a fishing expedition, not necessarily directed at obtaining relevant materials.

The Court also finds that the Magistrate Judge correctly concluded that Shukh failed to make a threshold showing that the information sought from Ms. Heitzman was relevant. The only argument Shukh makes in his objections regarding relevancy is that "Ms. Heitzman's prior testimony is relevant to whether she applied the proper standard

and methodology to the facts of this case." (Pl.'s Obj. at 11.) It was not clear error to deem this broad, generic attack (which seems to prematurely introduce a *Daubert*-like determination) insufficient to warrant a fishing expedition into Ms. Heitzman's prior testimony. Shukh has not demonstrated how transcripts of depositions and court testimony as well as expert reports from the many cases in which Ms. Heitzman has testified (beyond the disclosures Ms. Heitzman has already made regarding cases in which she testified in the past four years) will help him assess whether Ms. Heitzman's methodology is appropriate, or whether she has properly applied the facts of this case to that methodology.

Importantly, the Court also notes that the Magistrate Judge declined to preclude the discovery sought in Shukh's subpoenas altogether. Instead, the Magistrate Judge noted that much of the discovery sought was inappropriate at this time, before Shukh had taken depositions of the experts. Therefore, the Magistrate Judge's protective order explicitly does not prevent Shukh from crafting a discovery request that seeks relevant documents and discovery with respect to the testimony of Dr. Bajorek and Ms. Heitzman.

Because the Court finds that the Magistrate Judge appropriately applied the Federal Rules of Civil Procedure in granting Seagate's motion, it will affirm the January 18, 2013 protective order.

## II.    MOTION TO EXCLUDE DR. BAJOREK

Shukh also moves to exclude the report and testimony of Seagate's expert Dr. Bajorek under Federal Rule of Civil Procedure 37 on the basis that Seagate failed to

make timely disclosures of the prior cases in which Bajorek testified within the four years prior to the date of his expert report, as required by Rule 26(a)(2)(B)(v). Shukh claims that the lack of timely disclosure prejudiced him in his preparation of the case.

Rule 37 provides that:

> ***Failure to Disclose or Supplement.*** If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. . . .

Fed. R. Civ. P. 37(c)(1). Rule 26(e) requires a party to supplement or correct its expert disclosures "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect." Fed. R. Civ. P. 26(e)(1)(A).

Here, Seagate served Dr. Bajorek's expert report on November 30, 2012. When Seagate discovered the omission of the list of cases in which Dr. Bajorek had previously testified required by Rule 26(a)(2)(B)(v), it corrected Dr. Bajorek's report in accordance with Rule 26(e). Seagate corrected its error "in a timely manner" on January 2, 2013 – a little over a month after service of the initial report and well before Dr. Bajorek's deposition. Therefore, Rule 37 does not apply to exclude Dr. Bajorek's testimony, because Seagate did not "fail[] to provide information . . . as required by Rule 26(a) or (e)." Fed. R. Civ. P. 37(c)(1).

Even if Rule 37 did apply to Seagate's disclosure of cases in which Dr. Bajorek previously testified, it would not bar Dr. Bajorek's testimony in this case because any failure to disclose was "harmless." *See* Fed. R. Civ. P. 37(c)(1). Although Shukh's brief insinuates bad faith on the part of Seagate, Shukh has not demonstrated that the one

month delay in receiving information about the three prior cases in which Dr. Bajorek was retained as an expert impeded his ability to adequately conduct discovery. Indeed, Shukh was able to ask Dr. Bajorek numerous questions about his previous cases during the January 24 deposition. Because the late disclosure was harmless, the Court will deny Shukh's motion to exclude Dr. Bajorek's expert testimony on that ground.

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff's Objections [Docket No. 412] are **OVERRULED** and the Magistrate Judge's January 18, 2013 Protective Order [Docket No. 407] is **AFFIRMED.**

2.      Plaintiff's Motion to Bar the Expert Report and Testimony of Seagate's Expert Bajorek [Docket No. 413] is **DENIED**.


DATED:   September 30, 2013                    _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                   United States District Judge

# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| ALEXANDER M. SHUKH,<br><br>                  Plaintiff,<br><br>v.<br><br>SEAGATE TECHNOLOGY, LLC,<br>SEAGATE TECHNOLOGY, INC.,<br>SEAGATE TECHNLOGY,<br>UNKNOWN OWNERS AND<br>ASSIGNEES, and SEAGATE<br>TECHNOLOGY, PLC,<br><br>                  Defendants. | Civil No. 10-404 (JRT/JJK)<br><br><br>**MEMORANDUM OPINION AND<br>ORDER GRANTING<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT** |

James H. Kaster and Christina Parra Herrera, **NICHOLS KASTER, PLLP**, 80 South Eighth Street, Suite 4600, Minneapolis, MN 55402; and Constantine John Gekas, **GEKAS LAW, LTD.**, 11 South LaSalle Street, Suite 1700, Chicago, IL 60603, for plaintiff.

Charles F. Knapp, Calvin L. Litsey and Elizabeth Cowan Wright, **FAEGRE BAKER DANIELS LLP**, 90 South Seventh Street, Suite 2200, Minneapolis, MN 55402; and Sarah E. Benjes, **FAEGRE BAKER DANIELS LLP**, 1700 Lincoln Street, Suite 3200, Denver, CO 80203, for defendants.

Plaintiff Alexander M. Shukh filed this action against Defendants Seagate Technology, LLC, Seagate Technology, Inc., Seagate Technology, and Seagate Technology, PLC (collectively, "Seagate"), alleging numerous claims arising out of Seagate's eleven-year employment and eventual termination of Shukh. Shukh filed a complaint in February 2010 asserting thirteen claims against Seagate. After four years of litigation only Shukh's claims under Title VII and the Minnesota Human Rights Act ("MHRA") for employment discrimination and retaliation based upon his national origin

remain. Seagate now moves for summary judgment on these claims. Because Shukh has failed to present evidence upon which a reasonable jury could conclude that Seagate discriminated or retaliated against Shukh based on his national origin, the Court will grant Seagate's motion for summary judgment in its entirety.[1]

## BACKGROUND[2]

This employment termination case has been the subject of extensive litigation spanning four years, involving nineteen hearings before the Court, more than fifty Court orders, and over 500 docket entries. The parties have produced thousands of pages of record material, and have presented the facts identified in the following background section as relevant to the present motion. As the Court's analysis will show, many of these facts are irrelevant to the ultimate legal question presented by Shukh's remaining claims – did Seagate discriminate against Shukh because of his national origin or retaliate against him for making complaints based on perceived discrimination. For the sake of completeness and to demonstrate that the Court has fully considered the myriad conflicts

---

[1] The parties also filed various motions to exclude expert reports and testimony at trial. Because the Court will grant Seagate's motion for summary judgment on the only remaining claims in the case, no trial will be held. Accordingly, the Court will deny the motions to exclude as moot.

[2] The Court recites the background only to the extent necessary to rule on the instant motion. A more complete recitation of the facts surrounding Shukh's termination and his employment at Seagate as it relates to his other claims appears in the Court's previous orders. *See, e.g.*, *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2013 WL 1197403 (D. Minn. Mar. 25, 2013); *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2011 WL 6003951 (D. Minn. Nov. 30, 2011); *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2011 WL 1258510 (D. Minn. Mar. 30, 2011).

and incidents of mistreatment Shukh alleges he suffered at the hands of Seagate, the Court will lay out the facts identified by the parties before addressing the legal merits of the present motion.

## I.     SHUKH'S BACKGROUND

Shukh was born in Minsk, Belarus, in 1953 when Belarus was still part of the former Soviet Union. (Decl. of Sarah Benjes, Ex. 1 (Dep. of Alexander M. Shukh ("Shukh Dep.") 10:17-11:24), Apr. 1, 2013, Docket No. 468.) Shukh describes his national origin as Belarusian, Soviet, and Russian. (Shukh Dep. 10:25-11:1, 357:13-15.)[3] Shukh speaks both Belarusian and Russian. (*Id.* 11:20-12:2.) Shukh also speaks English with a strong accent. (*Id.* 361:17-25.)

Shukh holds a Ph.D. in Condensed Matter Physics and a B.S. and M.S. in Electronics and Electronic Engineering. (Fourth Decl. of Constantine John Gekas, Ex. 12, July 20, 2012, Docket No. 324.) Shukh is recognized as one of the leading scientists in his field, and his reputation has been one of an extremely successful

---

[3] At least one court has criticized the assumption that "Russia and Belarus are of the same national origin, because they were once part of the Soviet Union." *See Dolgaleva v. Va. Beach City Pub. Schs.*, 364 F. App'x 820, 826 n.4 (4th Cir. 2010). *Dolgaleva* noted that "'the term 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came.'" *Id.* (alteration omitted) (quoting *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973)). Based on this definition "[a]s a matter of ancestry, it would seem that the nations comprising the former Soviet Union are distinct." *Id.* Therefore, it is possible that Shukh's definition of his national origin as Belarusian, Russian, and Soviet is overly broad. Seagate, however, has accepted this definition and for purposes of its motion uses "Belarus" or "Belarusian" to refer collectively to Belarusian, Russian, and/or Soviet national origins. (Defs.' Mem. in Supp. of Mot. for Summ. J. at 1 n.1, Apr. 1, 2013, Docket No. 467.) Because Seagate has not challenged Shukh's definition of his own national origin, the Court will assume, for purposes of this motion, that Shukh actually possesses these three distinct national origins.

innovator in the hard disk drives engineering community.  (Benjes Decl., Ex. 12 at 28.)

Prior to 1997, Shukh had over twenty-three years of experience in his field and was

"recognized internationally as outstanding in the field of hard disk drive magnetic

recording." (Fourth Gekas Decl., Exs. 12, 14.)

## II.    SHUKH'S EMPLOYMENT AT SEAGATE

In 1997 Shukh was working in Minsk, Belarus, at the Belarusian State University

of Informatics and Radio Electronics as a researcher.  (Third Am. Compl. ¶ 35, Jan. 17,

2012, Docket No. 268.)  Seagate recruited Shukh after observing his presentations at an

international scientific conference in Louisiana.  (*Id.* ¶¶ 36-37.)  Shukh interviewed with

numerous Seagate employees before Seagate offered him a position.  (*Id.* ¶ 38; Shukh

Dep. 584:7-24.)   In September 1997 Shukh began working at Seagate's office in

Bloomington, Minnesota, as a Senior Advisory Development Engineer.  (Third Am.

Compl. ¶ 33; Shukh Dep. 31:3-9.)   After Shukh began his employment, Seagate

sponsored Shukh for an H-1B work visa, a visa extension, and finally permanent

residency status.  (Third Am. Compl. ¶¶ 80-81.)

### A.    Inventorship Accomplishments at Seagate

During his tenure at Seagate, Shukh was named as an inventor on seventeen

Seagate patents, and several of his inventions have been incorporated into Seagate

products.  (Shukh Dep. 415:9-13; Fourth Gekas Decl., Ex. 13 ¶¶ 14-15; Eighth Decl. of

Chad Drown, Exs. 1-18, Apr. 1, 2013, Docket No. 475.)  Shukh has received numerous

awards from Seagate including awards for outstanding achievement and innovation

generally as well as awards for his role in inventing specific products. (Fourth Gekas Decl., Ex. 12 at 2; Benjes Decl., Ex. 9; Shukh Dep. 496:21-24.) Seagate also named Shukh to the Seagate Hall of Fame for Outstanding Inventions. (Shukh Dep. 495:21-24.)

Shukh was widely recognized during his employment at Seagate as having excellent technical skills and being an outstanding innovator. (*Id.* 246:1-10.) Shukh's managers consistently gave Shukh the highest ratings on performance evaluations of his knowledge, innovation, and creativity. (Decl. of Douglas Engelke, Ex. 4 at 0110-0111, Ex. 5 at 0101, 0103, Ex. 6 at 0223, Ex. 7 at 0214-0215, Ex. 8 at 0208, Apr. 1, 2013, Docket No. 469; Benjes Decl., Ex. 20.) Shukh's coworkers also testified that Shukh had a reputation as "a very good design person" with a "strong reputation for technical knowledge." (Benjes Decl., Ex. 2 (Dep. of Frank E. Stageberg ("Stageberg Dep.") 102:8-14).) Additionally, in sponsoring Shukh for the immigration statuses necessary to maintain his employment, Seagate consistently represented to immigration officials that Shukh was an outstanding researcher in his field and was an extremely valuable asset to Seagate. (*See, e.g.*, Fourth Gekas Decl., Exs. 14, 15.)

### B. General Competitiveness and Ability to Work with Others

Shukh testified that he has a competitive nature that "sometimes create[s] a lot of issue[s] for others." (Shukh Dep. 247:21-23.) Shukh testified "I was discriminated [against] by Seagate because I'm different. I'm different [in] nationality, the language I speak, my accent, my culture, to some extent because I am challenging. I like to challenge the problem and I was asking question[s], technical questions." (*Id.* 379:23-380:5.) As an example of some of the issues his nature created for coworkers, Shukh

testified that he applies a "three-strikes" rule to his interactions with coworkers. (*Id.* 271:8-18.) Under the three-strikes rule if a coworker engages in dishonest behavior three times, Shukh "just stop[s] talking to him." (*Id.* 271:13-23, 351:4-8.)

### 1. Shukh's Managers

Shukh testified that most, but not all of his managers, described him as having a difficult time working with other people. (*Id.* 270:3-12.) For example, Shukh recalled that one of his managers had told him that he was "too competitive" and "too tough in playing by the rules." (*Id.* 360:17-19.) Early in Shukh's career at Seagate, performance evaluations from these managers reflected that he was too straightforward in criticizing other employees and their work. (*Id.* 243:5-244:12; 245:1-11, 369:21-370:12 (discussing evaluations in 1999 and 2003).) Shukh testified that his direct style in confronting coworkers about technical issues was a cultural difference, and coworkers in the United States took direct questions and discussions about technical issues more personally than his colleagues in Belarus. (*Id.* 370:1-12.)

For example, in 1999 Shukh received a rating of three out of five for organizational relationships in an evaluation from his manager at the time, Ed Murdock. (Engelke Decl., Ex. 4.) The evaluation stated that

> Alex sometimes tends to sabotage recognition and appreciation of his knowledge and efforts and to create unnecessary antagonism by advocating his ideas without doing his own critical evaluation of their strengths and weaknesses first. Also, he has shown a tendency to implicitly put down the knowledge and experience of other engineers by comments in meetings such as "that's clearly wrong" or "I know the answer" when contradicting or disputing others' work. People who know Alex well realize that this arises from a sense of enthusiasm for new ideas, but he needs to work harder to listen to and appreciate other

> peoples' ideas. . . . On numerous occasions, he has discounted the data, reservations or ideas of others as he expresses confidence in his own ideas. This has cut off discussion and leads to friction with other members of the work group.

(*Id.*, Ex. 4 at 0111.) Shukh was given an opportunity to respond to the evaluation and stated that he agreed with the evaluation of his organizational relationship skills, but stated that these difficulties were a result of practices learned in his "former country" and he understood "that this culture is not acceptable at [a] western company." (*Id.*, Ex. 4 at 0113.)

A 2001 evaluation from manager Pat Ryan echoed Murdock's concerns, and scored Shukh at a three out of five for organizational relationships. (*Id.*, Ex. 5 at 0103.) Ryan noted that

> Dr. Shukh will continue to be plagued by organizational relationship controversies until he learns to disagree without being disagreeable. Also he needs to understand that once an issue has been thoroughly debated and a conclusion has been reached, it is very destructive to publicly insist on one[']s minority point of view. The goal is not to have a muzzled or docile posture but to know where to draw the line. He must also learn to trust his management chain to sort out controversial and interpersonal issues fairly and to ensure that he receives the accolades and recognition that he deserves. . . . I will not hesitate to issue a failing grade in the future if I don't see improvement in Dr. Shukh's ability to exercise good judgment when conflicts arise.

(*Id.*) In 2002, Shukh was given a "learning" rating (the rating one step above unsatisfactory) by manager Sining Mao for his "Respect for People." (*Id.*, Ex. 6 at 0224.) Mao noted that Shukh needed to "understand differences between [people and get] the job done for team success. Put per[so]nal ego behind." (*Id.*) A 2004 evaluation from Ryan noted that Shukh's "delivery of . . . insightful comments can be improved," and that

"all people are different. We need to keep this in mind, and assume that everybody is trying to do their best." (*Id.*, Ex. 7 at 0214.) Shukh responded that

> it is very difficult to respect a person that cheats on you and your colleagues, [is] dishonest, has a h[a]bit to steal somebody's ideas and presents them as their own, etc. In this situation there is only [one] way to keep [a] reasonable relationship with this person: try to reduce the interference with this person up to the possible limit. . . . Respect between people can be established on the mutual basis only. If somebody does not respect you how can you respect him/her? It's impossible. Personally, I experienced many times with a hid[den] disrespect and all [of] my appeals to managers were without response.

(*Id.*, Ex. 7 at 0217.) A 2006 evaluation gave Shukh the second best score for "respect for people" and "teamwork" but similarly instructed Shukh to "work to cultivate relationships with colleagues" and to "make an effort to ensure people feel that you are listening to what they have to say and are giving consideration to their positions." (Benjes Decl., Ex. 20 at 46205.) That evaluation also noted "[y]ou speak honestly and do not seek to mislead people. You can at times be harsh with others and I would like to see you work toward being more positive in your interactions with your colleagues." (*Id.*, Ex. 20 at 46206.) With respect to these evaluations, Shukh testified that he received poor evaluations despite his "absolutely outstanding performance," based solely on the difference in his "cultural behavior." (Shukh Dep. 384:7-17.)

Shukh made several references to his belief that Seagate managers were personally biased against him in responding to his performance reviews. In responsive comments to his performance review for the time period between July 1, 2003 and June 30, 2004, Shukh stated:

> People make a difference [in] every organization. This is a well-known postulate. The right people [in] the right place is a major component of

any company success. People are very sensitive to results of their evaluation. Therefore, a manager has a big responsibility evaluating [the] performance of his/her engineers or technicians. Any personal bias in this situation is forbidden. However, I feel there is a bias to me from my managers. I have [had] this feeling for a long time. [The] [n]ice thing is that I know the reason for that and can forgive them this bias to some exten[t]. At the end, I would like to make a comment about [the] existing system of evaluation. [In] my mind, the existing system is too subjective.

(Engelke Decl., Ex. 7 at 0218.) Shukh also referenced his perception of bias in his comments to his evaluation for 2006. (Benjes Decl., Ex. 20.) Shukh stated:

Management style [on the team] is not a secret to me. I found out long ago that there is a strong bias to me from the management team. This is a fact. I do not pretend to change it since this is useless. I do know that [I] cannot be promoted to a higher position even though the company makes millions of dollars per year by using my inventions, my head designs and my technical proposals. . . . I would like to give to the management team one suggestion: please change some [of] Seagate's policies such as "Equal Employment Opportunity", "Performance Management", "Rewards and Recognition", etc. since they are in . . . serious contradiction with . . . reality. Also, I can give the management team [a] couple of hints for future evaluations of my performance. You can always give me [an "excellent" rating (the second highest rating out of four)] for not going to café during lunch time, for a strong Russian accent, etc. I just don't know how the management team can expect a high performance from [an] employee by treating him like this.

(Benjes Decl., Ex. 20 at 46207.)

Kenneth Allen, who managed Shukh during his last three years of employment at Seagate testified that "Alex has probably the single largest ego of any human being I ever met. And he is incapable of taking input from others at the level he needs to to work in teams." (Benjes Decl., Ex. 15 (Dep. of Kenneth D. Allen ("Allen Dep.") 180:12-15).) Allen also testified that "[i]n general, Alex had a tendency in public forums, meetings, to accuse other people of stealing his ideas. He had a tendency to say they were stupid; only

**A223**

his ideas were right. . . . He was basically sort of insulting in a very personal way – not critiquing the work necessarily, but being insulting in a very personal way." (Allen Dep. 149:3-10.) Additionally, Allen testified that Shukh's difficulty working with others increased during his time at Seagate and that over time he "slowly alienated just about every designer in the recording heads operations." (*Id.* 127:20-128:4.)

### 2. Shukh's Coworkers

Some of Shukh's coworkers testified that at Seagate, Shukh had "a reputation of [being] sometimes hard to work with," (Stageberg Dep. 103:20-25, 105:2-20; Benjes Decl., Ex. 16 (Dep. of Taras Pokhil ("Pokhil Dep.") 140:4-7)) being patronizing in presentations, and having a very high opinion of himself, (Pokhil Dep. 142:2-24). Seagate's brief in support of its motion for summary judgment cites a number of instances that it argues demonstrate the difficulty Shukh had working with others. Shukh contests the nature and extent of each of these incidents. Although some of these events are only peripherally related to the discrimination and retaliation claims at issue, for completeness, this Order presents a version of each story viewing the record facts in the light most favorable to Shukh.

In 2001 a controversy occurred between Niru Sharma, a Seagate engineer working in the Springfield office, and Shukh. (Allen Dep. 99:5-9.) Shukh discovered that portions of Sharma's presentation contained ideas and designs he believed should have been accredited to him. (*Id.* 99:16-20.) Shukh wrote an email to Sharma stating that "I didn't have a chance to know you personally but the very first impression about you isn't very good." (Benjes Decl., Ex. 17.) Shukh requested that Sharma "please immediately

make corrections in all presented materials" and warned her that "[w]hat you did in your presentation is [a] violation of corporate policy and some other laws. I hope you did that without intention." (*Id.*) Allen testified that Shukh's reaction to Sharma was "less than constructive" because "it wasn't clear that there was any real or actual offense" and that "it doesn't tend to be the best way to further your ongoing working relationship by accusing the other person of, you know, unfair practices without at least working through the process first." (Allen Dep. 99:16-100:10.) Shortly after the incident, Allen reviewed the documents and sent an email in which he "agree[d] that Alex's name should have been prominently included in the package since he did most/all of the design and simulation work." (Ninth Decl. of Constantine John Gekas, Ex. 6, May 6, 2013, Docket No. 489; Shukh Dep. 728:8-730:8.) Allen concluded, "Let's take these actions and then take a chill pill. When things we don't like happen, we each get to decide how to react. I'm going to assume this was a simple oversight on Niru's part – this can be easily corrected." (Ninth Gekas Decl., Ex. 6.)

The record also contains evidence of an incident with coworker Eric Linville. (Allen Dep. 152:6-12.) During a meeting, Linville allegedly expressed concern that one of Shukh's designs would not work. (Ninth Gekas Decl., Ex. 7; Shukh Dep. 818:6-17.) Shukh responded that he was surprised by the comments since Linville had been involved in the modeling of the design at issue. (Ninth Gekas Decl., Ex. 7; Shukh Dep. 818:6-17.) Linville asked to see certain materials, and after the meeting came to Shukh's office. (Ninth Gekas Decl., Ex. 7.) Shukh testified that Linville "jump[ed]" into Shukh's cubicle, raised his hand over Shukh, and said "Go to the street." (Shukh Dep. 354:15-

20.)  During the incident, Shukh also stated that Linville repeatedly called him an idiot. (Ninth Gekas Decl., Ex. 7.)  With respect to Linville, Shukh further testified "[h]e attacked me, called me to the street, used all my designs.  He is [a] horrible person." (Shukh Dep. 354:9-14.)  Linville did not physically make contact with Shukh at any point. (*Id.* 354:21-23.)

In response to the Linville incident, Shukh sent an email to his manager Sining Mao. (Ninth Gekas Decl., Ex. 7.)  In the email Shukh stated that the day before he had informed Mao "about a rude behavior of Eric Linville against me and asked [you] to take required actions to prevent this kind of behavior in the future.  I did not hear from you so far." (*Id.*)  Shukh also stated "Sining.  I have to admit, since you retook a position of manager on the design team a situation around me has got worse dramatically.  I am continuously under a pressure from you and other team members close to you.  I request to stop this practice and take required measures about reported accidents." (*Id.*)  In a postscript to the email, Shukh noted "[s]ince English is not my native language and I don't have any experience in this kind of letters, I apologize in advance for an inappropriate use of some words." (*Id.*)  Shukh later asked that Linville be made to apologize to him before he would continue working with him. (Shukh Dep. 353:7-22.) Shukh further testified that, pursuant to his three-strikes rule, he did not talk to Linville after the incident. (*Id.* 272:4-9.)

At some point during his employment, Shukh asked coworkers Nurul Amin and Johannes van Ek about inaccurate data they had presented, in order to demonstrate that

their own design was superior to Shukh's. (*Id.* 352:16-353:5.) Shukh later asked Amin and van Ek to apologize to him. (*Id.*)

Coworker Frank Stageberg testified about a meeting during which Shukh told Stageberg that Stageberg wasn't "really a designer." (Stageberg Dep. 54:25-55:16.) Stageberg found this comment to be disrespectful and unconstructive. (*Id.* 64:5-21.) Stageberg testified that this statement fit his general impression that Shukh made statements that were unconstructive toward "Seagate collaborative, work-together goals." (*Id.* 65:25-66:21.) Stageberg also recalled an incident when Shukh requested that Stageberg meet with him out in the back parking lot to have a discussion. (*Id.* 86:9-25.) During the discussion, Shukh insinuated to Stageberg that Shukh had been promoted, and had a direct line of communication with Allen, the vice president in Shukh's area. (*Id.* 70:15-71:24.) Shukh told Stageberg that his modeling work on a particular project was "unacceptable, deficient, not good." (*Id.* 71:8-12.) Stageberg reported the incident to his boss, which was the only time he had ever talked to a Seagate manager about another employee. (*Id.* 72:3-75:3.)

### 3. Shukh's Collaboration

The parties do not seriously dispute that Shukh did, in fact, collaborate with other Seagate engineers during his employment at Seagate. In his brief in opposition to the present motion, Shukh contends that he had no difficulty working collaboratively with other employees. As evidence of his collaboration, Shukh points to papers and presentations he co-authored as well as patents he co-invented with numerous other Seagate employees. (Ninth Gekas Decl., Exs. 3-5.) Additionally, coworker Vladyslav

Vas'ko testified that Shukh had "a productive relation[ship]" with his coworkers. (Benjes Decl., Ex. 32 (Dep. of Vladyslav Vas'ko ("Vas'ko Dep.") 112:20-113:1).) Vas'ko further testified that the people Shukh primarily had trouble working with at Seagate were his supervisors. (Vas'ko Dep. 114:7-17.) Shukh also submitted evidence that he received awards from Seagate that listed Shukh as a member of a design team and thanked him for his work on the designs. (Ninth Gekas Decl., Ex. 10.)

### C.     Requests for Transfers and Promotions

In April 2002 Shukh asked his managers, Ned Tabat and Sining Mao, to promote him to a technologist position. (Shukh Dep. 489:17-22, 546:20-23.) Shukh did not receive the promotion and believed that since April 2002 "management put [a] taboo" on any promotion requested by Shukh. (*Id.* 491:5-6.) Shukh also testified that the individuals in the position of technologist at that time were qualified for that position, and that he did not believe he was more qualified than them. (*Id.* 548:-549:2.)

Sometime in January 2006, Shukh met with a Seagate vice president, Dave Brown, to inquire about the possibility of transferring from Seagate's advanced transducer department ("ATD") to the traducer development team ("TDT"). (Shukh Dep. 580:21-25, 744:7-14.) Pat Ryan was the manager of ATD and Allen was the manager of TDT. (Shukh Dep. 744:7-14.) Ryan had had some previous discussions with Allen about the possibility of Shukh transferring teams. (Allen Dep. 153:19-154:8.) Ryan expressed to Allen that he "felt like it wasn't going to work for Alex anymore, that Alex was very frustrated and unhappy and upset." (*Id.* 154:2-4.) Ryan told Allen he "felt like

it would be a good thing for [Shukh] to move over to [Allen's] team and have a fresh start." (*Id.* 154:6-8.)

During the meeting with Shukh about the proposed transfer from ATD to TDT, Dave Brown allegedly jumped up, turned red and said "[w]hat are you doing here." (Shukh Dep. 581:1-3.) Shukh understood this comment to be questioning why Shukh had come to the United States. (*Id.* 581:3-4.) Shukh testified that he could not recall whether Brown had actually said the word "country," (*id.* 583:17-25), but later testified that Brown had said "[w]hat are you doing here in this country," (*id.* 745:10-20), and still later testified that Brown had actually asked why Shukh had come to "the USA," (*id.* 752:7-9). Brown apparently accused Shukh of hating America and told him that he needed to "know [his] place." (*Id.* 746:2-10, 752:10-11.) Shukh responded that he had come to America to work and for democracy, and asked "Why you treat me like [an] enemy? Cold War is over." (*Id.* 754:2-6.) Shukh could not recall how Brown responded to the question. (*Id.* 754:7-8.) Shukh also told Brown that he felt it was his duty to share his ideas to make America stronger, noting that at Seagate "initially people hate my ideas since they are [un]usual . . . then they accept them and put into products and so on." (*Id.* 756:10-24.)

In February 2006 Allen interviewed Shukh for the ADT to TDT transfer and allegedly told him "[y]ou must stop talking about your designs. This is team work, this is team designs. This is your last chance to work at this company, otherwise you will not find a job anywhere." (*Id.* 543:18-544:2; *see also id.* 490:4-13.) Shukh was transferred to the TDT team in March 2006. (*Id.* 650:21-24, 744:7-14.)

In August 2006, Shukh requested that Ryan promote him to the position of principal engineer. (*Id.* 578:9-17.) Ryan told him that he did not "match the corporate culture," there was "a decision" about Shukh, and therefore he could not be made manager. (*Id.* 578:9-17.) Also at some point Shukh began requesting that Ryan promote him to the position of manager of the writer team. (*Id.* 370:14-17.) Shukh testified that he asked Ryan to promote him at least three times, and Ryan told him "[n]obody will listen to you." (*Id.* 370:20-24, 388:9-14.)[4]

On September 1, 2006, Shukh wrote an email to Ryan, in response to an earlier meeting between the two. (Ninth Gekas Decl., Ex. 13 at 46217.) In the email Shukh expressed his belief that Ryan was expressing "personal bias" toward Shukh and that Shukh wished to discuss the issue with top management. (*Id.*) Ryan responded, asking Shukh to "please outline, in writing, all of the complaints/issues/wishe[s] that you have concerning your career at Seagate." (*Id.*, Ex. 13 at 46216.) On September 7, 2006, Shukh followed up with an email to Ryan, carbon-copying Allen, Brown, and Debra Reutiman – a human resources representative. (*Id.*, Ex. 13 at 46215.) In the email Shukh objected to his failure to be promoted since 2001, explaining:

> Five years in a r[o]w I've asked you in writing to promote me. You never responded. Three times I asked you personally to promote me or to give me a chance to be a technical leader of writer team (I recognized long ago that [I] cannot be a manager at Seagate, maybe since I am Russian). You always responded to my requests with the same sentence: "Nobody will listen to you?" What did you mean: my strong

---

[4] It is unclear from the record whether these three discussions were separate from the request to be promoted to the position of principal engineer. Given the similarity of the comments testified to, it appears that one of the requests for promotion to manager may have been a request to be promoted to principal engineer.

accent or something else? Since then I don't like to talk in public. Whether it is good or bad for the company I don't know but it is much more convenient for me.

(*Id.*) Shukh then detailed some of his technical achievements at Seagate. (*Id.*, Ex. 13 at 46215-16.) Shukh also referenced his experience with receiving appropriate credit for his work, explaining:

> You created at ATD an atmosphere of plagiarism when lot[s] of engineers are used to us[ing] . . . my ideas and results of my work without referring [to] my name for their personal advantages. It seems to me, there is a taboo on my name at ATD. My numerous appeals to ATD management to stop this practice were not heard, even more, I was forced to apologize in one case and literally attacked by my colleague in another case.

(*Id.*, Ex. 13 at 46216.) Finally Shukh noted "August 16th in your office you said: 'There is a decision about you'. I have the same opinion: there is a decision about me. I would like to ask you: what is this decision about; who took this decision, when and why?" (*Id.*) Later in September, shortly after this email was sent, Shukh was promoted to the position of principal engineer. (Shukh Dep. 491:18-20.)

### D. Escalation of Events in 2007

#### 1. Human Resources Letter

In early January 2007 Allen and Mastain pressured Shukh to work on a project with Linville. (Shukh Dep. 434:22-435:1; Benjes Decl., Ex. 18.) When Shukh refused, Allen told Shukh that Shukh was "such a horrible person that nobody wants to work with you." (Shukh Dep. 434:18-435:4.) When Shukh asked for evidence of other Seagate employee's complaints against him, Allen told Shukh "[t]omorrow you will get ten of them." (*Id.* 435:4-9.)

On January 9, 2007, in response to this interaction Shukh wrote a letter to Seagate's human resources department, which he submitted two days later. (Benjes Decl., Ex. 18; Shukh Dep. 353:9-17, 434:18-435:13.) In the letter, Shukh discussed his refusal to work with either Linville or Ryan until they made formal apologies to him. (Benjes Decl., Ex. 18; Shukh Dep. 353:7-22.) Shukh also detailed some of his work on the project at issue and Seagate's failure to give him appropriate inventorship credit for his work. (Benjes Decl., Ex. 18.) The letter addressed Shukh's meeting with Allen and Allen's comment that by tomorrow Allen could have ten complaints against Shukh. (*Id.*) Shukh explained:

> I reminded [Allen] that his behavior is illegal, that for the third time during last year I am facing this kind of treatment from RHO managers. I told him, if he wants [to fire me] he should do it, but he must stop intimidat[ing me]. I added also, he can order me to take [the] project and I'd do it. However, it would be much better for the company to cr[e]ate a NORMAL working condition[] for me. I reminded him about a history of human society when the slavery was replaced by feudalism, and the last [was] succeeded by capitalism. The slave cannot be productive.

(*Id.*) Shukh outlined the following thoughts and requests to Seagate's human resources department:

- I am asking for [prevention of] this kind of treatment in the future since it violates my human rights and I cannot be efficient for the company in these working conditions.

- I [am] afraid that [I] might face a provocative behavior from some of my colleagues or managers against me to create the "ten cases". I have to point out; that all cases created against [me now] will be unfair. I do have a reason to take this threat seriously. For your information: In December 2005, just after [the] attack by Eric Linville, I found a flat tire on my car. A mechanic[ at a] tire shop told me that my brand new tire cannot be repaired due to a long cut. Moreover, he found a piece of utility knife in the tire that was a cause of the cut. This is just information for consideration . . .

- Now I am convinced that there has been a persistent strong bias of the ATD and TDT managers against me. Therefore, the majority results of my evaluations cannot be fair. I would like to ask [the] HR department of the company to check results of my evaluations. I can provide HR with copies of self-evaluations and manager evaluations during all my work with the company.

- ATD and TDT created an atmosphere of plagiarism in their organizations and support it. This atmosphere gave an opportunity to many people close[] to the management to take advantages of other engineers['] work results for getting promotions, salary raises, and other benefits.

- Once Pat Ryan told me "there is a decision about me". This statement and an analysis of the situation artificially created around me lead me to the conclusion that the management wants me to quit[] the company. They might have some reason for that, which is not related to my performance defiantly. What is it?

(*Id.*)

After writing the letter, Shukh met with Doug Engelke, a human resources representative, on January 19, 2007. (Benjes Decl., Ex. 6 (Dep. of Doug Engelke ("Engelke Dep.") 97:25-98:7).) At the meeting Shukh expressed his belief that his previous conversation with Allen was illegal regarding the threat to obtain ten complaints. (*Id.* 66:5-10; Benjes Decl., Ex. 18.) Shukh also requested that Engelke review his performance evaluations and compensation history. (Engelke Dep. 66:13-25.) Shukh told Engelke about the incident with Linville and also requested that Engelke investigate responses to his patent applications from the intellectual property department. (*Id.* 67:11-25.) Shukh also told Engelke that he would like to work alone. (*Id.* 67:5-6.)

After the meeting, Engelke investigated Shukh's concerns. (*Id.* 70:6-71:3.) On January 24, Reutiman forwarded to Engelke the September 7, 2006 email from Shukh to

Ryan outlining Shukh's frustration with failing to be promoted. (Ninth Gekas Decl., Ex. 20.) Engelke also received an email from Allen regarding Shukh. (*Id.*, Ex. 25.) In the email Allen noted that because Shukh was objecting to working on a particular project and could not work with Linville, Allen was going to transfer Shukh out of Mastain's team. (*Id.*) Allen noted:

> I will assign him a series of special design projects, and will have him report directly to me. Jason Gadbois and I will provide him with a written set of project expectations and deliverables. We may consider physically isolating him as well, but probably not at first.

(*Id.*) Allen testified that by physical isolation, Allen was referring to moving the location of Shukh's cubicle because at the time he was seated in the middle of the team that he was having difficulty working with. (Allen Dep. 185:5-19.) In addition to these emails, Engelke reviewed Shukh's evaluations and other personnel records and met with Mastain, Allen, Linville, and Paul Dietz – an intellectual property attorney that had been involved in the patent review process – and two of Shukh's coworkers, among others. (Engelke Dep. 68-78, 89:18-19.) Based on these complaints he received from Shukh, Engelke did not specifically investigate whether Shukh was being treated unfairly based on his national origin. (*Id.* 121:5-6; *see also id.* 94:22-95:1.)

After the investigation, Engelke concluded that Shukh's complaints were unfounded. (*Id.* 78-84; Benjes Decl., Ex. 21.) Engelke met with Shukh and explained that Engelke's investigation had revealed no unfairness in evaluations, that Shukh was being compensated appropriately, and that the patent review board was appropriately communicating its decisions to Shukh. (Engelke Dep. 81:11-82:15.) Engelke informed Shukh that the chief technologist position he wanted to be promoted to was not an open

position.  (*Id.* 83:12-19.)  Engelke also provided Shukh with a confidential memorandum dated February 20, 2007, which summarized Engelke's findings in response to the issues raised by Shukh in his January 2007 letter to human resources.  (Benjes Decl., Ex. 21.) In the letter Engelke stated that he "was unable to conclude that there have been any violations of Seagate policy."  (*Id.*)  Engelke noted that Shukh had "been provided written communication when the patent review committee has decided not to pursue a patent application on an invention for which you are a named inventor.  This is in accordance with Seagate's procedure for pursuing patent applications to protect its intellectual property."  (*Id.*)  As for Shukh's evaluations, Engelke explained "[y]our performance evaluations reflect your contributions to Seagate and there is no indication any adjustments need to be made to those documents."  (*Id.*)  Engelke also addressed the Linville incident explaining "[a]lthough you were involved in a verbal disagreement with a coworker in 2005, it could not be characterized as an 'attack.'  Site security has no record of a vehicle damage report being filed at that time."  (*Id.*)  Finally, Engelke noted:

> Please also be advised that Seagate has a strict policy prohibiting retaliation against an employee who makes a good faith report of a violation of the law or Company policy.  Accordingly, you should immediately advise Human Resources if you experience any conduct, which you believe is in retaliation for having made your report or having participated in this investigation.

(*Id.*)

### 2.    Supervision by Ken Allen

On February 13, 2007, Shukh met with Allen.  (Ninth Gekas Decl., 23.)  During the meeting, Shukh allegedly told Allen that he would not share any more of his ideas

until he was promoted two levels and paid royalties. (Allen Dep. 173:6-20; Ninth Gekas Decl. Ex. 21.) Allen sent Shukh a memorandum regarding the meeting on February 20, 2007, and requested specific work product, noting that "failure to meet this request, or a more general continued failure to work cooperatively as a member of my team, will be viewed as grounds for disciplinary action up to and including termination." (Ninth Gekas Decl., Ex. 23.) Additionally, the memorandum noted that Shukh's stance that he would not provide ideas until he was properly recognized for past contributions and given a promotion "is inconsistent with your employment by Seagate as a Principal Engineer." (*Id.*) In response, Shukh sent an email to Allen, carbon-copying Engelke and Brown. (*Id.*, Ex. 24.) In the email, Shukh discussed various technical ideas, and also stated:

> I did not take any stance. I just requested [that you] respect me like a human being and treat me equally to other people in the company. That was it. I understand, that you are looking for a reason [to] fire me and are preparing a ground to do that. Your motives are clear to me. In fact, they have very little to do with me as an employee and with my performance but I am not going to discuss them here.

(*Id.*)

At some point in February 2007, Allen decided that Shukh should report directly to him, in an effort to resolve some of the issues Shukh had been having. (Decl. of Kenneth Allen ¶ 2, Apr. 1, 2013, Docket No. 470.)[5] Shukh's pay, benefits, and title did not change – he merely began reporting to Allen. (Engelke Dep. 91.)

---

[5] It is not clear when this reassignment took place in relation to the memoranda written by Allen and Engelke to Shukh regarding the February 13 meeting and the human resources investigation.

Shukh testified that during this time period he was "completely isolated" from other engineers. (Shukh Dep. 472:16-23.) Shukh described this isolation as people avoiding him and his not being allowed to collaborate with other members of the production team. (*Id.* 472:16-474:6.) Shukh testified that this was not the first time he had experienced isolation at Seagate. Specifically, Shukh alleged that his isolation from others at work began in February 1998. (Shukh Dep. 481:24-482:12, 514:23-515:7, 521:13-15.) Shukh cited examples from 2004 or 2005 when he asked to be allowed to work with a WAMR team, and was told by the leader of the team that "[n]obody will work with you." (*Id.* 477:3-18.) In 2006, one coworker asked Shukh why he had been told not to work with Shukh. (*Id.* 476:4-21.) Shukh testified that throughout his career his managers neglected his requests to have assistance from other people in developing his designs, and forced him to do difficult design point work alone. (*Id.* 508:6-24.) Shukh testified that he believed the reason for this behavior was that in his managers' "mindset I am Soviet and in their mindset they [are] still at war with the Soviets . . . . It seems to me [the] obvious explanation of their absolutely irrational behavior." (*Id.* 617:10-20.)

In July 2007, for example, Shukh learned that he had not been invited to brainstorming sessions. (Ninth Gekas Decl., Ex. 27.) James Wessel told Shukh that he had chosen not to invite Shukh because he "was concerned that your presence would not be conducive to a free flowing brainstorming session. . . . I have witnessed a few meeting interactions which made me think that your demeanor would be counterproductive to brainstorming." (*Id.*) Wessel then began inviting Shukh to the sessions. (*Id.*) In an

email related to the brainstorming sessions, Allen told Brown and Engelke that Shukh has "been much more respectful of others in the way he says things . . . and has been very responsive to my requests for modeling work." (*Id.*) Shukh also testified that the brainstorming session incident was not the first in which he had been excluded from meetings. Shukh testified that he stopped being invited to tech review sessions in November 2002 and writer team meetings from the beginning of his employment. (Shukh Dep. 507:2-122, 518:15-519:8, 520:8-521:12.) Shukh testified that he was pulled from roadmap development beginning in July 2003. (*Id.* 507:2-122, 518:15-519:8, 520:8-521:12, 601:1.)[6]

In a September 2007 meeting with Brown, Shukh testified that Brown told him that a coworker Declan Macken had received a technical award during the fiscal year, and noted to Shukh that "he is not American." (Shukh Dep. 798:12-18.) Shukh sent Brown an email about the meeting, requesting that he receive the same implementation of his ideas as others, and again raising concerns that he had not been given proper credit for his inventions. (Ninth Gekas Decl., Ex. 17.) Brown responded that his and Allen's goal "is to find a way to improve your ability to contribute to the team and also improve your job satisfaction. I realize we don't have an obvious solution right now, but that is our

---

[6] Shukh also testified generally that he was not allowed to publish papers he thought he should have been allowed to publish beginning in the fall of 1998. (Shukh Dep. 507:14-17, 519:14-20.) Shukh stated that Seagate would not allow him to publish certain results because they were sensitive with respect to the company's technology. (*Id.* 610:2-4.) Shukh later learned that other people had published on the topic. (*Id.* 601:4-8.) Shukh concluded that "there is only one explanation when you put everything together. As I told you, they simply hate me because they look at me like – treated me like the – enemy." (*Id.* 610:12-19.) Shukh also testified that other Soviet or Belarusian employees were given the opportunity to publish technical papers and that he did publish several papers during his tenure at Seagate. (*Id.* 611:3-7, 613:3-19.)

goal, regardless of what you may have inferred.  I am open for more discussion if you see fit." (*Id.*, Ex. 17 at 46410.)

### E.  Inventorship of Disputed Patents

Throughout his employment Shukh frequently expressed concern that he was not being given appropriate credit for work he performed.  This concern forms a large part of Shukh's claims against Seagate in the present lawsuit.

### 1.  Seagate's Patent Application Process

Shukh's employment with Seagate was governed by an Employment Agreement. (Fourth Gekas Decl., Ex. 9.)  Pursuant to this agreement, Shukh assigned to Seagate his

> right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade secrets, whether or not patentable . . . which [Shukh] may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time [Shukh is] in the employ of the Company.

(*Id.*, Ex. 9 at 2.)   This provision prohibited Seagate employees from filing patent applications for their own inventions.  (*Id.*; *see also* Third Am. Compl. ¶ 107.)  Instead, employees were required to disclose inventions to Seagate by submitting an Employee Invention Disclosure Form to Seagate's Intellectual Property ("IP") Department.  (Fourth Gekas Decl., Ex. 10; *see also* Decl. of Jennifer Buenzow ¶ 2, Ex. A, Apr. 1, 2013, Docket No. 471.)   The invention disclosure form requires, among other things, a title and description of the invention, a technology classification code, and the names and signatures of each inventor.  (Buenzow Decl. ¶ 2.)  The inventors are responsible for filling out the disclosure form themselves and determining which individuals to identify

as co-inventors. (*Id.* ¶ 4.) The IP Department would then forward the form "to the appropriate Patent Review Board which [would] determine whether the invention w[ould] be pursued as a patent application, protected as a trade secret, or otherwise." (Fourth Gekas Decl., Ex. 10 at 1; Buenzow Decl. ¶ 3.) If the Patent Review Board determined that an application would be pursued for patenting, Seagate would refer the application to outside counsel, who would, with the cooperation of the employee inventor(s), ensure that the applicable requirements of patent law had been met, then draft and file the necessary patent application. (Buenzow Decl. ¶ 5.) \

## 2. The Disputed Patents

Shukh claims that Seagate discriminated and/or retaliated against him on the basis of his national origin by failing to name him as an inventor on six issued patents and four patent applications. (Third Am. Compl. ¶¶ 122, 196, 233.)

In his answers to interrogatories, Shukh contends that with respect to some of the disputed patents, Seagate's IP Department informed Shukh that it had decided not to pursue his inventions for patenting, but later filed patent applications that allegedly contained Shukh's inventions and failed to name Shukh as an inventor. (Benjes Decl., Ex. 12 at 16-17, 19, 23, 26.) For some of the disputed patents Seagate's IP Department allegedly informed Shukh that although it had decided not to pursue his particular invention for patenting, Shukh's work would be incorporated with other inventions for which Seagate would pursue patenting. (*Id.*, Ex. 12 at 16-17; Shukh Dep. 719:5-8.) Seagate did not, however, list Shukh as an inventor in the final patent applications into which Seagate had represented it would incorporate Shukh's work. (Benjes Decl., Ex. 12

at 16-17.)   With respect to other disputed patents, Seagate did not communicate its intentions regarding Shukh's inventions, but filed patent applications that allegedly contained Shukh's inventions and failed to name Shukh as an inventor.  (*Id.*, Ex. 12 at 20-21.)   Seagate never told Shukh that it had filed applications for any of the disputed patents, or that it had omitted Shukh as a co-inventor on the applications.  (*Id.*, Ex. 12 at 16-17, 20.)   Seagate did, however, present Shukh with inventorship awards, apparently recognizing Shukh for his work on at least two of the disputed patents.  (*Id.*, Ex. 12 at 17, 19.)

On August 30, 2007, Shukh sent an email to Kenneth Massaroni, Vice President of Seagate's IP Department, notifying Massaroni that Shukh believed he had been wrongfully omitted as an inventor on two of the disputed patents.  (Shukh Dep. 255:18-24; Benjes Decl., Ex. 11.)  Massaroni indicated that he would investigate the matter, and informed Shukh in March 2008 that the stated inventorship on the patents was correct, because Shukh was not an inventor of the patented inventions.  (Shukh Dep. 255:18-24; Benjes Decl., Ex. 11.)  Seagate did not notify the United States Patent and Trademark Office ("USPTO") of Shukh's complaints.  (Exs. in Supp. of Pl's Surreply, Ex. C (Dep. of Kenneth M. Massaroni ("Massaroni Dep.") 59:25-60:4), Oct. 23, 2012, Docket No. 360.)[7]  After receiving Massaroni's response, Shukh searched the USTPO website

---

[7] Many of Shukh's citations to the facts come from earlier submissions in the case. Shukh filed two sets of exhibits in support of his two surreply briefs to Seagate's previous motion for partial summary judgment, but labeled the exhibits consecutively as a single set. Therefore, where reference is made to "Exs. in Supp. of Pl's Surreply," exhibits A and B can be found at Docket Number 360, filed on October 23, 2012, and exhibits C through P can be found at Docket Number 383, filed on December 14, 2012.

for other patents embodying his inventions, and discovered the other disputed patents. (Fourth Gekas Decl., Ex. 13 ¶ 23.)

For the ten patents that Shukh disputes, the named inventors submitted Employee Invention Disclosures that did not identify Shukh as a co-inventor. (Buenzow Decl., Exs. A-I.) In three of these Employee Invention Disclosures other employees with Russian and/or Soviet backgrounds – Taras Pokhil and Vladyslav Vas'ko – were named as inventors. (*Id.*, Exs. A, G, I; *see also* Decl. of Douglas Engelke, Ex. 3, Apr. 1, 2013, Docket No. 469.)

### 3.    Inventorship Rights of Other Employees with Soviet Backgrounds

Shukh testified that there was one instance in which a Russian woman from Seagate's Boulder, Colorado office discussed with Shukh that an invention disclosure made by either her or a different Russian woman had been "taken over by [a] supervisor." (Shukh Dep. 409:7-410:5.) Additionally, Shukh had a conversation with Vlad Vas'ko, another Seagate employee of Soviet origin, in which Vas'ko communicated that he was unhappy about being omitted as an inventor on a Seagate patent. (*Id.* 413:21-414:6.) Vas'ko testified that on one occasion he had submitted an invention disclosure to Seagate and the content of the disclosure had been included in a patent application without naming him as an inventor. (Vas'ko Dep. 81-82.)

### 4.    Reason and Time Period for Infringement of Shukh's Rights

Shukh testified that he believed Seagate retaliated against him because of his "consistent request[s] about [his] inventorship rights." (Shukh Dep. 424:10-16, 427:10-

17.) Shukh further testified that he thought Seagate failed to name him as an inventor because "they really hate me. In their mind [the] Cold War was still going on." (*Id.* 581: 15-24.)

Shukh testified that Seagate stole his intellectual property "continuously from the very beginning of [his] employment through the end of [his] employment." (*Id.*.) Shukh also testified that projects he had originated were given to others to develop, beginning in 1998. (*Id.* 506:23-507:1, 517:2-6.) Shukh testified that Seagate omitted his name on presentations and changed the names of Shukh's designs. (*Id.* 620:1-621:4.) Based on this treatment, Shukh said it was clear "they really hate me." (Shukh Dep. 620:11-14.)

### F.     Shukh's 2007 Evaluation

In his 2007 evaluation of Shukh, Allen gave Shukh unsatisfactory ratings in the "Respect for People" and "Teamwork" categories. (Benjes Decl., Ex. 19 at 0191, 0192. Allen explained that "Alex has demonstrated respect for some of my team members, but frankly, for very few. He is quite open about his lack of respect for the capability, motives, and accomplishments of many members of the design community." (*Id.*, Ex. 19 at 0192.) As for teamwork, Allen concluded that "some of Alex's behaviors severely limit his ability to collaborate effectively across the entire team – specifically, he acts as if he must always be right and he is often insistent on getting appropriate or complete credit for his work." (*Id.*) Allen explained:

> I do understand [Shukh]'s concerns about credit for past work. He has made a number of contributions over the years, and I have come to see over the past 6 months that he sometimes doesn't receive proper credit for work he has done in the past. What Alex needs to understand is that much of this is self-inflicted. For example, Alex often insists that full

design credit be give[n] to modeled optimization of head geometries – clearly, geometries are critical; however, they are not high-level intellectual concepts and generally must be optimized experimentally. He has also repeatedly accused a number of different people of stealing his work – I have learned that several members of the design community now refuse to read his highlights or modeling work; they believe their only defense against accusations of plagiarism is to remain ignorant of his work. If Alex learns to collaborate more effectively, he will become more effective and get more credit for his work because he will be able to leverage the skills and efforts of many others, rather than work in isolation.

(*Id.*)

### G. Shukh's Performance in 2008

At the beginning of 2008 Shukh wrote a memo to Seagate vice president Jerry Glembocki about his performance evaluations. In the memo, Shukh noted that he believed ten years ago Seagate's directors and managers had made "a special decision" about Shukh – that he would never become a manager because "he is too challenging, too competitive, too tough, too smart (this is not my definitions, I heard them from these people), and too different (of c[ourse], I am Soviet)." (Ninth Gekas Decl., Ex. 18.)

In his 2008 Evaluation, Allen gave Shukh a four out of five rating for in the "Respect for People" category. (Benjes Decl., Ex. 5 at 46658.) Allen explained that he was "pleased with the effort Alex has put into improving his working relationships. . . . There is still room to improve and there is, unfortunately, a lot of historical relationship damage to repair, but Alex is making progress." (*Id.*, Ex. 5 at 46659.) Allen rated Shukh a three out of five for teamwork, explaining that "[c]ollaboration is the competency area where I would like to see the most focus on improvement in FY09. . . . I have seen signs that Alex understands these issues intellectually, but he need[s] to continue to improve

**A244**

how he supports his teammates on an ongoing basis." (*Id.*) Allen gave Shukh an overall rating of three out of five, stating:

> Overall, I am pleased with Alex's progress in FY08 – especially in the past four to six months; I would have rated Alex as a "4" performer over this time period and intend to reflect that in the KCPB cycle. However, I have not yet seen sufficient sustained contribution to promote Alex to Grade 162 as per his request – but I will go forward out of cycle if I see improved integration and commitment to the larger team's needs, and continue to see adequate teamwork.

(*Id.*, Ex. 5 at 46661.)

### H.    Termination

In the fall of 2008, in response to the economic downturn, Seagate initiated a series of reductions in force. (Allen Decl. ¶ 3.) In conducting the reduction in force, Allen assigned points to employees in his department based on position elimination, performance history, documented counseling for performance, misconduct or attendance issues, technical or specialized skills, and length of service. (*Id.* ¶ 4.) Allen recommended the elimination of sixteen positions (ten percent of his department), including Shukh's position. (*Id.* ¶ 6.) In total, Seagate's Bloomington facility terminated 179 employees, including Shukh, in January 2009. (Engelke Decl. ¶ 5.)

Allen recommended Shukh's elimination because Allen determined that elimination of one of the eight most senior staff persons would have the highest money saving potential, and Shukh scored lower than the other seven managers on the point assignment rubric. (Allen Decl. ¶ 7, Ex. 2.) Additionally, Allen chose to retain employees with more development and product design engineering experience than Shukh. (*Id.*) Allen indicated that Shukh's primary skill was RSS modeling, which was

already available at Seagate in sufficient quantity. (*Id.*) Allen testified that the difficulties he had with Shukh were not the primary reason for his termination but "[t]hey were part of the secondary set of factors." (Allen Dep. 174:10-14.) Another employee had the same score as Shukh and was identified as a peer, but was retained due to greater seniority. (Allen Decl. ¶ 7.) The employee retained was also not a United States national. (Engelke Decl. ¶ 8.) Shukh alleges that when Allen walked him out of the building on his last day, Allen wished him "every success in building a new political party in Belarus." (Ninth Gekas Decl., Ex. 31.)

## III.   DISCRIMINATION CHARGE

### A.   Job Applications

Since his 2009 termination, Shukh has submitted 135 job applications, but has been unable to secure employment. (Fourth Wright Decl., Ex. 4 at 31, 37-57.) These applications resulted in only two interviews. (Shukh Dep. 570:20-571:4.) Shukh testified that the hiring manager at Hitachi, a company to which Shukh applied, contacted Vas'ko to discuss rumors the hiring manager had heard about Shukh. (*Id.* 534:9-21.) Shukh attributes these rumors to the statement made by Allen prior to Shukh's termination, wherein Allen instructed Shukh to stop talking about his designs, stating "[t]his is your last chance to work at [Seagate], otherwise you will not find a job anywhere." (*Id.* 543:22-544:2.) Vas'ko allegedly expressed to Shukh that he would not be able to get a job at Hitachi. (*Id.* 535:19-23.) Mirza Abatchev, a friend of Shukh's, told him that he would not be able to get a job at Western Digital, but did not specify why. (*Id.* 544:18-545:2.) Additionally, during Shukh's interview at Hitachi, a Hitachi

engineer allegedly told Shukh that "[w]ith your reputation you will not find employ[ment] here." (*Id.* 541:23-542:11.)

Shukh also applied for six positions with Seagate. (Third Am. Compl. ¶ 243.) One of the positions was subsequently cancelled and the others filled either with internal candidates or applicants that were more qualified than Shukh. (*See* Decl. of Abebe Hailu, Apr. 1, 2013, Docket No. 472; Decl. of David Robinson, Apr. 1, 2013, Docket No. 473; Decl. of James Wessel, Apr. 1, 2013, Docket No. 474; Decl. of Lori Beal, Apr. 1, 2013, Docket No. 476.)

## B. Discrimination Charge

On March 17, 2009, Shukh filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), which was cross-filed with the Minnesota Department of Human Rights. (Third Am. Compl. ¶ 244.) In its response Seagate stated:

> Shukh alleges that he was subjected to discrimination on the basis of his national origin and age in connection with his employment with Seagate and that he was also retaliated against. Shukh's unsupported allegations are at direct odds with the facts surrounding his employment. After a history of combative and unproductive behavior in his working relationships, Shukh was selected for termination in connection with a Company-wide reduction in force conducted by Seagate. There is simply no merit to Shukh's claims of unequal treatment. Nor is there any merit to his allegation of retaliation.

(Ninth Gekas Decl., Ex. 26.) The EEOC issued a right to sue notice on November 25, 2009, and the Minnesota Department of Human Rights issued a notice that Shukh was to file any claim under the MHRA within ninety days. (Third Am. Compl. ¶ 245, Ex. 2.)

## IV.    PROCEDURAL HISTORY

The Court has previously considered Shukh's discrimination and retaliation claims in the context of Seagate's motion to dismiss filed earlier in the proceedings. (*See* Am. Mot. to Dismiss, May 18, 2010, Docket No. 14.)   Although Shukh filed his third amended complaint following the Court's ruling on that motion to dismiss, the discrimination and retaliation claims presented in his amended complaint are identical to those currently before the Court in his third amended complaint. (*Compare* Am. Compl. ¶¶ 228-262, Apr. 7, 2010, Docket No. 7, *with* Third Am. Compl. ¶¶ 228-262.)   The Court's previous ruling is therefore relevant to the scope of discrimination and retaliation claims that Shukh can now properly assert.

On March 30, 2011, the Court issued an order that, among other things, denied Seagate's motion to dismiss Shukh's discrimination and retaliation claims.  *Shukh v. Seagate Tech., LLC*, Civ. No. 10-404, 2011 WL 1258510, *1 (D. Minn. Mar. 30, 2011). With respect to Shukh's discrimination claims under Title VII and the MHRA, the Court noted that Shukh's allegations of discrimination "included disparate treatment in pay, promotions, and denial of recognition and inventorship." *Id.* at *12.  The Court found that the complaint adequately alleged continuing violations for purposes of tolling the statute of limitations. *Id.* at *13.  Specifically, the Court explained "[t]hough Shukh has not explicitly alleged that his work environment was 'hostile,' a plain reading of the complaint suggests that it is, in essence, what he claims." *Id.*  The Court also found that Shukh's retaliation claims adequately stated a claim for relief with respect to both pre- and post-termination retaliation. *Id.* at *14.  Specifically, the Court found that Shukh had

adequately pled retaliation "for pre-termination conduct based on allegations relating to his failure to be promoted, and to have his pay increased." *Id.* With respect to post-employment conduct, the Court found that the retaliation was related to "statements and rumors from Seagate [that] have affected [Shukh]'s ability to be hired elsewhere and that he was not rehired for available positions at Seagate despite being well-qualified for them." *Id.*

## ANALYSIS

## I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport*

*v. Univ. of Ark. Bd. of Trs.*, 553 F.3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.  NATIONAL ORIGIN DISCRIMINATION AND RETALIATION

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . national origin." 42 U.S.C. § 2000e-2(a)(1).  It is also unlawful for an employer "to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of the employee's national origin.  42 U.S.C. § 2000e-2(a)(2).  Similarly, the MHRA makes it unlawful for an employer to "discharge an employee" or "discriminate against a person with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of an employee's national origin.  Minn. Stat. § 363A.08, subd. 2.

Title VII also prohibits an employer from retaliating against an employee for "oppos[ing] any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a).  Under the MHRA, it is an "unfair discriminatory practice" for an employer to "intentionally engage in any reprisal" against a person because that person opposed "a practice forbidden under [the MHRA]." Minn. Stat. § 363A.15(1).  The Court analyzes an employer's liability under both Title VII and the MHRA using the same legal standards.  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011); *Bahr v. Cappella Univ.*, 788 N.W.2d 76, 83 (Minn. 2010).

Although Shukh's brief in response to the present motion is not a model of clarity regarding the scope of his claims, counsel clarified at oral argument that Shukh brings claims for discrimination based on a hostile work environment and his termination. He also brings claims for retaliation based on a hostile work environment, denial of a promotion to Grade 162 in 2008, and his termination. Seagate disputes that each of these claims was either properly pled, carved out in the Court's March 2011 order on Seagate's motion to dismiss, or adequately briefed in response to the present motion. Because the Court concludes that summary judgment in favor of Seagate is warranted on each of these claims, it will assume, without deciding, that Shukh properly raised and preserved the claims he identified at oral argument, and will address each of these claims in turn.

### A.    Discriminatory Hostile Work Environment

A work environment that is hostile because of an employee's national origin violates Title VII. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Diaz v. Swift-Eckrich, Inc.*, 318 F.3d 796, 798 (8th Cir. 2003). To establish a claim for hostile work environment based on discrimination a plaintiff must show that (1) he is a member of a protected group, (2) there was unwelcome harassment, (3) there was a causal nexus between the harassment and membership in the protected group, and (4) the harassment affected a term, condition, or privilege of employment. *Watson v. CEVA Logistics U.S., Inc.*, 619 F.3d 936, 942 (8th Cir. 2010); *see also Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 571 n.11 (Minn. 2008). "To the extent non-supervisory employees are responsible for the harassment, 'the plaintiff must also show that the employer knew or should have known about the harassment but failed to take proper action.'" *Watson*, 619

F.3d at 941 (quoting *Williams v. ConAgra Poultry Co.*, 378 F.3d 790, 794 (8th Cir. 2004)).

To establish that harassment altered a term, condition, or privilege of employment, a plaintiff must "show that it was 'severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive.'" *Diaz*, 318 F.3d at 800 (quoting *Harris*, 510 U.S. at 21). This standard "is a demanding one, and '[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious)' will not suffice." *Watson*, 619 F.3d at 942 (alteration in original) (quoting *Arraleh v. Cnty. of Ramsey*, 461 F.3d 967, 979 (8th Cir. 2006)). Instead, the plaintiff must demonstrate that the workplace was "permeated with discriminatory intimidation, ridicule, and insult." *Id.* (internal quotation marks omitted). And the "'[m]ere utterance of an epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment to support a claim of hostile work environment.'" *Id.* (alteration in original) (quoting *Arraleh*, 461 F.3d at 979). "The environment must be both objectively hostile to a reasonable person and subjectively hostile to the victim." *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005).

The Court assesses the existence of a hostile work environment "based on the totality of the circumstances." *O'Brien v. Dep't of Agric.*, 532 F.3d 805, 809 (8th Cir. 2008). Specifically, the Court examines "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive

utterance; and whether it unreasonably interferes with an employee's work performance."

*Arraleh*, 461 F.3d at 979 (internal quotation marks omitted).

Shukh alleges that he was subjected to a hostile work environment because of (1) the comment by Brown asking Shukh what he was doing here or doing in this country, (2) Allen's threat that he would get ten complaints against Shukh, (3) Seagate's failure to follow its policies in investigating a complaint of national origin discrimination, (4) failure to be named on patents, (5) physical isolation, (6) exclusion from meetings, and (7) prohibition on communicating with colleagues. Although not specifically addressed in connection with his hostile work environment claim it is also possible that Shukh relies upon the comments made by Ryan that "nobody will listen to you."[8]

---

[8] Counsel clarified at oral argument that the various other grievances listed in Shukh's brief were not the basis of his hostile work environment claim. The Court notes, however, that its analysis would be the same even if it considered the totality of the examples of discrimination listed in Shukh's brief. (*See* Pl.'s Opp. to Mot. for Summ. J. at 38-40, May 6, 2013, Docket No. 488.) The only incidents cited by Shukh that have any relationship to his national origin are instances in which Shukh himself put his national origin at issue. For example, as evidence of discrimination Shukh cites his own September 2006 email to Ryan, Allen, Brown and Reutiman in which he stated "I recognized long ago that [I] cannot be a manager at Seagate, maybe since I am Russian" (Ninth Gekas Decl., Ex. 13 at 46215) and his January 2008 communication to Glembocki in which he indicated his belief that there was a decision about him at Seagate that he would never be a manager "[o]f course, because I am Soviet" (*id.*, Ex. 18). Although, as discussed below, Shukh's comments may be relevant to retaliation, a plaintiff cannot manufacture a discrimination claim by repeatedly invoking his own protected status in response to work place occurrences. Instead, Shukh must present evidence upon which a reasonable jury could conclude that anyone at Seagate, other than Shukh, put his national origin at issue, and used it to harass him or subject him to adverse employment actions. The other incidents identified by Shukh have no bearing upon his national origin, and he has not demonstrated how a reasonable jury could identify them as such. For example, Shukh cites to an incident in early 2006 when Allen warned Shukh that he "must stop talking about [his own] designs. This is team work, this is team designs. This is your last chance to work at this company, otherwise you will not find a job anywhere." Although this statement evidences hostility between Allen and Shukh, Shukh has presented no evidence as to how this statement could be related to his national origin

The Court finds that these facts, taken as a whole, fail to present sufficient evidence upon which a reasonable jury could find both that there was a causal connection between those incidents and Shukh's national origin and that the harassment was so severe or pervasive as to affect a term, condition, or privilege of his employment. The only incidents alleged by Shukh that contain any possible inference of a relationship to his national origin is the statement by Brown asking Shukh what he was doing in this country and the comment by Ryan that no one would listen to Shukh, which Shukh attributed to refer to his accent. Even if a jury could construe these statements as evidencing discriminatory animus based on Shukh's national origin, two isolated statements over the course of eleven years of employment is insufficient to meet the high standard for demonstrating the existence of a hostile work environment. *See Gordon v. Shafer Contracting Co.*, 469 F.3d 1191, 1195 (8th Cir. 2006) (finding that three to four racially offensive comments and additional sexually offensive comments were a "limited number of offensive comments . . . insufficient to create a hostile work environment"); *Al-Zubaidy v. TEK Indus., Inc.*, 406 F.3d 1030, 1039 (8th Cir. 2005) (finding no hostile work environment where plaintiff "produced only a few comments [a supervisor] allegedly made over a ten-month period. Most of these offhand and isolated comments were wholly unrelated to each other and had a tenuous connection to race, sex, religion or national origin. [The] comments were infrequent, were not severe, never physically

or anything other than the problems that he was experiencing at Seagate in attempting to ensure that he received what he perceived to be appropriate credit for his work.

threatened Al-Zubaidy, were more akin to mere offensive utterances, and did not interfere with Al-Zubaidy's work performance.").

With respect to the other bases for his hostile work environment claim – such as Allen's threat to obtain ten complaints against Shukh, isolation, and failure to follow policies – Shukh has presented no evidence that would allow a reasonable jury to conclude that a causal connection existed between these incidents and his national origin. *See Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000) (finding no hostile work environment where there was no evidence of a "causal nexus between the complained of harassment and the protected status of [plaintiff]"). Although "[a]ll instances of harassment need not be stamped with signs of overt discrimination to be relevant under Title VII" in order to be actionable they must be "part of a course of conduct which is tied to evidence of discriminatory animus." *Carter v. Chrysler Corp.*, 173 F.3d 693, 701 (8th Cir. 1999). Shukh has not presented evidence linking the complained of conduct to the isolated statements of Brown and Allen such that a jury could reasonably conclude all of the conduct was "part of the same pattern of harassment." *See Diaz*, 318 F.3d at 800 (finding that a supervisor's rude noises, laughter, and statements that plaintiff was stupid were sufficiently related to her Hispanic status because the supervisor had made earlier comments "in which she demeaned Hispanics and specifically referred to both Hispanics and [plaintiff] as 'stupid'"). Therefore, those comments do not make Seagate's otherwise neutral actions discriminatory.

The only record evidence possibly linking the incidents at Seagate to Shukh's national origin in his own testimony that he believed his national origin was the reason

for his alleged mistreatment at Seagate. (*See, e.g.*, Shukh Dep. 456:13-457:17 (testifying that he was discriminated against because he "was so different" and was not promoted to manager because of his "strong accent"); *id.* 617:10-20 (testifying the he believed that in his managers' "mindset I am Soviet and in their mindset they [are] still at war with the Soviets . . . . It seems to me [the] obvious explanation of their absolutely irrational behavior."); *id.* 666:3-14 (explaining his belief that he was discriminated against due to his national origin because "from the very beginning of my employment the whole picture of relation . . . how they treated me, my achievement and the history, how this kind of pressure intensified while the time, when especially I started to complain, this is obvious to me. It's obvious this is retaliation, severe discrimination.").) This is insufficient to satisfy the evidentiary showing required to survive summary judgment on a hostile work environment claim. *See Bradley v. Widnall*, 232 F.3d 626, 632 (8th Cir. 2000) ("Bradley has also been unable to provide any evidence, either directly or by inference, beyond her own speculation, that her alleged mistreatment was due to her protected status. To the contrary, close scrutiny of the record reveals that the majority of the problems encountered by Bradley stemmed from inter-office politics and personality conflicts rather than race based animus."), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011). Because Shukh has failed to present sufficient evidence that any potentially discriminatory comments were severe or pervasive enough to create a hostile work environment and that other employment actions were causally connected to his national origin, the Court will grant Seagate's motion for summary judgment with respect to his discriminatory hostile work environment claim.

## B.    Retaliation

In the absence of direct evidence, retaliation claims are analyzed under the *McDonnell Douglas* burden shifting framework. *See Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 978 (8th Cir. 2012); *Young-Losee v. Graphic Packaging Int'l, Inc.*, 631 F.3d 909, 912 (8th Cir. 2011).[9]  Under the *McDonnell Douglas* framework, a plaintiff must first establish a prima facie case of retaliation by showing that (1) he engaged in protected conduct, (2) he suffered a materially adverse employment action, and (3) the adverse action was causally linked to the protected conduct. *Guimaraes*, 674 F.3d at 978. After a plaintiff establishes a prima facie case, the burden of production shifts to the employer "to produce a legitimate, non-retaliatory reason for the action it took against the plaintiff." *Logan v. Liberty Healthcare Corp.*, 416 F.3d 877, 880 (8th Cir. 2005) (internal quotation marks omitted).  If the employer identifies a legitimate, non-retaliatory reason

---

[9] Shukh's brief does not delineate between direct evidence and the evidence necessary to survive summary judgment under the *McDonnell Douglas* test, nor does it specify what test he intends to proceed under.  Direct evidence of retaliation is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."  *Torgerson*, 643 F.3d at 1044 (internal quotation marks omitted).  "'[D]irect' refers to the causal strength of the proof, not whether it is 'circumstantial' evidence." *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).  "'Direct evidence' does not include 'stray remarks in the workplace,' 'statements by nondecisionmakers,' or 'statements by decisionmakers unrelated to the decisional process itself.'"  *Browning v. President Riverboat Casino-Missouri, Inc.*, 139 F.3d 631, 635 (8th Cir. 1998) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J., concurring)).  The Court has reviewed the record and found no evidence of retaliation that demonstrates a specific link between the alleged retaliation and any protected conduct that would meet the standard of direct evidence. *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012) ("[Direct] evidence must be 'strong' and must 'clearly point[ ] to the presence of an illegal motive' for the adverse action." (alteration in original) (quoting *Griffith*, 387 F.3d at 736)); *Harnan v. Univ. of St. Thomas*, 776 F. Supp. 2d 938, 944 (D. Minn. 2011) (holding that vague comments subject to nondiscriminatory interpretations do not constitute direct evidence of discrimination)

for the action "the burden returns to the plaintiff who is then obliged to present evidence that (1) creates a question of fact as to whether defendant's reason was pretextual and (2) creates a reasonable inference the defendant acted in retaliation." *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1043 (8th Cir. 2007) (alterations and internal quotation marks omitted). There must be a genuine issue of material fact at any step of the *McDonnell Douglas* analysis to defeat a defendant's motion for summary judgment. *See Riley v. Lance, Inc.*, 518 F.3d 996, 1000 (8th Cir. 2008).

### 1. Protected Conduct

Seagate first argues that Shukh has not presented a prima facie case of retaliation because he did not engage in protected conduct. Specifically, Seagate argues that during his employment Shukh never complained that he was being discriminated against based on his Belarusian national origin. "A retaliation claim requires that the plaintiff have engaged in protected conduct, or, as the Civil Rights Act of 1964 states, 'oppos[ing] any practice made an unlawful employment practice by this title.'" *Smith v. Int'l Paper Co.*, 523 F.3d 845, 848-49 (8th Cir. 2008) (alteration in original) (quoting 42 U.S.C. § 2000e-3(a)). Discrimination on the basis of national origin is one such unlawful employment practice. *Id.* at 849. "[C]omplaints do not constitute protected activity for purposes of a retaliation (or reprisal) claim unless they implicate race or some other illegitimate criterion." *Colenburg v. STARCON Int'l, Inc.*, 656 F. Supp. 2d 947, 957 (D. Minn. 2009); *see also Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028-29 (8th Cir. 2002) ("While Hunt complained that she was entitled to a pay increase and a change in job title, she did not attribute NPPD's failure to give her a raise or a promotion to sex

discrimination. Thus, Hunt has not engaged in a protected activity for the purposes of Title VII . . . ."). Therefore "[m]erely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006).

Although Shukh's brief raised a host of complaints that he made to Seagate, many of which are unrelated to his national origin, counsel clarified at oral argument that Shukh engaged in protected conduct (1) in responding to his performance evaluation for fiscal year 2006 when he stated "I found out long ago that there is a strong bias to me," and "You can always give me an 'E' for not going to café during lunch time, for a strong Russian accent, etc." (2) when he sent an email to Ryan in September 2006 in which he stated "I recognized long ago that [I] cannot be a manager at Seagate, maybe since I am Russian," and (3) when he sent the January 2007 letter to the human resources department in which he stated that his "human rights" were being violated, he was convinced that "there has been a persistent strong bias of . . . managers against me," and that he was being subjected to unfair working conditions.

The **numerous** complaints identified in Shukh's brief that he made to various supervisors at Seagate that were unrelated to his status as a Belarusian or referenced unfair treatment only generally do not constitute protected conduct. *See Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1008 (7th Cir. 2000) (finding no protected conduct where instead of alleging pregnancy discrimination plaintiff's "complaints instead concerned a **general** displeasure with being paid less than her co-workers" (emphasis in

original)).  Similarly, the January 2007 letter to human resources fails to identify national origin as a basis for his complaint.  Although the letter uses the terms "human rights," "strong bias," and "unfair," these terms would not alert a reasonable person to the fact that Shukh was making complaints that he was being mistreated because of his Belarusian national origin.  *See Smith*, 523 F.3d at 850 (explaining that an employee engages in protected conduct only if a reasonable person could believe that the complaints were protected under Title VII); *see also Tomanovich*, 457 F.3d at 664 (explaining that raising "issues of harassment" was insufficient to indicate that the alleged harassment was based upon his sex).  With respect to the 2006 evaluation and the September 2006 email to Ryan, however, the Court concludes that the complaints contained in these communications – albeit somewhat vague – were sufficient to put a reasonable person on notice that Shukh's complaints were related to discrimination based on his national origin.[10]  Having determined that Shukh engaged in protected conduct, the Court will go on to consider whether each of Shukh's retaliation claims involved an adverse employment action and whether any adverse employment actions were causally linked to the protected conduct in his 2006 evaluation and September 2006 email.

_____

[10] Although the statement in Shukh's 2006 evaluation was related specifically to his accent, not his national origin, this is likely sufficient to constitute protected conduct because "comments ridiculing an employee's accent may be relevant evidence of national-origin animus."  *Guimaraes*, 674 F.3d at 974; *see Hossaini v. W. Mo. Med. Ctr.*, 97 F.3d 1085, 1086, 1089 (8th Cir. 1996) (finding that a reasonable jury could infer a discriminatory motive where, among other things, the defendant "ridiculed [plaintiff]'s accent" and "imitated it").

## 2. Hostile Work Environment

Shukh first argues that Seagate created a hostile work environment as retaliation for his complaints of discrimination. The Eighth Circuit has recognized that "retaliation claims under Title VII c[an] be based on a hostile work environment and need not be based solely on discrete adverse employment actions that affect the terms or conditions of employment." *Stewart*, 481 F.3d at 1042 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 66-67 (2006)). In a prima face case for retaliation, proof of a hostile work environment satisfies plaintiff's burden of demonstrating that he suffered a materially adverse employment action. *Id.* at 1044-45.

Shukh appears to advance the same basis for his retaliatory hostile work environment claim as he did for his discriminatory hostile work environment claim. Specifically (1) the comment by Brown asking Shukh what he was doing here or doing in this country, (2) Allen's threat that he would get ten complaints against Shukh, (3) Seagate's failure to follow its policies in investigating a complaint of national origin discrimination, (4) failure to be named on patents, (5) physical isolation, (6) exclusion from meetings, (7) prohibition on communicating with colleagues, and possibly (8) comments made by Ryan that "nobody will listen to you."

The problem with the basis for Shukh's retaliatory hostile work environment claim is that he cannot establish that many of the adverse actions he relies on are causally linked to his protected conduct because they occurred prior to his protected conduct in

raising complaints in his 2006 evaluation[11] and the September 2006 email to Ryan. *See Stewart*, 481 F.3d at 1044 ("[A]lleged retaliation which precedes protected conduct cannot logically be used to show causation because a prior event cannot be caused by a later event."). The comment by Brown took place in January 2006, prior to any protected conduct. Additionally, with respect to the failure to be named on patents, Shukh testified that Seagate stole his intellectual property "continuously from the very beginning of [his] employment through the end of [his] employment." (Shukh Dep. 502:23-503:3.) Shukh also testified that projects he originated were given to other Seagate engineers to develop as early as 1998. As for exclusion from meetings and prohibition on communicating with colleagues, Shukh testified that his isolation from others at work began in February 1998. Shukh cited examples from 2002, 2004, and 2005, in which coworkers indicated that they would not work with Shukh and that he had stopped being invited to tech review sessions, writer team meetings, and roadmap development. Because this conduct occurred prior to Shukh's protected conduct, it cannot form the basis of a retaliatory hostile work environment. *See Chivers v. Wal-Mart Stores, Inc.*, 641 F.3d 927, 933 (8th Cir. 2011) (finding that there was no causal connection between protected activity and adverse employment actions where the actions occurred "sometime before" plaintiff's reports of discrimination).

---

[11] The record reflects that the evaluations for a particular year were conducted in the summer and fall of the given year. Thus, Shukh's comments in his 2006 evaluation were likely made during that time period.

Therefore, the only actions or incidents that could properly form the basis of a retaliatory hostile work environment are Allen's threat that he would get ten complaints against Shukh, Seagate's failure to follow its policies in investigating a complaint of national origin discrimination, a threat of physical isolation,[12] and the comment made by Ryan that "nobody will listen to you."  These incidents, even if causally related to Shukh's protected conduct, are not sufficient to meet the demanding standard of a hostile work environment.  *See Devin v. Schwan's Home Serv., Inc.*, 491 F.3d 778, 788 (8th Cir. 2007) ("As for her claims she was denied a Route Builder, was unfairly disciplined, was paid less than male RMs, was not allowed to expense pay phone calls, and was required to make inventory changes on the computer, they, at best, amount to a frustrating work environment rather than an objectively hostile work environment."), *abrogated on other grounds by Torgerson*, 643 F.3d 1031 (8th Cir. 2011); *see also Bradley*, 232 F.3d at 631-32 (finding allegations that plaintiff's "supervisory duties were curtailed, that she was left out of the decision-making process, treated with disrespect, and subject to false complaints . . . may have resulted in a frustrating work situation [but were not] so severe or pervasive as to have affected a term, condition, or privilege of her employment"). Although Shukh argues that many of the alleged actions may have been taken against him due to cultural differences, and his direct style with coworkers, employers are allowed to require a certain level of conduct in the workplace, regardless of an employee's national

---

[12] The Court notes that although Allen communicated with Engelke that he may consider physically isolating Shukh, the record does not reflect that this physical isolation occurred. Instead, the isolation Shukh testified to was his inability to work with other engineers and his exclusion from important meetings.

origin. *See Rapold v. Baxter Int'l Inc.*, 718 F.3d 602, 613-14 (7th Cir. 2013). Because Shukh has failed to demonstrate a prima facie case with respect to his retaliatory hostile work environment claim, the Court will grant Seagate's motion for summary judgment with respect to this claim.

### 3. Failure to Promote

Shukh also alleges that his failure to be promoted to Grade 162 in 2008 was retaliation for engaging in protected conduct. It appears that the basis for this claim is the comment in Shukh's 2008 evaluation in which Allen states:

> Overall, I am pleased with Alex's progress in FY08 – especially in the past four to six months; I would have rated Alex as a "4" performer over this time period and intend to reflect that in the KCPB cycle. However, I have not yet seen sufficient sustained contribution to promote Alex to Grade 162 as per his request – but I will go forward out of cycle if I see improved integration and commitment to the larger team's needs, and continue to see adequate teamwork.

(Benjes Decl., Ex. 5 at 46661.)

To establish a prima facie case, Shukh must present evidence of a causal connection between his protected conduct and the adverse employment action, showing that Seagate's "retaliatory motive played a part in the adverse employment action." *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 865 (8th Cir. 2006) (internal quotation marks omitted). "Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Sisk v. Picture People, Inc.*, 669 F.3d 896, 900 (8th Cir. 2012) (internal quotation marks omitted). Where a plaintiff relies solely upon a temporal connection to show causation the protected conduct and the adverse employment action must occur

close in time. *See Hesse v. Avis Rent A Car Sys., Inc.*, 394 F.3d 624, 633 (8th Cir. 2005); *see also Sisk*, 669 F.3d at 901 ("More than two months is too long to support a finding of causation without something more.").

Shukh has not identified evidence in the record establishing that Allen's decision not to promote him was due to retaliation in response to Shukh's complaints of discrimination in 2006. Accordingly, Shukh can only rely on temporal proximity to establish a causal connection between his protected activity and his failure to be promoted. But here the record reflects that Allen's evaluation denying Shukh's promotion was prepared in the summer of 2008 – almost two years after Shukh engaged in the protected conduct. *See Kipp v. Mo. Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) ("Here, the interval of two months between the complaint and Ms. Kipp's termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in Ms. Kipp's favor on the matter of causal link.").[13]

Furthermore, even if the protected activity and the 2008 promotion denial were closer in time "evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of temporal proximity." *Chivers*, 641 F.3d at 933 (alterations and internal quotation marks omitted). Here, the record reflects concerns with Shukh's team work dating back to evaluations

---

[13] Even if the Court views additional incidents in the record, such as Shukh's forwarding of the September 2006 email to Engelke in January 2007 and his January 2008 complaint to Glembocki that he could not be manager because he is Soviet, as separate protected conduct, the timeline between the protected conduct and the failure to be promoted remains too broad to support an inference of causation between the protected conduct and the retaliation.

completed in 1999. Therefore, Allen's reliance on documented issues with Shukh's team work in denying the promotion would serve to undercut the significance of any temporal proximity. Finally, Shukh **was** promoted to the position of principal engineer in September 2006 after the protected conduct at issue occurred. This promotion post-dating Shukh's protected conduct suggests that Shukh's failure to be promoted in 2008 was not the result of a retaliatory motive. Because Shukh has not demonstrated a causal connection between any protected conduct and his failure to be promoted in 2008, the Court will grant Seagate's motion for summary judgment with respect to that claim.

### 4. Termination

Shukh also claims that he was terminated in retaliation for engaging in protected conduct. Shukh was terminated in January 2009, which is even further in time from the protected conduct than his failure to be promoted. Accordingly, in the absence of other evidence demonstrating that Shukh's termination was related to his protected conduct, the Court similarly finds that Shukh has failed to demonstrate a causal connection between his protected activity and Seagate's termination decision. *See Recio v. Creighton Univ.*, 521 F.3d 934, 941 (8th Cir. 2008) (holding that six months was not close enough to raise inference of causation).

### C. Discriminatory Termination

Finally, Shukh argues that Seagate terminated him because of his Belarusian national origin. As with Shukh's retaliation claims, the Court analyzes this claim under the *McDonnell Douglas* burden-shifting analysis because the record does not reveal any

direct evidence of discriminatory termination.   To establish a prima facie case of discrimination, Shukh must establish that (1) he is a member of a protected class, (2) he met Seagate's legitimate expectations, (3) he suffered an adverse employment action, and (4) the circumstances give rise to an inference of discrimination.  *Guimaraes*, 674 F.3d at 973-74.   Here, Shukh's termination occurred as the result of an undisputed bona fide reduction in force.   Once an employer has demonstrated that the employee was terminated based on a bona fide reduction in force, the plaintiff "'then must show that the nondiscriminatory reason is a pretext for discrimination, and . . . that the protected criteria . . . was a factor in the adverse employment decision.'"  *Hillins v. Mktg. Architects, Inc.*, 808 F. Supp. 2d 1145, 1152 (D. Minn. 2011) (quoting *Groves v. Cost Planning & Mgmt. Int'l, Inc.*, 372 F.3d 1008, 1009 (8th Cir. 2004)).

In the hundreds of pages of depositions and Shukh's recounting of eleven years of employment, he has identified only three statements – made by someone other than himself – that could possibly give rise to a suggestion of discriminatory animus on the basis of his national origin.   These statements include (1) Brown's January 2006 statement, "What are you doing here in this country?" (2) Ryan's September 2006 statement, "Nobody will listen to you" and (3) Allen's statement, "every success in building a new political party in Belarus" made when walking Shukh out of Seagate's Bloomington office on his last day of employment.   Even if these statements were sufficient to establish a prima facie case, the Court finds that Shukh has failed to demonstrate that his termination as part of a reduction in force was pretext for illegal discrimination.

A plaintiff may demonstrate a material issue of fact with respect to pretext by showing that an employer's explanation is unworthy of credence because it has no basis in fact or that a prohibited reason more likely motivated the employer. *See Torgerson*, 643 F.3d at 1047. "Either route amounts to showing that a prohibited reason, rather than the employer's stated reason, actually motivated the employer's action." *Id.* "[A]n employee's attempt to prove pretext requires more substantial evidence than it takes to make a prima facie case, because unlike evidence establishing a prima facie case, evidence of pretext is viewed in light of the employer's justification." *Logan*, 416 F.3d at 881 (alterations and internal quotation marks omitted). Although the evidentiary burden that a plaintiff must meet at the prima facie stage is minimal, "[w]here the evidence used to establish a prima facie case meets this minimal burden but is not strong, that evidence, standing alone, may be insufficient to sustain the plaintiff's case at the final stage of the burden-shifting analysis." *Stewart*, 481 F.3d at 1043.

Here Shukh argues that Seagate's stated reasons for termination are pretext because (1) Seagate shifted its explanation of the reasons for his termination and (2) the accusations that Shukh had numerous interpersonal conflicts with co-workers and management are false. Although evidence that an employer shifted its explanation can support a finding of pretext, *see Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 875 (8th Cir. 2010), the Court finds that Shukh has failed to show that Seagate shifted its explanation.

Allen explained that Shukh's termination was part of the reduction in force. In determining what employees should be eliminated, Allen assigned points to employees in his department based on whether the employee's position could be eliminated,

performance history, documented counseling for performance, misconduct or attendance issues, technical or specialized skills and length of service. Allen recommended that Shukh's position be eliminated because elimination of his managerial position would generate more money savings, and he had scored lower on the rubric than the other seven managers. Allen also determined that Shukh's primary skill in RSS modeling was already sufficiently available at Seagate, and therefore retention of employees with more development and product design engineering experience was preferred. This is identical to the explanation for termination given in Seagate's brief in support of the present motion. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 12-13, Apr. 1, 2013, Docket No. 467.)

Shukh contends that Seagate shifted its explanation of the reason for his termination in its response to the EEOC when it stated that "Shukh's unsupported allegations are at direct odds with the facts surrounding his employment. After a history of combative and unproductive behavior in his working relationships, Shukh was selected for termination in connection with a Company-wide reduction in force conducted by Seagate." (Ninth Gekas Decl., Ex. 26.) This document, however, does not contradict Allen's stated reasons for Shukh's termination. Although the document references the history of combative and unproductive behavior in his working relationships, it does not cite that history as the reason for Shukh's termination. Rather, consistent with Allen's testimony and the brief in support of this motion, the EEOC response indicates that "Shukh was selected for termination in connection with a Company-wide reduction in

force conducted by Seagate." (*Id.*) Accordingly, the EEOC response does not provide evidence of pretext through a shifting explanation.

Shukh also contends that Seagate shifted its explanation in its brief in support of the present motion when it stated that the reason for Shukh's layoff was his "[i]nability to develop productive relationships with co-workers." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 7, Apr. 1, 2013, Docket No. 467.) But Seagate's brief never states that this was the reason for Shukh's layoff. Instead, the brief merely indicates that "[t]he record is replete with examples of Shukh's inability to develop productive relationships with co-workers." (*Id.*) Given the host of adverse employment actions Shukh claimed he suffered in support of his discrimination and retaliation claims, the inclusion of Shukh's history with coworkers at Seagate was relevant to this motion independent of Shukh's termination claim. Therefore, Seagate's inclusion of this information in its brief cannot fairly be interpreted as an explanation of the reasons for Shukh's termination, particularly in light of the fact that the brief specifically discusses the reason for Shukh's termination as arising out of the reduction in force. (*Id.* at 12-13.) Therefore, Seagate's brief does not provide evidence of pretext, because it does not demonstrate that Seagate has shifted its explanation for Shukh's termination.

Finally, Shukh contends that Seagate has shifted its explanation of the reasons for his termination because, in his deposition, Allen admitted that although the difficulties he had with Shukh were not the primary reason for his termination, they may have been part "of the secondary set of factors." (Allen Dep. 174:10-14.) This testimony does not establish a shifting explanation, as it does not contradict that the stated reasons for

Shukh's termination in connection with the reduction in force were the primary factors for his termination. Even if this testimony provided evidence of a shifting explanation, it does not provide sufficient evidence of pretext to demonstrate a triable question of fact, because it does not show a genuine issue as to whether Allen acted "based on an intent to discriminate." *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 855 (8th Cir. 2012). "[I]n the context of the *McDonnell Douglas* analytical framework, a court's use of the words 'pretext,' 'pretextual' or similar terminology, often must be read as shorthand for indicating that a defendant's proffered discriminatory explanation for adverse employment action is a pretext **for unlawful discrimination**, not that it is merely false in some way." *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017 (8th Cir. 2005) (emphasis in original). Therefore, ultimately it is insufficient for Shukh to simply cast doubt on Seagate's true reason for termination because he has presented no evidence upon which a reasonable jury could find that he meets his "ultimate burden of proof and persuasion that [Seagate] discriminated against [him] based on [his] national origin." *Guimaraes*, 674 F.3d at 976 (internal quotation marks omitted).

At most, Allen's testimony shows that Shukh's history of conflicts with coworkers and managers was a secondary factor in his termination, but this is not a prohibited basis for termination. The record reflects that throughout his employment, managers and coworkers consistently found Shukh to be wanting in the areas of teamwork and interpersonal skills. Although Shukh has presented evidence that certain coworkers did not experience problems working with him, this testimony is irrelevant because "[t]he relevant inquiry is whether [Seagate] **believed** [Shukh] was guilty of the conduct

justifying discharge." *Chivers*, 641 F.3d at 934 (emphasis in original) (internal quotation marks omitted). Here, Shukh has presented no evidence – and the record does not reflect – that a reasonable jury could conclude that Allen did not genuinely believe that Shukh had difficulty working with managers and coworkers. Accordingly, even if Allen relied on conflicts with Shukh as a secondary factor in his termination, this is insufficient to demonstrate pretext. *See Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 725 (8th Cir. 2008) ("Hervey also disagrees with Mastin's assessment of her insubordinate behavior and poor performance, but her evidence must do more than raise doubts about the wisdom and fairness of the supervisor's opinions and actions. It must create a real issue as to the genuineness of the supervisor's perceptions and belief."). Therefore, the Court finds that Shukh has failed to demonstrate a material issue of fact with respect to pretext, and will grant Seagate's motion for summary judgment with respect to his discriminatory termination claim.

Although the Court is not without empathy for what appears to have been a difficult decade of employment, it concludes, based upon a thorough review of the voluminous record, that Shukh has failed to articulate that the difficulties he experienced were due to his national origin. In other words, although a reasonable jury could determine that the relationship between Shukh and Seagate was rife with conflicts and that Seagate may have mistreated Shukh, it could not – based upon the evidence presented here – conclude that the conflicts and mistreatment were a result of Shukh's national origin and in violation of the law. Accordingly, summary judgment in Seagate's favor with respect to Shukh's discrimination and retaliation claims is appropriate.

# ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion for Summary Judgment [Docket No. 465] is **GRANTED**. Counts nine, ten, eleven, and twelve of Plaintiff's Third Amended Complaint are **DISMISSED with prejudice.**

2.      Defendants' Motion to Exclude the Expert Report and Opinions of Dr. Henry Lahmeyer [Docket No. 443] is **DENIED as moot**.

3.      Defendants' Motion to Exclude the Expert Report and Opinions of Edward Grochowski, Ph.D. [Docket No. 448] is **DENIED as moot**.

4.      Defendants' Motion to Exclude the Expert Report and Opinions of Howard B. Rockman [Docket No. 454] is **DENIED as moot**.

5.      Plaintiff's Motion to Bar Expert Report and Testimony of Angela M. Heitzman [Docket No. 480] is **DENIED as moot**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: March 31, 2014                         _____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                    United States District Judge

# United States Court of Appeals
## for the Federal Circuit

*Shukh v. Seagate Technology, LLC,* 2014-1406

## CERTIFICATE OF SERVICE

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by GEKAS LAW LTD., Attorneys for Appellant to print this document. I am an employee of Counsel Press.

On **September 9, 2014,** counsel has authorized me to electronically file the foregoing **Opening Brief for Appellant (confidential and non-confidential version)** with the Clerk of Court using the CM/ECF System, which will serve via e-mail notice of such filing to all counsel registered as CM/ECF users, including any of the following:

| | |
|---|---|
| Calvin L. Litsey | Chad Drown |
| *(principal counsel)* | Aaron D. Van Oort |
| David J.F. Gross | Elizabeth C. Wright |
| Faegre Baker Daniels LLP | Faegre Baker Daniels LLP |
| 1950 University Avenue | 2200 Wells Fargo Center |
| Suite 450 | 90 South 7th Street |
| East Palo Alto, CA 94303 | Minneapolis, MN 55402 |
| 650-324-6700 | 612-766-8707 |
| calvin.litsey@faegrebd.com | chad.drown@faegrebd.com |
| david.gross@faegrebd.com | aaron.vanoort@faegrebd.com |
| | elizabeth.cowanwright@faegrebd.com |

Confidential copies will also be email and mailed to the above principal counsel on this date.

Upon acceptance by the Court of the e-filed document, six confidential paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

The brief was originally filed and served on August 14, 2014 and is being refiled pursuant to the Court's August 19, 2014 order.

September 9, 2014                                    /s/ John C. Kruesi, Jr.
                                                     Counsel Press

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE
REQUIREMENTS**

    1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).

    The brief contains _____15989_____ words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

    2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

    The brief has been prepared in a proportionally spaced typeface using _MS Word 2007_ in a 14 point Century Schoolbook font.

Date: _September 9, 2014_          __/s/ Constantine John Gekas_____
                                             Constantine John Gekas